```
D65QcegC
```

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   UNITED STATES OF AMERICA
3
              v.                              12 CR 876 (ALC)
4
   PAUL CEGLIA
5
              Defendant
6  ------------------------------x

7                                             New York, N.Y.
                                              June 5 2013
8                                             10:15 a.m.

9
   Before:
10
                    HON. ANDREW L. CARTER, JR.
11                                            District Judge

12
                            APPEARANCES
13
   PREET BHARARA
14      United States Attorney for the
        Southern District of New York
15 JANIS ECHENBERG
   CHRISTOPHER FREY
16      Assistant United States Attorney

17 FEDERAL DEFENDERS OF NEW YORK INC.
        Attorneys for Defendant Ceglia
18 DAVID E. PATTON
   ANNALISA MIRON
19

20

21

22

23

24

25

1        (In open court)

2        THE DEPUTY CLERK:  Criminal cause for status

3   conference, case 12 CR 876, United States v. Paul Ceglia.

4        Counsel, please state your appearance for the

5   government.

6        MS. ECHENBERG:  Good morning, your Honor.  Janice

7   Echenberg for the government.  With me at counsel table is

8   Christopher Frey.

9        THE COURT:  Good morning.

10       THE DEPUTY CLERK:  For the defendant.

11       MR. PATTON:  Good morning, your Honor.  David Patton

12  and Annalisa Miron from Federal Defenders for Mr. Ceglia, who

13  is not present.  He has waived his presence for today's

14  proceeding, which we understand will involve primarily

15  scheduling and discovery issues.

16       THE COURT:  Good morning.  That's fine.  As indicated

17  earlier, I certainly will allow Mr. Ceglia to waive his

18  appearance for scheduling matters due to the costs of traveling

19  back and forth to New York City.

20       I want to make sure counsel is aware I certainly would

21  grant Mr. Ceglia permission to appear by telephone if that is

22  something he would wish to do.  Have you discussed that with

23  Mr. Ceglia?

24       MR. PATTON:  I did, your Honor.  I spoke with him

25  yesterday.  He was fine, given the nature of the anticipated

1 conference, not to participate.

2 THE COURT: Thank you.

3 Government have any position on that?

4 MS. ECHENBERG: No, your Honor. That's fine with the
5 government.

6 THE COURT: How would the parties wish to proceed
7 today? I have a proposed discovery order on consent. I also
8 received a letter from defense counsel regarding that. Before
9 we talk about the discovery, the proposed discovery order on
10 consent, how do the parties wish to proceed with this case?
11 What's the posture of the case at this point?

12 MS. ECHENBERG: Your Honor, I can provide a brief
13 update. We have produced the bulk of discovery in the case.
14 There are a few outstanding items. One is getting a forensic
15 analysis of the contract that's at issue in the case, and that
16 was the subject of the letter that Mr. Patton had sent to your
17 Honor, so we will want to discuss that today.

18 The other remaining items are our forensic computer
19 expert report that we expect in a matter of weeks. We had
20 produced all of the underlying data to Mr. Patton back in
21 December, and we expect to give him our expert report on that
22 data in a matter of weeks.

23 There are also several emails and documents from two
24 law firms that had previously represented Mr. Ceglia in his
25 civil litigation that we are undergoing a privilege review. We

1   have an assistant in our office who has been walled off to
2   review those documents, and then he will be making
3   determinations if there is any litigation we want to engage in
4   with regard to those documents.  We think there may be reason
5   to believe that either some of those documents are not
6   privileged or the prime fraud exception may apply to some of
7   those documents.  So we are going to be engaging in that
8   review.
9           Other than that, discovery is complete.  I also
10  understand that Mr. Patton intends to make at least one motion.
11  I believe he wants to address the Court on the timing of that
12  motion.
13          THE COURT:  OK.  Thank you.  With regard to the
14  walled-off assistant and this potentially privileged
15  information, just clarify for me, these emails that you're
16  discussing, the government is currently in possession of these
17  emails?
18          MS. ECHENBERG:  The government is getting a copy of
19  these emails from these two law firms.  We've discussed this
20  with Mr. Patton, and he's agreed to this approach.  There is an
21  assistant who we will not be engaging with at all, who will be
22  reviewing those emails independently, and he will be supervised
23  independently on his review, and then he will engage directly
24  with Mr. Patton on how he intends to proceed.  Mr. Patton
25  already has a copy of these documents.

