UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X

**UNITED STATES OF AMERICA,**           :

                                        :

                - v -                   :           **12 CRIM 876 (ALC)**

**PAUL CEGLIA,**                        :

                Defendant.    :

-------------------------------X


**DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS THE INDICTMENT**



DAVID E. PATTON, ESQ.
YUANCHUNG LEE, ESQ.
ANNALISA MIRÓN, ESQ.
Federal Defenders of New York
Attorneys for Defendant
  **Paul Ceglia**
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8738

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X

**UNITED STATES OF AMERICA,**          :

                                       :

        - v -                          :          **12 CRIM 876 (ALC)**

**PAUL CEGLIA,**                       :

                Defendant.    :

-------------------------------X


## DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

This memorandum of law is submitted in reply to the Government's opposition to defendant Paul Ceglia's motion to dismiss the indictment for (1) failing to state an offense pursuant to Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure, and (2) violating the First Amendment of the United States Constitution.

In its opposition, the Government, among other things, relies on inapposite case law, advocates a reading of the mail and wire fraud statues that far exceeds their scope, incorrectly asserts that judges and juries can be the victims of fraud in their roles as fact finders in a civil lawsuit, and generally presses a theory of prosecution that, if accepted, would violate the Constitution.

- 2 -

I.   **The Charges Against Ceglia Involve Nothing More than His Pursuit of a Civil Suit, which Cannot form the Basis of a Mail or Wire Fraud Prosecution**

A.   **Eisen Is Inapposite**

In asserting that litigation activities can form the basis of mail and wire fraud prosecutions, the Government relies principally on United States v. Eisen, 974 F.2d 246 (2d Cir. 1992). Yet Eisen is distinguishable from the present case in fundamental respects.

Eisen involved the RICO prosecution of numerous lawyers and law firm employees who engaged in a long-running business of, among other things, defrauding insurance companies by paying or pressuring witnesses to make false statements in and out of court regarding personal injury claims. Id. at 250. Many of the false claims were made directly to the insurance companies, and the scheme to defraud could be, and often was, accomplished independent of the litigation filings themselves. Id. at 253 (describing settlements with insurance companies based on false claims).

As Judge Cote wrote about Eisen in Nakahara v. Bal, 1998 WL 35123 (S.D.N.Y. 1998): "The fraudulent scheme underlying the predicate mail fraud offenses in Eisen was entirely external to, and independent of, any of the particular disputes between the litigants in the civil actions that were improperly filed and litigated by the Eisen defendants in execution of their

scheme." Id. at *9.  She then dismissed the fraud-based RICO
claims at issue even where the claims included allegations of
forging a power of attorney and intimidating witnesses to make
false statements. Id. at *3-4.  She did so because those
activities were undertaken entirely in pursuit of the civil
lawsuit. Id. at *11.

Similarly, in a recent case in the Eastern District of
New York, Curtis & Assoc. v. Bushman, 758 F.Supp.2d 153
(E.D.N.Y. 2010), aff'd, 443 Fed. Appx. 582 (2d Cir. 2011),
Judge Matsumoto distinguished Eisen and found activities such
as "prosecuting 'knowingly false legal malpractice claims
[against the civil defendant] with suborned perjury,'" as
falling outside the scope of the fraud statutes, and were the
sort of "'frivolous' and 'phony' litigation activities [that]
cannot, alone, give rise to viable predicate acts of mail and
wire fraud." Id. at *176; see also Daddona v. Gaudio, 156
F.Supp.2d 153 (D.Conn. 2000)(dismissing fraud-based RICO claims
that alleged the filing of false affidavits and other documents
and quoting I.S. Joseph Co. v. J. Lauritzen A/S, 751 F.2d 265,
267-68 (8th Cir. 1984): "the fact remains that litigation is as
American as apple pie.  If a suit is groundless or filed in bad
faith, the law of torts may provide a remedy.  Resort to a
federal criminal statute is unnecessary.").

