E37WcegC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        12 CR 876 (ALC)

5    PAUL CEGLIA,

6              Defendant.

7    ------------------------------x

8                                   New York, N.Y.
                                     March 7, 2014
9                                   11:15 a.m.

10

     Before:
11
                    HON. ANDREW L. CARTER, Jr.,
12
                                       District Judge
13

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     CHRISTOPHER D. FREY
17        Assistant United States Attorney

18   DAVID E. PATTON
     ANNALISA MIRON
19        Attorneys for Defendant

20

21

22

23

24

25

E37WcegC

1          (Case called)

2          MR. FREY:  Good morning, your Honor.  Christopher

3     Frey, for the government.

4          THE COURT:  Good morning.

5          MR. PATTON:  David Patton, for Mr. Ceglia, who is

6     present, and also at counsel table is Annalisa Miron.

7          THE COURT:  Good morning.  Good morning, Mr. Ceglia.

8          The defendant has filed a motion to dismiss the

9     indictment.  I have a few questions for the parties and I

10    believe I'll be ready to rule.  In particular, Ceglia has

11    argued that the right to petition the courts which shield him,

12    immunize him from this prosecution under the Noerr-Pennington

13    doctrine, and it seems from the submissions that both parties

14    seem to agree that this doctrine applies to this case.  Maybe

15    I'm misreading that, but let me find out from the government.

16    Is that your position?

17         MR. FREY:  Your Honor, the government believes the

18    Noerr-Pennington doctrine could potentially be implicated here,

19    but it certainly doesn't agree that it shields the defendant in

20    this particular case, because what is alleged is beyond mere

21    litigation activity.

22         THE COURT:  My question is the Noerr-Pennington

23    doctrine is adopted in the context of antitrust litigation and

24    all the cases that have stemmed from that have been in the

25    context of antitrust litigation, indicating First Amendment

E37WcegC

1    principles as they apply to antitrust litigation.  I haven't

2    seen any cases in which the Noerr-Pennington doctrine has been

3    applied in a criminal context, unless I've missed something.

4    But let me just hear a little bit more from both parties about

5    that because, again, Noerr-Pennington is about shielding the

6    right to petition, basically indicating that an entity or an

7    individual has a right to petition the courts or petition the

8    legislature even if the results of successful petition could

9    have an anticompetitive effect, that that entity or that

10   individual would be shielded from litigation under the Sherman

11   Act.  I'm not sure this applies to a criminal case.  Again, I

12   haven't seen any courts that have applied this to a criminal

13   case, but let me hear more from the parties about this.

14            Let me give defense counsel an opportunity to address

15   that first.

16            MR. PATTON:  Sure, your Honor.  I think

17   Noerr-Pennington has been applied outside the context of

18   antitrust suits.  I mean, it certainly has.  I can think of the

19   NLRB instance where various government agencies have been

20   prevented from stopping a lawsuit, regardless of whether or not

21   it was subjectively filed for some sort of improper purpose, as

22   long as it wasn't objectively baseless.

23            I can't think offhand of a case in which it's been

24   raised in this context, where you have the government

25   instituting a criminal action rather than some sort of civil

E37WcegC

1    agency action that seeks to prevent somebody from following

2    through on a civil lawsuit.  Frankly, I think that just

3    highlights the unusual nature of this criminal prosecution,

4    that there are good reasons why you don't find criminal

5    prosecutions of civil litigants generally speaking.  So it

6    certainly is applied outside of the antitrust context and it is

7    applied broadly to provide immunity to civil litigants because

8    of the concern about protecting the right to petition the

9    courts.  I can't cite the particular case preventing the

10   government from proceeding criminally in a way that impacts the

11   right to petition the courts because, frankly, it's so rare.

12   And I don't know of any other instance in which it's been

13   raised.

14           THE COURT:  Thank you.  Let me hear from the

15   government.

16           MR. FREY:  Your Honor, I'll agree with defense counsel

17   that my understanding is that the Noerr-Pennington doctrine has

18   been applied outside the antitrust context, but I also agree

19   with your Honor that the government is not aware of any

20   criminal case in which the Noerr-Pennington doctrine has been

21   applied.  My review of the case law certainly did not uncover

22   any.  I do think though that to the extent the Noerr-Pennington

23   doctrine could be construed to apply in the criminal context,

24   if we look to the body of civil case law that has developed, it

25   makes very clear that looking at the allegations, the party

E37WcegC

1  accusing one of engaging in sham litigation is enough for the

2  Court to make a determination as to Noerr-Pennington.  So I

3  think if we were to draw an analogy, the Court could look to

4  the government's allegations, the allegations that the grand

5  jury returned in the indictment, and could make a determination

6  as to whether or not the suit is objectively baseless, or not.

7  But I think your Honor's correct, it has not been traditionally

8  applied in criminal cases.

9          THE COURT:  Anything else from the defense on that?

10          MR. PATTON:  On that, your Honor, I disagree strongly

11  that the Court can simply rely on allegations to pierce the

12  immunity.  The entire point of the immunity is to immunize this

13  type of interference with the right to petition.  The idea that

14  the government can simply pick sides in a civil lawsuit and,

15  based on the allegations alone, that's sufficient to pierce the

16  immunity eviscerates Noerr-Pennington.  At the very least, if

17  the government's relying on the sham exception, they would have

18  to make a factual showing to this Court to prove that it's

19  objectively baseless.

