UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X

**UNITED STATES OF AMERICA,**          :

                                       :

                 - v -                 :          **12 CRIM 876 (ALC)**

**PAUL CEGLIA,**                       :

                 Defendant.    :

-------------------------------X


**MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT CEGLIA'S
MOTION FOR THE ISSUANCE OF SUBPOENAS PURSUANT TO RULE 17(c)**


                          DAVID E. PATTON, ESQ.
                          ANNALISA MIRÓN, ESQ.
                          Federal Defenders of New York
                          Attorneys for Defendant
                           **Paul Ceglia**
                          52 Duane Street, 10th Floor
                          New York, New York 10007
                          (212) 417-8738

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X

**UNITED STATES OF AMERICA,**          :

                                       :

              - v -                    :          **12 CRIM 876 (ALC)**

**PAUL CEGLIA,**                       :

                  Defendant.   :

-------------------------------X


**MEMORANDUM  OF  LAW  IN  FURTHER  SUPPORT  OF  DEFENDANT  CEGLIA'S
MOTION  FOR  THE  ISSUANCE  OF  SUBPOENAS  PURSUANT  TO  RULE  17(c)**

<u>Introduction</u>

     This Memorandum of Law is submitted on behalf of
defendant Paul Ceglia in reply to the opposition briefs filed
by the government and counsel for Mark Zuckerberg and Facebook,
Inc. ("Facebook") objecting to the issuance of subpoenas to
Mark Zuckerberg, Facebook, and Harvard University. For the
reasons explained below, the government and Facebook's efforts
to restrict Paul Ceglia's ability to defend himself in his
criminal trial should be rejected. The subpoenas fully comply
with Rule 17(c), and the Court should issue an order endorsing
them.

     The charges in this criminal prosecution arise entirely
from conduct relating to claims made by Ceglia during the

course of his civil lawsuit against Facebook. At Facebook's prompting, the United States Attorney's Office chose to step into the shoes of Facebook, adopt its position in the civil suit wholesale, and indict Ceglia for the statements Facebook considers false.  Now Facebook and the government are attempting to avoid the inevitable consequences of instituting this highly unusual prosecution. They cannot have it both ways. Facebook could have availed itself of the many civil remedies available to civil litigants who feel they have been wrongly sued -- as thousands of litigants do every day. But having chosen to pursue criminal charges, and received a receptive audience in the Southern District of New York, Facebook cannot now seek to hide relevant information and deprive Ceglia of a fair trial.

During the course of the civil suit, no fewer than ten experts were deposed on the topics of document and computer forensics relating to the contract at issue. The purported factual recitation in Facebook's letter opposing the issuance of the subpoenas is full of conclusory statements that were and are hotly contested. Ceglia's need for the subpoenaed information arises precisely because the information sought is necessary to address the sorts of claims made in Facebook's

most recent letter.

## SUMMARY OF ARGUMENT

The government and Facebook have submitted separate briefs objecting in part to Ceglia's Rule 17(c) subpoenas. The objections relate to the subpoenas directed at Zuckerberg's and Facebook's computers, cell phones, email accounts, and bank records from the years 2003 and 2004, the period during which the government and Facebook concede that Ceglia and Zuckerberg engaged in business together.

As an initial matter, the government lacks standing to contest the issuance of these subpoenas. Thus the government's arguments that the subpoenas should be denied because they "seek documents outside of the rules of criminal discovery," June 30, 2013 Gov't Br. at 2, and seek early disclosure of witness statements, see id. at 10-11, are improperly raised.

Moreover, the government's arguments are based on case law that addresses subpoenas issued *to the government* or law enforcement agencies working closely with the government, not unaffiliated third parties as is the case here. Thus the claim that Rule 16 precludes the issues of defense subpoenas to third parties is simply wrong. Rule 16 provides for the minimum

- 3 -

disclosure necessary *by the government*; it does not act as a ceiling on information a defendant may gather from third parties.

Further, as to arguments raised by both the government and Facebook, courts in this district have expressed skepticism that the standards in <u>Nixon</u> apply to the subpoenas issued on behalf of criminal defendants to third parties. Despite the protestations in both opposition briefs, the proper standard is a less restrictive standard such as the one articulated in <u>United States v. Nachamie</u>, 91 F.Supp.2d 552, 563 (S.D.N.Y. 2000) and many other courts, and the requested subpoenas comply with Rule 17(c) because the sought material is reasonable and not unduly oppressive.

