UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X

UNITED STATES OF AMERICA,            :

         - v -            :            **12 CRIM 876 (ALC)**

**PAUL CEGLIA,**            :

            Defendant.  :

------------------------------X


**MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT CEGLIA'S
MOTION FOR THE ISSUANCE OF SUBPOENAS PURSUANT TO RULE 17(c)
(AMENDED)**


DAVID E. PATTON, ESQ.
ANNALISA MIRÓN, ESQ.
Federal Defenders of New York
Attorneys for Defendant
  **Paul Ceglia**
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8738

TO:  **PREET BHARARA, ESQ.**
    United States Attorney
    Southern District of New York
    One St. Andrew's Plaza
    New York, New York 10007

Attn:  **CHRISTOPHER FREY, ESQ.**
     **JANIS ECHENBERG, ESQ.**
     Assistant United States Attorneys

## TABLE OF CONTENTS

**Page**

Table of Authorities . . . . . . . . . . . . . . . . . . .   ii

Introduction . . . . . . . . . . . . . . . . . . . . . . .   1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . .   3

ARGUMENT

Point I

The Government Does Not Have Standing to
Challenge the Subpoenas at Issue . . . . . . . . . . . . .   5

Point II

The Subpoenas Comply with Rule 17(c) . . . . . . . . . . .   10

     A.  A more liberal standard applies to
        subpoenas issued to third parties by
        criminal defendants. . . . . . . . . . . . . .   10

     B.  Even under Nixon's standard of
        relevance, admissibility, and specificity,
        the subpoenas are proper. . . . . . . . . . . .   12

           1.  The Email Evidence . . . . . . . . . . .   13

           2.  "Street Fax Contract" v. "Work for Hire
              Contract" . . . . . . . . . . . . . . .   18

           3.  The Scope of the Subpoena Requests . . . .   19

Conclusion . . . . . . . . . . . . . . . . . . . . . . . .   23

# TABLE OF AUTHORITIES

## CASES

Arias-Zeballos v. Tan, 2007 WL 210112
   (S.D.N.Y. Jan. 25, 2007) . . . . . . . . . . . . . . 12

ConnectU LLC v. Zuckerberg et al.,
   522 F.3d 82 (1st Cir. 2008) . . . . . . . . . . 16, 17

Facebook, Incorporated v. Pacific
   Northwest Software, Incorporated,
   640 F.3d 1034 (9th Cir. 2011) . . . . . . . . . . . 17

In re McVane, 44 F.3d 1127 (2d Cir. 1995) . . . . . . . . 12

Xydas v. United States, 445 F.2d 660 (D.C. Cir.
   1971) . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Barnes, 2008 WL 9359654 at *1
   (S.D.N.Y. Apr. 2, 2008) . . . . . . . . . . . . 6, 11

United States v. Buck, 1986 WL 14970, at *1
   (S.D.N.Y. Dec. 15, 1986) . . . . . . . . . . . . . . 8

United States v. Chen De Yian, 1995 WL 614563 at *1
   (S.D.N.Y. Oct. 19, 1995) . . . . . . . . . . . . . . 6

United States v. Cherry, 876 F. Supp. 547
   (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . 8

United States v. Giampa, 1992 WL 296440
   (S.D.N.Y. Oct. 7, 1992) . . . . . . . . . . . . . . 5

United States v. King, 194 F.R.D. 569
   (E.D. Va. 2000) . . . . . . . . . . . . . . . . . . 7

United States v. Modi, 2002 WL 188327, at *2
   (W.D. Va. Feb. 6, 2002) . . . . . . . . . . . . . . 11

United States v. Nachamie, 91 F. Supp. 2d 552
   (S.D.N.Y. 2000) . . . . . . . . . . . . . . 4, 5, 10, 11

United States v. Nixon, 418 U.S. 683
   (1974) . . . . . . . . . . . . . . . . . 4, 10, 11, 12

<u>United States v. Nosal</u>, 291 F.R.D. 403
  (N.D. Cal. 2013) . . . . . . . . . . . . . . . . . . . 11

<u>United States v. Soliman</u>, 2009 WL 1531569
  (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . 11, 12

<u>United States v. Stein</u>, 488 F. Supp. 2d 350
  (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . 11

<u>United States v. Tomison</u>, 969 F. Supp. 587
  (E.D. Cal. 1997) . . . . . . . . . . . . . . . . . . . 7

