# EXHIBIT D



**UNITED STATES POSTAL SERVICE**

Requestor: USPIS\JWCawley

Forensic Laboratory Examination Report
Forensic Laboratory Services
22433 Randolph Drive
Dulles, VA 20104-1000

September 27, 2013

Case No. 1910925-MF - Lab File No. 9-109-009384(1)
Type of Examination: Questioned Documents
Request Date(s): 07-30-2013

C. P. Cizin
Postal Inspector
P. O. Box 191
New York, NY 10008-0191

EXAMINATIONS:
Determine the printing process(es) utilized to produce the machine printed entries on Exhibits Q-1-1 ("WORK FOR HIRE" CONTRACT, Page One, Barcode IS0000739359) and Q-1-2 (Page Two of "WORK FOR HIRE" CONTRACT, Barcode IS0000739359).

Determine whether indented impressions are discernible on Exhibits Q-1-1 and Q-1-2.

Determine whether the paper in Exhibit Q-1-1 and Exhibit Q-1-2 can be associated.

Determine whether Exhibits Q-1-1 and Q-1-2 were altered.

FINDINGS:
Based on visual and instrumental examinations, it was determined the machine printing on Exhibits Q-1-1 and Q-1-2 was produced using toner technology (e.g., photocopier, laser printer).

Based on visual and instrumental examinations, it was determined no indented impressions were observed on Exhibits Q-1-1 and Q-1-2.

Based on the examination and inter-comparison of the paper in Exhibits Q-1-1 and Q-1-2, no associations were effected due to the absence of any identifying characteristics (e.g., watermarks and/or encoding information).

Based on visual, instrumental and inter-comparison examinations of Exhibits Q-1-1 and Q-1-2, the following was determined:
- The design of the font on page one (Q-1-1) of the contract is not the same design as the font on page two (Q-1-2);
- Arrangement differences were observed between the margins, spacing and column widths of Exhibits Q-1-1 and Q-1-2;
- The face of the paper in Exhibit Q-1-2 reacts differently than the face of the paper in Exhibit Q-1-1 when exposed to ultraviolet light;

4431

Case No. 1910925-MF - Lab File No. 9-109-009384(1)     Page 2

- Tonal differences are present between the front and back of each page of Exhibits Q-1-1 and Q-1-2;
- Typographical errors were observed on Exhibits Q-1-1 and Q-1-2.

Due to the noted discrepancies, there are indications these pages may have come from multiple sources.

No other associations or examinations were possible with Exhibits Q-1-1 and Q-1-2 due to the condition of the documents.

REMARKS:
If testimony is required the undersigned should be notified at least three weeks prior to the scheduled trial or hearing date.

EXHIBITS:
Exhibits Q-1-1 and Q-1-2 received in this laboratory on July 30, 2013 are being returned with this report via hand carry.

John W. Cawley, III
Forensic Document Examiner, Sr.
Telephone: 703-406-7121
Fax: 703-406-7115

This is an official FLS examination report only if it contains an original signature of the forensic analyst.

AN ASCLD/LAB ACCREDITED LABORATORY SINCE JANUARY 28, 2010



4432

# EXHIBIT E

Prepared by Joan M. Winkelman: my listing of observations of similarities and differences that form the basis of my opinion --

Documents:
Work For Hire Contract, 2-pages
Kato---STREET FAX document, 3 pages   This document herein after referred to as KATO--Street Fax or Kato document, as represented to me by counsel, is presumed to be authentic.

dates:
Work For Hire page two in signature area hand dates the document  4/28/03
KATO--STREET FAX document page three in signature area typed date 5/5/03
  --- close proximity in time supports the conclusion that the Work For Hire document is authentic

the fonts in the documents:
Work For Hire page one is Times New Roman
Work For Hire page two is Garamond
Work For Hire page one font size is 8
Work For Hire page two font size is 7

KATO page one is Garamond
KATO page two is Garamond with exception of portion Column 2 between
        CONSULTING and Point 24 which is Times New Roman font
KATO page three is Garamond
KATO page one, two, and three are font size 7
   --- repeating same two fonts supports the conclusion that the Work For Hire document is
       authentic

appearance of fonts:
Work For Hire page one darker
Work For Hire page two slightly lighter - function of Garamond font style shading
        and smaller size

KATO page one, page two, except portion Column 2 between CONSULTING
        and Point 24, and page three slightly lighter - function of Garamond
        font style shading and smaller size
KATO page 2 portion Column 2 darker - Times New Roman font

