# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

Civil Action No.: 1:13-cv-00256-RJA

**PAUL D. CEGLIA**,

Plaintiff,

vs.

**ERIC HIMPTON HOLDER, JR.**,
as Attorney General of the United States,
**PREETINDER S. BHARARA**,
as US Attorney for the Southern District
of New York, **JANIS M. ECHENBERG**
and **CHRISTOPHER D. FRYE**,
in their capacity as representatives of the U.S.
Attorney's Office for the Southern District of New
York,

Defendants.

**DECLARATION OF KATHERINE M. KOPPENHAVER, CDE**

I, Katherine M. Koppenhaver, do hereby declare, under the pains and penalties of perjury of the United States, as follows:

1. I am a board certified forensic document examiner and have been qualified as an expert and given expert testimony in the field of forensic document examination on many occasions. A true and complete copy of my curriculum vitae is attached as Exhibit A. I have personal knowledge of the facts stated herein.

2. On December 17, 2013, I examined a “Work for Hire Contract” document that appears to bear the signatures of Paul Ceglia and Mark Zuckerberg at the United States Attorney’s Office in New York City. At the request of Mr. Ceglia’s counsel, I examined and

compared the two pages of the document to determine if it is an intact document and whether it was altered or page substitutions have been made.

3. I was also asked to examine Page 2 of the Work for Hire document to determine if indentations appear on that page and, if so, if they resulted from handwriting which appears on Page 1.

4. William Koppenhaver photographed the Work for Hire Contract including by the use of side lighting and ultra-violet lighting. His photographic images are those in this declaration as well as those of the Work for Hire Contract which are annexed as Exhibit B.

5. With respect to whether indentations appear on Page 2 of the Work for Hire Contract, I was able to observe the existence of indentations on Page 2 with the naked eye, without side-lighting or magnification. It was determined that the handwritten words on Page 1 and the indentations on Page 2 were correctly aligned. Based on my observations using side-lighting, the indentations can be read as "Providing web designer is finished by May 24, 2003," which matches the handwriting on Page 1. See Exhibit B attached. The initials "PC" and "MZ", also written on Page 1, were also identifiable as correctly aligned indentations on Page 2.

**First Page**

**Second Page**

6. Photographs were taken of the staple holes in the Work for Hire Contract. There was one set of staple holes for each page and they aligned indicating that the document had been stapled only once and the staple had been removed. This evidence supports the conclusion that another first page was never stapled to Page 2 and that Page 1 is the only first page that was attached to Page 2 and, therefore, Page 1 was not substituted for another page.

**Staple Holes on Page 1** **Staple Holes on Page 2**

7 . Based upon the comparisons made between Page 1 and Page 2 of the Work for Hire Contract, it is my opinion to a reasonable degree of scientific certainty that the Work for Hire Contract is an unaltered document which does not contain substitutions.

8. ASTM International's Designation E 1658-08 – Standard Terminology for Expressing Conclusions of Forensic Document Examiners is the recognized standard for the terminology used by forensic document examiners to express their conclusions. A copy of the ASTM standard is annexed hereto as Exhibit C. (That standard has also been adopted verbatim by The Scientific Working Group for Forensic Document Examination (see http://www.swgdoc.org/)).

9 . With regard to my opinion that the Work for Hire Contract is an unaltered document which does not contain substitutions, that opinion is stated with the highest degree of

Case 1:12-cr-00876-RJS Document 61-3 Filed 01/09/14 Page 4 of 15

confidence, at the "identification" level, meaning a definite conclusion of identity.

10. I have seen the Postal Service's Forensic Document Examiner's report of September 27, 2013, and although he, too, examined original documents, his opinion is rendered at the "indications" level which, as the ASTM discussion notes state, is "a very weak opinion," not rising even to the level of "probable."

I swear that the foregoing is true and correct under the pains of perjury of the United States.