1           THE COURT:  All right.  Thank you.

2           Mr. Patton?

3           MR. PATTON:  I don't have anything to add to the
4   discovery issues other than it's significant -- we have
5   significant computer discovery and paper discovery, and we are
6   awaiting a forensic report on one of the hard drives.  So there
7   is more discovery to review on our end.  There is also probably
8   more discovery for us to create in terms of investigation
9   perhaps retaining -- not perhaps -- almost certainly retaining
10  experts to do some forensic analysis ourselves.

11          On the motions front, I can anticipate at least one
12  specific motion.  I don't want to limit ourselves to that, but
13  I don't necessarily anticipate other specific motions.  The one
14  specific one that I anticipate is a motion to dismiss
15  essentially alleging that the conduct that the government has
16  alleged does not constitute mail and wire fraud, and obviously
17  we'll go into the details of those arguments in the motion.

18          I am asking for more time than we would typically ask
19  for, both to give us time to continue to review discovery and
20  see if there are potentially other motions and also simply
21  because we've got a lot on our plate.  So I would ask for 90
22  days to file our motions, and then I'm happy for the government
23  to ask for what it would like in response.

24          THE COURT:  As a practical scheduling matter, does it
25  make sense to go ahead and set the briefing schedule for the

1   motion or would it make more sense just to have another status
2   conference date, say, in 60 days to make sure counsel has had
3   enough opportunity to review whatever discovery there is, and
4   we can discuss the motion schedule at that time because there
5   very well may be -- you've indicated there's one specific
6   motion, and there may be other motions.  It may make sense to
7   adjourn the matter for 60 days or 90 days, whatever counsel
8   needs, to review the discovery and to make a determination as
9   to any motions that counsel wants to file.
10          MR. PATTON:  That makes sense, your Honor.  I would
11  feel confident that in either 60 or 90 days we'd have a more
12  certain view of whether there would be any additional motions,
13  and we can set a briefing schedule from there.  I'd be happy to
14  do that.
15          THE COURT:  Given the nature of the specific motion
16  that you've indicated, and given the nature of the discovery
17  that needs to be produced, I think it may make sense to adjourn
18  this for 90 days to just make sure counsel has all that
19  information.  So could we have a date about 90 days from now,
20  Tara?  When would that be?
21          THE DEPUTY CLERK:  Friday, September 6 at 4:00.
22          THE COURT:  Is that Rosh Hashanah?
23          THE DEPUTY CLERK:  Yes.
24          THE COURT:  Go maybe the next week, sometime the
25  middle of the next week.

1             THE DEPUTY CLERK:  Friday, September 13.

2             THE COURT:  That's not Yom Kippur?

3             THE DEPUTY CLERK:  No.

4             THE COURT:  Friday, September 13.  Friday, the 13th.

5             THE DEPUTY CLERK:  At 3:30.

6             THE COURT:  Does that time and date work for counsel?

7             MR. PATTON:  It does work for me.  I do have on my
calendar that Yom Kippur begins at sundown on the 13th.  I
don't know if that poses a problem for anyone.

10            THE COURT:  Let's avoid Yom Kippur and Rosh Hashanah.
Let's do it a different day.

12            THE DEPUTY CLERK:  Friday, September 20.

13            THE COURT:  Does that date and time work for everyone?

14            THE DEPUTY CLERK:  At 11:00.

15            MR. PATTON:  That's fine.

16            THE COURT:  We'll adjourn the matter till Friday,
September 20 at 11:00.

18            What's counsel's position on the Speedy Trial Act
between now and then?

20            MS. ECHENBERG:  The government moves for exclusion of
time so that defense counsel can review discovery and consider
motions in the interest of justice.