Finally, in a decision rendered only two weeks ago,

- 4 -

District Judge Siragusa of the Western District of New York came to the same conclusion. Snyder v. U.S. Equities Corp., Slip Op., 2014 WL 317189 (W.D.N.Y. Jan. 28, 2014). There, plaintiff alleged in her complaint that "the defendants pursued fraudulent litigation, using fraudulent affidavits and filings, in an attempt to obtain money or property to which they were not entitled," claiming that such conduct constituted mail and wire fraud predicates in a RICO action. Id. at *8. Judge Siragusa rejected this argument and granted defendants' motion to dismiss, following the lead of "a significant number of decisions, in this Circuit and in other Circuits, which hold, in the context of Civil RICO claims based on fraudulent litigation, that a defendant's use of mail and wire to conduct allegedly fraudulent 'litigation activities' is insufficient to establish predicate acts of racketeering." Id. at *7. Like Judge Cote in Nakahara and Judge Matsumoto in Curtis & Assocs., Judge Siragusa found Eisen inapposite because the action before him — like the action before this Court — "arises [solely] from the fact of the bogus lawsuit against [plaintiff], and from Defendants' alleged use of perjured documents to obtain a default judgment against [plaintiff]. The alleged racketeering activity is the fraudulent lawsuit." Id. at *8 (emphasis added).

In sum, Eisen does not control because as in Nakahara,

<u>Curtis</u>, and <u>Snyder</u>, the Government's allegations against Ceglia "in fact focus entirely upon 'litigation activities' involved in defendants' alleged 'phony' and 'frivolous' litigation." <u>Curtis</u>, 758 F.Supp.2d at 172.

The Government's failed attempt to describe the conduct alleged against Ceglia in expansive terms is aimed at obfuscating a fundamental flaw in its prosecution: the charges relate entirely and solely to his civil lawsuit against Zuckerberg and Facebook.  The fact that Ceglia is alleged to have doctored a contract or created false emails has no independent significance.  To constitute fraud, those false documents must have been used outside the context of litigation with the intent to deceive or trick someone into giving up money or property.  That is not alleged here (nor was it ever done).

In defense of its arguments, the Government makes two particularly remarkable statements.  The first is: "In its totality, the Civil Action is but a part of Ceglia's broader fraudulent scheme." (Govt. Br., 15).  That is simply false. There is not a single allegation that has anything do with conduct apart from the civil litigation.  The entirety of the Government's claim is that Ceglia doctored a contract and other evidence in pursuit of his civil claim.  Under no view of the charges is there some "broader fraudulent scheme" that is not

- 6 -

part of the civil action.

Second, the Government states, "It simply cannot be the case that the Government is powerless to act when an individual like the defendant uses the United States mails and interstate wire transmissions to execute a scheme to defraud simply because he does so in connection with pursuing litigation." The argument attacks a straw man.  If in fact there was some fraudulent scheme independent of the civil action, the Government might be correct that the additional aspect of litigation would not make it immune from prosecution.  But there is not.

As for the Government's claim it "cannot be" that it is "powerless," it is, in fact, entirely possible that the Executive Branch is powerless to right some alleged wrong via the criminal justice system.  The Government is (or is meant to be) highly constrained by the terms of the statutes granting it authority to punish citizens criminally.  Here the elements of the fraud statutes cannot be met, and it *can* be that the Government is without authority to criminally punish under such circumstances.

And as a matter of fact, the Government is not "powerless" to act in this arena generally.  If Ceglia's conduct met the elements of any number of other statutes that specifically governs false statements and evidence in the

- 7 -

filing of a lawsuit, the Government would be perfectly empowered to act.   The fact remains that the Government is not so empowered to act under the fraud statutes.

B.    **The Government's Reading of the Fraud Statutes Is Plainly Foreclosed by the Judicial Function Exception in 18 U.S.C. 1001(b).**

In addition to the reasons provided by the many courts that have distinguished <u>Eisen</u> from the sort of conduct at issue here, <u>Eisen</u> is inapposite because legislation passed after <u>Eisen</u> was decided in 1992 has plainly superceded whatever relevance it might have had to this case.   In short, there is a far more specific statute that governs the type of conduct alleged against Ceglia, and that statute forecloses this prosecution.

Congress long ago enacted 18 U.S.C. § 1001 which is specifically aimed at protecting the integrity of the "executive, legislative, or judicial" branches. The statute prohibits all manner of lying and deceit, including "false, ficticious, or fraudulent statement[s] or representation[s]" and "mak[ing] or us[ing] any false writing or document" "in any matter" that falls within the jurisdiction of the three branches. 18 U.S.C. § 1001(a).

In 1996, four years after <u>Eisen</u> was decided, Congress amended § 1001 and explicitly carved out an exception for litigants in judicial proceedings, in what is often referred to

- 8 -

as the "judicial function exception."  <u>See, e.g., United States</u>
<u>v. McNeil</u>, 362 F.3d 570 (9th Cir. 2004).