20          You have a fully contested civil lawsuit that's

21  ongoing where there are contested sets of facts, and this

22  Court, I don't think, is in any position to find, based on

23  nothing but the government's allegations, that that civil

24  lawsuit has no chance of success, which is what's required in

25  order to find that the suit is objectively baseless, as it

E37WcegC

1    must, in order to pierce the immunity.

2              THE COURT:  And I understand your motion to be asking

3    for the Court to conduct some sort of evidentiary hearing,

4    Noerr-Pennington hearing, and obviously, there are some cases

5    in which it's indicated that the Court has the authority to

6    conduct such a hearing.  I haven't seen any cases in which a

7    court has actually conducted such a hearing.

8              What would this hearing look like and why would this

9    hearing be different than the evidence that would be produced

10   at trial?  One of my overarching concerns is about the timing

11   of this motion.  This is a motion to dismiss the indictment.

12   Motions to dismiss indictments are generally disfavored.  It

13   seems to me that it is more appropriate to consider all of

14   these factors and the other grounds that you had for dismissing

15   the indictment in the context of a Rule 29 motion.  At the

16   close of the government's case or the close of all the

17   evidence, couldn't I then have a real sense as to whether or

18   not this is sham litigation?  Assuming Noerr-Pennington

19   applies, then couldn't I make a determination as to whether or

20   not this was sham litigation and whether or not

21   Noerr-Pennington immunity should apply?

22             It seems to me that it's one thing to say that

23   Mr. Ceglia would be immunized from liability.  It's another

24   thing to say he's immunized from going through any of this

25   process, and it seems that this motion that you're making is

E37WcegC

premature.  Along with that, I know this kind of long-winded,

and I'll certainly give you a chance to address this, some of

the other cases that you cited in terms of looking at the

actual language of the mail fraud statute, for example,

Pendergraft, which you relied heavily upon, which was in the

context of a defendant who went to trial and the Eleventh

Circuit, following the trial, dealt with both the issues of the

district court's refusal to grant the motion to dismiss the

indictment and the district court's refusal to grant an order

of acquittal.  And what the Eleventh Circuit did there, in

Pendergraft, is said it was error for the district court not to

grant the motion for acquittal and the Rule 29 didn't touch

anything about a motion to dismiss indictment.  So I guess my

question is sort of related there.  Why isn't this premature?

Why can't this be determined in the context of a Rule 29

motion?

          MR. PATTON:  Your Honor, very simply because we're

accepting all of the allegations of the government as true and

it's well settled that if there's not a factual, if based on

all of the government's allegations, accepting them as true,

our arguments about the fraud statutes, leaving aside the

Noerr-Pennington issue for a moment, there is no possible way

to construe the government's allegations that constitute an

offense under the federal fraud statutes.  They're barred

because, I mean, the government trips all over itself to try to

8

E37WcegC

1    describe this as some sort of broader fraudulent scheme apart

2    from a civil action.  It's just not.  They describe it entirely

3    as part of the civil action in their venue motions that were

4    earlier litigated.  They describe it in sort of tortured

5    language in their motions on this motion.  But there is simply

6    nothing, and I think many courts within the Second Circuit,

7    including recently, Judge Matsumoto, Judge Cote, others have

8    described cases involving alleged phony documents that were

9    filed, alleged phony powers of attorney, witness intimidation,

10   all sorts of things that involve phony and false litigation,

11   including things that were prepared to be included in filings,

12   and they say, Look, this isn't fraud.  And there is nothing

13   that the Court needs to hear in terms of any sort of factual

14   foundation to make that decision now.  The reason to make it

15   now is obvious, to prevent all of the waste and expense of

16   going through a trial that's based on claims that really

17   shouldn't stand, even accepting all the government's claims.

18           THE COURT:  But all of those cases were in the civil

19   context, and all of those cases were dealing with the civil

20   RICO statute and civil fraud, which, again, is very different

21   from this situation in which obviously the civil case you can

22   certainly grant a motion to dismiss readily, if you accept the

23   factual allegations as true and it doesn't make out a cause of

24   action.  It's similar in a criminal context, but I think one of

25   the things that troubles me is that under the mail fraud

E37WcegC

1    statute, what's really important is Mr. Ceglia's belief, what

2    Mr. Ceglia knew about whether or not this action would deceive

3    Mr. Zuckerberg.  The fact that you keep claiming that

4    Mr. Zuckerberg knew that this was false and, therefore, could

5    not have been deceived and that is certainly relevant, but that

6    is not dispositive of the issue.  So if Mr. Ceglia, for

7    example, believed that, and I have no reason to think this is

8    true, but if Mr. Ceglia believed that Mr. Zuckerberg had some

9    sort of early onset Alzheimer's and wouldn't remember it,

10   wouldn't know whether or not this was true, that would

11   certainly be able to sustain a conviction for mail fraud, for

12   example.

13           For example, in a related context, if someone is

14   passing off counterfeit bills to an individual and they don't

15   know that the individual they're giving counterfeit bills to is

16   someone who is trained in identifying counterfeit bills, the

17   fact that that person was not actually deceived doesn't make

18   that the defendant's actions weren't fraudulent, and in

19   Pendergraft the court there also relied heavily on that.  In

20   Pendergraft, the court said that the defendant knew that the

21   intended victim would not be deceived, so the simple fact that

22   Zuckerberg allegedly was not going to be deceived isn't quite

23   enough, and in terms of me making that leap to say that Ceglia

24   knew that Zuckerberg knew that this was false, that seems

25   that's improper for me to do at this time and it seems like

E37WcegC

 1    that's something we need more evidence, and I guess a jury

 2    could consider that.  And if there isn't enough evidence of

 3    that, or I find as a matter of law that the evidence that's

 4    been submitted is insufficient, then a Rule 29 motion would

 5    certainly be appropriate.