Finally, even if this Court applies the <u>Nixon</u> factors as urged by opposing counsel, the materials sought are relevant, admissible, and specific. <u>United States v. Nixon</u>, 418 U.S. 683 (1974).  The subpoenas seek only those materials from the time period in question, 2003-2004, and only from sources that contain information directly relevant to the charges against Ceglia.

Contrary to the claims of Facebook, the material sought would not unduly infringe on Zuckerberg's privacy interests.

- 4 -

The Court may always issue a protective order covering the produced material - as it has already done for virtually all of the discovery produced thus far, and with which the parties have fully complied throughout pre-trial litigation.

As discussed further below, Ceglia's request is far from a "fishing expedition."  There are specific, fact-based reasons why the request is reasonable and the material sought is necessary for the defense to prepare for trial.

<u>ARGUMENT</u>

<u>Point I</u>

**The Government Does Not Have Standing
to Challenge the Subpoenas at Issue**

"A party generally lacks standing to challenge a subpoena absent a claim of privilege or a proprietary interest in the subpoenaed matter." <u>United States v. Nachamie</u>, 91 F. Supp. 2d 552, 558 (S.D.N.Y. 2000); <u>see also</u> <u>United States v. Treacy</u>, 2008 WL 5082884, n.2 (S.D.N.Y. Dec. 1, 2008) ("It is not clear that the government has standing to move to quash the subpoenas."). Here, the government lacks standing to challenge the subpoenas because it has no legitimate interest in whether or not they are issued. <u>See</u> <u>United States v. Tucker</u>, 249 F.R.D.

58 (S.D.N.Y. 2008). The government has no privacy or propriety interest in the material sought, nor does the government claim that the subpoenas will result in undue delay or harassment of witnesses. See, e.g., United States v. Giampa, 1992 WL 296440 (S.D.N.Y. Oct. 7, 1992) (government had heightened interest in shielding witnesses in the "witness protection program").

The government's only purported interest - a concern that the "parties to the case comply with applicable federal law," June 30, 2013 Gov't Br. at 2 - by no means confers standing. Counsel for Zuckerberg and Facebook has filed objections to the subpoenas and the subpoenas are being reviewed by the Court. The government need not involve itself in whether or not the subpoenas issued to third parties properly comply with Rule 17.

Nor is the government needed as a representative of Zuckerberg and Facebook. Notably, Zuckerberg and Facebook did not solicit the government to represent them. See United States v. Chen De Yian, 1995 WL 614563 at *1 (S.D.N.Y. Oct. 19, 1995) (where sheriff's office forwarded any materials responsive to the subpoena to the United States Attorney's Office, the USAO "stands in the shoes" of the Sheriff's Office and can move to quash subpoena); United States v. Barnes, 2008 WL 9359654 at *1 (S.D.N.Y. Apr. 2, 2008) (government had standing to challenge

- 6 -

subpoenas where "the Senior Staff Attorney at the MDC contacted the United States Attorney's Office after being served with the subpoena to request assistance with making a motion to quash."). Here, the opposite occurred. After the government reached out to Gibson Dunn as counsel to Zuckerberg and Facebook to inform them of the pending subpoenas, Gibson Dunn emailed a letter to the Court requesting to be specifically heard on the matter. June 20, 2014 Letter from Orin Snyder at 1. Zuckerberg's and Facebook's interests are being represented by one of the largest law firms in the world; there is no reason for the government to weigh in on their behalf.

Even if the Court determines that the government has standing, the unique arguments put forth by the government - that the challenged portions of the subpoenas violate Rule 16 and seek early disclosure of witness statements - misapply relevant precedent.

First, misstating the relationship between Rules 16 and 17. The government responds as though Ceglia were subpoenaing documents from the government itself rather than a third party. Simply put, Rule 16 does not limit the materials that a defendant may subpoena from third parties. See, e.g., United States v. Tomison, 969 F. Supp. 587, 593 n.14 (E.D. Cal. 1997)

("The notion that because Rule 16 provides for discovery, Rule
17(c) has no role in the discovery of documents can, of course,
only apply to documents in the government's hands; accordingly,
Rule 17(c) may well be a proper device for discovering
documents in the hands of third parties."); United States v.
King, 194 F.R.D. 569, 573 n.3 (E.D. Va. 2000) ("Rule 16
regulates the discovery obligations of the United States and
the defendant, and does not address how the United States or
the defendant may secure evidence in the possession of third-
parties.").