<u>United States v. Treacy</u>, 2008 WL 5082884, n.2
  (S.D.N.Y. Dec. 1, 2008) . . . . . . . . . . . . . . . 5

<u>United States v. Tucker</u>, 249 F.R.D. 58
  (S.D.N.Y. 2008) . . . . . . . . . . . . . . . 5, 10, 11

<u>United States v. Vasquez</u>, 258 F.R.D. 68
  (E.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . 9

<u>United States v. Yian</u>, 1995 WL 614563, at *1
  (S.D.N.Y. Oct. 19, 1995) . . . . . . . . . . . . . . 8

<u>United States v. Young</u>, 2004 WL 784840, at *2
  (W.D. Tenn. March 4, 2004) . . . . . . . . . . . . . 9

## **<u>STATUTE</u>**

Rule 17(c) . . . . . . . . . . . . . . . . . . . . passim

Fed. R. Crim. P. 17(h) . . . . . . . . . . . . . . . 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X

UNITED STATES OF AMERICA,          :

            - v -                  :        **12 CRIM 876 (ALC)**

**PAUL CEGLIA,**                   :

                  Defendant.  :

------------------------------X


**MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT CEGLIA'S
MOTION FOR THE ISSUANCE OF SUBPOENAS PURSUANT TO RULE 17(c)
(AMENDED)**


## Introduction

This Memorandum of Law is submitted on behalf of
defendant Paul Ceglia in reply to the opposition briefs filed
by the government and counsel for Mark Zuckerberg and Facebook,
Inc. ("Facebook") objecting to the issuance of subpoenas to
Mark Zuckerberg, Facebook, and Harvard University. For the
reasons explained below, the government and Facebook's efforts
to restrict Paul Ceglia's ability to defend himself in his
criminal trial should be rejected. The subpoenas fully comply
with Rule 17(c), and the Court should issue an order endorsing
them.

The charges in this criminal prosecution arise entirely
from conduct relating to claims made by Ceglia during the
course of his civil lawsuit against Facebook. At Facebook's
prompting, the United States Attorney's Office chose to step

into the shoes of Facebook, adopt its position in the civil suit wholesale, and indict Ceglia for the statements Facebook considers false.  Now Facebook and the government are attempting to avoid the inevitable consequences of instituting this highly unusual prosecution.  They cannot have it both ways.  Facebook could have availed itself of the many civil remedies available to civil litigants who feel they have been wrongly sued -- as thousands of litigants do every day.  But having chosen to pursue criminal charges, and received a receptive audience in the Southern District of New York, Facebook cannot now seek to hide relevant information and deprive Ceglia of a fair trial.

During the course of the civil suit, no fewer than ten experts were deposed on the topics of document and computer forensics relating to the contract at issue.  The purported factual recitation in Facebook's letter opposing the issuance of the subpoenas is full of conclusory statements that were and are hotly contested.  Ceglia's need for the subpoenaed information arises precisely because the information sought is necessary to address the sorts of claims made in Facebook's most recent letter.

## SUMMARY OF ARGUMENT

The government and Facebook have submitted separate briefs objecting in part to Ceglia's Rule 17(c) subpoenas. The objections relate to the subpoenas directed at Zuckerberg's and Facebook's computers, cell phones, email accounts, and bank records from the years 2003 and 2004, the period during which the government and Facebook concede that Ceglia and Zuckerberg engaged in business together.

As an initial matter, the government lacks standing to contest the issuance of these subpoenas. Thus the government's arguments that the subpoenas should be denied because they "seek documents outside of the rules of criminal discovery," June 30, 2013 Gov't Br. at 2, and seek early disclosure of witness statements, see id. at 10-11, are improperly raised.

Moreover, the government's arguments are based on case law that addresses subpoenas issued *to the government* or law enforcement agencies working closely with the government, not unaffiliated third parties, as is the case here. Thus the claim that Rule 16 precludes the issues of defense subpoenas to third parties is simply wrong. Rule 16 provides for the minimum disclosure necessary *by the government*; it does not act as a ceiling on information a defendant may gather from third parties.

Further, as to arguments raised by both the government

- 3 -

and Facebook, courts in this district have expressed skepticism that the standards in Nixon apply to the subpoenas issued on behalf of criminal defendants to third parties.  Despite the protestations in both opposition briefs, the proper standard is a less restrictive standard such as the one articulated in United States v. Nachamie, 91 F.Supp.2d 552, 563 (S.D.N.Y. 2000) and many other courts, and the requested subpoenas comply with Rule 17(c) because the sought material is reasonable and not unduly oppressive.