ABCDEFGHIJKLMNOPQRSTUVWXYZ   Garamond 16
ABCDEFGHIJKLMNOPQRSTUVWXYZ   Times New Roman
abcdefghijklmnopqrstuvwxyz   1234567890  '''  ''''  ''''  Times 16
abcdefghijklmnopqrstuvwxyz   1234567890  '''  ''''  ''''  Garamond 16

format: paragraph indents -
KATO page 1 Point 3 Line 1  1 space
              Line 5  2 spaces
            Point 6 Line 20  3 spaces
            Point 7 Line 5  5 spaces
KATO page 2 Point 8 Line 9  1 space

Work For Hire page 1 Point 3 Line 12  11 spaces
Work For Hire page 2 Point 8 Line 9  1 space
   --- various indents including the same indent in both documents in Page 2 Point
       8 Line 9 supports the conclusion that the Work For Hire document is authentic

page 1 of 5

format: paragraph line spacing - within a Point
Work For Hire page 1 between Point 1 heading and wording  1 space
KATO page 1  between Point 1 heading and wording  1 space
   --- this similarity of line spacing within page 1 Point 1 of both documents supports the
       conclusion that the Work For Hire document is authentic

format: paragraph line spacing - between Points
Work For Hire page 1 between Point 3 and Point 4  2 spaces

Work For Hire page 1 between Point 5 and Point 6  3 spaces
KATO page 1  between Point 5 and Point 6  2 spaces

Work For Hire page 1 between Point 6 and Point 7  3 spaces
   --- the similarity of increased paragraph line spacing between Points 5 and
       Point 6 in both documents, and additional spacings in Work For Hire
       document, supports the conclusion that the Work For Hire document is authentic

total number of characters in columns and spaces:
Work For Hire  page 1 Column 1 longest Point 2 paragraph 2 line 2
       73 characters 9 spaces = 82
Work For Hire  page 1 Column 2 longest Point 6 paragraph 1 line 7
       70 char 12 spaces = 82
Work For Hire  page 1  distance between columns approx 2 characters

Work For Hire page 2 Column 1 longest Point 9 line 1
       58 characters 13 spaces = 71
Work For Hire page 2 Column 2 longest Point 15 line 13
       62 characters 7 spaces = 69
Work For Hire  page 2  distance between columns approx 11 characters

KATO page 1 Column 1 longest Point 2 line 3  66 characters 9 spaces = 75
KATO page 1 Column 2 longest Point 7 1st indented paragraph
       indent 5 characters, 58 characters 11 spaces = 74
KATO page 1  distance between columns approx 13 characters

KATO page 2 Column 1 longest (Point 8) line 2  60 characters 10 spaces = 70
KATO page 2 Column 2 longest Point 24 line 9  61 characters 13 spaces = 74
KATO page 2  distance between columns approx 11 characters

KATO page 3 Column 1 longest Point 26 line 3  56 characters 11 spaces = 67
   --- similarity of characters total in various columns and pages in both
       documents and difference in the inner margin between columns of two
       spaces in Work For Hire page 1 and 11 to 13 spaces in Work For Hire page
       2 and KATO pages 1, 2 supports the conclusion that the Work For Hire document is
       authentic

format: document heading - centered
WORK For Hire page 1 Heading  font size 18
KATO page 1 Heading font size  22
    KATO also has a pre-sub heading above and to left of the centered heading
   --- difference in font size of heading in each document supports the conclusion that the Work
       For Hire document is authentic

--- basic typing errors needing correction, in my opinion, that follow in this chart supports the
    conclusion that the Work For Hire document is authentic

    --- some errors occur in both documents in same location, others occur in only
        one of the documents