Dated: December 31 , 2013

Katherine M. Koppenhaver

Katherine M. Koppenhaver, CDE

# EXHIBIT A

Case 1:12-cv-00256-VSB Document 61-3 Filed 01/20/14 Page 6 of 15

Katherine Mainolfi Koppenhaver
P.O Box 324, Joppa, Md 21085

CURRICULUM VITAE

Board Certified Document Examiner
(410) 679-8257

SAFE
SCIENTIFIC ASSOCIATION OF FORENSIC EXAMINERS

**FOUNDER & CEO** of The Scientific Association of Forensic Examiners (SAFE) in 2012.
**CERTIFICATION:** Certified by the National Association of Document Examiners (NADE) 1986 - 2012 and SAFE beginning in 2013 Awarded Diplomate Status by NADE in 1996-2012.
**BOARD CERTIFIED:** Board Certified by the Board of Forensic Document Examiners (BFDE) 2004
**PROFICIENCY TESTING:** 2001 - 2008 with FEPL with a high degree of accuracy examining over 1900 samples.

**COURT-QUALIFICATIONS** : Testified in court and deposition over 470 times since 1983 in:

U. S. District Court for Maryland
U. S. District Court of Virginia
United States Court of Federal Claims, Wash., DC
Tribunal of Gothenberg, Sweden
Regional Trial Court of Makati City, Manila
Superior Court of the District of Columbia
Superior Court of Sussex County, Georgetown, DE
Chancery Court of Delaware, Wilmington, DE
Arbitration Hearing in Rehoboth, Delaware
Civil District Court for Parish of New Orleans, LA
Superior Court of Madison County, New York
Superior Court of Westchester County, New York
District Court of Suffolk Co., New York
Probate Court of Clark County, Las Vegas, Nevada
Middlesex County & Monmouth County, New Jersey
Adams County Probate Court, Gettysburg, PA
Columbia County Court of Common Pleas, PA
Circuit Court of Alexandria, Virginia
Circuit Court of Arlington County, Virginia
Circuit Court of Fairfax County, Virginia
Circuit Court of Fauquier County, Warrenton, VA
District Court of Manassas, Manassas, Virginia
Circuit Court of Norfolk, Virginia
Kanawha County Family Court, Charleston, WVA
Dallas County, Dallas, Texas
General Court Martial, First Judicial Court, APG
Orphans Court of Allegany County
Circuit, District, Orphans Court of Anne Arundel Co.
Circuit, District, Orphans Court of Baltimore County
Circuit, District, Orphans Court of Baltimore City
Circuit, District, Orphans Court of Carroll County
Circuit Court for Calvert County
Circuit & Orphans Court of Cecil County
Orphan's Court of Charles County
Orphans Court of Garrett County
Circuit, District, Orphans Court of Howard County
District Court of Kent County
Circuit & District Court of Montgomery County
Circuit, District, Orphans Court of Prince George Co.
District Court of Queen Anne's County
Circuit Court of Somerset County
Circuit Court of Washington County
Circuit Court of Wicomico County
Circuit, District & Orphan's Court of Worchester County
District Court of Worchester County
Alcohol Beverage Control Board, Washington DC
American Arbitration Association
American Labor Arbitration Board
Board of Law Examiners for Maryland
Inquiry Panels for Attorney Grievance Commission
Maryland Vehicle Administrative Hearings
NASD Arbitration & Securities Arbitration Board
Unemployment Hearings, Baltimore City & County
Depositions: Bexar County, San Antonio, Texas, Corpus Christi, Texas and Houston, Texas, San Francisco, California, and Woodbury, NJ