23            THE COURT:  Defense counsel?

24            MR. PATTON:  There's no objection.

25            THE COURT:  Based on the representations made in open

1    court, I find it's in the interest of justice and in the
2    interest of Mr. Ceglia to exclude time under the Speedy Trial
3    Act from today's date until September 20.  I further find that
4    Mr. Ceglia's interest outweighs the public's interest in a
5    speedy trial, and I will enter an order to that effect.  Again,
6    the reasons are so that defense counsel may review discovery
7    that has yet to be produced and to make any determinations
8    about any motions that need to be filed.
9            Now, let's turn to the proposed discovery order.  In
10   reviewing the discovery order, mostly everything in here seems
11   fine to the Court.  What I am concerned about is in paragraph
12   seven of the proposed discovery order:  In the event any party
13   in the civil action, including the defendant and the
14   defendant's counsel of record in the civil action, desires to
15   take custody or control of the contract from the government for
16   use in the civil action, that party shall seek relief from this
17   Court.
18           I am a little hesitant to do anything that is going to
19   potentially stymie Judge Arcara's ability to manage the civil
20   case.  Do counsel have any information about what procedures
21   are in place for the safekeeping of the alleged original
22   contract in the civil action?
23           MS. ECHENBERG:  Initially, your Honor, my
24   understanding is that Mr. Ceglia's counsel in the civil case
25   was holding the contract in a safe deposit box and he

1   essentially had control over it.  We now have the contract in
2   our vault.  I understand the issue your Honor is concerned
3   about, and I think there may be a way to address that.
4               I think what we were attempting to address in
5   paragraph seven was Mr. Ceglia's concern that if plaintiffs for
6   some reason came to us and tried to get the contract from us,
7   they wanted a remedy to stop that if plaintiffs wanted to do
8   additional testing on the contract.  I don't think we were --
9   please correct me if I'm wrong, I don't think we were
10  contemplating in this contract necessarily if Judge -- if the
11  Judge in the Western District ordered that the contract be made
12  available for proceedings that this would somehow get in the
13  way of that.
14              So maybe there is a way that we could carve out if
15  specifically the contract is needed for the civil case itself
16  and the Judge orders that, that that would be a carveout.  I
17  think this was focused more on the parties wanting access
18  outside of the specific proceeding of that civil case.
19              THE COURT:  OK.
20              MS. ECHENBERG:  Is that fair?
21              MR. PATTON:  I think that's right.  I'm afraid I
22  handed up my one copy, but ...
23              (Pause)
24              MR. PATTON:  I see the Court's point.  Perhaps it
25  would make sense for the Court to hold off on signing that.  We

can have discussions among ourselves to see if there is a way to address that issue. I doubt there is going to be disagreement on this front. I think we wanted to make sure that the civil litigants had equal access, and that whatever access they had was in accordance with the terms of the civil case, and I think this accomplishes that.

THE COURT: I will hold off on that and let the parties discuss that. It seems from what counsel has indicated one practical solution might be to just simply insert it before -- in the event something -- absent a court order and absent an order from the Western District of New York, that may carve that out and eliminate -- that certainly would alleviate my concerns.

Again, I don't want to get in the way of Judge Arcara's ability to manage this case or the assigned magistrate judge to manage this case, but I will let the parties work out the language and then you can submit something to me. Again, if that is OK, then I will sign it.

I understand there is also a dispute -- from Mr. Patton's letter of June 4, there is a dispute concerning the government's desire to visually inspect the contract at the U.S. Postal Inspection Services office in Virginia, and the defense wants to have a representative present and to videotape the inspection.