The statute now contains subsection (b) that reads as
follows:

> Subsection (a) does not apply to a party to a judicial
> proceeding, or that party's counsel, **for statements,**
> **representations, writings or documents submitted by such**
> **party to a judge** or magistrate in that proceeding.

18 U.S.C. § 1001(b)(emphasis added).

The amended statute was passed in the wake of the Supreme
Court's decision in <u>Hubbard v. United States</u>, 514 U.S. 695
(1995), in which the Court held that § 1001 did not apply to
the judicial branch.  Although the Court so found, Justice
Scalia warned that because of the statute's then-current
wording, there "remains... a serious concern that the *threat* of
criminal prosecution under the capacious provisions of § 1001
will deter vigorous representation of opposing interests in
adversarial litigation."  <u>Hubbard</u>, 514 U.S. at 717 (emphasis in
original).

For precisely that reason, Congress passed § 1001(b). The
exemption from prosecution applies broadly to cover "false
statements uttered during the course of court proceedings *or*
*contained in court pleadings*." <u>United States v. Manning</u>, 526
F.3d 611, 617 (10th Cir. 2008)(quoting the House Report).
Indeed the House Report explained in detail why documents, not
just statements, were included in the exemption from

prosecution: "The language of the exception recognizes that a wide range of filings are an integral part of the adversarial process, *and therefore goes beyond merely exempting 'statements,' exempting as well, 'representations, writings or documents' submitted to the judge*." H.Rep. 104-680, 104th Cong., 2nd Sess.1996 U.S.C.C.A.N. 3935, 3937-38 (footnotes omitted)(emphasis added).

It would be an extraordinary reading of the fraud statutes to conclude that they cover "false, fictitious, or fraudulent" "writing[s] or document[s]" filed by a party in a judicial proceeding, where that precise conduct is explicitly exempted from forming the basis of criminal prosecution by a far more specific statute.

That is not to say the Government cannot prosecute similar conduct under a more precise and applicable statute, including the charge of perjury where applicable under 18 U.S.C. § 1621 <u>et seq</u>. Nor does it foreclose any number of civil remedies by the parties themselves, including actions in tort for malicious prosecution or abuse of process, or an award of attorneys' fees in the original action.

But it surely means that the Government cannot stretch the fraud statutes well beyond their intended meaning to cover the type of conduct of that is specifically addressed elsewhere in the criminal code.

II.   **Even if the Fraud Statutes Could Be Stretched to Encompass Conduct Solely Related to the Filing of a Civil Suit, There Can Be No Fraud Here Because There Can Be No Finding of an Intent to Deceive**

A.   **There can be no intent to deceive Zuckerberg or Facebook**

A necessary and central element of any fraud charge is the intent to deceive or trick. See, e.g., 2 Leonard B. Sand et al., Modern Federal Jury Instructions, Inst. 44-5 (2013) ("'intent to defraud' means to act knowingly and with the specific intent to deceive..."). Merely making false statements to or about someone -- in court papers or otherwise -- is not fraud absent the intent to deceive. It may be slander, libel, perjury, or even extortion under some circumstances, but it is not fraud. For instance, if a person says to a work colleague: "You promised me $1,000, and I want that money," the effort to obtain $1,000 cannot possibly be fraud if they both know that no such promise was ever made. And no matter how many phony documents are created or false statements made, the effort to extract money will not constitute fraud.

By the Government's own allegation, Ceglia could not possibly have had the intent to deceive the civil defendants, Zuckerberg and Facebook, into believing the contract at issue was real because those civil defendants know of the purported falsity of the claim -- and indeed vigorously dispute it. And

- 11 -

by the Government's own account, *Ceglia knows that they know* of the contract's falsity and was not trying to trick them into believing that the allegedly false contract was real.  Nor, as further discussed below, is it possible for the district court judge in the civil case or some hypothetical, as-yet unpicked jury to be the victim of Ceglia's alleged fraud.  These flaws in the prosecution are not just fatal on their own terms; they highlight just how much the Government is attempting to fit this case's factual square peg into the round hole of the law of fraud.