 6            MR. PATTON:  Your Honor, I think it's actually the

 7    reverse; that is, I understand what the Court is saying about

 8    how there might be some conceivable set of facts in which

 9    Mr. Ceglia's intent could be shown to be fraudulent or within

10    the scope of the fraud, but it hasn't even been alleged.  The

11    government isn't alleging anywhere, in its papers, much less

12    the four corners of the indictment, that Mr. Ceglia intended to

13    deceive Zuckerberg into believing that it was a real contract.

14    Instead, they rely on this notion that it's why they have to

15    sort of really stretch the statutes and say, Well, that may be,

16    but he could deceive the jury and the judge.  And that's purely

17    a matter of law.  It's purely a matter of law that's foreclosed

18    by some, I think, pretty persuasive case law.  But the Court's

19    decision at this point is are there allegations that suffice,

20    even if entirely proved, would meet the elements of the fraud

21    statute, and there aren't.  There's no allegation and there

22    clearly couldn't be because it's very different from the

23    scenario of passing counterfeit money.  The entire point of

24    passing counterfeit money is to pass it and pass it off as

25    real.

1          The government isn't alleging that here.  They're

2     alleging that it is simply a phony, sham litigation, and that's

3     not fraud, and the Court needs no additional information to

4     make that decision.

5          THE COURT:  Thank you.  I'll hear from the government.

6          MR. FREY:  First of all, your Honor, I'll start with

7     defense counsel's point that we haven't alleged an intent to

8     deceive Mark Zuckerberg.  I think that's patently untrue from

9     the face of the indictment.  The indictment alleges a scheme

10    with a number of victims.  It alleges both a fraud upon Mark

11    Zuckerberg and Facebook, the company, being two separate

12    individuals or entities, and it also makes allegations with

13    respect to corrupting the judicial process, with respect to

14    deceiving the district court, deceiving a jury who would decide

15    the civil lawsuit into awarding Mr. Ceglia a monetary judgment

16    in his favor and against those two victims, Mark Zuckerberg and

17    Facebook.  So the case law is very clear.

18         With respect to what is required on a motion to

19    dismiss, the government has tracked the statutory language, but

20    beyond that, it has provided specific allegations with respect

21    to each of the elements of both mail fraud and wire fraud.  I

22    guess circling back to your Honor's initial question that

23    started this discussion with Mr. Patton, with respect to what

24    would an evidentiary hearing look like for Noerr-Pennington, I

25    agree, I don't think it would look any different than a trial,

E37WcegC

1   and in that respect, I think that the motion, really what

2   Mr. Patton, is asking for is premature.  The government should

3   be allowed to present its evidence.  This is a valid indictment

4   on its face.  It's sufficient to go to a jury.  There's no

5   basis for dismissing it now.

6          Your Honor, I think, highlighted the very clear case

7   law with respect to intent to deceive, that the Second Circuit

8   has held on multiple occasions that it is what the defendant

9   intends, the harm that he intends to the victim.  It is not

10  whether or not the intended victim is actually defrauded or

11  could be defrauded.  It has to do with the defendant's bad

12  intent and deceitful conduct, and the indictment certainly

13  includes allegations of that.

14          I agree with your Honor as well.  I think the civil

15  RICO cases are very different.  What seems to be animating the

16  Court's decisions in those cases has to do with the fact that

17  what was being alleged was just an attempt to relitigate

18  something between those exact same parties in pending or

19  ongoing litigation, long-standing disputes between those

20  parties.  That's certainly not the case here, and the court in

21  determining that the mail and wire fraud predicates for

22  purposes of civil RICO were not met in those cases was also

23  largely animated by policy concerns that are wholly absent

24  here.  The concern with converting run-of-the-mill tort

25  actions, malicious prosecution or abuse of process actions into

1    RICO predicates would open the floodgates of litigation in

2    federal court, allowing unprecedented access to a statute that

3    provides for treble damages.  Those concerns are wholly lacking

4    here.

5            The government, as I'm sure the Court is well aware

6    from our papers, believes that this is much more akin to the

7    criminal prosecutions both in Eisen in this circuit and the

8    Seidling matter in the Seventh Circuit.  This is more than just

9    litigation activity.  This is more than just the filing of a

10   false affidavit.  It has to do with the creation of evidence

11   out of whole cloth, the destruction of evidence that's

12   inconsistent with Mr. Ceglia's claims, and the manipulation of

13   documentary evidence, all intended to work a fraud upon a civil

14   jury and ultimately to obtain properly fraudulently from the

15   Zuckerberg and Facebook defendants in that case.

16           THE COURT:  Let me ask counsel for the government

17   this.  I haven't seen any cases sustaining a mail fraud or wire

18   fraud conviction for attempting to deceive a judge or a jury.

19   Do you have any such cases?

20           MR. FREY:  Did you say a criminal case, your Honor?

21           THE COURT:  Yes.

22           MR. FREY:  No, but there is certainly some case law in

23   the criminal context where the courts have held that a fraud on

24   civil defendants also works a fraud upon the court and upon a

25   jury.  That's the Rodolitz case as well as --

E37WcegC

1        Your Honor, just give me a moment.

2        THE COURT:  Yes.

3        MR. FREY:  -- as well as United States v. Coven, your

4   Honor, which we cite in our papers.  Those are Second Circuit

5   cases where the Second Circuit has recognized that fraud may be

6   worked on civil juries and courts as well as the litigants.