The cases cited by the government do not stand for the
proposition that a criminal defendant may only obtain documents
that would be discoverable under Rule 16. In all of the Rule 16
cases cited by the government, a criminal defendant subpoenaed
materials from a local or state law enforcement agency and the
court determined that the materials were covered by Rule 16 as
opposed to Rule 17, thereby barring disclosure. Thus those
cases turned on whether materials subpoenaed from federal law
enforcement agencies, see, e.g.,United States v. Buck, 1986 WL
14970, at *1 (S.D.N.Y. Dec. 15, 1986)[1], or local law

---

[1]While the court in Buck determined that "discoverability of
items under Rule 16 determines whether those items are subject to
a Rule 17(c) subpoena," in doing so it relied on a footnote in
(continued...)

enforcement, <u>see</u>, <u>e.g.</u>, <u>United States v. Cherry</u>, 876 F. Supp.
547, 552 (S.D.N.Y. 1995); <u>United States v. Yian,</u> 1995 WL
614563, at *1 (S.D.N.Y. Oct. 19, 1995), were properly
obtainable.

Second, the mere fact that the subpoenaed materials may
contain "statements of prospective witnesses," June 30, 2014
Gov't Br. at 10, <u>citing</u> Fed. R. Crim. P. 17(h), does not
immunize the materials from a Rule 17 subpoena. The government
quotes Rule 17(h) to stand for a broad proposition that "No
party may subpoena a statement of a witness or of a prospective
witness under this rule." However, by referring to Rule 26.2,
Rule 17(h) is directed at a defendant's subpoena of materials
that the *government* possesses. Fed. R. Crim. P.26 ("After a
witness other than the defendant has testified on direct
examination, the court...must order an attorney for the
government...to produce ... any statement of the witness *that
is in their possession*." (emphasis added); See <u>United States v.</u>

---

¹(...continued)
<u>Xydas v. United States</u>, 445 F.2d 660, 664 n.8 (D.C. Cir. 1971).
There the Court of Appeals for the District of Columbia explained
its application of Rule 16:  "While the documents here involved
were sought via subpoena under Rule 17, Fed. R. Crim. P., this,
where the subpoena seeks documents in the possession of the
Government, is simply an alternative means of determining
information available under Rule 16."

<u>Young</u>, 2004 WL 784840, at *2 (W.D. Tenn. March 4, 2004)
(rejecting government's argument that Rule 17(h) barred
subpoenas to third parties because "Rule 17(h) ... only
appl[ies] to statements in the government's possession"); <u>cf</u>.
<u>United States v. Vasquez</u>, 258 F.R.D. 68, 73 (E.D.N.Y. 2009)
(subpoena for statements possessed by Nassau County Police
Department quashed in light of Rule 17(h)).

      Once again, the government acts as though Ceglia had
subpoenaed the government for witness statements. The
government cites no cases that stand for the broad proposition
that a criminal defendant cannot subpoena materials from a
third party that might contain statements of a government
witness. As Ceglia's subpoenas are directed to third parties
and otherwise comply with the provisions of Rule 17 - whether
or not the sought materials may contain statements of a witness
- the Court should endorse them.


## Point II

### The Subpoenas Comply with Rule 17(c)

A. *A more liberal standard applies to subpoenas issued to third
parties by criminal defendants.*

      As explained in Ceglia's June 9, 2014 letter to the Court,

there is significant doubt that the <u>Nixon</u> factors apply to a Rule

17(c) subpoena requested by a criminal defendant for materials

from a third party.

In two well-reasoned opinions, <u>United States v. Nachamie</u>,

91 F. Supp.2d 552 (S.D.N.Y. 2000), and <u>United States v. Tucker</u>,

249 F.R.D. 58 (S.D.N.Y. 2008), Judge Scheindlin examined <u>Nixon</u>

in the context of the history of Rule 17, the limited nature of

discovery to federal criminal defendants, and determined that a

less stringent standard of should be applied to subpoenas

issued by criminal defendants to third parties. "A defendant in

such a situation need only show that the request is (1)