Finally, even if this Court applies the Nixon factors as urged by opposing counsel, the materials sought are relevant, admissible, and specific.  United States v. Nixon, 418 U.S. 683 (1974).  The subpoenas seek only those materials from the time period in question, 2003-2004, and only from sources that contain information directly relevant to the charges against Ceglia.

Contrary to the claims of Facebook, the material sought would not unduly infringe on Zuckerberg's privacy interests. The Court may always issue a protective order covering the produced material -- as it has already done for virtually all of the discovery produced thus far, and with which the parties have fully complied throughout pre-trial litigation.

As discussed further below, Ceglia's request is far from a "fishing expedition."  There are specific, fact-based reasons

why the request is reasonable and the material sought is
necessary for the defense to prepare for trial.

## ARGUMENT

### Point I

### The Government Does Not Have Standing
### to Challenge the Subpoenas at Issue

"A party generally lacks standing to challenge a subpoena
absent a claim of privilege or a proprietary interest in the
subpoenaed matter." United States v. Nachamie, 91 F. Supp. 2d
552, 558 (S.D.N.Y. 2000); see also United States v. Treacy,
2008 WL 5082884, n.2 (S.D.N.Y. Dec. 1, 2008) ("It is not clear
that the government has standing to move to quash the
subpoenas."). Here, the government lacks standing to challenge
the subpoenas because it has no legitimate interest in whether
or not they are issued. See United States v. Tucker, 249
F.R.D. 58 (S.D.N.Y. 2008). The government has no privacy or
proprietary interest in the material sought, nor does the
government claim that the subpoenas will result in undue delay
or harassment of witnesses. See, e.g., United States v.
Giampa, 1992 WL 296440 (S.D.N.Y. Oct. 7, 1992) (government had
heightened interest in shielding witnesses in the "witness
protection program").

The government's only purported interest - a concern that
the "parties to the case comply with applicable federal law,"
June 30, 2013 Gov't Br. at 2 - by no means confers standing.

- 5 -

Counsel for Zuckerberg and Facebook have filed objections to the subpoenas and the subpoenas are being reviewed by the Court.  The government need not involve itself in whether or not the subpoenas issued to third parties properly comply with Rule 17.

Nor is the government needed as a representative of Zuckerberg and Facebook. Notably, Zuckerberg and Facebook did not solicit the government to represent them.  See United States v. Chen De Yian, 1995 WL 614563 at *1 (S.D.N.Y. Oct. 19, 1995) (where sheriff's office forwarded any materials responsive to the subpoena to the United States Attorney's Office, the USAO "stands in the shoes" of the Sheriff's Office and can move to quash the subpoena); United States v. Barnes, 2008 WL 9359654 at *1 (S.D.N.Y. Apr. 2, 2008) (government had standing to challenge subpoenas where "the Senior Staff Attorney at the MDC contacted the United States Attorney's Office after being served with the subpoena to request assistance with making a motion to quash.").  Here, the opposite occurred.  After the government reached out to Gibson Dunn, as counsel to Zuckerberg and Facebook, to inform them of the pending subpoenas, Gibson Dunn emailed a letter to the Court requesting to be specifically heard on the matter.  (June 20, 2014 Letter from Orin Snyder at 1.)  Zuckerberg's and Facebook's interests are being represented by one of the largest law firms in the world; there is no reason for the

- 6 -

government to weigh in on their behalf.

Even if the Court determines that the government has standing, the unique arguments put forth by the government -- that the challenged portions of the subpoenas violate Rule 16 and seek early disclosure of witness statements -- misapply relevant precedent.

First, misstating the relationship between Rules 16 and 17, the government responds as though Ceglia were subpoenaing documents from the government itself rather than a third party. Simply put, Rule 16 does not limit the materials that a defendant may subpoena from third parties. See, e.g., United States v. Tomison, 969 F. Supp. 587, 593 n.14 (E.D. Cal. 1997) ("The notion that because Rule 16 provides for discovery, Rule 17(c) has no role in the discovery of documents can, of course, only apply to documents in the government's hands; accordingly, Rule 17(c) may well be a proper device for discovering documents in the hands of third parties."); United States v. King, 194 F.R.D. 569, 573 n.3 (E.D. Va. 2000) ("Rule 16 regulates the discovery obligations of the United States and the defendant, and does not address how the United States or the defendant may secure evidence in the possession of third-parties.").