/jwinkelman    P = point   L = line   ok = wording similar but no error

| ITEM | WORK FOR HIRE Page 1 | WORK FOR HIRE Page 2 | KATO Page 1 | KATO Page 2 | KATO Page 3 |
|---|---|---|---|---|---|
| Street Fax LLC or Inc or nothing, no sp or 1 sp betw | needs to be standardized | | needs to be standardized | | |
| no page number such as page 2 of 2 or date each page | should have page number | should have page number | should have page number | should have page number | should have page number |
| space betw heading & first line | P1 standardize | | P1 standardize | | |
| employees,suppliers, or | P1 needs sp betw comma and s | | ok | | |
| Comer | -- | | P1 L11 does it need changing - phrase not familiar | | |
| Second it is for | P2 L5 may need comma after Second -- needs clarity | | --- | | |
| university | P2 L7 needs cap | | -- | | |
| wesite | P2 L8 needs a b | | -- | | |
| of"The Face | P2 L9 needs space betw f & " | | -- | | |
| "The Page Book" | P3 para2 L4 - P2 para 2 L5 "The Face Book" - same thing? | | -- | | |
| line beg The agreed upon project-- para indents | P3 para4 indented - other para not | | different wording - paras indent 2 sp not needed | | |
| sole diiscretion | P3 para 6 remove an 'i' | | -- | | |
| seller.Those revisions | -- | | P4 a) needs 1 or 2 spaces | | |
| Does not include... | -- | | P5 L1&2 not a complete sentence | | |
| Buyer agree | P5 L1 needs s | | -- | | |
| as the sites webmaster | P5 para 2 L1 needs ' | | -- | | |
| | | | | page 3 | of 5 |

| | | | | | |
|---|---|---|---|---|---|
| between the Purchase and the | ok | | P6 L3 needs r | | |
| participated in | ok | | P6 L9 loose d | | |
| due the Seller.The Seller | P6 para2 L3 needs a space | | -- | | |
| instructions of the Purchase and it is | P6 para2 L4 add r | | P6 para2 L5 add r | | |
| compiance | P6 para2 L5 needs l | | -- | | |
| agreed I writing | P6 para2 L8 change I to lower case & add n | | -- | | |
| In all instances | P6 para3 switch s & n | | -- | | |
| Purchaser hold seller harmless | P7 L1 needs s | | P7 L1 needs s | | |
| infringement sellers work | P7 L1 needs ' | | P7 L1 needs ' | | |
| held by and third party | P7 L2 change and to any | | -- | | |
| Purchaser of the Customer | P7 L5 change f to r | | P7 para 2 L2 change f to r | | |
| agress | P7 L8 change to agrees | | -- | | |
| it's | P7 L8 change to its | | -- | | |
| all costs, expensed | P7 L11 change d to s | | P7 para 2 L8 change d to s | | |
| is reasonably can | ok but should change be to they | | P7 para 2 L12 needs change to it or they | | |
| can I the way of | P7 L14 change I to i add n | | -- | | |
| the the | P7 L19 loose one the | | -- | | |
| Purchasers | P7 L22 all others are singular | | P7 L21 all others are singular | | |
| on this project their work will be | | P8 para2 L2 needs comma, semi-colon, or new sentence | | -- | |
| Streetfax Inc | | P9 L2 cap F and space | | P9 L2 cap F and space | |
| | | | | page 4 | of 5 |

| | | | | |
|---|---|---|---|---|
| StreetFax Inc. If the | | P9 L4 needs a space | | P9 L4 needs a space |
| on it payment terms rights | | P9 L12 needs an s needs comma | | P9 L12 needs an s needs comma |
| notice if the seller | | P10 L2 change i to o | | P10 L2 change i to o |
| work to e completed | | P10 para2 L4 needs b | | P10 para2 L4 needs b |
| manufacture of procure | | P10 para2 L5 change f to r | | P10 para2 L5 change f to r |
| ages Purchaser | | P13 L4 change to damages | | P13 L4 change to damages |
| shall defend, indemnity and save | | P15 L1 change t to f | | P24 L1 change t to f |
| in whole or in party by reason | | P15 L11 loose y | | P24 L11 loose y |
| of Street Fax Notwithstanding the | | P15 L14 needs period | | P24 L14 needs period |
| of Buyer | | P16 L4 insert the | | P25 L4 insert the |

# EXHIBIT F



Designation: E1658 − 08

# Standard Terminology for Expressing Conclusions of Forensic Document Examiners[1]

This standard is issued under the fixed designation E1658; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This terminology is intended to assist forensic document examiners in expressing conclusions or opinions based on their examinations.

1.2 The terms in this terminology are based on the report of a committee of the Questioned Document Section of the American Academy of Forensic Science that was adopted as the recommended guidelines in reports and testimony by the Questioned Document Section of the American Academy of Forensic Science and the American Board of Forensic Document Examiners.[2]

## 2. Referenced Documents

2.1 *ASTM Standards:*[3]
E444 Guide for Scope of Work of Forensic Document Examiners

## 3. Significance and Use

3.1 Document examiners begin examinations from a point of neutrality. There are an infinite number of gradations of opinion toward an identification or toward an elimination. It is in those cases wherein the opinion is less than definite that careful attention is especially needed in the choice of language used to convey the weight of the evidence.