**SPECIALIZED TRAINING - 69 Seminars and Workshops attended.**

- Attended Seminars sponsored by NADE on questioned documents annually from 1982 to 2011.
- *Handwriting Identification* by Judith Housley, CDE & Jeanette Farmer, July 24 & 25, 1989, Wash, DC.
- *Ink and Paper Analysis* by Albert H. Lyter III of Federal Forensic Associates, Philadelphia, Pennsylvania.
- *Document Examination Seminar* by Marcel Matley and Ted Widmer, 1992, San Francisco, California.
- National Handwriting Seminar, American Board of Forensic Examiners, Aug. 5-9, 1993, Branson, MO.
- National Academy of the American Board of Forensic Examiners, Aug. 4-7th, 1994, Branson, MO.
- American Board of Forensic Examiners, Expert Witnessing, 7 credit hours, Feb. 22, 1995, Honolulu, HI.
- AFDE & International Graphonomics Society Symposium, August 7-11, 1995, London, Ontario Canada.
- Court Testimony Professional Development Seminar for Document Examiners by Larry Ziegler, 10/2/96.
- Forgery Investigators Association of Texas Seminar, April 18, 1997, Georgetown, Texas.
- Holistic Analysis: Physiological & Psychological Foundations, Forensic Applications, Marcel Matley, 8/8/99.
- American Academy of Forensic Science, QD General Sessions (1993, 1995, 1996, 1997, 2004)
- Mid-Atlantic Association of Forensic Scientists, Questioned Document Sessions (1993 thru 1998)
- The National Forensic Center Conferences (NFC) ( 1991, 1992, 1995 thru 1997)
- Economic Crime Summit, May 9-12, 1999 in Orlando, Fl & May 7-10, 2000 in Austin, Texas
- IAQDE Annual Seminar, Sept. 28th, 1995, Kansas City, Kansas; Sept. 24-28, 2002. Sarasota, FL
- AFDE & IGS Symposium, Sept. 9-11, 1994, Las Vegas, NV Oct 26-29, 2005 San Antonio, TX, Nov 2-5, 2003, Phoenix Arizona & Oct 20-23, 2004, Rochester, New York
- SEAK, June 17-18, 2005 Cape Cod
  Measurement Science and Standards in Forensic Handwriting Analysis Conf., June 4-5, Gaithersburg, MD 2013

**Last updated: September 10, 2013**

**FORMAL EDUCATION**

- Harford Community College with Associate of Applied Science in Criminal Justice with highest honors.
- Questioned Document Course at Northern Virginia Community College. & George Washington University taught by Larry Ziegler, Sr. FDE with FBI.

**BOOKS PUBLISHED**

- *Evaluating Evidence*, 1990
- *The Business of Document Examination*, 1991, Revised 1997
- *How To Be A Credible Witness or Taking the Fear Out of Testifying*, 1992
- *A Selection of International Penmanship Systems*, 1993
- *Demonstrative Evidence*, 1996
- *Scientific Document Examination Manual*, 1997
- *Attorney's Guide to Document Examination*, Quorum Books, Greenwood Publishers, 2002
- *Forensic Document Examination, Principles and Practices,* Humana Press, 2007.
- *A Systematic Examination of Handwriting,* 2008.

**DOCUMENT EXAMINATION INTERACTIVE TRAINING PROGRAM**

- Commissioned to write the Forensic Document Examination Interactive Training Program for the National Questioned Document Examiners Association in Texas. Completed and copyrighted in 1994.
- Course revised in 2004.
- Teach a weekly class on all aspects of document examination using a virtual classroom since 2008.

**MEMBERSHIPS and AWARDS**

- National Association of Document Examiners from 1982 to 2012, Document Examiner of the Year in 1991. President of NADE 1990 -1994. Re-elected President 2000 - 2005.
- Expert Witness Institute, London, England (EWI) since 2001.
- Scientific Association of Forensic Examiners since 2012 – Founder and CEO
- Maryland Investigators and Security Association (MISA).
- ASTM Main Committee 30 – Sub Committee 02 Questioned Document Section 2004 - 2012.
- Volunteer of the Year Award 2001 by the Maryland Volunteer Lawyers Service.

**SEMINARS PRESENTED – 79 with at least 26 being one full day.**

- American Institute of Banking: *Signature Verification and Forgery Alert.*
- American Handwriting Association: *Business of Document Examination*, CA, CO, AZ.
- *Document Examination Workshop*, Los Angeles, CA,
- National Academy of the ABFE: Branson, MO, 1993; 1994; 1995.
- General Public: *Reducing Losses from Forged and Fraudulent Checks*, Dallas, TX, 1995.
- Law Enforcement Officers: *Check Identification and Classification*, Dallas TX, Houston TX, OK
- National Forensic Center FC: San Diego, CA, Palm Springs, CA, Tampa, FL
- ASIS: *Desktop Forgery through Scanning* , Orlando, FL; Baltimore, MD 2000
- IAQDE: *The Handwriting of the Blind, A Case Study*, Sarasota , FL,
- Document Examiners: *Presenting A Professional Image,* Santa Monica, CA
- The School of Forensic Document Examination, Dallas, TX, 2004, 2005
- Forensic Document Examiners, Inc: *Presenting a Professional Image,* Baltimore, MD .2007.
- Forensic Document Examiners, Inc, Seminar and Workshop, Baltimore, MD. 2008
- Forensic Document Examiners, Inc, Interactive Seminar and Workshop, Edgewood, MD. 2009
- Maryland Association of the Judges of the Orphans' Court Spring Conference 2010, Annapolis, MD
- Forensic Document Examiners, Inc, Interactive Seminar and Workshop, Edgewood, MD. 2010, 2011, 2012.