The proposed order, which I haven't signed yet,

1  certainly deals with defense counsel's right to have up to
2  three additional representatives physically present and to
3  video record any testing of the contract.
4     Let me just get a sense from the government, what the
5  government is discussing now or what the government wishes to
6  do in the short term in terms of this visual inspection. This
7  is not any sort of test -- is this a test and is this a visual
8  inspection that will be done while the contract is still in
9  this protective folder? What are we talking about here?
10     MS. ECHENBERG: I just want to clarify one point, your
11  Honor. I think what the protocol calls for now is that if we
12  were to take the contract out at our offices, that the
13  defendant would be able to have representatives present.
14     THE COURT: OK.
15     MS. ECHENBERG: What we are proposing to do is to send
16  the contract to the lab -- postal lab, and they are going to do
17  testing, but it's what's called non-destructive testing. It
18  involves their agents and analysts looking at the contract,
19  looking at the ink, looking at the print, looking at the paper,
20  looking at things to try to make determinations about the
21  contract.
22     The lab has been very clear with us that it is
23  absolutely against their policies and procedures to have anyone
24  outside of the lab technicians observe what's going on.
25  They're an accredited lab. There are only certain people who

1  are allowed to be in when there is testing.  They're concerned
2  that someone else there would be disruptive to the operations
3  of the lab and their examiners.  There are also other
4  examinations going on in the lab that may be law enforcement
5  sensitive that they don't want to have outsiders present for.
6      They also noted that these examinations can take hours
7  and days.  So it's really, frankly, unrealistic to have someone
8  standing over the technician while this is happening.  So it is
9  against their policies and procedures to do this; and if forced
10 to do it, they said they would let someone in if a Court
11 ordered them to do it, but that would be, you know, against
12 their procedures, against what they've always done, and they
13 have concerns that that would sort of open the door for many
14 people to seek this and really get in the way of them doing
15 their job.
16     What they did offer is that they would be happy to
17 give a tour to Mr. Ceglia and any of his representatives in
18 advance.  They do give tours of the lab at certain times.  They
19 can show the types of testing that they're going to do and
20 their various protocols.  But that's what they offered.  They
21 were very concerned about having someone there standing over
22 them or videotaping them while they did their work.
23     And, frankly, we agree.  We don't think it's
24 necessary, and we think it could be disruptive and potentially
25 get in the way of law enforcement objectives.

1           THE COURT:  Mr. Patton?

2           MR. PATTON:  Your Honor, there are a variety of
3  reasons why I think it is important to have at least one person
4  present and to have the videotaping.  One is that they do
5  describe this testing as non-destructive, but beyond that, it's
6  not clear what it would involve.  Even observational testing,
7  my understanding, at very least they're going to be handling
8  it.  My understanding -- and, again, it's not from a place of
9  expertise but just a general understanding -- is that even
10 observational testing can involve UV lights, it can involve
11 infrared in terms of examining the ink and the paper and things
12 that can be important and can have an impact on the paper.

13          I know this from my discussions with the civil
14 litigants.  There is an ongoing civil case here.  This was a
15 contract that was being handled in that civil case that was in
16 the possession of Mr. Ceglia's counsel, and it was kept in a
17 certain way.  I think that for purposes of that case, and for
18 purposes of this case, it's important that there be a full
19 record of the testing, and to know if it's possible if somebody
20 has handled it in a certain way that could affect how the age
21 of the paper or smudges on the ink might be viewed, even if
22 there is not destruction.

23          If what they're saying is page 1 was created
24 separately from page 2, and we know that because of the way the
25 paper or the ink exists, minor things can make a difference.  I