Clark Gable could not possibly have been deceived by the woman who falsely claimed to have slept with him, <u>Norton v. United States</u>, 92 F.2d 753 (9th Cir. 1937) ("[t]here can be no intent to deceive where it is known to the party making the [false] representations that no deception can result."), and the <u>Pendergraft</u> plaintiffs' false affidavits claiming threats against them could not possibly have been believed by the non-threatened civil defendant.  <u>See</u> <u>United States v. Pendergraft</u>, 297 F.3d 1198, 1209 (11th Cir. 2002)("mailing of litigation documents, even perjurious ones, did not violate the mail fraud statute" and there could be no intent to deceive where the civil plaintiffs knew that their affidavits would not trick [the civil defendant] into admitting otherwise").

For this reason, the Government is wrong when it states

- 12 -

that, "Whether Zuckerberg would or could be misled by Ceglia's scheme is of no moment." (Govt. Br., 16). It is, in fact, of great moment. It is the reason other analogous criminal prosecutions have been dismissed.[1]

In responding to its failure to allege conduct that could satisfy the requirement of the intent to deceive, the Government again fashions a straw man and ignores the true failing. The straw man is as follows: fraud does not require an actual deception; it only requires the intent to deceive. (Govt. Br., 16). That is true. And Ceglia has never claimed otherwise. It remains true however, that the Government's own account of Ceglia's conduct forecloses the possibility that he intended to deceive.

The criminal fraud charges brought against the civil plaintiffs in <u>Norton</u> and <u>Pendergraft</u> were dismissed not because the civil defendants were not *actually* deceived, but because

---

[1]     The Government's reliance on <u>Eisen</u> and the Seventh Circuit case, <u>United States v. Seidling</u>, 737 F.3d 1155 (7th Cir. 2013), to suggest otherwise are entirely misplaced. In <u>Eisen</u>, the primary victims of the scheme were insurance companies who were not themselves witnesses to the accidents at issue and could be, and in fact were, deceived by the scheme to deprive them of their money. The facts of <u>Seidling</u> have virtually nothing to do with this case. In <u>Seidling</u>, the defendant filed numerous, bogus small claims against 25 different defendants over a six-year period, *and never served the civil defendants with the claims*. In other words, the civil defendants were entirely unaware of the false claims made against them and the default judgments that followed. Appellant in <u>Seidling</u>, moreover, failed to raise any of the arguments raised here by Ceglia.

under no reasonable scenario *could they have been* deceived.
For precisely the same reason, the creation of the purportedly
false contract could never have tricked Zuckerberg or Facebook
into thinking it was real, nor could Ceglia have intended it
to.

Finally, Facebook stands in precisely the same position
as Zuckerberg for purposes of the absence of any intent to
deceive.  Zuckerberg is Facebook's founder, Chief Executive
Officer, Chairman of the Board, and principal shareholder.[2]
Indeed the Court in <u>Pendergraft</u> found that the defendant there
could not have deceived either Cretul, the wrongly accused
threatener, or the civil defendant municipality, Marion County,
Florida, upon whose Board Cretul sat.  297 F.3d at 1209.  In
referring to the municipality, the Court found that:

> Such falsity might have deceived some, but it could not
> deceive Marion County. Cretul, after all, was the
> Chairman of the Marion County Board of Commissioners, and
> Pendergraft and Spielvogel were aware of Cretul's
> position.  They knew that Cretul would deny making these
> threats, and they knew that their affidavits would not
> trick Cretul into admitting otherwise.  If they knew that
> they could not deceive Marion County, then they could not
> have had the intent to deceive.

<u>Id.</u>  That is precisely the scenario here.  Indeed Zuckerberg as
Facebook's Chief Executive Officer and principal owner is in a
position of far greater authority than the Chairman of the

_____

[2]  According to Facebook's most recent filings with the
Securities and Exchange Commission, Zuckerberg owns 62.8% of the
company.  <u>See</u> SEC Form 10K, January 31, 2014.

Board of Commissioners.  It would be utter fiction to conclude that he could not be deceived but that Facebook could.

**B. The alleged attempted deception of the judge and jury cannot form the basis for fraud against Zuckerberg or Facebook**

The Government's claim that Ceglia intended to deceive the civil judge and jury, see Govt. Br., 17-18, ignores the Second Circuit's requirement that "the goal of the fraudulent scheme [must be] to deprive the party deceived (rather than someone else) of money or property." United States v. Evans, 844 F.2d 36, 37 (2d Cir. 1988).  There is no allegation that Ceglia attempted to deprive the civil judge or jury of money or property; therefore Ceglia's purported effort to deceive them cannot form the basis for fraud charges.  This has become even more apparent in the wake of the passage of the judicial function exception under § 1001(b), as discussed above.