7        THE COURT:  Let me ask defense counsel, going back to

8   an earlier question, what this Noerr-Pennington hearing would

9   look like.  And why wouldn't this be different than trial?

10        MR. PATTON:  Your Honor, the government would have the

11   burden.  The essential problem here is not just

12   Noerr-Pennington, it's also the First Amendment.  They're

13   similar, but they're separate doctrines and separate concerns.

14   The damage is being done now.  If the criminal case is allowed

15   to proceed and allowed to proceed to trial, we have an ongoing

16   civil suit that's very different.  I'm not aware of any case

17   out there, I haven't found anything, involving a criminal

18   prosecution of a civil litigant in an ongoing civil action.  As

19   far as I know, it's completely unprecedented.  The damage to

20   that immunity is being done now.  The immunity is being pierced

21   by the fact that they're sitting, and for the Court to allow

22   that to go on longer, and however long, is piercing the

23   immunity by truly restraining Mr. Ceglia's right to petition.

24   I think at the very least, if the government is going to say we

25   can pierce that immunity because this is sham litigation,

E37WcegC

within the meaning of the case law, they've got to put forward

evidence and they have got to put forward more than just

allegations to provide this Court with a sufficient basis to

make a factual finding that the civil suit in Buffalo actually

is objectively baseless.  And that would be on the government.

They would have the burden of showing that, and whatever

witnesses that they chose to call to meet that, but they have

raised the sham exception as a defense to the immunity, and

it's their burden to pierce that immunity.  And for good

reason, because of the highly unusual nature of this

prosecution and because of the damage that the prosecution

itself does to the right to petition and to Noerr-Pennington

immunity.

        If I could also just say one thing on the distinction

between the civil cases, I grant there's not a large body of

case law, again, precisely on point, and thank goodness.  I

mean, again, the idea that the government can come in and in

the middle of a civil prosecution criminally prosecute somebody

for the very issue that is being disputed in the civil suit is

highly problematic, but to the extent that the government says

don't look at those cases that have interpreted the fraud

statutes in civil RICO settings because there were other

concerns animating courts in those decisions and saying federal

fraud statutes aren't covered by these litigation activities,

it strikes me as a bit absurd to say those concerns should be

E37WcegC

1    greater concerns than in the criminal context.  Treble damages

2    and civil liability and relitigating things in the civil

3    context as opposed to somebody being criminally prosecuted, if

4    anything, it's exactly the reverse.  We should be much more

5    concerned about how the fraud statutes are construed.  They

6    ought to be more narrowly construed in the criminal setting

7    rather than the civil setting.  Whatever concerns animate the

8    courts in the civil context, they should be enhanced in this

9    context, so it strikes me as an odd position for the government

10   to take.

11             THE COURT:  Let me just ask defense counsel this

12   again.  Why wouldn't the trial encompass all of these issues

13   that you're talking about and then some?  Obviously, the trial

14   would be overinclusive of these issues.  Why couldn't this be

15   resolved?  I understand why you say it shouldn't be resolved

16   and why I shouldn't wait to make this determination.  But other

17   than the timing of that, what would be different in terms of

18   this hearing that you're talking about as opposed to what would

19   happen at a trial?  Obviously, the trial's going to have a lot

20   more evidence produced.  Obviously, at a trial, the government

21   has the burden of proof beyond a reasonable doubt, higher than

22   this burden.  But all the factors you're talking about, if at

23   some point I were to adopt what you're saying, why wouldn't all

24   that be covered in the context of a trial as a legal matter,

25   and, after the trial is over, I could make a determination as

E37WcegC

1    to whether or not this immunity applies or whether or not as a

2    matter of law there's enough evidence here for a reasonable

3    jury to convict him under the mail fraud statute?

4            MR. PATTON:  Your Honor, because if what your Honor is

5    asking is wouldn't there be a lot of overlap, there certainly

6    well may be.  I assume there would be.  But that doesn't change

7    the fact that in order for the government to proceed with this

8    prosecution, and there's no question that Noerr-Pennington

9    immunity applies to this situation, they are required to make a

10   factual showing.  There's nothing this Court can hang its hat

11   on to say, yes, that's objectively baseless litigation in

12   Buffalo.  There's no possible way for this Court to say that in

13   order to allow the prosecution to proceed.  You've got nothing

14   before you other than conclusory statements.  There has to be a

15   factual finding in order to support the government's claim that

16   the sham exception should apply.  It's their burden.

17           THE COURT:  Let me ask you this.  I understand the

18   position that this Noerr-Pennington immunity, if it applies,

19   should have even greater weight in the criminal context as

20   opposed to the civil context.  But as a procedural matter, what

21   about the fact that what you're asking me to do here is to

22   dismiss an indictment, an indictment by a grand jury, which is

23   a lot different than dismissing a cause of action in a

24   complaint that is simply just drafted by an attorney?  There

25   seems to be a real difference there and it seems that the

E37WcegC

indictment at this point has satisfied what it needed to

satisfy in terms of giving Mr. Ceglia notice as to the charges

against him.  It certainly meets the requirements of an

indictment.  What about that?  Shouldn't that be something I

should be concerned about?