reasonable, construed as 'material to the defense,' and (2) not

unduly oppressive for the producing party to respond." <u>Tucker</u>,

249 F.R.D. at 66.[2]  That standard tracks the text of Rule

---

[2]In footnotes, the Supreme Court and the Second Circuit have
declined to decide the precise standard to be employed in this
situation. <u>See</u> <u>United States v. Nixon</u>, 418 U.S. 683, n.12 (1974)
("The   Special   Prosecutor   suggests   that   the   evidentiary
requirement of *Bowman Dairy Co*. and *Iozia* does not apply in its
full vigor when the subpoena duces tecum is issued to third
parties rather than to government prosecutors.... We need not
decide whether a lower standard exists because we are satisfied
that the relevance and evidentiary nature of the subpoenaed tapes
were sufficiently shown as a preliminary matter"); <u>United States
v. Barnes</u>, 2014 WL 1099144, n.1 (2d Cir. 2014) ("While Barnes
invites us to forego the *Nixon* standard for the more permissive
standard employed in *United States v. Tucker*..., when, as here,
(continued...)

17(c)(2).  See United States v. Stein, 488 F. Supp. 2d 350, 366
(S.D.N.Y. 2007) ("[T]here is no reason to limit the plain
language of Rule 17(c) where, as here, there is no conflict
between the limited discovery afforded by Rule 16 and the broad
words of Rule 17(c).").

Under this significantly lower threshold, and as
explained infra pp. 12-23 the challenged subpoenas clearly pass
muster. See United States v. Soliman, 2009 WL 1531569 (S.D.N.Y.
2009) (upon further consideration and application of the
Nachamie standard, granting subpoenas for materials sought from
third party in Medicaid fraud case); United States v. Nosal,
291 F.R.D. 403, 407-09 (N.D. Cal. 2013) (applying Nachamie
standard, granting in part defendant's Rule 17 subpoena to
third party in theft of trade secrets prosecution); see also
United States v. Modi, 2002 WL 188327, at *2 (W.D. Va. Feb. 6,
2002) (acknowledging possibility that third party witness's
"independence from the government would suggest a more relaxed
test" than Nixon).

The fact that Ceglia's requests are being made in advance
of trial as opposed to "the eve of trial," Tucker, 249 F.R.D.

---

[2](...continued)
challenged subpoenas are issued to a non-party, we need not
address that point because Barnes's speculative showing failed to
meet even the "articulable suspicion requirement of Tucker.).

at 66, does not alter this conclusion. Here, where the parties
anticipate significant litigation regarding the admissibility
of expert testimony, Ceglia should be afforded his right under
the Sixth Amendment to compel witnesses to testify and to
examine materials in advance of trial. See, e.g., Soliman,
2009 WL 1531569 at *4 (subpoenas proper in light of defendant's
motion to dismiss although no trial date had been set).


*B. Even under Nixon's standard of relevance, admissibility, and
specificity, the subpoenas are proper.*

Even if the Court elects to apply the standard articulated
in United States v. Nixon, 418 U.S. 683 (1974), the subpoenas
satisfy this test. The sought materials are relevant,
admissible and specific. Id. at 699. Moreover, the application
is made in good faith and "is not intended as a fishing
expedition." Id. Finally, any privacy concerns raised by
Zuckerberg and Facebook may be remedied with a protective order
similar to the one covering materials produced through Rule 16
discovery.[3]

_____

[3] The cases cited by Gibson Dunn in support of its argument
regarding Facebook's and Zuckerberg's privacy interests, June 30,
2014 Letter from Orin Snyder at 4-5, are easily distinguishable.
Arias-Zeballos v. Tan, 2007 WL 210112 (S.D.N.Y. Jan. 25, 2007)
merely recognizes that individuals with a privacy interest in
their banking records have standing to challenge subpoenas
directed at those records - a point Ceglia does not dispute. In
(continued...)

1.  <u>The Email Evidence</u>

Neither Facebook nor the government disputes that

Zuckerberg and Ceglia engaged in extensive email correspondence

during 2003 and 2004 in connection with a business

relationship. Facebook and the government deny, however, that

emails referenced by Ceglia in his civil suit, in which Ceglia

and Zuckerberg discuss Facebook, are authentic. They claim that

Ceglia created those emails as Word documents closer in time to

the filing of the civil suit. In support of that claim they

have chosen to retrieve selected back-up copies from Harvard's

email servers and produced still a smaller selection of those

emails. Because that subset of emails does not contain the

contested emails between Ceglia and Zuckerberg, they claim

Ceglia must have fabricated them.