The cases cited by the government do not stand for the proposition that a criminal defendant may only obtain documents that would be discoverable under Rule 16.  In all of the Rule

- 7 -

16 cases cited by the government, a criminal defendant subpoenaed materials from a local or state law enforcement agency and the court determined that the materials were covered by Rule 16 as opposed to Rule 17, thereby barring disclosure. Thus those cases turned on whether materials subpoenaed from federal law enforcement agencies, see, e.g., United States v. Buck, 1986 WL 14970, at *1 (S.D.N.Y. Dec. 15, 1986)[1], or local law enforcement, see, e.g., United States v. Cherry, 876 F. Supp. 547, 552 (S.D.N.Y. 1995); United States v. Yian, 1995 WL 614563, at *1 (S.D.N.Y. Oct. 19, 1995), were properly obtainable.

Second, the mere fact that the subpoenaed materials may contain "statements of prospective witnesses," June 30, 2014 Gov't Br. at 10, citing Fed. R. Crim. P. 17(h), does not immunize the materials from a Rule 17 subpoena.  The government quotes Rule 17(h) to stand for a broad proposition that: "No party may subpoena a statement of a witness or of a prospective witness under this rule."  However, by referring to Rule 26.2, Rule 17(h) is directed at a defendant's subpoena of materials

---

[1]  While the court in Buck determined that "discoverability of items under Rule 16 determines whether those items are subject to a Rule 17(c) subpoena," in doing so it relied on a footnote in Xydas v. United States, 445 F.2d 660, 664 n.8 (D.C. Cir. 1971). There the Court of Appeals for the District of Columbia explained its application of Rule 16:  "While the documents here involved were sought via subpoena under Rule 17, Fed. R. Crim. P., this, where the subpoena seeks documents in the possession of the Government, is simply an alternative means of determining information available under Rule 16."

that the *government* possesses.  Fed. R. Crim. P.26 ("After a witness other than the defendant has testified on direct examination, the court ... must order an attorney for the government ... to produce ... any statement of the witness *that is in their possession*." (emphasis added); see <u>United States v. Young</u>, 2004 WL 784840, at *2 (W.D. Tenn. March 4, 2004) (rejecting government's argument that Rule 17(h) barred subpoenas to third parties because "Rule 17(h) ... only appl[ies] to statements in the government's possession"); <u>cf.</u> <u>United States v. Vasquez</u>, 258 F.R.D. 68, 73 (E.D.N.Y. 2009) (subpoena for statements possessed by Nassau County Police Department quashed in light of Rule 17(h)).

Once again, the government acts as though Ceglia had subpoenaed the government for witness statements.  The government cites no cases that stand for the broad proposition that a criminal defendant cannot subpoena materials from a third party that might contain statements of a government witness.  As Ceglia's subpoenas are directed to third parties and otherwise comply with the provisions of Rule 17 -- whether or not the sought materials may contain statements of a witness -- the Court should endorse them.

## Point II

### The Subpoenas Comply with Rule 17(c)

A.   *A more liberal standard applies to subpoenas issued to third parties by criminal defendants.*

As explained in Ceglia's June 9, 2014 letter to the Court, there is significant doubt that the Nixon factors apply to a Rule 17(c) subpoena requested by a criminal defendant for materials from a third party.

In two well-reasoned opinions, United States v. Nachamie, 91 F. Supp.2d 552 (S.D.N.Y. 2000), and United States v. Tucker, 249 F.R.D. 58 (S.D.N.Y. 2008), Judge Scheindlin examined Nixon in the context of the history of Rule 17, and the limited nature of discovery to federal criminal defendants, and determined that a less stringent standard of should be applied to subpoenas issued by criminal defendants to third parties. "A defendant in such a situation need only show that the request is (1) reasonable, construed as 'material to the defense,' and (2) not unduly oppressive for the producing party to respond." Tucker, 249 F.R.D. at 66.[2]  That standard tracks

---

[2] In footnotes, the Supreme Court and the Second Circuit have declined to decide the precise standard to be employed in this situation.  See United States v. Nixon, 418 U.S. 683, n.12 (1974) ("The Special Prosecutor suggests that the evidentiary requirement of *Bowman Dairy Co.* and *Iozia* does not apply in its full vigor when the subpoena duces tecum is issued to third parties rather than to government prosecutors....  We need not decide whether a lower standard exists because we are satisfied that the relevance and evidentiary nature of the subpoenaed tapes were sufficiently shown as a preliminary matter"); United States
(continued...)