3.2 Common sense dictates that we must limit the terminology we use in expressing our degrees of confidence in the evidence to terms that are readily understandable to those who use our services (including investigators, attorneys, judges, and jury members), as well as to other document examiners. The expressions used to differentiate the gradations of opinions should not be considered as strongly defined "categories". These expressions should be guidelines without sharply defined boundaries.

3.3 When a forensic document examiner chooses to use one of the terms defined below, the listener or reader can assume that this is what the examiner intended the term to mean. To avoid the possibility of misinterpretation of a term where the expert is not present to explain the guidelines in this standard, the appropriate definition(s) could be quoted in or appended to reports.

3.4 The examples are given both in the first person and in third person since both methods of reporting are used by document examiners and since both forms meet the main purpose of the standard, that is, to suggest terminology that is readily understandable. These examples should not be regarded as the only ways to utilize probability statements in reports and testimony. In following any guidelines, the examiner should always bear in mind that sometimes the examination will lead into paths that cannot be anticipated and that no guidelines can cover exactly.

3.5 Although the material that follows deals with handwriting, forensic document examiners may apply this terminology to other examinations within the scope of their work, as described in Guide E444, and it may be used by forensic examiners in other areas, as appropriate.

3.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 4. Terminology

4.1 *Recommended Terms:*

**identification (definite conclusion of identity)**—this is the highest degree of confidence expressed by document examiners in handwriting comparisons. The examiner has no reservations whatever, and although prohibited from using the word "fact," the examiner is certain, based on evidence contained in the handwriting, that the writer of the known material actually wrote the writing in question.
*Examples*—It has been concluded that John Doe wrote the questioned material, or it is my opinion [or conclusion] that John Doe of the known material wrote the questioned material.

**strong probability (highly probable, very probable)**—the evidence is very persuasive, yet some critical feature or quality is missing so that an *identification* is not in order;

---

[1] This terminology is under the jurisdiction of ASTM Committee E30 on Forensic Sciences and is the direct responsibility of Subcommittee E30.02 on Questioned Documents.
Current edition approved Aug. 15, 2008. Published October 2008. Originally approved in 1995. Last previous edition approved in 2004 as E1658 – 04. DOI: 10.1520/E1658-08.

[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

[3] McAlexander T. V., Beck, J., and Dick, R., "The Standardization of Handwriting Opinion Terminology," *Journal of Forensic Science*, Vol. 36, No. 2, March 1991, pp. 311–319.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

E1658 − 08

however, the examiner is virtually certain that the questioned and known writings were written by the same individual.
*Examples*—There is *strong probability* that the John Doe of the known material wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *very probably* wrote the questioned material.

DISCUSSION—Some examiners doubt the desirability of differentiating between **strong probability** and **probable**, and certainly they may eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

**probable**—the evidence contained in the handwriting points rather strongly toward the questioned and known writings having been written by the same individual; however, it falls short of the " virtually certain" degree of confidence.
*Examples*—It has been concluded that the John Doe of the known material probably wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *probably* wrote the questioned material.

**indications (evidence to suggest)**—a body of writing has few features which are of significance for handwriting comparison purposes, but those features are in agreement with another body of writing.
*Examples*—There is evidence which *indicates* (or *suggests*) that the John Doe of the known material may have written the questioned material but the evidence falls far short of that necessary to support a definite conclusion.

DISCUSSION—This is a very weak opinion, and a report may be misinterpreted to be an identification by some readers if the report simply states, "The evidence *indicates* that the John Doe of the known material wrote the questioned material." There should always be additional limiting words or phrases (such as "may have" or "but the evidence is far from conclusive") when this opinion is reported, to ensure that the reader understands that the opinion is weak. Some examiners doubt the desirability of reporting an opinion this vague, and certainly they cannot be criticized if they eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

**no conclusion (totally inconclusive, indeterminable)**—This is the zero point of the confidence scale. It is used when there are significantly limiting factors, such as disguise in the questioned and/or known writing or a lack of comparable writing, and the examiner does not have even a leaning one way or another.
*Examples*—*No conclusion* could be reached as to whether or not the John Doe of the known material wrote the questioned material, or I could not determine whether or not the John Doe of the known material wrote the questioned material.

**indications did not**—this carries the same weight as the indications term that is, it is a very weak opinion.
*Examples*—There is very little significant evidence present in the comparable portions of the questioned and known writings, but that evidence *suggests* that the John Doe of the known material did not write the questioned material, or I found *indications* that the John Doe of the known material did *not* write the questioned material but the evidence is far from conclusive.