**FOR THE NATIONAL QUESTIONED DOCUMENT EXAMINERS ASSOCIATION**

- Dallas, Texas Nov. 15, 1992.
- Kansas City, MO, June 11 & 12, 1994.
- Shawnee Mission, KS, November 7 & 8, 1996.
- Dallas, TX, January 11, 1996 & January 9, 1997.
- Dallas, Texas, March 17 & 18, 2001
- Atlanta, Georgia on Sept. 18 & 19, 1993.
- Dallas, Texas, June 10-11, 1995.
- Dallas, Texas, March 1 & 2, 1997.
- Dallas, Texas, March 18 & 19, 2000

**TOPICS INCLUDE**: *Check Points, Principles of Document Examination, Multiple Personalities and Other Identity Problems, Identifying Handprinting, The Telltale Dot and Trash Marks, and Semantics*

**Last updated: September 10, 2013**

**PAPERS PRESENTED**

- *Disguised Writing in Anonymous Writing Cases* , International Graphonomics Society, London, Ontario, Canada, August 10, 1995.

**LECTURES PRESENTED AT NADE CONFERENCES**

- *Case of A Promissory Note*, 1987.
- *Evaluating Evidence*, 1990
- *Red Flags*, 1994.
- *PreConference Workshop*, 1997.
- *Workshop on Qualifying as an Expert*, 1998
- *Development of Children's Handwriting*, 2000
- *Bond Salon Training in Cross-Examination,* 2001
- *How not to Testify, 2004*
- *A Systematic Examination of Handwriting 2006*
- *Distinguishing Between Court & Deposition Testimony* 2009
- *Evidence*, 1989.
- *Impeaching the Expert Witness*, 1992
- *Our Profession and It's Problems*, 1995
- *Hired to Criticize, An Ethical Problem*, 1997
- *Demonstrative Evidence,* 1999
- *Professional Panic*, 2002
- *Distinguishing Between Disguise & Simulation, 2003*
- *Handling Criticism 2005*
- *A Systematic Examination of Handwriting 2008*
- Pre-Conference Personal Training 2009, 2010, 2011

**ARTICLES PUBLISHED IN THE NADE JOURNAL** - 35 articles published:

- *Do's and Don't's for Accuracy in Suspect Document Cases,* August 1983, also in The Daily Record on March 2, 1983.
- *Qualifying as an Expert in Court*, Nov. 1987.
- *Handling Cross Examination*, May 1988.
- *Evidence*, November 1989.
- *Preparing Court Exhibits*, February 1990.
- *Identifying Class Characteristics vs Individual Characteristics,* February 1990.
- *Disguised Writing*, May 90.
- *Letter of Opinion*, May 90.
- *Working with Lawyers & Their Clients*, Aug. 90.
- *Evaluating Evidence - A Systematic Examination of Handwriting Characteristics in Suspect Document Cases*, November 1990.
- *How To Be A Credible Witness*, February 1991.
- *Interpreting the Writing Movement for Identification Purposes*, May, 1991.
- *Reducing Losses from Forged and Fraudulent Checks*, August, 1991.
- *Desktop Forgery*, August, 1991.
- *The Karlene Ann Griffith Case*, November 1991.
- *The Techniques of Cross-Examination*, May 1992.
- *The Elements of Fraud*, August 1992.
- *Handwriting Systems of the World*, Nov. 1992.
- *Impeaching the Expert*, November 1992.
- *Fundamental Truths About Handwriting*, April '93
- *Equipping Your Document Laboratory*, Nov 1993.
- *The Jack the Ripper Diary*, February 1994.
- *Principles of Handwriting Identification*, July 94.
- *Handprinting*, July 1994.
- *The TellTale Dots*, December, 1994.
- *Detecting Erasures in Pen and Pencil Writing*, Spring, 1995.
- *Deposition Testimony*, Spring 1996.
- *Principles of Identification*, December 1996
- *The Care & Preservation of Documents*, 1997
- *Descriptive Terminology*, Spring 1998
- *Why Document Examiners Disagree*, Winter 1998
- *Examination of a Passport*, Summer 1999
- *Demonstrative Evidence*, Spring 2000
- *Enough Exemplars*, Fall 2000
- *The Road to Graphic Maturity*, Summer 2001
- *Distinguishing Between Disguise & Simulation*, 2003