1   just think it's important that we have an accurate record of
2   it, and that we're not dependent on whatever postal inspector
3   report comes out of it to say, "This is how we handled it,"
4   particularly in light of the fact that there's this civil suit,
5   and it could have an impact on that suit.  That was a big part
6   of discussion in Mr. Ceglia's attorneys agreeing to turn it
7   over to the government for safekeeping in their box and that we
8   would develop some sort of protocol that was acceptable.
9           Obviously, we haven't been able to reach agreement on
10  this issue, but I think it's an important one.  I think it goes
11  to the point of having a protocol, and that we'd be able to
12  have somebody from our side in the sense of the civil case
13  present and able to simply observe the testing that goes on.
14          I think that they certainly can make arrangements in
15  the lab so that those people are not observing anything they
16  shouldn't be observing.
17          THE COURT:  So the representative that you are
18  proposing, the type of representative that you are proposing,
19  it doesn't sound as if you are talking about some expert who is
20  going to say, "Hold on.  Stop.  Don't do that."  You're just
21  talking about someone just to observe and witness as to what
22  happens.
23          MR. PATTON:  That's correct.  And, obviously, part of
24  the protocol is that the government will inform us of the
25  nature of the testing.  So I would assume that they would tell

1   us in more detail about the testing that they propose to do
2   whether they propose to use infrared or UV lights or how they
3   plan to handle it so that we could object ahead of time and say
4   "woa, woa, woa, if you do that, that's a problem."  But absent
5   them telling us "this is what we plan to do" and then us having
6   an observation -- a chance to observe it, that's correct, we
7   would not interject in the testing process.  It might not even
8   be an expert.  It simply could be an investigator from our
9   office standing there with a video camera.  It wouldn't
10  necessarily have to be a video expert.
11             THE COURT:  But if what you are talking about is
12  simply some sort of recording to record what is actually being
13  done, not some sort of person to object during the testing at
14  that time -- I guess what I'd ask both parties is why wouldn't
15  it be a reasonable compromise to simply have the testing
16  recorded by the postal inspectors themselves?  Wouldn't that
17  alleviate the concerns about having people who shouldn't be in
18  there who might have access to other information about other
19  non-related investigations there.  And you could simply record
20  the testing yourselves, the government could actually record
21  the testing themselves and then turn the recording over to
22  counsel?
23             MS. ECHENBERG:  We will certainly ask the lab about
24  that.  I guess one thing that comes to mind is just setting a
25  precedent that then this becomes something they have to do in

1   every case.  These labs are busy.  They review a lot of
2   material from a lot of different federal cases from all over
3   the country.  So I think their concern, in part, is setting a
4   precedent that if this is allowed here and all of a sudden they
5   have additional responsibilities.  I think what your Honor is
6   proposing is certainly a better alternative than having an
7   individual from the outside present, so we will certainly ask
8   their opinion, but I think our position is still that, you
9   know, there shouldn't be any intrusion on how they do their
10  work and what their policies and procedures are.
11           THE COURT:  OK.  Mr. Patton, what's your position on
12  that sort of recommendation?
13           MR. PATTON:  Your Honor, I think that would be
14  acceptable as long as we could come up with some parameters
15  that, for instance, any time that the contract is out of its
16  protective covering it's being videotaped so that there is --
17  because obviously they're going to have to transport it from
18  here to the lab, that we would have sort of an understanding
19  that it would be kept in certain conditions until it's in the
20  lab.  When it's in the lab, as soon as any sort of actual
21  observation or handling of the contract takes place, that that
22  is being videotaped.
23           I don't think the precedent setting issue should be
24  much of a concern.  This is a fairly unusual case where you
25  have a pending civil matter where one of the litigants has

1  turned over a key piece of evidence in that civil case and in
2  this case.  I think that is a rather unusual circumstance, so I
3  don't know that that should be a huge concern.
4              THE COURT:  Let's have counsel confer about that a
5  little bit more and send me a status report in three weeks?
6  Does that give counsel enough time to try to work something out
7  there?
8              MS. ECHENBERG:  Yes, your Honor.
9              THE COURT:  Let's have a status report by June 26.
10             Is there anything else we need to deal with today?
11             MS. ECHENBERG:  Nothing from the government.
12             MR. PATTON:  Nothing from us, your Honor.
13             THE COURT:  Thank you.  Have a good day.
14             MS. ECHENBERG:  Thank you.
15             (Adjourned)