In Evans, the defendant was charged with numerous counts of violating the Arms Export Control Act, false statements, and mail and wire fraud in connection the sale of arms to Iran. The Court affirmed the district court's dismissal of the fraud counts, finding that "we agree with the district court that the government must prove that the scheme aimed at depriving *it* of money or property." Id. at 37 (emphasis added).[3]

---

[3]  The Court in Eisen declined to revisit the Evans rule requiring alignment of the party deceived and the property (continued...)

Evans examined at length the Supreme Court's opinion in
McNally v. United States, 483 U.S. 350 (1987), which held that
the mail fraud statute requires that the defrauded party lose a
property right, not some intangible right.[4] Analyzing the
McNally reasoning, the Second Circuit concluded that a fair
interpretation of McNally requires that the party deceived be
deprived of money or property. 844 F.2d at 38-39. After all,
"the original impetus behind the mail fraud statute was to
protect the people from schemes to *deprive them* of their
property or money." Evans, 844 F.2d at 39 (quoting McNally, at
107 S.Ct. at 2879 (internal quotes omitted)). See also McEvoy
Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 794
(1st Cir. 1990) (affirming dismissal of civil RICO action where
only misrepresentations were to trade associations and
plaintiffs were not deceived); United States v. Lew, 875 F.2d
219, 221 (9th Cir. 1989) (reversing conviction where only
misrepresentations were to the government).

---

[3](...continued)
targeted -- the so-called "convergence theory" -- and instead
found that the fraud victims had been directly deceived. Eisen,
974 F.2d at 253 ("Even if the 'convergence theory' is applicable,
which we do not decide, its requirements are met here").

[4] McNally was later superceded by statute expanding the
fraud statutes to include the deprivation of "honest services."
See, e.g., Corcoran v. American Plan Corp., 886 F.2d 16 (2d Cir.
1989). The "honest services" provision was later narrowed by
United States v. Skilling, 561 U.S. 358 (2010) which held that
the deprivation of "honest services" only included bribes and
kickbacks.

The civil judge and (future, unknown) jury are not at risk of losing their property rights, and Ceglia's alleged attempted deception of them cannot constitute mail or wire fraud.[5]

## III. The Prosecution Violates the <u>Noerr-Pennington</u> Doctrine and the First Amendment

In responding to Ceglia's First Amendment challenge, the Government again relies on a combination of erroneous conclusory statements and straw man arguments.

In a single paragraph, the Government claims, on the one hand, that it is not prosecuting Ceglia solely for conduct relating to his pursuit of a civil lawsuit, while on the other hand states: "rather, the Defendant has been criminally charged for fabricating the evidentiary basis on which he has relied in asking a federal court to enforce his purported contractual rights and fraudulently obtain something of value from the Civil Defendants." (Govt. Br. at 23). The statement is a breathtaking, Orwellian effort to use different words to describe exactly what the Government disclaims it is doing: charging him for his conduct in pursuing a civil lawsuit.

---

[5]In any event, there is no governing authority for the proposition that a mail or wire fraud prosecution can be sustained where, as here, a court or a jury are the sole alleged victims of the fraudulent scheme (since, as argued above, neither Zuckerberg nor Facebook could possibly be deceived). The three Second Circuit cases cited by the Government, <u>see</u> Gov. Br. at 17 n.5, all involve an attempt to deceive private parties, in addition to any misconduct directed at the judicial system.

It is not surprising that the Government attempts to use absurdly expansive language to describe the straightforward allegations in this case.  For the Government to acknowledge the charges for what they are, would be to admit that it has exceeded the scope of the fraud statutes and violated the Constitution.

In addition, the Government turns to yet another straw man: that the First Amendment does not prohibit prosecutions for fraud generally.  (Govt. Br. at 24-25).  Again, that is true and has never been disputed.

The First Amendment does, however, place restrictions on the scope of the Government's power when it brings charges against a civil litigant for his conduct in litigating a claim. The Government concedes that the Noerr-Pennington doctrine provides First Amendment protection to litigants, but it asserts that the protection may be pierced here because Ceglia's suit is a "sham."

In order to invoke the shame exception, the Government bears the burden of proving both an illegitimate subjective intent and an objectively baseless claim.  Hirschfeld v. Spanakos, 104 F.3d 16 (2d Cir. 1997). To pierce the immunity, the Court must first determine that the "challenged litigation is objectively meritless," and only once that determination has been made, "may a court examine the litigant's subjective

motivation." <u>Id.</u> at 19; <u>see also</u> <u>White v. Lee</u>, 227 F.3d 1214, 1232 (9th Cir. 2000)("A court may not even consider the defendant's allegedly illegal objective unless it first determines that his lawsuit was objectively baseless.").