          MR. PATTON:  Of course, the Court should be concerned

about it, but I think this falls squarely within the rules of

procedure on what's an appropriate motion to dismiss, and,

frankly, I'd be happy to go back and provide the Court, because

there are certainly many examples of indictments that have been

dismissed because they failed to state a claim, because even

accepting all of the allegations as true, just as in this case,

that the statute can't be construed to cover that conduct.  I

grant it's unusual.  Hopefully, it's unusual.  Hopefully, the

government is generally in the business of alleging facts that

do fall within the parameters of criminal statutes.  So I grant

it's not as common as in the civil context, but that doesn't

make it any less appropriate when circumstances warrant, and

here they do.  There are no factual disputes.  We haven't taken

issue with anything the government, I mean, we're not accepting

that they're true, but for purposes of our legal arguments,

we're not taking issue with any of the facts as alleged.

          THE COURT:  No, I understand.  But it seems that,

again, you've got two different tracks going on here.

Obviously, your first couple of arguments deal with the actual

E37WcegC

1    mail fraud statute itself, and I think I disagree.  Maybe

2    there's no disagreement in terms of a legal analysis, in terms

3    of it's necessary for Mr. Ceglia to have the intent to deceive,

4    and whether or not the intended victim is actually deceived, or

5    not, is not really relevant to the consideration.  It's your

6    position that, based on what the government is indicating thus

7    far, it's objectively reasonable to assume that Ceglia did not

8    intend to deceive.  But obviously the government is not limited

9    to whatever it's put in its opposition papers in terms of the

10   proof that they can present at trial.  And if it's a

11   substantial variance from what's in the indictment, that's

12   another issue.  That's something again that doesn't get

13   resolved typically on a motion to dismiss.  That gets resolved

14   in a Rule 29 context.

15        In terms of the Noerr-Pennington immunity, and I'm

16   still doubtful that that actually applies here, but assuming

17   that it does apply in a criminal context such as this, that's

18   not really an issue in which you're saying that the government

19   has failed to state a claim.  You're saying that the government

20   has stated a crime but that he is immune from the crime, which

21   is very different.  It makes a huge difference in terms of when

22   this should be resolved, and it seems to me that this is more

23   properly resolved at a later date and in a Rule 29 motion.

24        Again, I know this is a rare situation.  At least it

25   appears to be a rare situation, but I'm certainly not aware of

E37WcegC

1   any cases in which any court has dismissed a mail fraud

2   indictment in this sort of situation, and I'm sure that if you

3   were aware of one, you would have cited one to me.  But I don't

4   have any cases like that.  Do you have any cases like that?  I

5   certainly didn't see any in the briefs and I haven't found any.

6   I've found the cases again where the circuits courts, after a

7   trial, have decided that the motion for acquittal should have

8   been granted.  But I haven't found any cases in which a circuit

9   court has said that the indictment should have been dismissed.

10              MR. PATTON:  But there are certainly many cases in

11   which district courts have dismissed indictments.

12              THE COURT:  Yes.

13              MR. PATTON:  And properly so and have been upheld.

14              THE COURT:  Don't mistake me as saying that it's

15   always improper for a court to dismiss the indictment.  I'm not

16   saying that at all.  I'm saying in this particular situation it

17   seems that it's inappropriate.

18              MR. PATTON:  Obviously, we think otherwise on that.

19              If I could go back to the Noerr-Pennington issue for a

20   moment, first of all, in terms of its use in a criminal

21   context, I mean, antitrust itself can be used in criminal

22   antitrust contexts, in fact.  So the criminal/civil distinction

23   I don't think is significant just broadly speaking.  And I

24   guess if the Court is concerned about the appropriateness of

25   the timing of determining this issue now as opposed to during

E37WcegC

1    or after a trial, I'd ask for the opportunity to submit some

2    examples of cases involving dismissals of indictment that I

3    think are on point in terms of the general notion that where

4    there's no dispute about the facts, it's appropriate to decide

5    it now rather than at trial.

6            THE COURT:  I don't think that's necessary.  I'm still

7    not convinced that Noerr-Pennington applies in the first place.

8            MR. PATTON:  I'm referring to our fraud --

9            THE COURT:  Right, and I think that, again, it seems

10   to me that there are scenarios in which it seems that you're

11   asking me to determine a factual issue and determine that

12   Mr. Ceglia had no intent to deceive at this point.  You're

13   asking me to make that determination based on what the

14   government has alleged in its moving papers and based on the

15   indictment.

16           MR. PATTON:  Just as in Norton, just as in

17   Pendergraft, there is no, and the government doesn't stand up

18   here and say, yes, we're saying that Ceglia was trying to

19   deceive.  I mean, nowhere in their more expansive motions

20   papers or in the indictment or in the complaint have they said

21   that the scheme involved Mr. Ceglia attempting to deceive Mark

22   Zuckerberg into believing this contract was real.  And, of

23   course, they can't say that, and the reason they can't say that

24   is it would be absurd, and regardless of whether they can say

25   it, they haven't, and they haven't put that forward as an

E37WcegC

1    allegation, which they would have to.  There is no allegation

2    that Mr. Ceglia intended to deceive Mark Zuckerberg.  There

3    just isn't.

4         THE COURT:  I guess I'm confused as to why you keep

5    saying that.  That's in the indictment, the intent to deceive.

6    I understand that you have a different view of the responses in

7    their moving papers, but, fine, tell me.  Is that element not

8    listed in the indictment?  Don't they track the statute?