However, there is significant reason to believe that the

emails produced as Rule 16 discovery do not include all of the

relevant emails that once existed on Harvard servers. The only

emails produced to the defense by the government are "selected

---

[3](...continued)
the other case cited by counsel, <u>In re McVane</u>, 44 F.3d 1127 (2d
Cir. 1995), the Second Circuit upheld administrative subpoenas
directed at former directors of a failed bank, but quashed those
aimed at the records of the directors' family members. Needless
to say, Ceglia's subpoenas do not seek records from the family
members of the owners and employees of Facebook.

emails" apparently culled from a larger production of emails
produced to the government by Harvard using only three back-up
dates from storage: November 3, 2003, October 1, 2010, and
February 2, 2012. (June 30, 2014 Gov't Br. at 10.) The storage
dates are significant because the retrieval of that material
may only provide a snapshot of what is contained on the servers
on the particular date requested.[4] In other words, material
contained in the October 1, 2010 back up file may not contain
all emails sent or received between November 3, 2003 (the first
date of retrieval) and October 1, 2010 (the next date of
retrieval).

In fact, although the 2010 compilation contains *some*
emails from 2003, it does not contain all of the emails that
existed that year. Specifically, the 2010 compilation is
missing five emails dated Wednesday, August 13, 2003 which can
be found at in the 2003 retrieval file.[5] The 2010 compilation
is therefore an incomplete record of emails sent prior to the
retrieval date of October 1, 2010. If it were a complete

_____

[4] We do not have a full picture of Harvard's storage
policies but will know more upon Harvard's compliance with the
defense request for the policies.

[5] These emails, Discovery bates numbers 000742-745 are
attached as Exhibit A, and are being provided to the Court under
seal.

- 15 -

record, the 2010 compilation would contain those five emails. This means that for a key period of time at issue in the case - 2003 through 2004 - we have no reliable data regarding the emails contained on Harvard's servers.

In addition, the government states that it obtained all emails in Harvard's custody or control "sent to or from" Zuckerberg's email address.  It is not clear if this includes deleted emails or emails contained in any number of the account's other folders.[6] Obviously, deleted emails or emails contained in trash or other folders would be highly significant.

There is a simple way to ascertain better information about the authenticity of the purportedly fake emails: Harvard[7]

_____

[6] The 2010 retrieval file suggests a reorganization of Zuckerberg's emails into various folders ("Business" and "Ceglia Matters"), whereas in the 2003 retrieval file individual emails are assigned apparently default folders ("Sent-Mail-Jul-2003"). This strongly suggests that Harvard's storage and/or retrieval method reflects an end user's (in this case, Zuckerberg's) deletion or reorganization of individual emails. Thus, in order to obtain an accurate compilation of those emails sent and received in a particular time period, one would need access to the hard drive of the computer from which the emails themselves were sent/received, or at minimum, a retrieval file from a date closer to the date the emails were sent/received.

[7] Indeed most of the emails that Facebook and the government claim are false post-date November 3, 2003. Presumably, Harvard backed up its email system in the seven years between November 3,

(continued...)

and Zuckerberg can provide as complete a picture as possible of Zuckerberg's email account from the relevant time period. Facebook and the government have refused to do so.

The government and Facebook have also hired computer forensics experts to examine a host of "Ceglia media" that were produced in the civil lawsuit. That media includes floppy discs that contained the contested copies of the Ceglia/Zuckerberg email exchange regarding Facebook. The Facebook and government experts claim that metadata from the computer files indicates "anomalies" that point to backdating and therefore, according to their theory, point to fraud. Ceglia's experts in the civil suit contested those findings and pointed to numerous other reasonable bases for the data that was found.

Yet again, highly relevant information exists that would directly speak to the authenticity of those emails. Just as Facebook and the government used the "Ceglia media" to make their claims, so too the "Zuckerberg media" would provide significant evidence of the existence of the emails and other

---

[7](...continued)
2003 and October 2010.  In all likelihood, it did so regularly and possesses backups in 2004 that would more accurately reflect Zuckerberg's communications during the relevant times in this case. Harvard has not yet objected to the subpoena, but would have the opportunity to do so if the Court endorses the subpoena.

relevant evidence regarding Ceglia and Zuckerberg's business relationship. And much, if not all, of that information is readily available and not burdensome to produce because it has been stored in connection with prior litigation involving Zuckerberg, Facebook, and other third parties who maintained that Zuckerberg breached contracts and stole from them in connection with the founding of Facebook. See, e.g., ConnectU LLC v. Zuckerberg et al., 522 F.3d 82 (1st Cir. 2008).