- 10 -

the text of Rule 17(c)(2).  See United States v. Stein, 488 F.
Supp. 2d 350, 366 (S.D.N.Y. 2007) ("[T]here is no reason to
limit the plain language of Rule 17(c) where, as here, there is
no conflict between the limited discovery afforded by Rule 16
and the broad words of Rule 17(c).").

      Under this significantly lower threshold, and as
explained *infra* pp. 12-22, the challenged subpoenas clearly
pass muster.  See United States v. Soliman, 2009 WL 1531569
(S.D.N.Y. 2009) (upon further consideration and application of
the Nachamie standard, granting subpoenas for materials sought
from third party in Medicaid fraud case); United States v.
Nosal, 291 F.R.D. 403, 407-09 (N.D. Cal. 2013) (applying
Nachamie standard, granting in part defendant's Rule 17
subpoena to third party in theft of trade secrets prosecution);
see also United States v. Modi, 2002 WL 188327, at *2 (W.D. Va.
Feb. 6, 2002) (acknowledging possibility that third party
witness's "independence from the government would suggest a
more relaxed test" than Nixon).

      The fact that Ceglia's requests are being made in advance
of trial as opposed to "the eve of trial," Tucker, 249 F.R.D.

---

      [2](...continued)
v. Barnes, 2014 WL 1099144, n.1 (2d Cir. 2014) ("While Barnes
invites us to forego the *Nixon* standard for the more permissive
standard employed in *United States v. Tucker...*, when, as here,
challenged subpoenas are issued to a non-party, we need not
address that point because Barnes's speculative showing failed to
meet even the "articulable suspicion requirement of *Tucker.*").

at 66, does not alter this conclusion.  Here, where the parties
anticipate significant litigation regarding the admissibility
of expert testimony, Ceglia should be afforded his right under
the Sixth Amendment to compel witnesses to testify and to
examine materials in advance of trial.  See, e.g., Soliman,
2009 WL 1531569 at *4 (subpoenas proper in light of defendant's
motion to dismiss although no trial date had been set).

B.   Even under Nixon's standard of relevance, admissibility,
     and specificity, the subpoenas are proper.

     Even if the Court elects to apply the standard articulated
in United States v. Nixon, 418 U.S. 683 (1974), the subpoenas
satisfy this test.  The sought materials are relevant,
admissible and specific.  Id. at 699.  Moreover, the
application is made in good faith and "is not intended as a
fishing expedition."  Id.  Finally, any privacy concerns raised
by Zuckerberg and Facebook may be remedied with a protective
order similar to the one covering materials produced through
Rule 16 discovery.[3]

_____

     [3]  The cases cited by Gibson Dunn in support of its argument
regarding Facebook's and Zuckerberg's privacy interests, June 30,
2014 Letter from Orin Snyder at 4-5, are easily distinguishable.
Arias-Zeballos v. Tan, 2007 WL 210112 (S.D.N.Y. Jan. 25, 2007)
merely recognizes that individuals with a privacy interest in
their banking records have standing to challenge subpoenas
directed at those records -- a point Ceglia does not dispute.  In
the other case cited by counsel, In re McVane, 44 F.3d 1127 (2d
Cir. 1995), the Second Circuit upheld administrative subpoenas
directed at former directors of a failed bank, but quashed those
aimed at the records of the directors' family members.  Needless
to say, Ceglia's subpoenas do not seek records from the family
members of the owners and employees of Facebook.

                                                (continued...)

1.  <u>The Email Evidence</u>

Neither Facebook nor the government disputes that Zuckerberg and Ceglia engaged in extensive email correspondence during 2003 and 2004 in connection with a business relationship.  Facebook and the government deny, however, that emails referenced by Ceglia in his civil suit, in which Ceglia and Zuckerberg discuss Facebook, are authentic.  They claim that Ceglia created those emails as Word documents closer in time to the filing of the civil suit.  In support of that claim they have chosen to retrieve selected back-up copies from Harvard's email servers and produced still a smaller selection of those emails.  Because that subset of emails does not contain the contested emails between Ceglia and Zuckerberg, they claim Ceglia must have fabricated them.