See Discussion after **indications**.

**probably did not**—the evidence points rather strongly against the questioned and known writings having been written by the same individual, but, as in the probable range above, the evidence is not quite up to the "virtually certain" range.
*Examples*—It has been concluded that the John Doe of the known material probably did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material probably did not write the questioned material.

DISCUSSION—Some examiners prefer to state this opinion: "It is unlikely that the John Doe of the known material wrote the questioned material." There is no strong objection to this, as "unlikely" is merely the Anglo-Saxon equivalent of "improbable".

**strong probability did not**—this carries the same weight as strong probability on the identification side of the scale; that is, the examiner is virtually certain that the questioned and known writings were not written by the same individual.
*Examples*—There is strong probability that the John Doe of the known material did not write the questioned material, or in my opinion (or conclusion or determination) it is highly probable that the John Doe of the known material did not write the questioned material.

DISCUSSION—Certainly those examiners who choose to use "unlikely" in place of "probably did not" may wish to use "highly unlikely" here.

**elimination**—this, like the *definite conclusion of identity*, is the highest degree of confidence expressed by the document examiner in handwriting comparisons. By using this expression the examiner denotes no doubt in his opinion that the questioned and known writings were not written by the same individual.
*Examples*—It has been concluded that the John Doe of the known material did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material did not write the questioned material.

DISCUSSION—This is often a very difficult determination to make in handwriting examinations, especially when only requested exemplars are available, and extreme care should be used in arriving at this conclusion.

4.1.1 When the opinion is less than definite, there is usually a necessity for additional comments, consisting of such things as reasons for qualification (if the available evidence allows that determination), suggestions for remedies (if any are known), and any other comments that will shed more light on the report. The report should stand alone with no extra explanations necessary.


**⚜️ E1658 – 08**

4.2 *Deprecated and Discouraged Expressions*:

4.2.1 Several expressions occasionally used by document examiners are troublesome because they may be misinterpreted to imply bias, lack of clarity, or fallaciousness and their use is deprecated. Some of the terms are so blatantly inane (such as "make/no make") that they will not be discussed. The use of others is discouraged because they are incomplete or misused. These expressions include:

**possible/could have**—these terms have no place in expert opinions on handwriting because the examiner's task is to decide to what degree of certainty it can be said that a handwriting sample is by a specific person. If the evidence is so limited or unclear that no definite or qualified opinion can be expressed, then the proper answer is *no conclusion*. To say that the suspect "could have written the material in question" says nothing about probability and is therefore meaningless to the reader or to the court. The examiner should be clear on the different meanings of "possible" and "probable," although they are often used interchangeably in everyday speech.

**consistent with**—there are times when this expression is perfectly appropriate, such as when "evidence consistent with disguise is present" or "evidence consistent with a simulation or tracing is present, but "the known writing is consistent with the questioned writing" has no intelligible meaning.

**could not be identified/cannot identify**—these terms are objectionable not only because they are ambiguous but also because they are biased; they imply that the examiner's task is only to identify the suspect, not to decide whether or not the suspect is the writer. If one of these terms is used, it should always be followed by "or eliminate[d]".

**similarities were noted/differences as well as similarities**—these expressions are meaningless without an explanation as to the extent and significance of the similarities or differences between the known and questioned material. These terms should never be substituted for gradations of opinions.

**cannot be associated/cannot be connected**—these terms are too vague and may be interpreted as reflecting bias as they have no counterpart suggesting that the writer cannot be eliminated either.

**no identification**—this expression could be understood to mean anything from a strong probability that the suspect wrote the questioned writing; to a complete elimination. It is not only confusing but also grammatically incorrect when used informally in sentences such as " I no identified the writer" or "I made a no ident in this case."

**inconclusive**—this is commonly used synonymously with no conclusion when the examiner is at the zero point on the scale of confidence. A potential problem is that some people understand this term to mean something short of definite (or conclusive), that is, any degree of probability, and the examiner should be aware of this ambiguity.

**positive identification**—This phrase is inappropriate because it seems to suggest that some identifications are more positive than others.

**[strong] reason to believe**—there are too many definitions of *believe* and *belief* that lack certitude. It is more appropriate to testify to our conclusion (or determination or expert opinion) than to our belief, so why use that term in a report?

**qualified identification**—An *identification* is not qualified. However, opinions may be qualified when the evidence falls short of an *identification* or *elimination*.

ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.

This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.

This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org). Permission rights to photocopy the standard may also be secured from the ASTM website (www.astm.org/COPYRIGHT/).