**OTHER PUBLICATIONS**

- Editor of the *Communique*, quarterly newsletter for NADE from1990 -2009 (approximately 95 issues published)
- Currently publishing a newsletter for SAFE – to date I have published 4 issues published.
- Was Co-Editor of *The NADE Journal* published 3-4 times a year through 1998.
- *Collecting Documents in Questioned Document Cases*, The MISA Messenger, Vol. 5, No. 7, July 1997
- *The Care and Preservation of Documents*, The MISA Messenger, Vol. 5, No. 8, August, 1997
- *From Graphology to Document Examination*, The Vanguard, January-March 2000.
- *The Document Examiner*, The Vanguard, July-September, 2000.
- *Qualifying As An Expert In Court*, The Vanguard, April - June 2001.
- *Presenting Testimony in Court*, The Vanguard, July - September 2001.
- *How To Help Consumers & Businesses Deter Document Forgery*, White Collar Crime Fighter, 7/00.
- *Outsmarting Today's High Tech Forgers and Counterfeiters,* White Collar Crime Fighter, 6/04
- *New High-Tech Tools for Busting Forgers and Counterfeiters*, White Collar Crime Fighter, 10/04.

**ARTICLES PUBLISHED IN THE DAILY RECORD**

- *Executive Order Provides Reforms To Improve Efficiency in Federal Court* on February 11, 1992.
- *Impeaching Experts on the Stand* on March 16, 1992.
- *Attorneys Should Ask Themselves Questions When Choosing Expert* on Sept. 5, 1992.
- *Careful Research Necessary Before Engaging in Cross-Examination* on Oct. 20, 1992.

**Last updated:September 10, 2013**

# EXHIBIT B

Case 1:12-cv-00876-VSB Document 79 Filed 01/29/14 Page 11 of 16

beyond that point.

agreed upon project due date i for the StreetFax software is

Providing web Design is Finished by May 22 2003

on completion for the expanded project with working title

incurred by the Purchaser over and above
rom the Seller plus freight costs shall be for

shall not be or become liable to the Seller or
ugh or under the Seller for any portion of
urchaser elects not to accept following
fault.

he items to be supplied hereunder free and
ces, and claims of laborers or material men
hold payment pending receipt of evidence
actory to it of the absence of such items,

y material relating thereto shall be governed

The signatures be

Buyer – Paul Ceg

Seller – Mark Zu

# EXHIBIT C



Designation: E1658 – 08

# Standard Terminology for Expressing Conclusions of Forensic Document Examiners[1]

This standard is issued under the fixed designation E1658; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This terminology is intended to assist forensic document examiners in expressing conclusions or opinions based on their examinations.

1.2 The terms in this terminology are based on the report of a committee of the Questioned Document Section of the American Academy of Forensic Science that was adopted as the recommended guidelines in reports and testimony by the Questioned Document Section of the American Academy of Forensic Science and the American Board of Forensic Document Examiners.[2]

## 2. Referenced Documents

2.1 *ASTM Standards:*[3]

E444 Guide for Scope of Work of Forensic Document Examiners

## 3. Significance and Use

3.1 Document examiners begin examinations from a point of neutrality. There are an infinite number of gradations of opinion toward an identification or toward an elimination. It is in those cases wherein the opinion is less than definite that careful attention is especially needed in the choice of language used to convey the weight of the evidence.

3.2 Common sense dictates that we must limit the terminology we use in expressing our degrees of confidence in the evidence to terms that are readily understandable to those who use our services (including investigators, attorneys, judges, and jury members), as well as to other document examiners. The expressions used to differentiate the gradations of opinions should not be considered as strongly defined "categories". These expressions should be guidelines without sharply defined boundaries.

3.3 When a forensic document examiner chooses to use one of the terms defined below, the listener or reader can assume that this is what the examiner intended the term to mean. To avoid the possibility of misinterpretation of a term where the expert is not present to explain the guidelines in this standard, the appropriate definition(s) could be quoted in or appended to reports.