In addition, as the Ninth Circuit held when examining <u>Noerr-Pennington</u> immunity in its original antitrust context, when a "plaintiff challenges one suit and not a pattern, a finding of sham requires not only that the suit is baseless, but also that it has other characteristics of grave abuse, such as being coupled with actions or effects external to the suit..." <u>Omni Resource Development Corp. v. Conoco, Inc.</u>, 739 F.2d 1412, 1413 (9th Cir. 1984).

Because the prosecution of Ceglia implicates the <u>Noerr-Pennington</u> doctrine and chills Ceglia's First Amendment right to petition the courts, it may not proceed unless the Court makes a factual finding that the civil lawsuit is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." <u>Professional Real Estate Investors, Inc. et al. v. Columbia Pictures Industries, Inc.</u>, 508 U.S. 49, 58 (1993). In order to make such a factual finding, the Court cannot rely on the Government's allegations alone; it must conduct a hearing and review the Government's evidence.

The Government surely recognized this requirement when it

- 19 -

stated in a footnote that this Court should rely on the Report and Recommendation of the Magistrate Judge in the Western District of New York "to the extent that the Court has concerns with accepting the Government's characterization of Ceglia's Civil Action..." (Govt. Br., fn 8).

But this Court cannot possibly make a factual determination and arrive at a finding based on a different and far higher standard (objective baselessness) by relying on another Court's recommendation in the civil suit.  Instead, it must examine the factual basis for the Government's charges to determine if the prosecution violates Ceglia's immunity under Noerr-Pennington and the First Amendment.  It must do so before a trial on the merits because the very act of the prosecution is a heavy restraint on Ceglia's ability to petition the courts.  See, e.g., White v. Lee, 227 F.3d 1214 (9th Cir. 2000)(discussing a lengthy HUD investigation and finding, even without any formal charges brought, that, "In the First Amendment context, courts must 'look through forms to the substance' of government conduct.  Informal measures, such as 'the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation,' can violate the First Amendment also.").

This is especially so given the pendency of the civil action and the hotly disputed facts in that case.  There is no

dispute that a contract existed between Ceglia and Zuckerberg, and there have been multiple and competing expert reports relating to the authenticity of the contract that Zuckerberg, and now the Government, claims is doctored. In addition, at the inception of Ceglia's civil suit, the state court initially granted a temporary restraining order against Zuckerberg and Facebook, a fact which other courts have found significant, if not dispositive, in determining whether a suit was baseless for purposes of Noerr-Pennington immunity.  See Intellective Inc. v. Massachusetts Mutual Life Ins. Co., 190 F.Supp. 2d 600, 608 (S.D.N.Y. 2002)(AKH)("Although the state court eventually decided against granting an injunction on the software portion of the complaint, the fact that a state court granted a TRO and then a partial preliminary injunction precludes a finding that the litigation was 'objectively baseless.'"), citing Omni Resource Development Corp. v. Conoco, Inc., 739 F.2d 1412, 1413 (9th Cir. 1984).

For this Court to find that a pending civil matter in front of another federal judge, the Honorable Richard J. Arcara in the Western District of New York, is "objectively baseless," would be an intrusion of the highest order into that Court's business.  This Court need not do so because there is a much more straightforward way to avoid the serious constitutional questions raised by the prosecution: the indictment should be

dismissed as failing to state an offense under the fraud
statutes.

## Conclusion

The indictment fails to state an offense under the fraud
statutes, violates the Constitution, and should be dismissed.


Dated:   New York, New York
         February 10, 2014

                                    _____
                                    DAVID E. PATTON, ESQ.
                                    YUANCHUNG LEE, ESQ.
                                    ANNALISA MIRÓN, ESQ.
                                    Federal Defenders of New York
                                    Attorneys For **Paul Ceglia**
                                    52 Duane Street, 10th Floor
                                    New York, New York 10007
                                    (212) 417-8738


TO:   **PREET BHARARA, ESQ.**
      United States Attorney
      Southern District of New York
      One St. Andrew's Plaza
      New York, New York 10007

Attn:       **CHRISTOPHER FREY, ESQ.**
            **JANIS ECHENBERG, ESQ.**