9         MR. PATTON:  They track statutory language, but

10   nowhere in the indictment or in their papers do they say, the

11   entire basis of the indictment and their papers, and all of the

12   allegations that they make, have to do with the attempt to

13   either get a jury to make an award -- and again, this isn't in

14   the indictment; this is additional language in their papers --

15   or to induce some sort of settlement, but there's no factual

16   support for that.  But regardless, nowhere do they take the

17   step of saying the scheme involved trying to deceive Mark

18   Zuckerberg into believing that these false statements were, in

19   fact, true.

20        THE COURT:  I understand.  But I don't think they're

21   required to do that at this point.  As long as it tracks the

22   statutory language, he's on notice of what's there.  Whether or

23   not they can prove that, that's something that gets resolved on

24   Rule 29.  It seems that the government has at least indicated

25   that in the indictment.  They've indicated that.  Perhaps you

E37WcegC

1    feel that their language is a little conclusory and some of the

2    circumstances they've put in the indictment and some of the

3    other things they've put in there seem to contradict that.

4            MR. PATTON:  I don't think they've even indicated it.

5    I think that put to the question, they can't possibly say that.

6    They can't possibly say the scheme to defraud was to deceive

7    Mark Zuckerberg.  I suppose the Court could put it to them:

8    Are you saying that the scheme to defraud involved an intent to

9    deceive Mark Zuckerberg.

10           THE COURT:  Any response from the government?

11           MR. FREY:  A few responses, if I may, your Honor.

12           First of all, I think the indictment clearly alleges

13   that this is a scheme to defraud Facebook, Inc., and Mark

14   Zuckerberg.  That's paragraph four of the indictment.  The

15   indictment's allegations go on then to describe how, the means

16   and methods by which Mr. Ceglia intended to work fraud on those

17   entities, and then, as your Honor has well noted, the

18   indictment tracks the statutory language.  And so all of the

19   elements for a sufficient indictment are present here.  There

20   is no basis on that ground for dismissing the indictment.

21           The case law, again, is also clear, as your Honor has

22   already noted, that with respect to the scheme to defraud, it

23   is Mr. Ceglia's intent to defraud that is relevant.  It is an

24   intention to work harm on the victims.  I think your Honor

25   appreciates the point, so I won't belabor it.

E37WcegC

|   |   |
|---|---|
| 1 | If I may just respond to the Noerr-Pennington argument |
| 2 | again. |
| 3 | THE COURT:  Yes. |
| 4 | MR. FREY:  Again, I agree it is not clear at all that |
| 5 | it applies in the criminal context.  There certainly is a |
| 6 | dearth of case law, no case law that either party can find in |
| 7 | the criminal context, it seems, at this point.  But what is |
| 8 | clear is, first of all, there is no damage being done here, as |
| 9 | Mr. Patton represents, with respect to Mr. Ceglia's First |
| 10 | Amendment rights.  He's continuing to pursue his civil |
| 11 | litigation.  The government has not stayed his civil |
| 12 | litigation.  In fact, Mr. Ceglia has gone so far as to pursue |
| 13 | another civil litigation, suing the government for bringing |
| 14 | this criminal prosecution against him.  So there's no chilling |
| 15 | effect here. |
| 16 | With respect to the case law on the Noerr-Pennington |
| 17 | doctrine, in the civil context, at least, in which this |
| 18 | doctrine has developed, it is clear that the objectively |
| 19 | baseless prong is satisfied if the litigant didn't have |
| 20 | probable cause to institute the underlying lawsuit.  Where |
| 21 | there's no dispute over the facts, courts have decided that |
| 22 | question as a matter of law.  Now, here, obviously, there is a |
| 23 | dispute as to facts, and similarly, where that is the case, the |
| 24 | Court's probable cause analysis, courts have held, can be based |
| 25 | on allegations by the party claiming it to be a sham.  In the |

E37WcegC

1  civil context, the courts have looked to the complaint or the

2  answer, depending on who is alleging it to be a sham.  The

3  government has more than sufficiently pled allegations here

4  that similarly would allow this Court to make that

5  determination.  The grand jury, as your Honor noted, returned

6  an indictment and the Court can certainly look to that.

7           I think the government has satisfied its burden and

8  the evidentiary hearing would not look any different, quite

9  frankly, than a trial.

10          MR. PATTON:  Your Honor, could I just make one point.

11          THE COURT:  Yes.

12          MR. PATTON:  It strikes me as remarkable that the

13  government would claim that instituting a criminal prosecution

14  doesn't have a chilling effect on the civil action.  Regardless

15  of whether Mr. Ceglia has quietly walked away or dropped it or

16  has, in fact, been coerced into walking away from the civil

17  suit because of the criminal, that doesn't mean it doesn't have

18  a chilling effect.  I think the chilling effect is

19  self-apparent, so that strikes me as a bit remarkable, to say

20  that there's no chilling effect on criminally prosecuting

21  somebody, an active civil litigant for their civil litigation

22  activities.

23          THE COURT:  Thank you very much.  I'm ready to rule.

24          A defendant faces a high standard in seeking to

25  dismiss an indictment.  That's <u>United States v. Post</u>, No. 8 Cr.

E37WcegC

1  243 2013 WL 2934229 at *5 (S.D.N.Y. June 3, 2013).  Under

2  Federal Rule of Criminal Procedure 7(c)(1), an indictment need

3  only consist of "a plain, concise, and definite written

4  statement of the essential facts constituting the offense

5  charged."  An indictment is sufficient so long as, one,

6  "contains the elements of the offense charged and fairly

7  informs the defendant of the charge against which he must

8  defend," and, two, "enables the defendant to plead an acquittal

9  or conviction in bar of future prosecutions for the same

10  offense."  Hamling v. United States, 418 U.S. 87, 117 (1974).