For example, one of Facebook's computer forensics experts in the Ceglia civil litigation acknowledged that he had reviewed the Zuckerberg media in connection with his examination for the Ceglia suit. (July 19, 2012 Michael F. McGowan Deposition, Ceglia v. Zuckerberg, 10-cv-569, Dkt #496, pp. 61-78, attached here as Exhibit B.) He stated that there were "approximately 28 devices belonging to Mr. Zuckerberg that were presented," id. at 61, to his company for inspection in September 2010. (Id. at 64) That media was stored at a law firm in San Jose, California. (Id. at 62) He further elaborated that "the devices included original hard drives as well as forensic images of devices that I understand were created during the course of prior litigations," including the ConnectU case. (Id. at 61.)  The media included items from 2003 and 2004, id. at

- 18 -

78, but the expert could not recall if there were *any* emails sent or received by Zuckerberg on *any* of those devices, and he claimed not to have found *any* correspondence with Ceglia. (<u>Id</u>. at 66-67.).  When pressed on this, the expert seemed to suggest that such things would have been outside the scope of what he was asked to review. (<u>Id</u>. at 70-76).

Needless to say, computer hard drives used by Zuckerberg during 2003 and 2004 for emailing and work related to both Facebook and Streetfax are highly relevant to this case. And relying on Facebook or the government (which has apparently never reviewed this material) to be the gatekeeper for that information is the ultimate example of letting the fox guard the henhouse.

These concerns are not mere conjecture.  The ConnectU litigation was full of claims about deceitful practices by Facebook during the litigation, prompting further litigation about the terms of the settlement. <u>See</u> <u>Facebook, Inc. v.</u> <u>Pacific Northwest Software, Inc.</u>, 640 F.3d 1034 (9th Cir. 2011) (not addressing the merits of deception claims because confidentiality agreements precluded the possibility of their use as admissible evidence).

    2.  <u>"Street Fax Contract" v. "Work for Hire Contract"</u>

- 19 -

Another allegation central to the prosecution is the government's claim that the "real" contract between Ceglia and Zuckerberg was found on Ceglia's parents' computer in an email from Ceglia (via his father's email account) in 2004 to his then-lawyer at the law firm Sidley Austin, LLP.  The hard drive of that computer is commonly referred to in the civil litigation as the "Seagate hard drive" for the name of the manufacturer. The civil experts produced extensive reports debating the authenticity of that contract which appears as two one-page "TIFF" images in attachments to two emails. The Facebook experts discussed the reasons why they concluded that there were indications that it was authentic, while the Ceglia experts discussed the many signs that it was not.[8]

Once again, obtaining the full scope of Zuckerberg's electronic media and emails from 2003 and 2004 is necessary to rebut the government's claim that the TIFF images capture the real contract between Ceglia and Zuckerberg. For example, the government has not disclosed any additional emails from Zuckerberg to other persons regarding the business relationship and contract he and Ceglia shared. One email from Zuckerberg to

---

[8]  The reports and depositions of the experts are voluminous and are not attached here, but they can be produced for the Court's inspection.

Karin Peterson dated February 28, 2004, disclosed by Sidley Austin, LLP in connection with the civil suit and attached as Exhibit C, clearly discusses payments demanded by Zuckerberg in connection with his business relationship Ceglia. This is the type of communication covered by the subpoenas at issue but not produced by the government pursuant to its discovery obligations. The information is necessary to rebut the government's argument regarding the "real" contract.

   3. <u>The Scope of the Subpoena Requests</u>

  Facebook and the government claim that the subpoenas are overbroad and call for material that is "irrelevant and inadmissible."  They propose instead to provide a far more limited set of materials.  The government agrees to provide the following material:

-  "All agreements, drafts and copies of agreements as well as all communications between Zuckerberg or Facebook, on the one hand, and Ceglia or companies he owned, on the other hand;" (Govt. Br., n. 1)

-  "Documents setting forth Harvard's policies related to back up and storage of emails from 2003 to the present;" (Govt. Br., n. 2)

  Facebook in its response agreed to provide the following

- 21 -

material:

- "written agreements between Ceglia and Mr. Zuckerberg;"

- "written correspondence between Ceglia and Mr. Zuckerberg;"

- "copies of any checks written by Ceglia to Mr. Zuckerberg."