However, there is significant reason to believe that the emails produced as Rule 16 discovery do not include all of the relevant emails that once existed on Harvard servers.  The only emails produced to the defense by the government are "selected emails," apparently culled from a larger production of emails produced to the government by Harvard using only three back-up dates from storage: November 3, 2003, October 1, 2010, and February 2, 2012.  (June 30, 2014 Gov't Br. at 10.)  The storage dates are significant because the retrieval of that material may only provide a snapshot of what is contained on

---

[3](...continued)

the servers on the particular date requested.[4]  In other words, material contained in the October 1, 2010 back up file may not contain all emails sent or received between November 3, 2003 (the first date of retrieval) and October 1, 2010 (the next date of retrieval).

In fact, although the 2010 compilation contains *some* emails from 2003, it does not contain all of the emails that existed that year.  Specifically, the 2010 compilation is missing five emails dated Wednesday, August 13, 2003 which can be found at in the 2003 retrieval file.[5]  The 2010 compilation is therefore an incomplete record of emails sent prior to the retrieval date of October 1, 2010.  If it were a complete record, the 2010 compilation would contain those five emails. This means that for a key period of time at issue in the case -- 2003 through 2004 -- we have no reliable data regarding the emails contained on Harvard's servers.

In addition, the government states that it obtained all emails in Harvard's custody or control "sent to or from" Zuckerberg's email address.  It is not clear if this includes deleted emails or emails contained in any number of the

---

[4] We do not have a full picture of Harvard's storage policies but will know more upon Harvard's compliance with the defense request for the policies.

[5] These emails, Discovery bates numbers 000742-745, are attached as Exhibit A, and are being provided to the Court under seal.

account's other folders.[6]   Obviously, deleted emails or emails

contained in trash or other folders would be highly

significant.

There is a simple way to ascertain better information

about the authenticity of the purportedly fake emails: Harvard[7]

and Zuckerberg can provide as complete a picture as possible of

Zuckerberg's email account from the relevant time period.

Facebook and the government have refused to do so.

The government and Facebook have also hired computer

forensics experts to examine a host of "Ceglia media" that were

produced in the civil lawsuit.   That media includes floppy

discs that contained the contested copies of the

Ceglia/Zuckerberg email exchange regarding Facebook.   The

Facebook and government experts claim that metadata from the

---

[6] The 2010 retrieval file suggests a reorganization of
Zuckerberg's emails into various folders ("Business" and "Ceglia
Matters"), whereas in the 2003 retrieval file individual emails
are assigned apparently default folders ("Sent-Mail-Jul-2003").
This strongly suggests that Harvard's storage and/or retrieval
method reflects an end user's (in this case, Zuckerberg's)
deletion or reorganization of individual emails.   Thus, in order
to obtain an accurate compilation of those emails sent and
received in a particular time period, one would need access to
the hard drive of the computer from which the emails themselves
were sent/received, or at minimum, a retrieval file from a date
closer to the date the emails were sent/received.

[7] Indeed most of the emails that Facebook and the government
claim are false post-date November 3, 2003. Presumably, Harvard
backed up its email system in the seven years between November 3,
2003 and October 2010.   In all likelihood, it did so regularly
and possesses backups in 2004 that would more accurately reflect
Zuckerberg's communications during the relevant times in this
case.   Harvard has not yet objected to the subpoena, but would
have the opportunity to do so if the Court endorses the subpoena.

- 15 -

computer files indicates "anomalies" that point to backdating and therefore, according to their theory, point to fraud. Ceglia's experts in the civil suit contested those findings and pointed to numerous other reasonable bases for the data that was found.

Yet again, highly relevant information exists that would directly speak to the authenticity of those emails.  Just as Facebook and the government used the "Ceglia media" to make their claims, so too the "Zuckerberg media" would provide significant evidence of the existence of the emails and other relevant evidence regarding Ceglia and Zuckerberg's business relationship.  And much, if not all, of that information is readily available and not burdensome to produce because it has been stored in connection with prior litigation involving Zuckerberg, Facebook, and other third parties who maintained that Zuckerberg breached contracts and stole from them in connection with the founding of Facebook.  See, e.g., ConnectU LLC v. Zuckerberg et al., 522 F.3d 82 (1st Cir. 2008).