3.4 The examples are given both in the first person and in third person since both methods of reporting are used by document examiners and since both forms meet the main purpose of the standard, that is, to suggest terminology that is readily understandable. These examples should not be regarded as the only ways to utilize probability statements in reports and testimony. In following any guidelines, the examiner should always bear in mind that sometimes the examination will lead into paths that cannot be anticipated and that no guidelines can cover exactly.

3.5 Although the material that follows deals with handwriting, forensic document examiners may apply this terminology to other examinations within the scope of their work, as described in Guide E444, and it may be used by forensic examiners in other areas, as appropriate.

3.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 4. Terminology

4.1 *Recommended Terms:*

**identification (definite conclusion of identity)**—this is the highest degree of confidence expressed by document examiners in handwriting comparisons. The examiner has no reservations whatever, and although prohibited from using the word "fact," the examiner is certain, based on evidence contained in the handwriting, that the writer of the known material actually wrote the writing in question.

*Examples*—It has been concluded that John Doe wrote the questioned material, or it is my opinion [or conclusion] that John Doe of the known material wrote the questioned material.

**strong probability (highly probable, very probable)**—the evidence is very persuasive, yet some critical feature or quality is missing so that an *identification* is not in order;

---

[1] This terminology is under the jurisdiction of ASTM Committee E30 on Forensic Sciences and is the direct responsibility of Subcommittee E30.02 on Questioned Documents.

Current edition approved Aug. 15, 2008. Published October 2008. Originally approved in 1995. Last previous edition approved in 2004 as E1658 – 04. DOI: 10.1520/E1658-08.

[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

[3] McAlexander T. V., Beck, J., and Dick, R., "The Standardization of Handwriting Opinion Terminology," *Journal of Forensic Science*, Vol. 36, No. 2, March 1991, pp. 311–319.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

however, the examiner is virtually certain that the questioned and known writings were written by the same individual.

*Examples*—There is *strong probability* that the John Doe of the known material wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *very probably* wrote the questioned material.

Discussion—Some examiners doubt the desirability of differentiating between **strong probability** and **probable**, and certainly they may eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

**probable**—the evidence contained in the handwriting points rather strongly toward the questioned and known writings having been written by the same individual; however, it falls short of the" virtually certain" degree of confidence.

*Examples*—It has been concluded that the John Doe of the known material probably wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *probably* wrote the questioned material.

**indications (evidence to suggest)**—a body of writing has few features which are of significance for handwriting comparison purposes, but those features are in agreement with another body of writing.

*Examples*—There is evidence which *indicates* (or *suggests*) that the John Doe of the known material may have written the questioned material but the evidence falls far short of that necessary to support a definite conclusion.

Discussion—This is a very weak opinion, and a report may be misinterpreted to be an identification by some readers if the report simply states, "The evidence *indicates* that the John Doe of the known material wrote the questioned material." There should always be additional limiting words or phrases (such as "may have" or "but the evidence is far from conclusive") when this opinion is reported, to ensure that the reader understands that the opinion is weak. Some examiners doubt the desirability of reporting an opinion this vague, and certainly they cannot be criticized if they eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

**no conclusion (totally inconclusive, indeterminable)**—This is the zero point of the confidence scale. It is used when there are significantly limiting factors, such as disguise in the questioned and/or known writing or a lack of comparable writing, and the examiner does not have even a leaning one way or another.

*Examples*—*No conclusion* could be reached as to whether or not the John Doe of the known material wrote the questioned material, or I could not determine whether or not the John Doe of the known material wrote the questioned material.

**indications did not**—this carries the same weight as the indications term that is, it is a very weak opinion.

*Examples*—There is very little significant evidence present in the comparable portions of the questioned and known writings, but that evidence *suggests* that the John Doe of the known material did not write the questioned material, or I found *indications* that the John Doe of the known material did *not* write the questioned material but the evidence is far from conclusive.

See Discussion after **indications**.

**probably did not**—the evidence points rather strongly against the questioned and known writings having been written by the same individual, but, as in the probable range above, the evidence is not quite up to the "virtually certain" range.

*Examples*—It has been concluded that the John Doe of the known material probably did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material probably did not write the questioned material.