11  "An indictment must sufficiently inform the defendant of the

12  charges against him and provide enough detail that he may plead

13  double jeopardy in a future prosecution based on the same set

14  of events," but it "need not be perfect, and common sense and

15  reason are more important than technicalities."

16      The indictment need only allege "the 'core of

17  criminality' the government intends to prove" at trial, and,

18  consequently, the indictment is "read to include facts which

19  are necessarily applied by the specific allegations made."

20  United States v. Rigas, 490 F.3d 208, 229 (2d Cir. 2007).

21      Before trial, the allegations of an indictment must be

22  taken as true.  Boyce Motor Lines v. United States, 342 U.S.

23  337, 343, n.16 (1952).  "The sufficiency of the evidence is not

24  a matter that may be appropriately addressed on a pretrial

25  motion to dismiss an indictment."  United States v. Alfonso,

1   143 F.3d 772, 777 (2d Cir. 1998).  This is because indictments

2   are "not meant to serve an evidentiary function," but rather,

3   "to acquaint the defendant with the specific crime with which

4   he is charged and allow him to prepare his defense."  United

5   States v. Juwa, 508 F.3d 694, 701 (2d Cir. 2007).

6           Mr. Ceglia raises four arguments in support of his

7   motion to dismiss.  I'll address each one in turn.

8           First, Ceglia contends that false claims in litigation

9   documents cannot form the basis for mail and wire fraud

10  charges.  In support of this argument, Ceglia cites to several

11  civil cases in which courts rejected a plaintiff's ability to

12  use mail and wire fraud as a predicate offense for a civil RICO

13  claim, when a defendant's only alleged fraud was to perpetrate

14  false litigation.  I do not find these civil cases persuasive

15  in determining whether to dismiss the indictment.

16          The only criminal case the defendant cites to in this

17  regard is United States v. Pendergraft, or at least the main

18  case the defendant cites to, 297 F.3d 1198, 1208 (11th Cir.

19  2002).  In that case, however, the court only commented on this

20  issue in *dicta*.  The defendants' mail fraud conviction was

21  vacated on other grounds.  As the government notes, in the

22  Second Circuit, convictions for mail and wire fraud have been

23  upheld in similar circumstances.  United States v. Eisen, 974

24  F.2d 246 (2d Cir. 1992); United States v. Rodolitz, F.2d 77 (2d

25  Cir. 1986).  I will note, however, that in those cases, the

E37WcegC

1   defendants' schemes to defraud at least initially included the

2   mailing or transmission of fraudulent documents in a

3   nonlitigation context.

4        In his reply briefs, Ceglia argues that the judicial

5   function exception to the False Statements Act, 18 U.S.C.

6   Section 1001, applies to mail and wire fraud.  Congress

7   specifically codified that exception in the False Statements

8   Act, and I have found no authority, nor has Ceglia cited any,

9   extending its application to other fraud statutes, specifically

10  mail and wire fraud.

11       Second, Ceglia argues that he could have no "intent to

12  deceive" when Zuckerberg was aware of Ceglia's

13  misrepresentations and could not possibly be deceived by them.

14  Ceglia supports this proposition with Norton v. United States,

15  92 F.2d 753 (9th Cir. 1937) and Pendergraft out of the Eleventh

16  Circuit.  While those cases are interesting and persuasive,

17  they are not binding on this Court.

18       The government argues that even if Zuckerberg could

19  not have been deceived, Facebook certainly could have.

20  Pendergraft forecloses that argument, but it's not binding on

21  this Court.

22       Next, the government suggests that Ceglia intended to

23  deceive the judge and jury in his allegedly fraudulent action.

24  I haven't found any cases sustaining a mail and wire fraud

25  conviction for attempting to deceive a judge or a jury.

E37WcegC

     Third, Ceglia argues that he did not use the mails and
wire transmissions "in furtherance" of his fraud, as required
by the mail and wire fraud statutes.  Taking the allegations in
the indictment as true, it certainly appears to me that the
government has alleged enough to show that the mail and wire
transmissions were in furtherance of Ceglia's allegedly
fraudulent scheme.

     Finally, Ceglia argues that the First Amendment
prohibits this prosecution because it impermissibly restricts
speak and infringes on his right to petition.  Insofar as the
restriction on speech is concerned, the Supreme Court has made
clear in Illinois ex rel. Madigan v. Telemarketing Associates,
Inc., 538 U.S. 600 (2003), that the First Amendment does not
shield knowingly false statements made as part of a scheme to
defraud.  The Second Circuit followed that precedent in United
States v. Rybicki, 354 F.3d 124 (2004) when it echoed that
"fraud is not conduct protected by the First Amendment."

     Ceglia's argument as to the right to petition the
courts is a little more concerning.  Both sides seem to agree
that the Noerr-Pennington doctrine shields litigation activity
in a commercial context, except where the litigation is a sham.
The government asserts that the litigation is, in fact, a sham
and that Ceglia is not entitled to immunity as a result.
Ceglia, in return, has urged me to hold a hearing, and I have
determined that I am not going to hold such a hearing.  It does

E37WcegC

appear to me that if Noerr-Pennington immunity is something I

have to determine, it would be more appropriately raised at the

end of trial once all the evidence is in.  It's inappropriate

for me to make factual determinations about the government's

evidence at this early stage.  Therefore, Ceglia's motion to

dismiss the indictment is denied.

Where are we at this point now?  I've denied the

motion to dismiss.  How do the parties wish to proceed?