(June 30, 2014 Letter from Orin Snyder at 6-7.) Notably, in making its offer to disclose this material, Facebook claims that Ceglia already possesses all of it. (Id. at 4-6). In other words, Facebook's offer is no offer at all.

It is not clear if the government's offer to produce all communications between Zuckerberg and Ceglia contemplates an additional production of discovery. Whatever the government's intent, it is not in a position to produce all of the communications between Zuckerberg and Ceglia and other relevant persons, because it does not possess all of those communications.  As discussed above, the Harvard servers and the Zuckerberg media contain additional materials that the government says it does not possess.

Both Facebook and the government rely heavily on what they perceive to be "historical facts" to contradict what they claim

- 22 -

to be inauthentic Ceglia emails reflecting communications with Zuckerberg.   (June 30, 2014 Letter from Orin Snyder at 3.) The parties should not be permitted to pick and choose which "historical facts" they compare to the communications at issue to determine the authenticity of those communications. The government has produced large quantities of Ceglia's phone, computer, and bank records, among others, precisely because it believes them to be relevant to a determination of the authenticity of Ceglia's claims in the civil suit. Those records relating to Zuckerberg are necessary and relevant to the preparation of the defense for the same reasons.

Zuckerberg's communications during the relevant time period – whether via email or text message or other means that might be available on his media devices – are highly likely to speak to the government's version of events about important topics such as when work on Facebook began (e.g., the government claims that the contract implausibly pre-dates Zuckerberg's conception of the idea for Facebook), with whom Zuckerberg was working when first establishing Facebook (e.g., did it include others working on Streetfax), and who else was providing funding for the work on Facebook and when they provided it.

- 23 -

At a bare minimum, Ceglia is entitled to all of the communications that can be reasonably obtained between himself, Zuckerberg, and their respective employees and work colleagues during the relevant periods in 2003 and 2004.[9] The Zuckerberg media should be searched for those items and additional back-up copies from the Harvard servers should be produced.

Lastly, the Harvard disciplinary records relating to Zuckerberg's unauthorized access to computer systems (by hacking them through the internet and using other means) and violating fellow students' privacy rights -- conduct that indisputably occurred contemporaneously with his work on Street Fax in the fall of 2003 -- is directly relevant to Zuckerberg's conduct with respect to matters at issue in this case.[10] Zuckerberg's ability to hack into computer systems at the same time he was doing programming work for Ceglia and developing Facebook, and shortly before he threatened to alter the Street Fax website because of his belief that he had not been paid in

---

[9] They include, at least, Karin Peterson, Andy Reed, Jeff Kazen, and Randy Kato.

[10] Again, this is not mere conjecture.  The accounts of Harvard disciplining Zuckerberg and placing him on probation are publicly available, including most famously in the book by the journalist David Kirkpatrick, which chronicles the founding of Facebook.  (See DAVID KIRKPATRICK, THE FACEBOOK EFFECT 23-25 (2010).)

a timely manner, see Exhibit C, at 1, speaks directly to his ability to manipulate the very communications and documents at issue here. This is not just impeachment material, it is evidence directly relevant to the events in this case.

The defense recognizes that these requests are broader than those made in a typical criminal case. But this is not a typical case. Because the criminal charges arise solely from Ceglia's civil litigation activities, the criminal case must necessarily grapple with the same questions that were at issue in the civil matter. Those questions cannot be answered accurately if Facebook and the government are permitted to hide information that is reasonably accessible and highly relevant. The subpoenas are directed at materials that are specific, admissible, and relevant for Ceglia's upcoming criminal trial.

## Conclusion

For the above reasons, the Court should fully endorse Ceglia's Rule 17(c) subpoenas.

Dated:    New York, New York
          July 8, 2014


DAVID E. PATTON, ESQ.
ANNALISA MIRÓN, ESQ.
Federal Defenders of New York, Inc.
Attorneys for Defendant
  **Paul Ceglia**
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8738



TO:   **PREET BHARARA, ESQ.**
      United States Attorney
      Southern District of New York
      One St. Andrew's Plaza
      New York, New York 10007



Attn:   **CHRISTOPHER FREY, ESQ.**
        **JANIS ECHENBERG, ESQ.**