For example, one of Facebook's computer forensics experts in the Ceglia civil litigation acknowledged that he had reviewed the Zuckerberg media in connection with his examination for the Ceglia suit.  (July 19, 2012 Michael F. McGowan Deposition, Ceglia v. Zuckerberg, 10-cv-569, Dkt #496, pp. 61-78, attached here as Exhibit B.)  He stated that there were "approximately 28 devices belonging to Mr. Zuckerberg that

were presented," id. at 61, to his company for inspection in September 2010.  (Id. at 64.)  That media was stored at a law firm in San Jose, California.  (Id. at 62.)  He further elaborated that "the devices included original hard drives as well as forensic images of devices that I understand were created during the course of prior litigations," including the ConnectU case.  (Id. at 61.)  The media included items from 2003 and 2004, id. at 78, but the expert could not recall if there were *any* emails sent or received by Zuckerberg on *any* of those devices, and he claimed not to have found *any* correspondence with Ceglia.  (Id. at 66-67.)  When pressed on this, the expert seemed to suggest that such things would have been outside the scope of what he was asked to review.  (Id. at 70-76.)

Needless to say, computer hard drives used by Zuckerberg during 2003 and 2004 for information related to both Facebook and Streetfax are highly relevant to this case.  And relying on Facebook or the government (which has apparently never reviewed this material) to be the gatekeeper for that information is the ultimate example of letting the fox guard the henhouse.

These concerns are not mere conjecture.  The ConnectU litigation was full of claims about deceitful practices by Facebook during the litigation, prompting further litigation about the terms of the settlement.  See Facebook, Inc. v. Pacific Northwest Software, Inc., 640 F.3d 1034 (9th Cir. 2011)

- 17 -

(not addressing the merits of deception claims because confidentiality agreements precluded the possibility of their use as admissible evidence).

   2.   "Street Fax Contract" v. "Work for Hire Contract"

   Another allegation central to the prosecution is the government's claim that the "real" contract between Ceglia and Zuckerberg was found on Ceglia's parents' computer in an email from Ceglia (via his father's email account) in 2004 to his then-lawyer at the law firm Sidley Austin, LLP.  The hard drive of that computer is commonly referred to in the civil litigation as the "Seagate hard drive" for the name of the manufacturer.  The civil experts produced extensive reports debating the authenticity of that contract which appears as two one-page "TIFF" images in attachments to two emails.  The Facebook experts discussed the reasons why they concluded that there were indications that it was authentic, while the Ceglia experts discussed the many signs that it was not.[8]

   Once again, obtaining the full scope of Zuckerberg's electronic media and emails from 2003 and 2004 is necessary to rebut the government's claim that the TIFF images capture the real contract between Ceglia and Zuckerberg.  For example, the government has not disclosed any additional emails from Zuckerberg to other persons regarding the business relationship

-----

   [8]   The reports and depositions of the experts are voluminous and are not attached here, but they can be produced for the Court's inspection.

- 18 -

and contract he and Ceglia shared.  One email from Zuckerberg
to Karin Peterson dated February 28, 2004, disclosed by Sidley
Austin, LLP in connection with the civil suit and attached as
Exhibit C, clearly discusses payments demanded by Zuckerberg in
connection with his business relationship Ceglia.  This is the
type of communication covered by the subpoenas at issue but not
produced by the government pursuant to its discovery
obligations.  The information is necessary to rebut the
government's argument regarding the "real" contract.

    3.  <u>The Scope of the Subpoena Requests</u>

    Facebook and the government claim that the subpoenas are
overbroad and call for material that is "irrelevant and
inadmissible."  They propose instead to provide a far more
limited set of materials.  The government agrees to provide the
following material:

- "All agreements, drafts and copies of agreements as
  well as all communications between Zuckerberg or
  Facebook, on the one hand, and Ceglia or companies he
  owned, on the other hand;" (Govt. Br., n. 1)

- "Documents setting forth Harvard's policies related
  to back up and storage of emails from 2003 to the
  present;" (Govt. Br., n. 2)

    Facebook in its response agreed to provide the following
material:

- "written agreements between Ceglia and Mr.

- 19 -

Zuckerberg;"

- "written correspondence between Ceglia and Mr. Zuckerberg;"

- "copies of any checks written by Ceglia to Mr. Zuckerberg."