Discussion—Some examiners prefer to state this opinion: "It is unlikely that the John Doe of the known material wrote the questioned material." There is no strong objection to this, as "unlikely" is merely the Anglo-Saxon equivalent of "improbable".

**strong probability did not**—this carries the same weight as strong probability on the identification side of the scale; that is, the examiner is virtually certain that the questioned and known writings were not written by the same individual.

*Examples*—There is strong probability that the John Doe of the known material did not write the questioned material, or in my opinion (or conclusion or determination) it is highly probable that the John Doe of the known material did not write the questioned material.

Discussion—Certainly those examiners who choose to use "unlikely" in place of "probably did not" may wish to use "highly unlikely" here.

**elimination**—this, like the *definite conclusion of identity*, is the highest degree of confidence expressed by the document examiner in handwriting comparisons. By using this expression the examiner denotes no doubt in his opinion that the questioned and known writings were not written by the same individual.

*Examples*—It has been concluded that the John Doe of the known material did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material did not write the questioned material.

Discussion—This is often a very difficult determination to make in handwriting examinations, especially when only requested exemplars are available, and extreme care should be used in arriving at this conclusion.

4.1.1 When the opinion is less than definite, there is usually a necessity for additional comments, consisting of such things as reasons for qualification (if the available evidence allows that determination), suggestions for remedies (if any are known), and any other comments that will shed more light on the report. The report should stand alone with no extra explanations necessary.

Case 1:12-cv-00576-VSB Document 61-3 Filed 01/20/14 Page 15 of 15

4.2 *Deprecated and Discouraged Expressions*:

4.2.1 Several expressions occasionally used by document examiners are troublesome because they may be misinterpreted to imply bias, lack of clarity, or fallaciousness and their use is deprecated. Some of the terms are so blatantly inane (such as "make/no make") that they will not be discussed. The use of others is discouraged because they are incomplete or misused. These expressions include:

**possible/could have**—these terms have no place in expert opinions on handwriting because the examiner's task is to decide to what degree of certainty it can be said that a handwriting sample is by a specific person. If the evidence is so limited or unclear that no definite or qualified opinion can be expressed, then the proper answer is *no conclusion*. To say that the suspect "could have written the material in question" says nothing about probability and is therefore meaningless to the reader or to the court. The examiner should be clear on the different meanings of "possible" and "probable," although they are often used interchangeably in everyday speech.

**consistent with**—there are times when this expression is perfectly appropriate, such as when "evidence consistent with disguise is present" or "evidence consistent with a simulation or tracing is present, but "the known writing is consistent with the questioned writing" has no intelligible meaning.

**could not be identified/cannot identify**—these terms are objectionable not only because they are ambiguous but also because they are biased; they imply that the examiner's task is only to identify the suspect, not to decide whether or not the suspect is the writer. If one of these terms is used, it should always be followed by "or eliminate[d]".

**similarities were noted/differences as well as similarities**—these expressions are meaningless without an explanation as to the extent and significance of the similarities or differences between the known and questioned material. These terms should never be substituted for gradations of opinions.

**cannot be associated/cannot be connected**—these terms are too vague and may be interpreted as reflecting bias as they have no counterpart suggesting that the writer cannot be eliminated either.

**no identification**—this expression could be understood to mean anything from a strong probability that the suspect wrote the questioned writing; to a complete elimination. It is not only confusing but also grammatically incorrect when used informally in sentences such as." I no identified the writer" or "I made a no ident in this case."

**inconclusive**—this is commonly used synonymously with no conclusion when the examiner is at the zero point on the scale of confidence. A potential problem is that some people understand this term to mean something short of definite (or conclusive), that is, any degree of probability, and the examiner should be aware of this ambiguity.

**positive identification**—This phrase is inappropriate because it seems to suggest that some identifications are more positive than others.

**[strong] reason to believe**—there are too many definitions of *believe* and *belief* that lack certitude. It is more appropriate to testify to our conclusion (or determination or expert opinion) than to our belief, so why use that term in a report?

**qualified identification**—An *identification* is not qualified. However, opinions may be qualified when the evidence falls short of an *identification* or *elimination*.

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org). Permission rights to photocopy the standard may also be secured from the ASTM website (www.astm.org/COPYRIGHT/).*