MR. FREY:  Your Honor, the government has completed

the production of discovery.  The case has been pending for

some time, so the government would request that we set a trial

date at this juncture.

THE COURT:  How does defense counsel want to proceed?

MR. PATTON:  Your Honor, I'm okay with setting a trial

date, but I think there are a few steps between here and there.

One is that we had asked for a motion schedule specifically on

this motion but reserving our right on other motions.  There is

a considerable amount of discovery in this case and a

considerable potential other motions relating more specifically

to the discovery, aside from our broader challenge to the suit.

I guess I would ask for a motion schedule, a deadline.  I don't

have anything specific in mind, but I'd at least ask for a

motion schedule and then we can go from there.  If it's the

Court's preference to also set a trial date now or to set one,

we can come back at that time.  I'm indifferent.

1          THE COURT:  I think it's preferrable to set the trial

2     date at a later time.  Let me get a sense from the parties that

3     if this case does, in fact, proceed to trial how long this

4     trial will be.

5          MR. FREY:  I would think the government's case would

6     be somewhere in the order of two to two and a half weeks.

7          THE COURT:  Defense counsel, do you have any sense yet

8     as to whether or not you have a case?  And if so, how long?

9          MR. PATTON:  It's hard to say, your Honor.  My guess

10    is that it might not look too dissimilar from the civil suit in

11    which case there is a likelihood of a defense case and that may

12    involve expert witnesses and factual witnesses.  I'd say in

13    terms of the spectrum of likelihood as compared to most

14    criminal cases, there's probably more of a likelihood of a

15    defense case and a significant one in this case.

16         THE COURT:  Why don't we do this.  Since the discovery

17    is extensive, what I could do is adjourn this matter for a

18    couple of months and give the defense an opportunity to

19    continue to review the discovery and figure out which motions

20    you plan on making and then we can reconvene and we can set a

21    motion schedule at that point.  How does that sound to the

22    parties?

23         MR. PATTON:  That's fine, your Honor.

24         MR. FREY:  Your Honor, the government would really

25    like a motion calendar to be set now and would also like a

E37WcegC

1    trial date.  The reality is this defendant was arrested at the

2    end of 2012.  It is now 2014.  Mr. Patton has been making his

3    motions in piecemeal.  He made first a motion to transfer

4    venue.  That was denied.  He then asked for time to make a

5    motion to dismiss the indictment.  That has now been denied.

6    To the extent that Mr. Patton has other motions, the government

7    thinks he should promptly make them.  Discovery was principally

8    produced at the end of 2012.  While it is voluminous, there's

9    no reason why Mr. Patton should not be, in short order,

10   prepared to make whatever motions remaining that he may have.

11   The government would also, just for planning purposes, like to

12   be able to know that it has a firm trial date in this matter.

13           THE COURT:  Mr. Patton, anything else on that?

14           MR. PATTON:  No, your Honor.

15           THE COURT:  I take it from earlier conferences in this

16   case that the government is going to have expert witnesses as

17   well.

18           MR. FREY:  I think that's probably likely, that we

19   would have probably one expert witness, possibly two, but I

20   suspect there will be one.

21           THE COURT:  Let's do this.  I will give Mr. Patton a

22   couple of months to figure out which motions he wishes to make,

23   but let's try to get all the motions together in one big bundle

24   if we can.  Let's just do that.  Let's get a date two months

25   from now.  I understand the government's desire for a trial

E37WcegC

1    date, and obviously I want to give a trial date.  Once I set a

2    trial date, it will be a firm trial date, and I want to make

3    sure that we've dealt with everything before I just give an

4    arbitrary trial date.  I'm not sure what motions Mr. Patton is

5    contemplating at this point, but with the experts that both

6    parties anticipate, I'm sure that at some point we're going to

7    have some <u>Daubert</u> hearings and other things we're going to have

8    to deal with.

9              Could we get a date two months from now, Tara.

10             THE DEPUTY CLERK:  May 6 at 10 a.m.

11             THE COURT:  Does that date and time work for both

12   parties?

13             MR. FREY:  That's fine, your Honor.

14             MR. PATTON:  Fine, your Honor.

15             THE COURT:  Based on the representations made by

16   counsel, and since this is for Mr. Patton to continue to

17   examine the voluminous discovery in this case, and I find this

18   is a complex case, based on the amount of discovery in this

19   case and also based on the location of certain documents, I

20   find it's in the interest of justice and the interest of

21   Mr. Ceglia to exclude time under the Speedy Trial Act from

22   today's date until May 6.  I further find that the interests of

23   justice and Mr. Ceglia's interests outweigh the public's

24   interest in a speedy trial and I will enter an order to that

25   effect.

E37WcegC

```
 1                  Is there anything else from the government?

 2                  MR. FREY:  Not from the government, your Honor.

 3                  THE COURT:  Anything else from the defense?

 4                  MR. PATTON:  No, your Honor.  Just to clarify.  On the

 5      sixth, we are to inform the Court of any additional motions?

 6                  THE COURT:  Correct.

 7                  Obviously, Mr. Ceglia, obviously, you are welcome to

 8      come to court as many times as you want to.  I know I

 9      previously ruled before, and that ruling still stands, if you

10      have financial constraints or issues that make it difficult for

11      you to appear, I will allow you to waive your appearance or

12      appear by telephone, however you wish to proceed.

13                  Thank you very much.

14                  (Adjourned)

15

16

17

18

19

20

21

22

23

24

25
```