(June 30, 2014 Letter from Orin Snyder at 6-7.)  Notably, in making its offer to disclose this material, Facebook claims that Ceglia already possesses all of it.  (Id. at 4-6).  In other words, Facebook's offer is no offer at all.

It is not clear if the government's offer to produce all communications between Zuckerberg and Ceglia contemplates an additional production of discovery.  Whatever the government's intent, it is not in a position to produce all of the communications between Zuckerberg and Ceglia and other relevant persons, because it does not possess all of those communications.  As discussed above, the Harvard servers and the Zuckerberg media contain additional materials that the government says it does not possess.

Both Facebook and the government rely heavily on what they perceive to be "historical facts" to contradict what they claim to be inauthentic Ceglia emails reflecting communications with Zuckerberg.  (June 30, 2014 Letter from Orin Snyder at 3.)  The parties should not be permitted to pick and choose which "historical facts" they compare to the communications at issue to determine the authenticity of those communications.  The

- 20 -

government has produced large quantities of Ceglia's phone,
computer, and bank records, among others, precisely because it
believes them to be relevant to a determination of the
authenticity of Ceglia's claims in the civil suit.  Those
records relating to Zuckerberg are necessary and relevant to
the preparation of the defense for the same reasons.

Zuckerberg's communications during the relevant time
period -- whether via email or text message or other means that
might be available on his media devices -- are highly likely to
speak to the government's version of events about important
topics such as when work on Facebook began (e.g., the
government claims that the contract implausibly pre-dates
Zuckerberg's conception of the idea for Facebook), with whom
Zuckerberg was working when first establishing Facebook (e.g.,
did it include others working on Streetfax), and who else was
providing funding for the work on Facebook and when they
provided it.

At a bare minimum, Ceglia is entitled to all of the
communications that can be reasonably obtained between himself,
Zuckerberg, and their respective employees and work colleagues
during the relevant periods in 2003 and 2004.[9]  The Zuckerberg
media should be searched for those items and additional back-up
copies from the Harvard servers should be produced.

---

[9] They include, at least, Karin Peterson, Andy Reed, Jeff
Kazen, and Randy Kato.

- 21 -

Lastly, the Harvard disciplinary records relating to Zuckerberg's unauthorized access to computer systems (by hacking them through the internet and using other means) and violating fellow students' privacy rights -- conduct that indisputably occurred contemporaneously with his work on Street Fax in the fall of 2003 -- is directly relevant to Zuckerberg's conduct with respect to matters at issue in this case.[10] Zuckerberg's ability to hack into computer systems at the same time he was doing programming work for Ceglia and developing Facebook, and shortly before he threatened to alter the Street Fax website because of his belief that he had not been paid in a timely manner, see Exhibit C, at 1, speaks directly to his ability to manipulate the very communications and documents at issue here.  This is not just impeachment material, it is evidence directly relevant to the events in this case.

The defense recognizes that these requests are broader than those made in a typical criminal case.  But this is not a typical case.  Because the criminal charges arise solely from Ceglia's civil litigation activities, the criminal case must necessarily grapple with the same questions that were at issue in the civil matter.  Those questions cannot be answered accurately if Facebook and the government are permitted to hide

---

[10] Again, this is not mere conjecture.  The accounts of Harvard disciplining Zuckerberg and placing him on probation are publicly available, including most famously in the book by the journalist David Kirkpatrick, which chronicles the founding of Facebook.  See DAVID KIRKPATRICK, THE FACEBOOK EFFECT 23-25 (2010).

information that is reasonably accessible and highly relevant.
The subpoenas are directed at materials that are specific,
admissible, and relevant for Ceglia's upcoming criminal trial.

### Conclusion

For the above reasons, the Court should fully endorse
Ceglia's Rule 17(c) subpoenas.

Dated:      New York, New York
            July 9, 2014


                              _____
                              DAVID E. PATTON, ESQ.
                              ANNALISA MIRÓN, ESQ.
                              Federal Defenders of New York, Inc.
                              Attorneys for Defendant
                                **Paul Ceglia**
                              52 Duane Street, 10th Floor
                              New York, New York 10007
                              (212) 417-8738




TO:   **PREET BHARARA, ESQ.**
      United States Attorney
      Southern District of New York
      One St. Andrew's Plaza
      New York, New York 10007

Attn: **CHRISTOPHER FREY, ESQ.**
      **JANIS ECHENBERG, ESQ.**
      Assistant United States Attorneys




- 23 -