# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

_____

### PAUL D. CEGLIA,

#### Plaintiff,

#### v.

### MARK ELLIOT ZUCKERBERG, and
### FACEBOOK, INC.,

#### Defendants.

_____

### REPORT
### and
### RECOMMENDATION

### 10-CV-00569A(F)

# TABLE OF CONTENTS

**Page**

JURISDICTION..................................................................................................... 2

BACKGROUND......................................................................................................2

FACTS.....................................................................................................................8

DISCUSSION........................................................................................................14

1.  Jurisdiction, Seventh Amendment, Fed. R. Evid. 902, and Use of Expert Evidence....................................................................................................15

2.  Standard of Proof......................................................................................27

3.  Merits of Defendants' Motion to Dismiss ................................................31

    A.  Clear and Convincing Evidence Establishes the StreetFax Document's Authenticity.........................................................................33

    B.  Clear and Convincing Evidence Establishes the Work for Hire Document and Supporting E-mails are Fraudulent..............................49

        1.  Work for Hire Document...........................................................49

            a.  Chemical Analysis of Handwritten Notations.................49

            b.  Printing variations between pages 1 and 2....................61

            c.  Printer, Toner and Paper Variations...............................64

            d.  Page One Substitution Theory and Staple Holes...........70

            e.  Handwriting Analysis......................................................75

            f.  StreetFax LLC References..............................................86

            g.  Backdated Versions of Work for Hire Document...........87

            h.  Hex Editor......................................................................92

i

**Page**

2. Supporting E-mails Quoted and Referenced in Amended Complaint...................................................................................94

    a. Back-Dating Anomalies.................................................96

    b. Formatting Anomalies.................................................108

    c. Historical Inaccuracies...............................................110

    d. Harvard E-mail Server............................................... 112

    e. Linguist Analysis.......................................................115

C. Spoliation and Litigation Misconduct......................................................119

1. Spoliation...............................................................................120

    a. Multiple Versions of Work for Hire Document..............121

    b. "Baking" of Work for Hire Document...........................122

    c. Missing USB Drives.......................................................133

    d. Reinstallation of Windows............................................137

    e. Deletion of Electronic Copies of Work for Hire Document and Other Electronic Evidence...................140

2. Litigation Misconduct.................................................................144

4. Motion for Judgment on the Pleadings.........................................................150

CONCLUSION.................................................................................................151

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

PAUL D. CEGLIA,

                          Plaintiff,

           v.

MARK ELLIOT ZUCKERBERG, and
FACEBOOK, INC.,

                     Defendants.

_____

**REPORT**
**and**
**RECOMMENDATION**

**10-CV-00569A(F)**

APPEARANCES:        PAUL A. ARGENTIERI, ESQ.
                          Attorney for Plaintiff
                          188 Main Street
                          Hornell, New York 14843

                          BOLAND LEGAL, LLC
                          Attorneys for Plaintiff
                          DEAN M. BOLAND, of Counsel
                          18123 Sloane Avenue
                          Lakewood, Ohio 44107

                          GIBSON, DUNN & CRUTCHER LLP
                          Attorneys for Defendants
                          ORIN S. SNYDER, and
                          ALEXANDER H. SOUTHWELL, of Counsel
                          200 Park Avenue
                          47th Floor
                          New York, New York 10166-0193
                                    and
                          THOMAS H. DUPREE, JR., of Counsel
                          1050 Connecticut Avenue, N.W.
                          Washington, District of Columbia 20036

                          HARRIS BEACH LLP
                          Attorneys for Defendants
                          TERRANCE P. FLYNN, of Counsel
                          Larkin at Exchange
                          726 Exchange Street
                          Suite 1000
                          Buffalo, New York 14210

## JURISDICTION

This case was referred to the undersigned by Honorable Richard J. Arcara, on May 27, 2011, for pretrial matters. It is presently before the court on Defendants' motions filed March 26, 2012 to dismiss (Doc. No. 318), and for judgment on the pleadings (Doc. No. 320).

## BACKGROUND

Plaintiff Paul D. Ceglia ("Plaintiff" or "Ceglia"), commenced this action on June 30, 2010, in New York Supreme Court, Allegany County, seeking a declaratory judgment enforcing a purported contract, an accounting, and monetary damages based upon Plaintiff's alleged ownership interest in the social networking website now known as Defendant Facebook, Inc. ("Facebook"), created by Defendant Mark Elliot Zuckerberg ("Zuckerberg") (together, "Defendants"), while a student at Harvard University ("Harvard"). At the center of this action is the authenticity of the purported contract entitled "Work for Hire" (the "Work for Hire Document"), allegedly executed on April 28, 2003, between Plaintiff and Zuckerberg. According to the Work for Hire Document, Plaintiff hired Zuckerberg to perform programming for StreetFax.com ("StreetFax"), an on-line database developed by Plaintiff, and Plaintiff would help fund the development of Facebook in exchange for a one-half interest in Facebook. In an amended complaint filed April 11, 2011 (Doc. No. 39) ("Amended Complaint"), Plaintiff asserts seven claims for relief against Zuckerberg including (1) declaratory relief; (2) breach of fiduciary duties; (3) constructive fraud; (4) actual fraud; (5) declaratory relief (only claim also asserted against Facebook); (6) breach of contract; and (7) breach of

the implied covenant of good faith and fair dealing.  Defendants maintain another document, the "StreetFax Document," is the operative agreement signed by the parties on April 28, 2003.

Because the authenticity of the Work for Hire Document is critical to this action, in lieu of general discovery the parties agreed to participate in discovery limited to the purported contract's authenticity and on July 1, 2011, the undersigned granted expedited discovery (Doc. No. 83) ("July 1, 2011 Expedited Discovery Order"), limited to determining whether the Work for Hire Document and e-mails referenced in and attached as exhibits to the Amended Complaint to demonstrate that Zuckerberg breached the Contract ("the supporting e-mails"), are authentic, as Plaintiff claims, or forgeries, as Defendants maintain.  Since the commencement of this action, Defendants have retained the services of Stroz Friedberg ("Stroz Friedberg"), an international firm specializing in, *inter alia*, digital forensics who conducted extensive digital forensic examination of the computers owned and used by Plaintiff during the times relevant to this action.  The Electronic Asset Protocol so ordered on July 1, 2011 (Doc. No. 85) ("Electronic Asset Protocol"), and governing Defendants' inspection of the electronic assets Plaintiff was required to produce provided for Stroz Friedberg to "create forensically-sound copies of the Electronic Assets" which Stroz Friedberg would maintain in a secure facility at their offices in New York, Electronic Asset Protocal ¶ 2, and that "[p]rior to disclosing any files or artifacts from the Electronic Assets to Defendants, Stroz Friedberg will identify and provide such files and artifacts to Plaintiff's counsel, so that counsel may conduct a privilege review of this data."  *Id.* ¶ 4.  Stroz Friedberg would then produce to Defendants' counsel only those relevant documents

Plaintiff did not designate as privileged.  *Id.* ¶ 6.

The parties filed cross-motions regarding the July 1, 2011 Expedited Discovery Order.  On August 18, 2011, the undersigned issued an Order (Doc. No. 117) ("Aug. 18, 2011 Order"), directing Plaintiff to provide, *inter alia*, a declaration identifying, by name and location, files, computers, and electronic media within Plaintiff's custody, possession, or control, and for those no longer in Plaintiff's custody, possession, or control, a detailed account of the non-existence, loss, or destruction of each item, including the approximate date on which such item was lost, destroyed, or otherwise disposed of.

After numerous discovery disputes, including requests and awards of monetary sanctions, Defendants filed on March 26, 2012, a motion to dismiss the instant action (Doc. No. 318) ("Motion to Dismiss"), asserting the contract is a forgery such that Plaintiff, by relying on the contract in pursuing his claims, is perpetrating a fraud on the court, a motion for judgment on the pleadings (Doc. No. 320) ("Motion for Judgment on the Pleadings"), in which Defendants argue the Amended Complaint's factual allegations establish Plaintiff's claims are time-barred, Plaintiff's claims fail to relate back to the date of the original complaint, and the claims are barred by the doctrine of laches (together, "Defendants' Dispositive Motions"), and a motion to stay discovery (Doc. No. 322) ("Motion to Stay"), seeking to stay discovery and defer setting a schedule for general discovery pending resolution of the Motion to Dismiss. Defendants' Motion to Dismiss is supported by the Memorandum of Law in Support of Defendants' Motion to Dismiss (Doc. No. 319) ("Defendants' Memorandum"), the Declaration of Alexander H. Southwell, Esq. (Doc. No. 324) ("Southwell Declaration"),

4

exhibits A through W (Docs. Nos. 325-332) ("Defendants' Exh(s). __"), the Declaration of Bryan J. Rose (Doc. No. 333) ("Rose Declaration"), with attached exhibits A through L (Docs. Nos. 333-1 through 333-12) ("Rose Declaration Exh(s). __"), the Declaration of Amanda M. Aycock, Esq. (Doc. No. 334) ("Aycock Declaration"), with attached exhibits A through H (Docs. Nos. 334-1 through 334-8) ("Aycock Declaration Exh(s). __"), and the Declaration of Lisa T. Simpson, Esq. (Doc. No. 335) ("Simpson Declaration"), with attached exhibit A (Doc. No. 335-1) ("Simpson Declaration Exhibit").[1]  In a Decision and Order filed April 30, 2012 (Doc. No. 366) ("April 30, 2012 D&O), the undersigned granted in part and denied in part Defendants' Motion to Stay with general discovery stayed, but a limited period of expert discovery was granted to permit Plaintiff to prepare his opposition to Defendants' Motion to Dismiss.[2]

On August 9, 2012, Defendants filed the Declaration of Alexander H. Southwell, Esq. (Doc. No. 472) ("Supplemental Southwell Declaration"), with attached exhibits including the supplemental expert report of Defendants' forensic document examiner and handwriting expert Gus R. Lesnevich ("Lesnevich") (Doc. No. 472-1) ("Supplemental Lesnevich Report").  On August 22, 2012, Plaintiff unsuccessfully moved (Doc. No. 499) to strike the Supplemental Lesnevich Report, arguing the supplemental report was a rebuttal to one of Plaintiff's expert's reports and, thus, was in

---

[1] Although Defendants filed papers in support of their Motion for Judgment on the Pleadings, the details of such papers are not provided because the undersigned is recommending granting Defendants' Motion to Dismiss.

[2] The April 30, 2012 D&O also permitted Plaintiff to conduct discovery necessary to oppose Defendants' Motion for Judgment on the Pleadings, and converted the Motion for Judgment on the Pleadings into a motion for partial summary judgment on the statute of limitations and laches issues, *i.e.*, the issues on which Defendants sought judgment on the pleadings.

violation of Fed.R.Civ.P. 26(e)(2) (imposing duty to supplement report of expert). *See* October 31, 2012 Decision and Order (Doc. No. 583) (denying Plaintiff's motion to strike Supplemental Lesnevich Report but granting Plaintiff 10 days in which to file any rebuttal expert reports).

On August 21, 2012, Plaintiff filed his Memorandum in Response to Defendants' Motion to Dismiss for Fraud on the Court (Doc. No. 481) ("Plaintiff's Response"),[3] with attached exhibits A and B (Doc. Nos. 481-1 and 481-2) ("Plaintiff's Exh(s) __"), the Declaration of Paul D. Ceglia (Doc. No. 482) ("Plaintiff's Declaration"), the Declaration of Arthur J. Kleinfeldt (Doc. No. 483) ("Kleinfeldt Declaration"), the Declaration of Paul Argentieri, Esq. (Doc. No. 484) ("Argentieri Declaration"), the transcripts of depositions of Peter V. Tytell (Doc. No.485) ("Tytell Dep. Tr."), Valery N. Aginsky (Doc. No. 486) ("Aginsky Dep. Tr."), Hany Farid (Doc. No. 487) ("Farid Dep. Tr."), Albert Lyter (Doc. No. 488) ("Lyter Dep. Tr."), John Paul Osborn (Doc. No. 489) ("Osborn Dep. Tr."), Neil Broom (Doc. No. 495) ("Broom Dep. Tr."), Michael F. McGowan (Doc. No. 496) ("McGowan Dep. Tr."), Gerald M. LaPorte (Doc. No. 497) ("LaPorte Dep. Tr."), with attached exhibits 1 through 9 (Docs. Nos. 497-1 through 497-9) ("LaPorte Dep. Exh(s). __"), and Bryan J. Rose (Doc. No. 498) ("Rose Dep. Tr."), as well as Farid Deposition exhibits 52 (Doc. No. 490) ("Farid Dep. Exh. 52"), and 53 (Doc. No. 491) ("Farid Dep. Exh. 53").

On November 9, 2012, Defendants filed their Reply Memorandum of Law in Support of Defendants' Motion to Dismiss (Doc. No. 588) ("Defendants' Reply"), and

---

[3] To correct an electronic signature error, Plaintiff's Response was refiled, without exhibits, on August 22, 2012 (Doc. No. 502).

6

the Declaration of Alexander H. Southwell, Esq. (Doc. No. 589) ("Southwell Reply Declaration"), with attached exhibits A through R (Docs. Nos. 589-1 through 589-18) ("Defendants' Reply Exh(s). __").

On November 11, 2012, Plaintiff filed his Response to Filing of New Lesnevich Report (Doc. No. 591) ("Plaintiff's Response to Supplemental Lesnevich Report"), and the transcript of the deposition of Erich Speckin (Doc. No. 593) ("Speckin Dep. Tr."), and also refiled the transcripts of the depositions of Aginsky (Doc. No. 592) and Osborn (Doc. No. 594). On November 26, 2012, Plaintiff, also without leave of the court, filed the Declaration of Paul Argentieri, Esq., in Sur-Rebuttal to Defendants' Reply to Plaintiff's Response to Their Motion to Dismiss for Fraud on the Court (Doc. No. 610) ("Plaintiff's Sur-Rebuttal"), with attached exhibits 1 and 2 (Docs. Nos. 610-1 and 610-2) ("Plaintiff's Sur-Rebuttal Exh(s). __"). On November 27, 2012, Plaintiff filed a transcript of the deposition of Larry F. Stewart (Doc. No. 611) ("Stewart Dep. Tr.").

On December 5, 2012, Plaintiff, without obtaining leave from the court, filed the Declaration of Paul Argentieri, Esq. (Doc. No. 623) ("Plaintiff's Supplemental Sur-Rebuttal"), with three attached exhibits[4] (Docs. Nos. 623-1 through 623-3) ("Plaintiff's Supplemental Sur-Rebuttal Exh(s). __"). On December 14, 2012, Defendants filed Defendants' Response to Paul Argentieri's "Sur Rebuttal" Declarations (Doc. No. 635) ("Defendants' Sur-Rebuttal Response"), and the Declaration of Alexander H. Southwell, Esq. (Doc. No. 636) ("Southwell Sur-Rebuttal Response Declaration"). Oral argument was deemed unnecessary.

---

[4] The three attached exhibits are neither numerically nor alphabetically denominated.

Based on the following, Defendants' Motion to Dismiss should be GRANTED because clear and convincing evidence establishes the StreetFax Document is the authentic contract and the Work for Hire Document is a recently created fabrication; alternatively, the Defendants' Motion to Dismiss should be GRANTED based on Plaintiff's spoliation of evidence, but DENIED based on litigation misconduct. Defendants' Motion for Judgment on the Pleadings should be DISMISSED as moot.

## FACTS[5]

Early in 2003, Plaintiff Paul D. Ceglia ("Plaintiff" or "Ceglia"), was engaged in the development of a now defunct internet database commercial endeavor, StreetFax ("the StreetFax project"), for use in the automobile insurance industry.  The StreetFax project involved the creation of an internet search engine that could locate particular street intersections within designated cities by the names of the intersecting streets provided the spelling of the relevant street names, even if misspelled,  was "close" to the correct spelling.  Amended Complaint ¶¶ 15-17.  Plaintiff posted an advertisement on Craigslist.com seeking programmers to assist with the development of the StreetFax project's search engine.  Defendant Mark Elliot Zuckerberg ("Zuckerberg"), then a Harvard student, responded to Plaintiff's Craigslist.com advertisement.[6]

On April 28, 2003, Plaintiff and Zuckerberg met in a hotel lobby in Boston, Massachusetts, signed a contract and entered into a business agreement, the disputed

---

[5] Taken from the pleadings and motion papers filed in this action.

[6] The precise dates when Plaintiff posted the Craigslist.com advertisement and Zuckerberg answered are not in the record.

8

nature of which is at the core of this action.  Specifically, Plaintiff has proffered as the signed contract a document entitled Work for Hire ("Work for Hire Document"), according to which Zuckerberg, in exchange for monetary payment from Plaintiff, agreed to provide programming and coding services for the StreetFax project, and to give Plaintiff a one-half interest in the social networking website now known as Defendant Facebook Inc. ("Facebook"), which Zuckerberg was then in the process of developing as a Harvard student.  The bulk of the agreement relates to the StreetFax project and is in typeface; a handwritten interlineation is found on the first page and is an emendation pertaining to the StreetFax project's deadline.  Zuckerberg does not deny signing a contract with Plaintiff on April 28, 2003, but maintains he agreed only to perform limited website development work for StreetFax, and the subject of Facebook was not only never discussed, but Zuckerberg did not even conceive of the idea of Facebook until months later.  Plaintiff maintains upon contracting with Zuckerberg to work on the StreetFax project, Zuckerberg realized the same source code Zuckerberg had contracted to create for the StreetFax project could be adapted for use in creating Facebook, *i.e.*, permitting a user to search for a person by name so long as the spelling of the name of the searched person was close to, if not correct.  The record does not indicate whether the parties executed two originals of the contract or whether Zuckerberg was given a copy of the contract.  Plaintiff has proffered the purported original of the contract, copies of which were attached to the Complaint and Amended Complaint.  In contrast, Zuckerberg has proffered a copy of a different contract recovered by Stroz Friedberg, Defendants' digital forensics experts, during discovery, bearing the title "StreetFax" ("StreetFax Document"), asserting such contract is the

contract executed, and containing the agreement reached by Plaintiff and Zuckerberg on April 28, 2003, and which is devoid of any mention of Facebook.

Both sides maintain the business relationship between Plaintiff and Zuckerberg was plagued with issues regarding the work Zuckerberg was to perform for Plaintiff, and Plaintiff's payments to Zuckerberg. The copies of the canceled checks recovered from Defendants' digital forensics experts' examination of Plaintiff's computer hard drives show payments from Plaintiff to Zuckerberg that are consistent with Zuckerberg's version of the working relationship between Plaintiff and Zuckerberg as well as the terms of the StreetFax Document, and are inconsistent with the payment terms set forth in the Work for Hire Document as well as the payments referenced in the supporting e-mails.

In particular, the Work for Hire Document provides for Plaintiff to pay Zuckerberg a total of $ 2,000 for work on both the StreetFax project, as well as Facebook. Work for Hire Document, § 3, Payment Terms ("Buyer agrees to pay the seller the Sum of $ 1000 a piece for the work to be performed for Streetfax and $ 1,000 for the work to be performed for "The Page Book."). In contrast, the StreetFax Document provides for Plaintiff to pay Zuckerberg a total of $ 18,000 for work on only the StreetFax project. StreetFax Document, § 3, Payment Terms ("The Agreed upon Cost that the Seller and the Buyer have agreed upon are [*sic*] as follows: Buyer agrees to pay seller the Sum of $3,000 at the onset of this contract. The Buyer agrees to pay seller $ 2,000 on the due date of the project, and upon completion Buyer agrees to pay seller an additional $13,000 US dollars within Thirty days of delivery of the Final approved program.").

In March 2011, Plaintiff produced his electronic assets to Kasowitz, Benson,

Torres & Friedman, LLP ("the Kasowitz firm"), a law firm Plaintiff briefly retained in connection with this action, but which never appeared on Plaintiff's behalf, withdrawing from representation on April 12, 2011.  On March 29, 2011, Plaintiff's former digital forensic expert, the Capsicum Group ("Capsicum"), at the request of the Kasowitz firm, captured images of various electronic media produced by Plaintiff in connection with this action, including Plaintiff's laptop computer, floppy disks, and a loose internal computer hard drive referred to as the Seagate Hard Drive.  Capsicum never produced any written report or opinion regarding this action but, rather, its involvement was limited to imaging and data collection and conveying to one Aaron H. Marks, Esq. ("Marks") of the Kasowitz firm the information recovered from the electronic assets.  Upon reviewing the information and documents received from Capsicum, Marks advised Plaintiff's counsel, Paul A. Argentieri, Esq. ("Argentieri"), that certain documents Capsicum had retrieved established page 1 of the Work for Hire Document was fabricated, and that the Kasowitz firm was withdrawing from the case.

During court-ordered expedited discovery limited to determining the Work for Hire Document's authenticity, no exact copy of the executed Work for Hire Document was found among the electronic media Plaintiff produced, including three computers, three hard drives, 174 floppy disks, and 1087 compact disks ("CDs") ("the Ceglia Media").  In connection with the July 1, 2011 Expedited Discovery Order, Defendants' digital forensics experts Stroz Friedberg examined and analyzed between July 15 and 22, 2011, in three different locations including Chicago, Illinois, Buffalo, New York, and Sarasota, Florida, certain digital media belonging to and identified by Plaintiff as relevant to this action ("Ceglia Media"), including (1) a Compaq Presario desktop

computer, (2) an eMachines desktop computer, (3) a Toshiba Satellite laptop computer, (4) a Maxtor Personal Storage 3200 external hard drive,[7] (5) a Seagate internal hard drive ("Seagate Hard Drive") Plaintiff produced as a standalone device,[8] (6) a Western Digital internal hard drive Plaintiff produced as a standalone device, (7) 174 floppy disks, (8) 1087 CDs, and (9) one DVD. Stroz Friedberg Report[9] at 7-8. Although Stroz Friedberg had received from Argentieri a copy of the Work for Hire Document, no exact copy of the Work for Hire Document was found among the Ceglia Media examined by Stroz Friedberg. *Id.* at 11. Stroz Friedberg, however, recovered from both the Seagate Hard Drive and a forensic image of the Seagate Hard Drive a copy of the StreetFax Document. *Id.* The StreetFax Document had been stored as an attachment to two e-mails Ceglia had sent on March 3, 2004 from his ceglia@adelphia.net e-mail account to one Jim Kole, Esq. ("Kole"), an attorney then associated with the Chicago law firm Sidley Austin Brown & Wood LLP ("Sidley Austin"). The StreetFax Document's first page was sent to Kole as an attachment to the first e-mail, with the second page sent as an attachment to the second e-mail. Forensic examinations and comparisons by Stroz Friedberg of the StreetFax Document with the Work for Hire Document establish that the second page of the StreetFax Document is virtually identical to the second page of the Work for Hire Document, but the first pages of both documents are

---

[7] According to Stroz Friedberg, and undisputed by Plaintiff, an external hard drive is designed to be used and connected externally to a computer, rather than being inserted into the computer's case. Stroz Friedberg Report at 7.

[8] Stroz Friedberg maintains, and Plaintiff does not dispute, that an internal hard drive is designed to be used within a computer and not as an external device. Stroz Friedberg Report at 7.

[9] Southwell Declaration Exh. A.

12

different, and that scanned images of the StreetFax Document were uploaded onto Plaintiff's computer minutes before the two e-mails with the attached StreetFax Document pages were sent to Kole.  Defendants thus maintain that Plaintiff created the Work for Hire Document by amending the text of page 1 of the StreetFax Document, inserting the provisions, handwritten and initialed, purportedly giving Plaintiff an ownership interest in Facebook, and appending the amended first page to either the authentic second page of the StreetFax Document, containing Zuckerberg's signature, or a detailed copy of the second page on which Zuckerberg's signature is forged.

Plaintiff, when confronted with the StreetFax Document and accompanying e-mails, originally maintained the documents were privileged communications with his then attorney, but later maintained the StreetFax Document was created by Defendants' attorneys and then planted on Plaintiff's hard drive.  Defendants thus issued a subpoena to Sidley Austin, finding Plaintiff's March 3, 2004 e-mails with the attached files containing the StreetFax Document on Sidley Austin's server where the documents had been stored since 2004.  Also recovered were e-mails exchanged between Zuckerberg and Plaintiff, and one Karin Petersen ("Petersen"), who worked for Plaintiff on the StreetFax project, as well as copies of canceled checks from Plaintiff to Zuckerberg representing payments Plaintiff made to Zuckerberg in connection with the April 28, 2003 business agreement.  The amounts of the checks are consistent with the payment terms set forth in the StreetFax Document, but are inconsistent with the Work for Hire Document's payment terms.

During discovery, the Work for Hire Document was submitted to forensic analysis by several experts retained by Plaintiff and Defendants.  Relevant to

13

Defendants' Motion to Dismiss, when Defendants' experts examined the Work for Hire Document in July 2011, it was discolored with the white paper on which the document is printed appearing tan and the ink used in the handwritten interlineation, signatures, and initials was faded when compared to an examination by one of Plaintiff's experts on January 13, 2011. Both Plaintiff and Defendants attribute the discoloration to the Work for Hire Document having been exposed to an intense light source with Defendants asserting such exposure was done by Plaintiff in an attempt to "age" the document.

## DISCUSSION

Defendants' Motion to Dismiss seeks dismissal of the instant action on three grounds, including (1) the Work for Hire Document and supporting e-mails are fraudulent such that Plaintiff, in bringing this action, is perpetrating a fraud on the court; (2) Plaintiff has engaged in spoliation of evidence; and (3) Plaintiff has engaged in extensive litigation misconduct. Plaintiff maintains the merits of Plaintiff's arguments cannot be reached without depriving Plaintiff of his Seventh Amendment right to a jury trial, that Defendants' Motion to Dismiss incorrectly applies the "clear and convincing" evidence standard insofar as Defendants rely on expert opinions, rather than facts, and that the expert opinions on which Defendants rely in support of their motion have been sufficiently refuted by Plaintiff's experts to avoid dismissal of the action on the basis that the Work for Hire Document is a fraud. In further support of dismissal based on fraud, Defendants argue Plaintiff has acknowledged the court's inherent power to dismiss the action for fraud, Plaintiff mistakes the "clear and convincing" evidence standard, Plaintiff has failed to rebut Defendants' arguments and evidence establishing the StreetFax

14

Document is the authentic contract, and Defendants' experts' findings regarding the authenticity of the Work for Hire Document, and that Plaintiff engaged in extensive discovery abuses and litigation misconduct.

**1.    Jurisdiction, Seventh Amendment, Fed. R. Evid. 902, and Use of Expert Evidence**

The linchpin of Defendants' Motion to Dismiss is their assertion that the Work for Hire Document is a recently created fabrication such that Plaintiff, by pursuing this action, is perpetrating a fraud on the court.  Defendants argue district courts have inherent authority to dismiss an action that is based on fraud.  Defendants' Memorandum at 20-21.  Plaintiff maintains in opposition that Defendants' Motion to Dismiss requires the court to weigh evidence, particularly, expert evidence, such that the court's decision on the Motion to Dismiss will deprive Plaintiff of his Seventh Amendment right to a jury trial, and that New York substantive law permits a collateral attack based only on judgments obtained by extrinsic, but not intrinsic evidence.  Plaintiff's Response at 3-8.  In further support of the motion, Defendants argue this court's inherent authority to dismiss based on fraud has been acknowledged by Plaintiff, who has misstated the "clear and convincing" evidence standard, Defendants' Reply at 4-6, that Plaintiff has failed to rebut the salient points made by Defendants' experts in support of Defendants' assertion that the Work for Hire Document and e-mails are not genuine, *id.* at 7-26, and that Plaintiff engaged in spoliation of evidence and other litigation misconduct to hinder the court's resolution of this action.  *Id.* at 27-34.  In his Sur-Rebuttal, Plaintiff points to recent caselaw Plaintiff maintains sets forth

definitions of "fraud on the court" and the "clear and convincing" evidence standard that are inconsistent with those proffered by Defendants, and attempts to highlight what Plaintiff maintains are critical distinctions between his expert witnesses' reports and those of Defendants' expert witnesses. In his supplemental Sur-Rebuttal, Plaintiff a draws the court's attention to yet more caselaw and evidence in support of Plaintiff's opposition to Defendants' Motion to Dismiss.

In *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991), the Supreme Court articulated that a federal court's authority "to fashion an appropriate sanction for conduct which abuses the judicial process" is inherent. Sanctionable abuse includes "an attempt to perpetrate a fraud on the court." *Chambers*, 501 U.S. at 50. Such sanctions within the court's discretion range from an assessment of attorney's fees for less severe abuse of judicial process, to the most severe sanction of "outright dismissal" of an action. *Chambers*, 501 U.S. at 45 (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980)). The court's inherent power has been construed "to deny the court's processes to one who defiles the judicial system by committing a fraud on the court." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989) (filing of complaint based on bogus agreement attached to complaint constituted fraud on the court warranting dismissal of action). Specifically, "[a] 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Id.* (citing cases).

16

Significantly, courts within the Second Circuit have dismissed cases upon determining the actions were based on forged documents or fabricated evidence. *See Shangold v. Walt Disney Co.*, 275 Fed.App'x. 72, 73-74 (2d Cir. 2008) (affirming district court's dismissal of complaint as sanction after finding the plaintiffs had committed a fraud upon the court when the plaintiffs attempted to manipulate the judicial process by submitting as evidence certain documents, the fabrication of which was established by the use of certain terms which did not exist in the English lexicon as of the dates of the documents); *Scholastic, Inc. v. Stouffer*, 221 F.Supp.2d 425, 440-45 (S.D.N.Y. 2002) (sanctioning under court's inherent power defendant's submission of falsified evidence and untruthful testimony in support of copyright infringement counterclaim by dismissing such counterclaim and awarding costs and attorney's fees to plaintiff); *McMunn v. Memorial Sloan-Kettering Cancer Center*, 191 F.Supp.2d 440, 461 (S.D.N.Y. 2002) (dismissing, upon defendant's motion and in exercise of court's inherent power, employment discrimination claim and awarding defendant costs and fees to sanction plaintiff who committed fraud on the court by intentionally and in bad faith engaging in multiple instances of misconduct, including withholding credit card account statements and receipts that conclusively established plaintiff's whereabouts at time of alleged employment discrimination were inconsistent with plaintiff's claims, rendering her claims impossible); and *Cerruti 1881 S.A. v. Cerruti, Inc.*, 169 F.R.D. 573, 583-84 (S.D.N.Y. 1996) (exercising discretion and inherent power to protect court's integrity against abuse of judicial process, by granting plaintiff's motion to strike defendant's answer and counterclaims, entering judgment for plaintiff on merits, and imposing as sanction costs and fees against defendant who presented false documents and deposition testimony

in opposition to plaintiff's claims and in support of counterclaims).

Nor does a determination on Defendants' Motion to Dismiss violate Plaintiff's Seventh Amendment right to a jury trial on the merits, as Plaintiff maintains. Plaintiff's Response at 5-6. In support of this argument, Plaintiff relies, *id.*, on *Galloway v. United States*, 319 U.S. 372 (1943), and *Lynch v. United States*, 162 F.2d 987 (2d Cir. 1947), both of which are distinguishable from the instant case as neither case involved fraud; rather, both cases were appeals from directed verdicts entered in favor of the government upon determining there was insufficient evidence to support the claims. *Galloway*, 319 U.S. at 407 (holding directed verdict entered after the close of evidence did not deprive petitioner of his Seventh Amendment right to a jury trial where insufficient evidence was submitted in support of the claim); *Lynch*, 162 F.2d at 988-89 (reversing directed verdict entered by District Court after jury was unable to reach a verdict and remanding for a new trial because evidence adduced at trial, although conflicting, sufficiently established the plaintiff's claim possibility). Significantly, Plaintiff relies on the dissenting opinion in *Galloway* in support of his position. *See* Plaintiff's Response at 5-6 (quoting *Galloway*, 319 U.S. at 407 (Black, J., dissenting)).

Although the caselaw Plaintiff references fails to support his argument that dismissal of the instant action for fraud would deprive him of his Seventh Amendment right to a jury trial, Defendants draw the court's attention to two cases where the dismissal of an action for fraud was specifically found not to violate the Seventh Amendment. In *Pope v. Federal Express Corp.*, 974 F.2d 982, 984 (8th Cir. 1992), the Eighth Circuit Court of Appeals held the plaintiff's admission she fabricated an exhibit critical to her claim rendered the action devoid of any issue for the jury to decide such

that the District Court's dismissal of the action under Rule 11 did not deprive the plaintiff of her constitutional right to a jury trial.  Similarly, in *REP MCR Realty, L.L.C. v. Lynch*, 363 F.Supp.2d 984, 1015-16 (N.D.Ill. 2005), *aff'd*, 200 Fed.Appx. 592 (7th Cir. 2006), the District Court held the Seventh Amendment was not violated by its dismissal of a third-party complaint with prejudice upon finding the documents submitted in its support were fabricated, and sanctioning the third-party plaintiff for perpetrating a fraud upon the court.

The exercise of the court's inherent power to protect the integrity of its processes and judgments against purposeful fraud is a well-recognized exercise of judicial power predating adoption of the Seventh Amendment.  *Hazel-Atlas Glass Co. v. Hartford-Empire*, 322 U.S. 238, 244 (1944) (equitable relief from fraudulently obtained judgment based on fabricated document "firmly established in English practice long before the foundation of our Republic"), *overruled on other grounds*, *Standard Oil Co. v. United States*, 429 U.S. 19 (1976); *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575, 580 (1946) ("The inherent power of a federal court to investigate whether a judgment was obtained by fraud is beyond question." (citing *Hazel-Atlas Glass Co.*, 322 U.S. 238)).  The court's inherent power to protect itself from a disposition based on fraud includes the power to dismiss the action upon discovery of the fraud at the earliest point in the case.  *Hazel-Atlas Glass Co.*, 322 U.S. at 250 ("Had the District Court learned of the fraud . . . at the original infringement trial, it would have been warranted in dismissing [the] case.").  In making a finding that a fraud on the court has been committed, the court may rely on "affidavits or other acceptable evidence." *Id.* at 248.  *See also Pope*, 974 F.2d at 983 (court relied on "expert testimony and

19

demonstrative evidence" in finding note submitted by plaintiff in support of plaintiff's claim "had been manufactured as a cut and past composite of other documents" and thus fabricated).  Exercise of the court's equitable power to avoid abuse of its processes based on fraud does not entitle the abuser to a jury trial.  *See Broadnax v. City of New Haven*, 415 F.3d 265, 271 (2d Cir. 2005) (holding plaintiff not entitled to jury determination on question of equitable remedy).  As use of the court's inherent power to dismiss a case based on a fraud on the court was recognized at common law and under the court's equity jurisdiction prior to the adoption of the Seventh Amendment, dismissing Plaintiff's case based on such fraud does not violate Plaintiff's right to a jury trial under the Seventh Amendment.  *See Chambers*, 501 U.S. at 52-53 (federal law applies in diversity case to appropriate sanctions for perpetrating a fraud on court).  Accordingly, Plaintiff's argument that dismissing the action as based on fraud would deny him his constitutional right to a jury trial is without merit.

The court's inherent power to dismiss an action for fraud is not, as Plaintiff suggests, Plaintiff's Response at 6-7, restricted by Fed.R.Evid. 901 ("Rule 901") or 1008 ("Rule 1008").[10]  Rule 901 merely requires that prior to admitting an item into evidence, the proponent of the evidence must authenticate the item by "produc[ing] evidence sufficient to support a finding that the item is what the proponent claims it is." Fed.R.Evid. 901(a).  Here, Plaintiff's filing of numerous exhibits and affidavits in opposition to Defendants' Motion to Dismiss is properly construed as an attempt to

---

[10] Nor is 18 U.S.C. § 1001 ("§ 1001"), which criminalizes making false statements, except for false statements made during a judicial proceeding by a party to the proceeding or that party's counsel, relevant to this action, as Plaintiff suggests, Plaintiff's Supplemental Sur-Rebuttal ¶¶ 4-9; that the making of false statements in a judicial proceeding does not constitute, under § 1001, criminal conduct is irrelevant to whether the instant action may be dismissed as based on a fabricated document.

authenticate the Work for Hire Document as the authentic contract that governed the business relationship into which Plaintiff and Zuckerberg entered on April 28, 2003.

As relevant to the instant action, Rule 1008 provides that "in a jury trial, the jury determines" any issue regarding whether an asserted writing ever existed, or whether a writing produced at trial is the original.  Fed.R.Evid. 1008(a) and (b).  Rule 1008 is thus, on its face, limited to evidence submitted at trial and nothing within the text of Rule 1008 restricts a court's inherent authority to dismiss an action prior to trial where the only evidence submitted in support of the action is fraudulent.  Plaintiff cites no authority to the contrary.

Plaintiff's argument, Plaintiff's Response at 7-8, that Defendants' assertion regarding "fraud on the court" supports only an "intrinsic fraud" argument, and that a critical distinction under New York law permits collateral attack upon any judgment only when extrinsic fraud is established is without merit.  Preliminarily, this argument was already rejected by the undersigned in the June 28, 2012 Decision and Order (Doc. No. 457) ("June 28, 2012 D&O"), denying Plaintiff's motion to vacate the April 4, 2012 Order (Doc. No. 348), as without any foundation in law.  June 28, 2012 D&O at 32.

In particular, the New York case law on which Plaintiff relies permits collateral attacks on judgments obtained by extrinsic, but not intrinsic fraud.  Plaintiff's Memorandum Response at 7 (citing *Altman v. Altman*, 542 N.Y.S.2d 7, 9 (1st Dept. 1989)).  Here, however, there has been no final judgment, regarding the authenticity of the Contract and supporting e-mails, such that Defendants' Motion to Dismiss is not a collateral attack on a judgment.  June 28, 2012 D&O at 29-30.  The extrinsic-intrinsic distinction on which Plaintiff relies is of a state procedural, rather than substantive,

21

nature, not binding on this court.  *See Grand Bahama Petroleum Co., Ltd. v. Asiatic Petroleum Corp.*, 550 F.2d 1320, 1325 (2d Cir. 1977) (federal court sitting in diversity must apply state procedural provision only where such provision is "intimately bound up with the right being enforced" or "its application would substantially affect the outcome of the litigation. . . .").  Moreover, such distinction is irrelevant as Defendants' Motion to Dismiss is based on the court's well-established inherent authority to reject at the outset of a case claims based on demonstrable fraud.  *Id.* at 30.  As discussed, June 28, 2012 D&O at 30-32; Discussion, *supra*, at 16-18, it is settled that federal courts sitting in diversity have inherent power to dismiss an action for fraud.  *See Chambers*, 501 U.S. at 50.[11]

As for Plaintiff's argument that resolution of Defendants' Motion to Dismiss requires the court to "weigh conflicting expert evidence or engage in 'statistical dueling of experts,'" Plaintiff's Response at 4-5 (quoting *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 129-30 (2d Cir. 2001)), a question solely reserved for the jury who alone is permitted to assess the credibility of dueling experts, *id.* (citing cases), such statements were made in connection with class certification motions. Significantly, in overruling *In re Visa Check/MasterMonty Antitrust Litigation*, the Second Circuit specifically held that district courts are required to resolve at the class certification stage those factual disputes relevant to each class certification

---

[11] The cases cited as "new" authority in Plaintiff's Sur-Rebuttal ¶¶ 4-9, filed without the court's permission, similarly fail to support Plaintiff's argument on this point.  In particular, only two such cases were decided after Plaintiff's Response was filed on August 21, 2012, and, as such, Plaintiff cannot be excused for failing to include the earlier cases in his Response.  Furthermore, both of the "new" cases involve attempts to set aside a final judgment in a prior action based on fraud.  *See Space Hunters, Inc. v. United States*, 2012 WL 4903254, at * 1 (2d Cir. Oct. 17, 2012) (unpublished decision), and *Harris v. City of New York*, 2012 WL 5464576, at * 1-2 (S.D.N.Y. Nov. 9, 2012).

requirement. *In re Initial Public Offerings Securities Litigation*, 471 F.3d 24, 41-42 (2d Cir. 2006).

*In re Joint Eastern & Southern District Asbestos Litigation*, 52 F.3d 1124, 1135 (2d Cir. 1995), and *Valdez v. Ward*, 219 F.3d 1222, 1238 (10th Cir. 2000), do not, as Plaintiff urges, Plaintiff's Response at 5, preclude the court's consideration of expert evidence in deciding Defendants' Motion to Dismiss. Not only did both cases involve post-trial challenges to the sufficiency of the evidence, but in the former case, the Second Circuit found that the District Court, in granting judgment as a matter of law in favor of the defendant, had failed to consider evidence submitted by the plaintiffs in the light most favorable to the plaintiffs, despite the fact that none of the expert reports submitted by either side were flawless. *In re Joint Eastern & Southern District Asbestos Litigation*, 52 F.3d at 1135. *Valdez* involved a prison inmate's appeal of the district court's denial of his petition seeking habeas relief, with the petitioner arguing the criminal trial court should not have disregarded the testimony of two expert witnesses as less credible than the testimony of a third expert witness who had conducted more extensive analysis of petitioner's mental condition. *Valdez*, 219 F.3d at 1238. The Tenth Circuit, in affirming the district court's denial of habeas relief, stated it was for the jury to decide, at trial, which expert's testimony was more credible. *Id.* As such, *Valdez* is limited to expert testimony that is admitted at trial, which is in stark contrast to the Defendants' Motion to Dismiss before the court in this action, which asks the court to determine whether the Work for Hire Document is authentic.

Simply put, accepting Plaintiff's argument precluding the court from considering a plethora of evidence establishing the disingenuous nature of a document that is the

linchpin of an action, in the absence of any evidence to the contrary, thereby requiring an action to go forward, would be to permit a plaintiff who is perpetrating a fraud on the court to run roughshod over the court's integrity.  This is particularly unacceptable where, in this era, significant fraud may be perpetrated by the use of sophisticated technology such as computers, for which expert forensic analysis is required to assist the court in discovery of the fraud.  Thus, courts, where necessary for a correct determination of the alleged fraud, have relied upon expert testimony. *See*, *e.g.*, *Pope*, 974 F.2d at 983 (court relied on "expert testimony and demonstrative evidence" in finding note submitted by plaintiff in support of plaintiff's claim "had been manufactured as a cut and past composite of other documents" and thus fabricated); *REP MCR Realty, L.L.C.*, 363 F.Supp.2d at 1014 (considering expert witness testimony which "helped significantly to establish that the [challenged document] was a fabrication and that [Defendant] was committing perjury.").  Even in the absence of Defendants' Motion to Dismiss, a district court is vested with the inherent authority to *sua sponte* dismiss an action as frivolous regardless of whether the plaintiff has been granted *in forma pauperis* status.  *See Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363-64 (2d Cir. 2000) (dismissing, *sua sponte*, complaint filed by *pro se* plaintiff where, given the frivolous nature of the complaint, dismissal would have been mandatory under 28 U.S.C. § 1915(e)(2)(B)(i) (permitting court to dismiss action at any time upon determining the action is frivolous), had the plaintiff sought to proceed *in forma pauperis*).  This argument is thus without merit.

Finally, although not addressed by the parties, in each of the cases in which courts have dismissed an action for fraud before trial, it is an unstated premise that

once the subject item or document was determined to be fraudulent, there was no actionable case or controversy.  Insofar as Plaintiff seeks a jury determination that the Work for Hire Document grants him an ownership interest in Facebook, such request presumes the Work for Hire Document is authentic.  Defendants, by challenging the Work for Hire Document's authenticity, have injected into the case a factual issue which, if decided in Defendants' favor, would establish there is no actionable case or controversy, such that the court is without jurisdiction over the matter.  Simply put, because the viability of the instant action is wholly dependent on the validity an agreement memorialized in a document, *i.e.*, the Work for Hire Document, a determination that such document is a fabrication would establish there is no case or controversy but, rather, only a 'feigned case' is presented over which the court has no jurisdiction.

It is well-settled that the court is obligated to establish jurisdiction exists.  *See College Standard Magazine v. Student Ass'n of State Univ. of New York at Albany*, 610 F.3d 33, 35 (2d Cir. 2010) (recognizing court's obligation to address mootness *sua sponte* because it pertains to jurisdiction).  It logically follows that the court is similarly obligated to resolve, at the outset, a compelling challenge to the document's authenticity as Defendants' Motion to Dismiss presents because an action based entirely on a fabricated document is, at best, frivolous.  Moreover, "'the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits.'" *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998) (quoting *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 948 F.2d 90, 96 (2d Cir. 1991)).  "The district court should consider *all the submissions of the*

25

*parties and may hold an evidentiary hearing, if it considers that such a hearing is warranted*, in resolving the question of jurisdiction." *Filetech S.A.*, 157 F.3d at 932 (italics added). "Before arriving at its legal conclusion regarding the existence *vel non* of subject matter jurisdiction, the district court should resolve the disputed factual matters by means of findings of fact." *Id. See also Robinson v. Government of Malaysia*, 269 F.3d 133, 140 n. 6 (2d Cir. 2001) ("A district court 'may' consult evidence to decide a Rule 12(b)(1) motion [to dismiss for lack of subject matter jurisdiction][12] in contrast with a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, where it may not. It 'must' do so if resolution of a proffered factual issue may result in the dismissal of the complaint for want of jurisdiction." (citing cases)).

Accordingly, it is unquestionable that this court has the inherent authority to resolve the disputed issue of the Work for Hire Document's authenticity, an issue of fact that is critical to establishing whether Plaintiff has presented an actionable case or controversy over which the court may exercise its jurisdiction, that in making such determination the court may rely on matters outside the pleadings, including "all submissions by the parties," and may, but is not required to, hold an evidentiary hearing if necessary. *Filetech S.A.*, 157 F.3d at 932. Neither Plaintiff's Seventh Amendment right to a jury trial, nor Rules 901 or 1008 of the Federal Rules of Evidence pose any impediment to the court's authority to resolve the issue of the Work for Hire Document's authenticity on Defendants' Motion to Dismiss. Moreover, such determination may be

---

[12] Unless otherwise indicated, bracketed material is added.

26

based on matters outside the pleadings, including expert evidence submitted by the parties, aided by an evidentiary hearing only if necessary.  Here, the court finds no such hearing is necessary.

2.         **Standard of Proof**

Although the parties agree that the action must be dismissed if Defendants can prove by "clear and convincing" evidence that the Work for Hire Document is a fraud, each side urges a different interpretation of the burden imposed by the "clear and convincing" standard.  Defendants maintain "clear and convincing" is equivalent to a "highly probable" standard of proof, Defendants' Memorandum at 22 (citing cases), whereas Plaintiff asserts the standard is defined as "evidence such that <u>no reasonable jury could find in favor of the non-moving party</u>."   Plaintiff's Response at 8 (underlining in original and citing *Univ. of Rochester v. G.D. Searle & Co., Inc.*, 249 F.Supp.2d 216, 220-21 (W.D.N.Y. 2003)).  Defendants reply in further support of dismissal that Plaintiff has confused the clear and convincing standard with the standard applicable to a motion for judgment as a matter of law.  Defendants' Reply at 6.

"Fraud on the court must be established by clear and convincing evidence." *Shangold v. Walt Disney Company*, 2006 WL 71672, at * 4 (S.D.N.Y. Jan. 12, 2006), *aff'd*, 275 Fed.Appx. 72, 73 (2d Cir. 2008) (holding district court correctly found "defendants established, by clear and convincing evidence, that [plaintiffs] submitted fraudulent evidence to the district court in order to bolster their claim of copyright infringement.").  *See also Aoude*, 892 F.2d at 1118 (applying clear and convincing standard to motion to dismiss for fraud on the court).  "The clear and convincing

standard of proof has been variously defined . . . as evidence which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Cruzan v. Missouri Dep't of Health*, 497 U.S. 261, 285 n. 11 (1990) (internal quotation omitted; bracketed material in original).

The Second Circuit's definition of "clear and convincing" evidence, albeit in the context of considering a criminal defendant's danger to the community upon release on bail, is "something more than 'preponderance of the evidence,' and something less than 'beyond a reasonable doubt,'" *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985) (citing *Addington v. Texas*, 441 U.S. 418, 431 (1979)), which is consistent with Black's Law Dictionary's definition of "clear and convincing" as "[e]vidence indicating that the thing to be proved is highly probable or reasonably certain. This is a greater burden than preponderance of the evidence, the standard applied in most civil trials, but less than evidence beyond a reasonable doubt, the norm for criminal trials." *Blacks's Law Dictionary* 636 (9th ed. 2009). *See also Miller v. Racette*, 2012 WL 1999490, at * 8 (W.D.N.Y. June 4, 2012) ("New York's clear and convincing standard is more stringent than the preponderance of the evidence standard." (citing *United States v. Mastrangelo*, 693 F.2d 269, 273 (2d Cir. 1982) (observing "the clear and convincing test may well apply to issues of admissibility arising under [the constitutional right of confrontation]"))).

The definition of "clear and convincing" pressed by Plaintiff, Plaintiff's Response at 8, *i.e.*, that no reasonable jury could find in favor of the nonmovant, has been applied to a motion for summary judgment seeking to invalidate a patent. *See University of*

28

*Rochester*, 249 F.Supp.2d at 220-21. Plaintiff, however, points to no caselaw involving a motion to dismiss for fraud in which the court construed the "clear and convincing" standard of proof consistent with that urged by Plaintiff; rather, in light of the plethora of caselaw defining "clear and convincing" as "highly probable," particularly in connection with motions to dismiss for fraud, the court will also construe the standard in accordance with prevailing judicial definitions.

Without any merit is Plaintiff's argument, Plaintiff's Response at 9-10, that Defendants' Motion to Dismiss is supported only by expert opinions, each of which Plaintiff has countered, such opinions are not facts and, thus, cannot satisfy the clear and convincing standard. In support of this argument, Plaintiff references *Shangold*, 275 Fed. Appx. 72, where indisputable facts, unaided by experts, established the personal digital assistant device mentioned in a manuscript submitted for publishing was not publicly available until after the creation of the manuscript, and *Aoude*, 892 F.2d 1118, where the plaintiff admitted having forged the agreement on which the complaint was predicated. According to Plaintiff, the fraudulent nature of the documents at issue in *Shangold* and *Aoude* could be determined without reference to expert opinion such that the court was not required to make an impermissible credibility determination between dueling experts. Plaintiff's Response at 9-10. In opposition, Defendants maintain that because Plaintiff has failed to counter the salient points made by Defendants' experts, most of Defendants' experts' reports are unrebutted and constitute clear and convincing evidence of fraud, in addition to the numerous objective and undisputed facts established without reference to any expert opinions that Defendants have also identified. Defendants' Reply at 6-7.

Plaintiff is correct that "a factfinder is not required to accept expert opinions" as fact. *Biediger v. Quinnipiac University*, 691 F.3d 85, 102 (2d Cir. 2012). Nevertheless, "[t]he question of what weight to accord expert opinion is a matter committed to the sound discretion of the factfinder . . . [who] may certainly consider the bases for an expert's opinion and may accord the opinion less, or even no, weight if the record suggests that the bases are defective, incomplete, or questionable." *Pope v. County of Albany*, 687 F.3d 565, 581 (2d Cir. 2012). This is true regardless of whether evidence contradicting an expert's opinion is offered. *Id.* Accordingly, this argument of Plaintiff also fails.

Contrary to Plaintiff's argument, that the weight accorded to an expert's opinion is within a fact finder's discretion does not preclude the court's reliance on such opinion in considering the merits of Defendants' Motion to Dismiss. That courts are required to evaluate the admissibility of each expert's opinion is well-established. *See* Fed.R.Evid. 602 (requirement that witness testify to a matter only if evidence establishes witness has personal knowledge of the matter does not apply to expert witness's testimony under Fed.R.Evid. 703), and 703 (an expert's opinion may be based on facts or data in the case of which the expert has been made aware or has personally observed); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993) (when expert scientific testimony is proffered, trial court must first determine whether expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact in understanding or determining a fact in issue). Further, courts may rely on expert opinion in granting summary judgment. *Cf. Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979) (holding summary judgment is not appropriate where "intelligent

adjudication requires more than the use of lay knowledge and the resolution of a disputed issue hinges in large measure upon conflicting opinions and judgments of expert witnesses . . . .").  If accepted, Plaintiff's argument would disarm the court from protecting itself against fraud by any reliance on expert opinion regardless of the persuasiveness of such opinion when contrasted to that of the alleged perpetrator. Plaintiff points to no authority in support of Plaintiff's theory and neither *Shangold* nor *Aoude* supports it.  Accordingly, this argument also fails.

Having determined that the court has jurisdiction over Defendants' Motion to Dismiss, and that the proper standard of proof applicable to the motion is "clear and convincing," defined as "highly probable or reasonably certain," and that expert opinions may be considered in considering the Work for Hire Document's authenticity, the court turns to the motion's merits.

**3.    Merits of Defendants' Motion to Dismiss**

> *Oh, what a tangled web we weave,*
> *When first we practise to deceive!*

**Sir Walter Scott,** *Marmion***,** *Canto vi. Stanza 17.*

Defendants move to dismiss this action on the basis that the StreetFax Document is the authentic contract memorializing the business agreement reached by Plaintiff and Zuckerberg on April 28, 2003, Defendants' Memorandum at 28-38, the Work for Hire Document is a recently created fabrication, *id.* at 38-45, and the supporting e-mails quoted and referenced in the Amended Complaint are equally fabricated, *id.* at 45-50.  Alternatively, Defendants seeks dismissal based on Plaintiff's

spoliation of evidence, *id.* at 51-62, and litigation misconduct, *id.* at 62-65.  In

opposition, Plaintiff maintains that Defendants have failed to rebut evidence Plaintiff

submitted to establish the authenticity of the Work for Hire Document, Plaintiff's

Response at 10-22, raises issues with several of Defendants' experts' reports regarding

the authenticity of both the Work for Hire Document and the supporting e-mails, *id.* at

22-50, asserts Defendants have misrepresented the facts to create the impression that

Plaintiff wrongly destroyed evidence, *id.* at 50-59, suggests that Zuckerberg's computer

skills were more than sufficiently adept to permit Zuckerberg to manipulate data on the

computers Plaintiff owned or used, *id.* at 59-61, and asserts Defendants have engaged

in an unwarranted character assault on Plaintiff, *id.* at 61-64.  In further support of their

Motion to Dismiss, Defendants maintain Plaintiff has failed to rebut evidence that the

StreetFax Document is authentic, which establishes the Work for Hire Document and

the supporting e-mails are fabrications intended to deceive the court, Defendants' Reply

at 7-27, and that Plaintiff engaged in litigation misconduct and spoliated evidence, *id.* at

27-35.  Because copious evidence has been submitted by both Defendants in support

of their challenge to the Work for Hire Document's authenticity ans by Plaintiff in

opposition, including expert witness reports, affidavits, exhibits and deposition

transcripts, a thorough discussion of all the evidence[13] would be overwhelming to the

reader and unnecessary.  As such, the court discusses only the evidence most

favorable to Defendants' Motion to Dismiss and any relevant rebuttal evidence

submitted by Plaintiff.

---

[13] In total, the parties have submitted almost 4,500 pages supporting and opposing Defendants' Motion to Dismiss.

Here, the evidence in the record establishes it is highly probable or reasonably certain that the StreetFax Document is the authentic contract governing the business relationship between Plaintiff and Zuckerberg.  Furthermore, the evidence filed by Plaintiff in opposition, although voluminous, simply is replete with patent inconsistencies demonstrating the Work for Hire Document is a gross fabrication.  Finally, the severe sanction of dismissal of the action is warranted by the numerous instances of spoliation of evidence in which Plaintiff has engaged, but not by litigation misconduct.

### A.  Clear and Convincing Evidence Establishes the StreetFax Document's Authenticity

Defendants maintain the discovery of the StreetFax Document is fatal to Plaintiff's claim because Defendants' evidence clearly and convincingly establishes that the StreetFax Document is genuine and both the StreetFax Document and the Work for Hire Document cannot be authentic.  Defendants' Memorandum at 28-29.  Specifically, Stroz Friedberg discovered electronic image files of the StreetFax Document attached to two e-mails ("StreetFax e-mails")[14] Plaintiff sent on March 3, 2004, from the ceglia@adelphia.net e-mail account to one Jim Kole, Esq. ("Kole"), an attorney then with Sidley Austin LLP ("Sidley Austin"), and an initial member of StreetFax, at Kole's Sidley Austin e-mail account, jkole@sidley.com.  *Id.* at 12.  In contrast to the Work for Hire Document, the StreetFax Document, which contains the signatures of both Plaintiff

---

[14] In the interest of clarity, references to the StreetFax e-mails should be construed as pertaining to both the actual e-mails and the attached electronic image files.

and Zuckerberg and is dated April 28, 2003,[15] is devoid of any reference to Facebook. The first page of the StreetFax Document is attached as a scanned image file to the first StreetFax e-mail, for which the subject line is "page 1 of 2 for Streetfax contract w/ mark," and the text of which reads "Hi Jim, Hope all is well, I am at 727 490 5751 when your [*sic*] ready. Ill [*sic*] send page two next I should be here for the next hour. Paul." *Id.* at 12-13. The second page of the StreetFax Document is attached as a scanned image file to the second StreetFax e-mail for which the subject line is "2 of 2 for streetfax contract," but the body of which contains no text. *Id.* Stroz Friedberg found on the Seagate Hard Drive deleted files of the scanned images of the two pages of the StreetFax Document including "Scan0001.tif" (the first page), and "Scan0002.tif" (the second page). *Id.* at 15-16. The deleted files show the images were scanned and saved onto the Seagate Hard Drive on March 3, 2004 with the image file of the second page scanned at 10:35:21 a.m., and e-mailed to Kole at 10:37:15 a.m., and the image file of the first page scanned at 10:38:35 a.m., and e-mailed to Kole at 10:39:11 a.m. *Id.* at 14-15.

Forensic examinations and comparisons of the StreetFax Document with the Work for Hire Document establish that the second page of the StreetFax Document is virtually identical to the second page of the Work for Hire Document, but the first pages of both documents are different, and that the scanned TIFF[16] images of the StreetFax Document were uploaded onto Plaintiff's computer minutes before the two e-mails with

---

[15] Stroz Friedberg Report Exh. F.

[16] "TIFF" is an acronym for "Tagged Image File Format" and refers to a standard computer image file format for storing computer graphics, by which a document is stored as a picture, rather than as a text-based document. Stroz Friedberg Report at 14.

the attached StreetFax Document pages were sent to Kole. Defendants thus maintain

that the StreetFax Document must have existed no later than March 3, 2004, that

Plaintiff thereafter created the Work for Hire Document by amending the text of page 1

of the StreetFax Document, inserting the provisions purportedly giving Plaintiff an

ownership interest in Facebook, and appending the amended first page to either the

authentic page 2 of the StreetFax Document, containing Zuckerberg's actual signature,

or a detailed copy of the second page containing Zuckerberg's forged signature.

On July 27, 2011, Stroz Friedberg, in accordance with the Electronic Asset

Protocol, provided Plaintiff with the StreetFax e-mails recovered from the Seagate Hard

Drive to permit Plaintiff to review the e-mails for possible privilege designation.

Defendants' Reply at 8 (citing Defendants' Memorandum at 34-35 (citing November 28,

2011 Declaration of Alexander H. Southwell, Esq. (Doc. No. 241) (Southwell Nov. 28,

2011 Declaration"))). At that time, Plaintiff did not challenge the authenticity of the

StreetFax e-mails but, rather, created a privilege log on which Plaintiff designated all

120 e-mails recovered by Stroz Friedberg as "confidential," and further designated the

StreetFax e-mails as protected by the attorney-client privilege. Southwell Nov. 28, 2011

Declaration ¶ 13 and Exh. B (Plaintiff's privilege log provided to Stroz Friedberg on

August 2, 2011 designating the StreetFax e-mails as privileged attorney-client

communications). On August 4, 2011, Defendants moved to compel Plaintiff to

produce the StreetFax e-mails (Doc. No. 97), which the undersigned granted on August

12, 2011 (Doc. No. 107).

It was only after being ordered to produce the StreetFax e-mails that Plaintiff

asserted the StreetFax e-mails, along with the attached files containing the StreetFax

Document, were forgeries, speculating that either Zuckerberg or the law firm of Orrick, Herrington & Sutcliffe LLP ("Orrick, Herrington"), which has also appeared on Defendants' behalf in this action, hacked[17] into the Seagate Hard Drive and planted the StreetFax e-mails there.  Emil Protalinski, *Friending Facebook, Exclusive: Paul Ceglia Says Facebook is Doing the Forgery*, ZDNet, August 16, 2011.[18]  See Defendants' Reply at 8 (discussing that Plaintiff essentially argues that in March 2004, more than six years before commencing this action claiming ownership of Facebook, Zuckerberg created the StreetFax Document by manipulating the Work for Hire Document, removing all references to Facebook, then hacked into Plaintiff's computer, causing the computer to e-mail the StreetFax Document to Kole).  It belies common sense that Plaintiff would initially designate as privileged communications with his attorney any file that Plaintiff truly believed to be a forgery planted on the Seagate Hard Drive; rather, the only logical construction of such action is that after Plaintiff's futile attempt to invoke the attorney-client privilege to shield from disclosure the StreetFax e-mails containing the StreetFax Document which, on its face, casts serious doubt on the validity of the Work for Hire Document, Plaintiff's only remaining option was to assert the invalidity of the StreetFax Document and accompanying e-mails as themselves forged.

    After discovering the StreetFax Document on the Seagate Hard Drive,

---

[17] The term "hack" refers to "gaining unauthorized access to computer and network resources often, but not always, with malicious intent.  Hackers break into computer systems by exploiting security vulnerabilities . . . .  Hackers may modify existing computer resources and settings without consent and, in so doing, cause damage or disruption to computer systems or networks."  David Dunning, *What is the Definition of Computer Hacking?*, http://www.ehow.com/info_8642666_definition-computer-hacking.html (last visited March 26, 2013).

[18] Southwell Declaration Exh. I.

Defendants subpoenaed the internet server through which Sidley Austin accesses the internet ("the Sidley Austin server") where Stroz Friedberg, upon digital forensic examination, discovered residing the same StreetFax e-mails to Kole retrieved from the Ceglia Media. Stroz Friedberg Report at 18. Further analysis of the sender, recipient, sent on, and subject metadata, as well as the content and attachments confirmed both sets of the StreetFax e-mails, *i.e.*, those discovered on the Seagate Hard Drive and those found on the Sidley Austin server, are identical, establishing that each set of the StreetFax e-mails is one half of the same e-mail correspondence, *i.e.*, the sender's side and the recipient's side. *Id.* Examination of the internet headers of the StreetFax e-mails further confirms that such e-mails were both sent and received on March 3, 2004 through servers used by Adelphia (Ceglia's internet service provider for his Ceglia@adelphia.net internet account), and Sidley Austin (for Kole's jkole@sidley.com internet account). *Id.* at 19. As Stroz Friedberg reports, and Plaintiff does not contest, an internet header relates to an e-mail's transmission and is affixed to the e-mail message by the internet servers through which the e-mail passes, not by the computer used to send or receive the e-mail and, as such, is not dependent on the date or time setting of the computers used by Plaintiff or Kole. *Id.*

Stroz Friedberg's examination of the Ceglia Media also established that at some time between October 23, 2006 and July 11, 2007, Plaintiff had installed on the Seagate Hard Drive a search application called "Google Desktop" which allows a user to search a computer for files by creating a searchable database, or index, of the computer's contents, which the user can then search. Stroz Friedberg Report at 54. The index provides historical evidence of what files existed on the Seagate Hard Drive

when Google Desktop last indexed the files, here, July 11, 2007. *Id.* Because the StreetFax e-mails were discovered by Stroz Friedberg in the index created by Google Desktop on July 11, 2007, Stroz Friedberg concluded the StreetFax e-mails must have existed on the Seagate Hard Drive on or before July 11, 2007. *Id.*

More recently, in opposing Defendants' Motion to Dismiss, Plaintiff added that the StreetFax Document discovered by Stroz Friedberg originated on Plaintiff's parents' computer, which Plaintiff neither purchased, owned, used, nor operated. Plaintiff's Response at 50 (citing Declaration of Carmine Ceglia filed June 4, 2012 (Doc. No. 419) ("Carmine Ceglia Declaration")), averring Carmine Ceglia, Plaintiff's father, purchased the HP Pavilion computer in which the Seagate Hard Drive was installed, but that the computer was never transported outside of New York State, had not been in use and was unplugged for more than two years before Carmine Ceglia removed the Seagate Hard Drive and provided it to Defendants' experts for forensic testing, that Plaintiff never used the computer, and that during 2003 and 2004, Carmine Ceglia maintained an Adelphia.net e-mail account he used in connection with his StreetFax account). Such assertions, however, are in direct contrast to Plaintiff's earlier representations that the Seagate Hard Drive was his own.

In particular, the same StreetFax e-mails with the attached image files of the StreetFax Document were discovered by Capsicum, a digital forensics firm retained by Plaintiff's prior counsel, the Kasowitz firm, upon examining the Ceglia Media provided by Plaintiff, specifically retrieving the StreetFax e-mails from "a loose hard drive from another computer" produced to Capsicum by Plaintiff, which is the Seagate Hard Drive taken from another computer which Plaintiff then asserted belonged to his parents.

Defendants' Reply at 9 (citing April 13, 2011 Kasowitz Letter (Southwell Reply Declaration Exh. R) (citing April 12, 2011 Kasowitz Letter)). Further, in his July 15, 2011 Declaration ("Doc. No. 88") ("Plaintiff's July 15, 2011 Declaration"), Plaintiff specifically identified the Seagate Hard Drive as in his "possession, custody or control. . . ." Plaintiff's July 1, 2011 Declaration ¶ 2.A. In connection with a detention hearing held in a criminal proceeding recently commenced against Plaintiff in the Southern District of New York, *United States of America v. Ceglia*, pursuant to a criminal complaint on allegations relating to this case,[19] No. 12-MJ-2842, Plaintiff referred to the computer on which the images of the StreetFax Document were found as "my personal computer." Detention Hearing Tr.[20] at 25:4-5. Furthermore, listed in the privilege log Plaintiff created in response to Stroz Friedberg's examination of the Ceglia Media are other files related to this action, including "emails with mark and jeff 091803 incl email list.doc," "mark emails 082903.doc," and "emails with mark and jeff 102003.doc." Southwell Reply Declaration ¶ 5 and Exh. C (copy of relevant portions of privilege log). Defendants point to, and Plaintiff does not dispute, that the "Source File Path" column indicates items numbers 33 through 39 listed in the privilege log are from source media "FL02" which is Stroz Friedberg's identifier for the Seagate Hard Drive. Southwell Reply Declaration ¶ 5.

Other e-mails between Plaintiff and Kole confirm the StreetFax Document's authenticity, including two e-mails exchanged on March 4 and 5, 2004 ("March 4 and 5,

---

[19] Ceglia was subsequently indicted on mail and wire fraud charges. Indictment No. 1:12-CR-00876-ALC.

[20] References to "Detention Hearing Tr." are to the transcript of the October 31, 2012 detention hearing, a copy of which is attached as Exh. D to the Southwell Reply Declaration.

2004 e-mails"). Stroz Friedberg Report at 16-17; Southwell Declaration Exh. M. A scanned image of the March 4 and 5, 2004 e-mails was obtained by Stroz Freidberg attached to a June 30, 2011 e-mail from one Jessica Ceglia, Plaintiff's niece, to Plaintiff, containing a handwritten notation, the context of which strongly suggests it was added by Kole. *Id.* According to the text of the March 4 and 5, 2004 e-mails, on March 4, 2004, Plaintiff wrote Kole requesting advice as to whether to send Zuckerberg more money to ward off Zuckerberg's threats that without further payment, Zuckerberg would disable the StreetFax.com website. *Id.* Kole's response, also sent on March 4, 2004, was to have StreetFax employee Petersen create back-up files of the StreetFax project, and Kole would send Zuckerberg a letter indicating Kole was in possession of funds from Plaintiff that would be forwarded to Zuckerberg upon receiving Zuckerberg's assurance he would not attempt to disable the StreetFax.com website. *Id.* Plaintiff replied on March 5, 2004, that money was "very tight" and he might need to pay another information technology person to restore the StreetFax website's functionality that Zuckerberg had already removed, especially since no more money was owed under the contract with Zuckerberg. *Id.* In a handwritten notation at the top of the scanned copy of the March 4 and 5, 2004 e-mails, Kole wrote he intended to make a "veiled reference to payments that could be made if he settles the matter as a businessman rather than a cyber-briber," and requests Plaintiff fax a copy of the contract as the copy Kole had was difficult to read. *Id.* Kole's assertion is consistent with the fact that the scanned image of the StreetFax Document found on the Seagate Hard Drive and the Sidley Austin server was low-resolution. Stroz Friedberg Report at 17. That the March 4 and 5, 2004 e-mails are devoid of any mention of Facebook is especially troublesome for Plaintiff

given that Facebook was launched a month earlier on February 4, 2004.

Further, Plaintiff's attempt to raise a specter of doubt as to the StreetFax e-mails' authenticity by Plaintiff's averment that he does not recall ever using the Adelphia e-mail account, ceglia@adelphia.net, Plaintiff's Declaration filed November 24, 2011 (Doc. No. 230), ¶¶ 13-16, using a computer Plaintiff did not own, use, or have access to, Carmine Ceglia Declaration ¶ 8; Plaintiff's Response at 56-57, is directly contradicted by Plaintiff's own admission that he has used an Adelphia.net e-mail account belonging to his parents. *See* Supplemental Declaration of Paul D. Ceglia (Doc. No. 176-1), ¶ 179 ("The Adelphia.net account I used in the past belonged to my parents."). Plaintiff's asserted limited use of his parents' Adelphia.net e-mail account is also undermined by the fact that one Robert Frykberg, a StreetFax business associate of Plaintiff, sent three e-mails to Plaintiff at the Adelphia.net account in 2006. Southwell Reply Declaration ¶ 7 and Exh. E (portion of Plaintiff's Privilege Log listing three e-mails, dated August 27, 2006, September 2, 2006, and October 17, 2006, each from "rgfdpm@msn.com" to "paul@streetfax.com," "paulceglia@msn.com," and copies to "ceglia@adelphia.net").

In yet another e-mail to Zuckerberg dated January 7, 2004, Rose Declaration Exh. E, Petersen, Plaintiff's StreetFax associate, presented the same telephone number contained in the first StreetFax e-mail, Stroz Friedberg Report at 12, *i.e.*, 727 490 5751, as the contact telephone number for StreetFax. Although Plaintiff has admitted this telephone number was his personal contact telephone number when the e-mails were sent, Plaintiff's Response at 56-57, Plaintiff maintains that the "727" area code is for Florida, where Plaintiff was then renting a home, and that the telephone

number was assigned to a land line, rendering it impossible for Plaintiff to have sent the e-mails from his parents' computer that was located in New York. *Id.* Defendants, however, obtained the services of Kroll Associates, Inc. ("Kroll"), an intelligence and investigation firm that, upon conducting a search of public records, determined the telephone number was not a traditional land line number but, rather, was provided by a Voice over Internet Protocol or "VoIP" provider. Defendants' Reply at 10; Southwell Reply Declaration ¶ 8. Plaintiff does not dispute Defendants' explanation that "VoIP numbers are portable and can be used anywhere with an Internet connection." Defendants' Reply at 10; Southwell Reply Declaration ¶ 8. As such, that the telephone number contains a Florida area code is irrelevant to Plaintiff's physical location when the StreetFax e-mails were sent, and Plaintiff would have been aware that he had obtained and was using a VoIP number. Defendants' Reply at 10. Plaintiff, by failing to rebut this assertion, has thus acquiesced in it. *See Felske v. Hirschmann*, 2012 WL 716632, at * 3 (S.D.N.Y. Mar. 1, 2012) (by failing to respond to defendants' argument regarding personal jurisdiction, plaintiff effectively conceded point); *Goodwin v. Burge*, 2011 WL 2117595, at *12 (W.D.N.Y. Mar. 7, 2011) (holding plaintiff, by failing to argue in opposition to summary judgment on a claim for relief, effectively conceded to defendant's assertions establishing there was no factual basis for asserting the claim against such defendant); *Gonzalez v. City of Schenectady*, 2001 WL 1217224, at * 11 (N.D.N.Y. Sept. 17, 2001) (deeming defendants' failure to present a position on one plaintiff's motion to sever his claim from those of the other plaintiffs showed acquiescence in the relief sought). Plaintiff's assertions that the telephone number was a traditional land line, when Plaintiff could not reasonably have entertained such a

notion, thus are properly construed as in furtherance of the fraud on the court presented by Plaintiff's action.

Plaintiff also challenges the StreetFax Document's authenticity based on the fact that the "actual size" of the two images of each page is 2.4 inches by 3.2 inches, and Defendants failed to advise the court that their experts had to first enlarge the images prior to examining them. Plaintiff's Reply at 55. Defendants explain, however, that after scanning a document, the size of the resulting electronic image can easily be reduced, such that the size of the electronic image does not reflect the actual size of the scanned document. Defendants' Reply at 11. Defendants also rely on deposition testimony from Plaintiff's expert witness, Neil Broom ("Broom"), who acknowledged that Plaintiff's practice of storing information on standard floppy disks would have required Plaintiff to reduce the size of the StreetFax Document prior to storage. *Id.* (citing Broom Dep. Tr.[21] at 149:3 - 153:25). The court therefore finds Plaintiff's attempt to diminish the import of the scanned version of the StreetFax Document to be spurious.

Nor is there any merit to Plaintiff's assertion that the Seagate Hard Drive was infested with computer viruses[22] and other "malware,"[23] compromising the integrity of the Seagate Hard Drive and rendering it susceptible to "hacking" by Zuckerberg who

---

[21] References to "Broom Dep. Tr." are to the page of the transcript of Defendants' June 28, 2012 deposition of Broom, a copy of which is filed as Doc. No. 495.

[22] "Computer viruses are small software programs that are designed to spread from one computer to another and to interfere with computer operation." *What is a Computer Virus?*, http://www.microsoft.com/security/pc-security/virus-whatis.aspx (last visited March 26, 2013).

[23] Malware, short for "malicious software . . . . is any kind of unwanted software that is installed without your adequate consent. Viruses, worms, and Trojan horses are examples of malicious software that are often grouped together and referred to as malware." *What is Malware?*, http://www.microsoft.com/security/resources/malware-whatis.aspx (last visited March 26, 2013).

then planted the StreetFax e-mails onto the Seagate Hard Drive. Plaintiff's Response at 58-60. Although Broom testified that his examination in 2012 of the Seagate Hard Drive revealed viruses and malware, Broom was unable to establish that any virus or malware was present on the Seagate Hard Drive in 2004 when the StreetFax e-mails originated, or that such malware actually permitted remote access by a "hacker." Broom Dep. Tr. at 105:6-23. The idea that Zuckerberg, in March 2004, anticipated being sued six years later by Plaintiff in connection with Zuckerberg's creation of Facebook, such that Zuckerberg then took steps to sabotage any such prospective legal action by planting the StreetFax Document in Plaintiff's computer, is beyond absurd.

Moreover, substantial evidence in the record, unrebutted by Plaintiff, establishes that the monetary payments from Plaintiff to Zuckerberg in connection with their business agreement are consistent with the business arrangement under the StreetFax Document, rather than under the Work for Hire Document, as alleged. *See* Amended Complaint ¶ 19 (providing Plaintiff agreed to pay Zuckerberg $ 1,000 for working on the StreetFax project, and $ 1,000 to continue developing "The Face Book"). In particular, in an August 28, 2003 e-mail to Zuckerberg, Plaintiff's StreetFax colleague Karin Petersen wrote

> In the actual contract itself, under #3 Payment Terms, states:
> "Late fees are agreed to be a 5% deducation [*sic*] for the seller if project is not completed by due date and an additional 1% deducatin [*sic*] for each day the project is late thereafter."

44

Rose Declaration, Exh. C.[24]

Misspellings aside, in her e-mail Petersen is quoting from Section 3 of the StreetFax Document, as compared to Section 3 of the Work for Hire Document which states

> Late fees are agreed to be a 5% deduction for the seller if the project is not completed by *the* due date and an additional 1% deduction for each day the project is *delayed beyond that point*.

Work for Hire Document, § 3 (italics added to emphasize variation from similar language in StreetFax Document § 3.

Other evidence in the record, unchallenged by Plaintiff, establishes Plaintiff made payments to Zuckerberg consistent with the terms of the StreetFax Document, providing for Zuckerberg to be paid $ 18,000, and an additional $ 1,500 for a side agreement, memorialized in an e-mail, according to which Zuckerberg was to create a scrolling function. In particular, the StreetFax Document states

> Buyer [Plaintiff] agrees to pay seller [Zuckerberg] the Sum of $3,000 at the onset of this contract. The Buyer agrees to pay seller $2,000 on the due date of the project, and upon completion, Buyer agrees to pay seller an additional $13,000 US dollars within Thirty days of delivery of the Final approved program.

StreetFax Document § 3, Payment Terms (capitalization errors in original).

In contrast, the Work for Hire Document provides for payment of $ 2,000 as follows:

> The Agreed upon Cost that the Seller and the Buyer have agreed upon are as follows: Buyer agrees to pay the seller the Sum of $1000 a piece for the work to be performed for Streetfax and $1,000 for the work to be performed for "The Page Book."

Work for Hire Document, § 3, Payment Terms(capitalization and grammatical errors in original).

---

[24] Notably, Plaintiff does not challenge this e-mail's authenticity, nor can he given that Petersen's August 28, 2003 e-mail to Zuckerberg was also submitted by Plaintiff as an exhibit in support of Plaintiff's earlier motion for a protective order filed November 17, 2011 (Doc. No. 224 and Exh. A (Doc. No. 224-1), at 2).

In a series of e-mails exchanged on November 15, 2003, Plaintiff and Zuckerberg reached a further agreement ("the side agreement") pursuant to which Zuckerberg was to develop a scroll-searching feature for StreetFax for an additional payment of $ 1,500, with payment of $ 1,000 then due and the balance to be paid after Plaintiff secured a customer for StreetFax's services.  Rose Declaration Exh. D.

Uncontradicted evidence in the record, including copies of checks made payable to Zuckerberg and e-mails exchanged between Zuckerberg and people associated with StreetFax, including Plaintiff and Petersen, establishes Zuckerberg was paid for his work on StreetFax in accordance with the StreetFax Document's payment scenario and the November 15, 2003 side agreement, which provide for total payment of $ 19,500, rather than the Work for Hire Document under which Plaintiff was to pay Zuckerberg only $ 2,000.  Specifically, Plaintiff produced to Defendants during expedited discovery copies of three checks made payable to Zuckerberg, including a cashier's check dated April 25, 2003, in the amount of $ 3,000,[25] Southwell Declaration Exh. N, a check dated August 4, 2003 in the amount of $ 5,000, Southwell Declaration Exh. O, and a check dated November 24, 2003 in the amount $ 1,000.  Complaint Exh. C.  Plaintiff makes

---

[25] That the $ 3,000 cashier's check for the initial payment, issued by Community Bank, N.A., in Wellsville, New York, is dated three days before Plaintiff and Zuckerberg signed the contract on April 28, 2003, is consistent with Plaintiff's allegation that Plaintiff prepared and printed the agreement to be signed from his home office in Wellsville, New York, on April 25, 2003, Amended Complaint ¶ 21, then met with Zuckerberg on April 28, 2003 in the lobby of the Radisson Hotel in Boston, *id.* ¶ 22.  The court takes judicial notice of the fact that April 25, 2003 was a Friday, and April 28, 2003 was a Monday, *see Thomas v. American Red Cross*, 2011 WL 4025219, * 1 (W.D.N.Y. Sept. 9, 2011) (taking judicial notice of fact established by calendar), such that Plaintiff would likely have had to obtain the cashier's check, *i.e.*, a check purchased from a bank with cash and guaranteed for payment when presented, prior to the close of the bank's business on April 25, 2003.  This is consistent with the fact, of which the court also takes judicial notice, *see Brisco v. Ercole*, 565 F.3d 80, 83 n. 2 (2d Cir. 2009) (taking judicial notice of distance established by internet mapping service), that the distance between Wellsville, New York, and Boston, Massachusetts, is in excess of 400 miles, requiring a significant amount of time to traverse, whether by overland transportation or by air.

no attempt to explain why the first check for $ 3,000, dated within a few days of the April 28, 2003 execution of the contract governing the business relation between Plaintiff and Zuckerberg, matches the initial upfront payment due Zuckerberg under the StreetFax Document's payment terms, and exceeds the $ 2,000 total amount due to Zuckerberg under the Work for Hire Document's payment terms.

Further, copies of e-mails exchanged between StreetFax and Zuckerberg and retrieved from the Harvard e-mail server corroborate that such payments were made under the StreetFax Document. In particular, on August 15, 2003, Plaintiff wrote to Zuckerberg "I sent a check for $ 5,000 to you today mark [*sic*]." Rose Declaration Exh. B. Zuckerberg responded in an August 16, 2003 e-mail that, "[a]t this point I can assure you that we've done more than $ 8,000 worth of work, and probably more than the whole $ 18,000 of the entire project. We will complete these final requests for you, but we cannot continue to develop for you until we see some money." Rose Declaration Exh. B.[26] Significantly, Zuckerberg's reference to "$ 8,000" is consistent with having received the April 25, 2003 check for $ 3,000, and the August 4, 2003 check for $ 5,000, and far exceeds the $ 2,000 to be paid in total under the Work for Hire Document.

Zuckerberg sums up the payments received under the StreetFax Document in a January 25, 2004 e-mail to Petersen, stating "[t]he deal was for $18k. I received $3k upfront and $5k over the summer, and that's it for the original deal. There was a side

---

[26] As with Petersen's August 28, 2003 e-mail to Zuckerberg, Zuckerberg's August 16, 2003 e-mail to Plaintiff was also submitted by Plaintiff in connection with Plaintiff's earlier motion for a protective order. *See* Doc. No. 224-1 at 74.

deal for the scroll search which was for $1.5k of which I have been paid $1k. . . .  To date I have received $9k out of a total $19.5 that was owed to me."  Rose Declaration Exh. F.  By e-mail to Plaintiff dated February 21, 2004, Zuckerberg repeats this same summation, asserting, "I am owed $19,500 - $9000 = $10,500."  Rose Declaration Exh. H.  Thus, copies of the indisputable checks and contemporaneous e-mails establish that Zuckerberg received payment from Plaintiff that is consistent with the payment terms of the StreetFax Document, and is totally inconsistent with the payment terms of the Work for Hire Document, including, most significantly, that the $ 9,000 Zuckerberg received from Plaintiff is 450% of the total $ 2,000 to be paid under the Work for Hire Document.  Tellingly, Plaintiff offers no explanation for this material discrepancy.[27]

In summary, Plaintiff has utterly failed to rebut the plethora of evidence establishing that it is highly probable and reasonable the StreetFax Document was the operative contract that governed the business relationship between Plaintiff and Zuckerberg such that Defendants' assertion that the StreetFax document is the operative agreement between Plaintiff and Zuckerberg is completely uncontroverted and Plaintiff's attempts to corroborate his self-serving assertion that the Work for Hire Document is the authentic contract simply fall short.  Upon finding that the StreetFax Document is the authentic, operative contract governing the business relationship established between Plaintiff and Zuckerberg on April 28, 2003, it logically follows that

---

[27] The statements contained in two e-mails exchanged between Petersen and Kole (Doc. No. 623-1), and Plaintiff and Kole (Doc. No. 623-2), on March 1 and 5, 2004, which e-mails were produced by Plaintiff for the first time in Plaintiff's Supplemental Sur-Rebuttal, filed without leave of the court on December 5, 2012, further establish that Plaintiff's cash-flow problems made it difficult to pay Zuckerberg money due under terms consistent with the StreetFax Document.

the Work for Hire Document is fraudulent such that Defendants' Motion to Dismiss should be GRANTED on this basis alone; nevertheless, because the matter is before the undersigned for a report and recommendation, Defendants' arguments challenging the authenticity of the Work for Hire Document and the supporting e-mails quoted and referenced in the Amended Complaint are addressed.

## B.    Clear and Convincing Evidence Establishes the Work for Hire Document and Supporting E-mails are Fraudulent

As discussed above, the finding that the StreetFax Document is authentic and the operative contract between Plaintiff and Zuckerberg requires finding fraudulent both the Work for Hire Document and the supporting e-mails Plaintiff alleges exchanging with Zuckerberg and quoted and referenced in the Amended Complaint ("supporting e-mails"). Even without having determined the StreetFax Document is authentic, however, the evidence in the record clearly and convincingly establishes the fraudulent nature of the Work for Hire Document and the supporting e-mails.

### 1.    Work for Hire Document

#### a.    Chemical Analysis of Handwritten Notations

Handwritten notations are found on both pages of the StreetFax Document and the Work for Hire Document, although a purported original of only the Work for Hire Document has been produced.[28] On page 1 of both documents, following a statement

---

[28] No original of the StreetFax Document has been produced by either party, the only copies being located as image files attached to the StreetFax e-mails discovered on the Seagate Hard Drive and the Sidley Austin server.

49

establishing May 31, 2003 as the due date for the StreetFax project software to be developed by Zuckerberg, is a handwritten interlineation followed by the initials "PC" (Paul Ceglia), and "MZ" (Mark Zuckerberg).  The handwritten interlineation on the Work for Hire Document states "Providing web designer is finished by May 24, 2003," in contrast to the StreetFax Document on which the handwritten interlineation states "Providing web designer has finished by May 24, 2003."  The second page of both the StreetFax Document and the Work for Hire Document contains the purported signatures of Plaintiff and Zuckerberg.  Defendants assert that forensic testing, performed by Defendants' expert witness Gerald M. LaPorte, M.S.F.S. ("LaPorte"), a forensic chemist and document dating specialist, of the ink used in the handwritten notations on the Work for Hire Document establishes the ink is less than two years old, indicating the notations could not have been handwritten onto the contract in 2003 as Plaintiff maintains, but within two years of LaPorte's examination on August 28, 2011, thus calling into question the Work for Hire Document's authenticity.  Defendants' Memorandum at 39-40; LaPorte Report.[29]  In opposition, Plaintiff argues LaPorte's ink-dating method is unreliable, Plaintiffs' Response at 22-23,[30] that LaPorte's methodology

---

[29] Southwell Declaration Exh. B.

[30] Although Plaintiff references *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), in support of his assertion that LaPorte's ink-testing methodology does not satisfy the criteria applicable to scientific or expert testimony necessary for the court's operation as "a gatekeeper preventing junk science from being relied upon in court proceedings," Plaintiff's Response at 22, burying a request for a *Daubert* hearing in his memorandum of law, *id.* at 4, Plaintiff has not moved pursuant to *Daubert* to exclude LaPorte's opinion and more than a simple request for a hearing is required.  *See Sawant v. Ramsey*, 2012 WL 3265020, at * 17 (D.Conn. Aug. 9, 2012) (holding "a *Daubert* hearing is not required simply because a request for such a hearing is raised." (citing cases)); *Colon v. BIC USA, Inc.*, 199 F.Supp.2d 53, 71 (S.D.N.Y. 2001) ("Nothing in *Daubert*, or any other Supreme Court or Second Circuit case, mandates that the district court hold a *Daubert* hearing before ruling on the admissibility of expert testimony.").

has been neither published nor peer-reviewed, *id.* at 23-24, fails to consider the conditions under which the Work for Hire Document was stored, *id.* at 25-27, and that it is possible the Work for Hire Document was contaminated by a household product containing the same chemical compound as the tested ink, thereby affecting the chemical testing results, *id.* at 28. In further support of their Motion to Dismiss, Defendants characterize Plaintiff's attacks on LaPorte's findings as baseless and misleading. Defendants' Reply at 13-17.

LaPorte chemically analyzed the handwriting ink using thin layer chromatography ("TLC"), and gas chromatography/mass spectrometry ("GC/MS") methodology. LaPorte Report at 13. In particular, the GC/MS analysis used by LaPorte is an ink-dating method involving the measurement of a solvent, 2-phenoxyethanol ("PE"), commonly found in inks, including in the ink used to sign the Work for Hire Document. LaPorte Report at 7. The so-called "PE test" dates the subject ink by comparing the levels of PE in the ink sample both before and after heating the ink and determining the "solvent-loss ratio." *Id.* Evaporation or "loss" of more than 25% of the pre-heating PE after heating indicates the ink is less than two years old or "fresh." *Id.* at 7-8, 15. According to LaPorte's expert witness report, PE testing LaPorte performed on the ink from the handwritten intelineation on the Work for Hire Document yielded an average solvent-loss ratio of 64%, which "far exceeds any value [LaPorte] ha[s] seen in inks known to be older than 2 years." *Id.* at 15.[31] LaPorte's PE testing of the ink thus confirms the ink on

---

[31] PE testing on Plaintiff's initials on the first page and the signatures on the Work for Hire Document's second page indicated the quantity of PE in the captured ink sample was too low to provide an accurate measurement for ink-dating using the PE test. LaPorte Report at 16.

the Work for Hire Document is less than two years old, supporting Defendants' assertion that because Plaintiff has alleged the Work for Hire Document is the contract the parties executed in April 2003, the entire action is a fraud on the court. *Id.* at 7-8, 15-16. Based on the PE test, LaPorte concluded it was "highly probable" that the ink taken from the first page of the Work for Hire Document, which includes the disputed language granting Plaintiff a one-half interest in Facebook, was less than two years old, having been produced within 24 months before August 28, 2011, the date LaPorte conducted the PE testing. *Id.* at 2 & n. 2.

Insofar as Plaintiff argues the PE test is unreliable because it has never been published or subjected to peer review, nor been accepted within the scientific community, Plaintiff's Response at 22-24, evidence in the record establishes otherwise. In particular, the PE test was initially developed by Valery N. Aginsky ("Aginsky"), the forensic chemist initially retained by Plaintiff as an expert in connection with this action but who, despite conducting a visual examination of the Work for Hire Document, performed no chemical analysis of the document and was not asked by Plaintiff to prepare an expert report concerning his findings, nor did Aginsky render an opinion as to the age of the ink used for the handwritten notations. Aginsky Dep. Tr.[32] at 7-8, 10-12 , 14-15.

Arginsky gave deposition testimony that he initially discussed with Plaintiff his

---

[32] References to "Aginsky Dep. Tr." are to the page of the transcript of Defendants' August 9, 2012 deposition of Aginsky, filed in this action as Doc. No. 486. In response to questions put to him at his deposition, Aginsky explained that he never prepared a report regarding his inspection of the Work for Hire Document because he had not received payment for his time and, as of the August 9, 2012 deposition, Aginsky was not certain of his status with regard to this case, *i.e.*, whether Aginsky was still considered an expert witness for Plaintiff. Aginsky Dep. Tr. at 15-17.

possible involvement in this action as an ink-aging specialist, and Aginsky understood he would be subjecting the handwritten notations on the Work for Hire Document to one of the two PE tests which Aginsky developed, including the solvent-loss ratio test, also referred to as the "ink-aging method" or GC/MS analysis used by LaPorte, and the TLC test.  Aginsky Dep. Tr. at 45, 63.  Aginsky further testified both of the PE tests he developed have been published in peer-reviewed journals and "ha[ve] never been criticized as junk science in scientific literature."  Aginsky Dep. Tr. at 63.  Aginsky further stated the solvent-loss ratio method "had been reproduced and used for more than ten years by Canada Border Services Agency, which is a government lab similar to FBI lab in the United States.  And they still - - they are using this method now.  So they applied it to cases, to criminal cases, in Canada."  *Id.* at 63-64.  Aginsky had previously used the PE tests while working "for the government lab in Russia, for the former Soviet Union. . . " where Aginsky would prepare reports under penalty of perjury for use in court proceedings.  *Id.* at  68-69.  Aginsky, prior to moving to the United States, also performed PE testing for cases in which he testified in Hong Kong and Poland.  *Id.* at 69.

Aginsky's depsition testimony is consistent with his June 16, 2011 Declaration (Doc. No. 66) ("Aginsky Declaration"), filed in connection with the parties' earlier cross-motions for expedited discovery.  In particular, Aginsky averred that his inspection of the Work for Hire Document was limited to "non-destructive testing" so as to avoid damaging the document, and that "the process of forensic ink comparison always begins with the physical examination of the inks using techniques designed to obtain as much information as possible from the ink (and the document as a whole) by visual

53

examination and other nondestructive means, such as microscopic ultraviolet (UV), and infrared (IR) absorption and IR luminescence (IRL) examinations." Aginsky Declaration ¶ 5. Such examinations by Aginsky revealed both pages were printed on the same type of paper with "matching characteristics such as color, thickness, short and long wave UV fluorescence, IR luminescence, opacity, and surface texture," *id.* at ¶ 8, and there was no "discernable difference in ink used to write the interlineation on page 1 of the Agreement [Work for Hire Document] and to sign and date the Agreement [Work for Hire Document] on page 2," *id.* ¶ 9, although the nondestructive techniques Aginsky employed were unable to "discriminate between the inks being compared," requiring "chemical methods" involving "destructive testing," *id.* ¶ 11, *viz.*, the extraction of small portions of the Work for Hire Document taken from the handwritten interlineations using a "hypodermic needle sized hole punch" to remove ink samples "less than 1 mm in diameter." *Id.* ¶ 13. The ink samples would then be analyzed according to a combination of two chemical methods, including TLC, by which ink colorants are examined to determine whether two inks are from the same ink source, and GC/MS, used to determine a specific ink's age according to the ink's vehicle components, including volatile solvents, resins, and other noncolored ink components. *Id.* ¶¶ 11-12. Because TLC and GC/MS each provides only partial information regarding the composition of writing ink, the two methods are often used in combination. *Id.* ¶ 12.

Aginsky then proceeded to describe the ink-aging analysis, explaining the age of ballpoint ink on paper can be measured to within two years, with fast aging ballpoint inks ceasing to age within six months, and slower aging ballpoint inks ceasing to age within two years. *Id.* ¶ 14. As such, if the ink aging analysis of the ballpoint ink on the

Work for Hire Document indicated the ink had ceased to age, "the document is likely at least 6 moths old (if the ink is a fast aging ink) and may likewise be older than two years (if the ink is a slow aging ink)." *Id.* Significantly, Aginsky's description of the ink-dating process is consistent with the PE test used by LaPorte, which Aginsky not only developed, but, contrary to Plaintiff's assertion, defended as a peer-reviewed scientific method that was widely accepted and used by ink chemists including government agencies within the former Soviet Union, Russia, Canada and the United States.

Plaintiff argues LaPorte failed to consider what impact the conditions under which the Work for Hire Document was purportedly stored would have on the ink-dating analysis, including that the temperature at which the document was stored was, for a majority of the time, below the freezing temperature for water. Plaintiff's Response at 25-27. In particular, Plaintiff previously averred that the Work for Hire Document was stored in a "hope chest" located against the north wall of a spare room in Plaintiff's house in Wellsville, New York, which Plaintiff "closed" during the winters of 2003 through 2008, by shutting off the main electrical breaker and leaving "the house for extended periods of time during the freezing New York Winter conditions." Declaration of Paul Ceglia filed June 4, 2012 (Doc. No. 422) ¶¶ 3-7 (capitalizations in original). Plaintiff further maintains that his Wellsville home had no central heating, but was heated with a wood stove, a pellet stove, and a gas fireplace, and that even during the winters of 2008-09 and 2009-10 when Plaintiff remained in the home, the spare room in which the Work for Hire Document was stored remained "closed off from the rest of the house to conserve heat." *Id.* ¶¶ 8-11. To further emphasize that Plaintiff's Wellsville home was cold during the winter months, Plaintiff states that despite draining the water

lines and pipes prior to vacating the home for the winter months, each winter the pipes would freeze and rupture, requiring Plaintiff to repair the pipes in the spring. *Id.* ¶¶ 12-13. *See* also Carmine Ceglia Declaration, ¶¶ 12-13 (Plaintiff's father averring he was regularly at the home of his son, Plaintiff, "when he was not living there, repairing damage caused by freezing temperatures and frozen pipes.").

Inasmuch as Plaintiff asserts, Plaintiff's Response at 25-27, that LaPorte failed to consider the impact on the ink-dating analysis the conditions under which the Work for Hire Document was stored, specifically, that the document was stored at temperatures below 32° F, LaPorte explained at his July 26, 2012 deposition that the 25% solvent-loss ratio benchmark used in the PE testing as indicating tested ink is "fresh" accounts for variations in storage conditions such that even if cold storage conditions slowed the solvent-loss ratio to 18%, the 64% solvent- loss ratio LaPorte observed is still too high for a document that purportedly was signed in 2003. LaPorte Deposition Tr.[33] at 189-92 ("given the fact the document's purported to have been done in 2003, that just - - that doesn't make sense at all that the phenoxyethanol levels would still stay that high over that period of time."). LaPorte further stated he was aware of the conditions under which Plaintiff maintains the Work for Hire Document was stored, *i.e.*, in below freezing temperatures during the winter months, but the effect of such conditions on the ink's aging would be countered by the fact that the document would

---

[33] References to "LaPorte Deposition Tr." are to the page of the transcript of Plaintiff's July 26, 2012 deposition of LaPorte, filed on August 21, 2012 (Doc. No. 497).

have been stored at warmer temperatures during the summer.[34]  *Id.* at 191-92.

Plaintiff failed to submit any evidence in support of his supposition, Plaintiff's Response at 30-31, that the Work for Hire Document was contaminated by use, within its proximity, of a household product containing PE.  Not only did Plaintiff's experts not test the Work for Hire Document to determine whether it had been contaminated, but the record is devoid of any evidence remotely suggesting that any product containing PE was within the vicinity of the Work for Hire Document, such that Plaintiff's contamination theory is, at best, mere conjecture.  As LaPorte explained in response to deposition questioning, if the Work for Hire Document had been stored in close proximity to PE sources other than the ink, the PE would have been detected when LaPorte tested his "paper blank," which LaPorte described as being taken from an area of the Work for Hire Document that was "blank" but within the vicinity of the area from which the ink samples were taken, and the same size as the ink samples.  LaPorte Dep. Tr. at 212-13.  According to LaPorte, the "paper blanks" are tested as "part of the quality control measures" to ensure there is no outside contamination, and LaPorte was "a hundred percent confident there wasn't any phenoxyethanol contamination . . . . [b]ased on the quality control samples, based on the fact it didn't show up in the other blanks, [and] the probability of doing that is just unrealistic."  *Id.* at 218-20.

Nor is there any merit to Plaintiff's argument, Plaintiff's Response at 28, that because LaPorte had prepared a report in another, unrelated, case on April 17, 2012

---

[34] LaPorte further testified that the absence of central heating in Plaintiff's home rendered it unlikely the home had central air conditioning such that extreme cold storage temperatures experienced during the winter months would be offset by extreme warm storage temperatures during the summer months.  LaPorte Deposition Tr. at 192.  Plaintiff has not disputed LaPorte's assumption that Plaintiff's Wellsville home was not air-conditioned.

("April 2012 Report"),[35] in which LaPorte, after conducting PE testing of ink on a document that showed an average solvent-loss ratio of 71%, concluded the ink was no more than 69 days old, and upon repeating the test 11 days later found a solvent-loss ratio of 46%, concluded the ink was then 80 days old, LaPorte should have likewise concluded with regard to the instant case that an average solvent-loss ratio of 64% indicated the Work for Hire Document was less than three months old. Plaintiff's argument ignores the fact that LaPorte's more exact conclusions drawn in the other case were aided by the fact that what LaPorte was analyzing in the unrelated case was a ledger containing dated and sequential entries that provided more information as to the subject ink's age. *See* April 2012 Report at 12-19. Further, because, as explained by Aginsky, some inks are "fast aging" while others are "slow aging," without knowing the precise identity of the ink being analyzed, ink-dating is limited to determining whether a specific ink sample is more or less than two years old, at which point all inks cease to age. Aginsky Dep. Tr. at 177-83; *accord* LaPorte Report at 7-8; LaPorte Dep. Tr. at 92.

Plaintiff's reliance on the opinion of forensic scientist and expert witness Larry F. Stewart ("Stewart") for the proposition that it is "not possible to perform ink age determination" on the Work for Hire Document, and other challenges to LaPorte's conclusions, Plaintiff's Response at 22 (quoting Report of Larry F. Stewart ("Stewart Report") (Doc. No. 416), at 416-3, ¶¶ 382-440), is also misleading. Significantly, as Defendants point out, Defendants' Sur-Rebuttal Response at 7, not only did Stewart not

---

[35]LaPorte Declaration Exh. C.

conduct any GC/MS testing, including the PE test, on the Work for Hire Document, but Stewart fails to explain why such testing was not conducted. Further, Stewart testified at his July 11, 2012 deposition that he has not used GC/MS to chemically analyze any compound substances since 1982. Stewart Dep. Tr.[36] at 258. According to his Curriculum Vitae, (Stewart Report Exh. 1 (Doc. No. 416-4) ("Stewart Curriculum Vitae")), since 2004, Stewart has published only in newsletters and internet expert witness directories, many self-published, but not in any academic journal. Stewart Curriculum Vitae at 9-12 (Original Research Publications/Presentations). Defendants attribute Stewart's limited professional research publications to the fact that in 2004, he was indicted by the United States Department of Justice for perjury, Defendants' Reply at 17, an assertion Plaintiff does not dispute.[37]

Other statements by Stewart attribute testing concepts to statements that do not support the concepts. For example, Stewart quotes a handbook published by the Federal Bureau of Investigation ("FBI"), in support of his assertion that "The FBI does not use the Laporte PE test" because "[e]xaminations cannot determine how long ink has been on a document." Stewart Report ¶ 405 (quoting FBI Laboratory Publication, Handbook of Forensic Services (revised 2007), at 79). A plain reading of the quoted statement, however, establishes only that no ink examination can precisely date the age of any ink, a fact that does not preclude LaPorte's use of the PE test, corroborated

---

[36] References to "Stewart Dep. Tr." are to the page of the transcript of Defendants' July 11, 2012 deposition of Stewart, filed as Southwell Reply Declaration Exh. N.

[37] Defendants' allegations regarding Stewart's professional difficulties have no bearing on Stewart's findings regarding the Work for Hire Document. As such, the court need not consider Plaintiff's assertions made in his sur-rebuttal, Plaintiff's Sur-Rebuttal ¶¶ 23, 27-27, in an attempt to rehabilitate Stewart as an expert witness.

by Aginsky, to determine only whether the ink has, based on the solvent-loss ratio, ceased to age, indicating the ink is less than two years old. Nor is Stewart's assertion, referenced by Plaintiff, Plaintiff's Response at 23 (citing Stewart Report ¶ 383), that the PE test for ink-aging has not been subject to peer review or publication correct. Rather, as discussed, Discussion, *supra*, at 52-54, Plaintiff's own expert, Aginsky, testified that he developed the PE test which has been subjected to peer-review in relevant scientific journals, "has never been criticized as junk science in scientific literature," and has been used by government agencies throughout the world in criminal cases and other court proceedings. Aginsky Dep. Tr. at 63-69. As such, Plaintiff's reliance on Stewart to discredit PE testing is in error.

Finally, Plaintiff's assertion that Defendants' expert forensic document examiner and chemist Albert H. Lyter, III, Ph.D. ("Dr. Lyter"), found the ink on the Work for Hire Document "unsuitable" for ink-dating, Plaintiff's Response at 1, 21, and 25, is unfounded. Dr. Lyter's complete statement regarding his chemical analysis of the ink is that he

> was unable to obtain satisfactory <u>TLC</u> results because the ink writing on the "Work for Hire" document was deteriorated in a way that changed the chemical composition of the dye components in the ink. This deterioration is apparent in the results of the <u>TLC</u> analysis, which were quite unusual for ball pen inks. Specifically, the components of the extracted ink did not separate into distinct bans of color, but instead elongated over diffuse areas. This diffuse elongation of the ink components was tonally uncharacteristic – different in both color and intensity – of the dye components normally found in ball pen ink. I have only seen this kind of <u>TLC</u> result for inks that have been damaged in some way, either chemically or environmentally.

Lyter Report at 8 (underlining added).

As such, Dr. Lyter subjected the ink samples taken from the Work for Hire Document

only to TLC analysis, which is not used to determine the age of a particular ink but, rather, to determine the ink's chemical composition for use in comparing different ink samples so as to determine whether the ink samples are from the same ink source. That Dr. Lyter found the ink samples "unsuitable" for TLC testing has no bearing on LaPorte's determinations based on PE testing.

Accordingly, Plaintiff has failed to successfully rebut LaPorte's ink-dating of the ballpoint ink used for the handwritten notations on the Work for Hire Document, such that LaPorte's conclusion that it is highly probable the ink is less than two-years old and, thus, could not have been placed on the Work for Hire Document on April 28, 2003, is unchallenged.

### b.    Printing variations between pages 1 and 2

Defendants rely on the variations in the fonts, formatting, and spacing found on page 1 of the Work for Hire Document as compared to those found on page 2 as evidence of the Work for Hire Document's fraudulent nature.  Defendants' Memorandum at 40-41.  Defendants retained typeface and print technology expert Professor Frank J. Romano ("Romano"), to examine the typesetting and formatting of both the Work for Hire Document and the StreetFax Document.  Defendants' Memorandum at 40-41; Report of Frank J. Romano ("Romano Report"),[38] at 2-9.  Prior to conducting his analysis of the Work for Hire Document on July 14, 2011, Romano reviewed the purported scan of the Work for Hire Document attached to the Amended

---

[38] Southwell Declaration Exh. C (Doc. No. 327).

Complaint, in two forms including as an electronic file in .pdf format, and a printout of that same file. Romano Report at 2. The "many observable inconsistencies" between pages 1 and 2, "as well as the fact that all references to "The Face Book" or "The Page Book" appear on Page 1" directed Romano to conclude that page 1 of the Work for Hire Document is an "amateurish forgery." *Id.* Upon physical examination of the paper Work for Hire Document presented by Argentieri for analysis on July 14, 2011, Romano found several objective inconsistencies including that pages 1 and 2 of the Work for Hire Document are composed in different fonts, with page 1 in Times New Roman and page 2 in Garamond. *Id.* at 4. Further differences between the two pages include the width of margins, columns, "gutters,"[39] and indentations, *id.* at 5-6, as well as the spacing between paragraphs on page 1 which varies from single, to double and triple, whereas the spacing on page 2 is consistently double-spaced. *Id.* at 7.

In August 2011, Romano examined a scan of the two-page StreetFax Document provided by Defendants. Romano Report at 8. Romano observed both pages of the StreetFax Document were composed in Garamond font, which is consistent with page 2 of the Work for Hire Document. *Id.* at 8-9. None of the formatting inconsistencies observed with regard to the Work for Hire Document were observed with the StreetFax Document. *Id.* at 9. Further, although the Work for Hire Document contains an "errant return code" on page 1, section 4, no similar errant return code is observed in the StreetFax Document. *Id.*

Romano concluded (1) the Work for Hire Document is, "at least in part, forged,"

---

[39] "Gutters" refers to the space between columns of typeface. Romano Report at 5.

(2) page 1 of the Work for Hire Document "is an amateurish forgery," (3) pages 1 and 2 of the Work for Hire Document were printed on different printers, (4) page 1 was printed on a more recent printer than page 2, (5) the typeface, point sizes, and formatting of both pages of the StreetFax Document are "significantly more consistent" than those of the Work for Hire Document, and (6) page 1 of the Work for Hire Document "appears to be a modification" of page 1 of the StreetFax Document. Romano Report at 11. Romano "state[d] these conclusions beyond any reasonable doubt and with the highest degree of certainty possible." *Id.*

Plaintiff's challenge to Romano's conclusion that the Work for Hire Document is an "amateurish forgery" based on the detection of numerous discrepancies in the fonts and formatting of the document's two pages, as merely indicative of "two laypersons creating a contract," Plaintiff's Response at 15, without identifying any evidence in support of this assertion, ignores the unlikelihood that such discrepancies represent even a layman's attempt to draft a business agreement. As such, Plaintiff's explanation is unfounded speculation. That all of the inconsistencies Romano observed appear only on page 1 of the Work for Hire Document, and not on that document's second page, nor on either page of the Street Fax Document, and that the font and formatting of page 2 of the Work for Hire Document are the same as on page 2 of the StreetFax Document, is compelling evidence the Work for Hire Document, at least the first page, is a forgery. Even Plaintiff's own expert, forensic document examiner John Paul Osborn ("Osborn"), agreed that the "marginal formatting issues, the discrepancies between the first page and the second page of the Work for Hire document" would "raise suspicion" as to the document's authenticity, which would best be allayed by

63

Plaintiff producing other work for hire documents from the same period of time containing similar "malformatting." Osborn Dep. Tr.[40] at 87-88. Nor does Plaintiff, despite asserting "Plaintiff has an additional contract with another third party involved in the Street Fax Project whose fonts precisely mirror the fonts Romano claims are indicative of fraud within the [Work for Hire Document]," Plaintiff's Response at 36, further identify or submit a copy of such contract in support of this assertion, such that there is no basis for comparison in support of Plaintiff's argument.[41]

Accordingly, inconsistencies with the fonts, typesetting, and formatting observed between pages 1 and 2 of the Work for Hire Document, absent satisfactory explanation by Plaintiff, call the document's authenticity into question.

### c.      Printer, Toner and Paper Variations

Defendants assail Plaintiff's claim that he "printed and saved" the Work for Hire Document on April 25, 2003, Amended Complaint ¶ 21, as without merit given evidence the two pages were separately printed using different printers, toner, and paper. Defendants' Memorandum at 41-42. In support of their argument, Defendants point to Romano's conclusion to "the highest degree of certainty possible" that different printers were used to print each page of the Work for Hire Document. *Id.* at 41 (citing Romano

---

[40] References to "Osborn Dep. Tr." are to the transcript of Defendants' August 13, 2012 deposition of Osborn (Doc. No. 489).

[41] Nor has Plaintiff indicated whether the other contract to which Plaintiff refers is the March 5, 2003 Street Fax contract with another individual, pertaining to another aspect of the StreetFax project not relevant to this action, a copy of which Defendants filed in support of their Motion to Dismiss. Aycock Exh. A. A plain review of this contract establishes its content, terms, and formatting are nearly identical to those of the StreetFax Document and, like the StreetFax Document, contains no reference to Facebook.

64

Report at 8).

According to Romano, his examination under magnification of the Work for Hire Document's printed features established that pages 1 and 2 were printed by laser jet printers using powder toner, but that "all printers lay down towner in a fashion that can typically be distinguished."  Romano Report at 8.  Romano continues that

> Under magnification, the edges of the letters ("edge gradient" or "edge definition") are recognizable as created by a particular type of printer.  Moreover, the combination of scaling and resolution enhancement technologies result in an edge gradient that can distinguish one printer from another.  Thus, by observing the edge gradient under magnification, an expert can determine whether text was printed by a specific printer that did or did not use particular technologies.

*Id.*

Based on his observation, under magnification, Romano found "the application of scaling and resolution enhancement technologies to Page 1 and not Page 2 demonstrates that those pages were printed with two different laser printers," given that the printer used to print page 1 "applied these new technologies, [and] was the more recent of the two printers used."  Romano Report at 8.

Plaintiff does not directly dispute Romano's findings; rather, in opposition to Defendants' Motion to Dismiss, Plaintiff relies on the findings made by fiber analyst Walter J. Rantanen, II ("Rantanen"), Technical Leader in Fiber Science with Integrated Paper Services ("IPS"), a paper testing facility, who had conducted fiber identification analysis and other testing on paper samples Stewart had extracted from the Work for Hire Document and another document entitled "StreetFax Back-End Specifications"

("Specifications Document").[42] According to Rantanen's expert report (Doc. No. 421) ("Rantanen's Report"), the paper samples he analyzed were "consistent with coming from the same mill and production run." Rantanen Report at 2. Although Plaintiff presents Rantanen's conclusion as supporting the Work for Hire's authenticity, Plaintiff's Response at 19, Rantanen clarified at his deposition that the finding only means that it is not "factually impossible" for the paper samples tested to have come from the same paper mill and production run, and that his findings established it was "also not factually impossible" that the paper samples came from different paper mills or production runs. Rantanen Dep. Tr.[43] at 149. *See also id.* at 207 ("I said it was consistent with. I did not say it definitely came from that production run.").

Not only does Rantanen's conclusion that the paper samples he analyzed were "consistent with coming from the same mill and production run" fail to support Plaintiff's assertion that both pages of the Work for Hire Document were printed on the same paper, but the question as to whether the paper samples Rantanen analyzed were from the Work for Hire Document or the Specifications Document was discussed at length in a Decision and Order filed November 20, 2012 (Doc. No. 605) ("Nov. 20, 2012 D&O") at 14-18 (finding record established Rantanen analyzed paper samples from Specifications Document rather than the Work for Hire Document). Rantanen then conducted further analysis of paper samples purportedly from both pages of the Work

---

[42] The parties do not dispute that both Plaintiff and Zuckerberg signed the Specifications Document on April 28, 2003.

[43] References to "Rantanen Dep. Tr.") are to the transcript of Defendants' July 16, 2012 deposition of Rantanen, attached to the Southwell Reply Declaration as Exh. O (Doc. No. 589-15).

for Hire Document, based on which Rantanen concluded in a supplemental report, dated November 15, 2012 (Doc. No. 610-2) ("Supplemental Rantanen Report"),[44] that the samples were "consistent with [ ] being from the same source and manufacturing facility." Supplemental Rantanen Report at 2. Nevertheless, Rantanen's conclusions reached in the Supplemental Rantanen Report are as equivocal as the conclusion in the original Rantanen Report, such that neither conclusion supports Plaintiff's assertion that Rantanen found pages 1 and 2 of the Work for Hire Document were printed on the same paper, *i.e.*, from the same ream of paper, which would tend to indicate the Work for Hire Document is authentic.

Plaintiff also challenges LaPorte's conclusion, LaPorte Report at 11, that the two pages of the Work for Hire Document were printed on paper of different thicknesses, as contradicted by Defendants' expert forensic document examiner Peter V. Tytell ("Tytell"), Aginsky, Stewart, and Plaintiff's expert forensic document examiner James A. Blanco ("Blanco"). Plaintiff's Response at 18, 20 and 37. Blanco concluded both sheets of paper on which pages 1 and 2 of the Work for Hire Document are printed measure 0.11 mm, Blanco Declaration ¶ 233(12), which is consistent with Aginsky's averment that both pages were printed on sheets of paper with "matching characteristics such as . . . thickness . . . ." Aginsky Declaration ¶ 8.

Plaintiff, however, misrepresents LaPorte's findings regarding the thickness of the pages of the Work for Hire Document. LaPorte describes his examination of the Work for Hire Document as including performing eight measurements on each sheet of

---

[44] The court notes the Supplemental Rantanen Report was filed without the court's permission.

paper comprising the Work for Hire Document, from which LaPorte determined the average thickness of each page. LaPorte Report at 11. The average thickness of the first page was 0.0042 with a margin of error of +/- 0.00005 inches, whereas the average thickness of the second page was 0.0043 with a margin of error of +/- 0.00005 inches. *Id.* As such, it is possible, given the margin of error for each page, that the two pages were of the same thickness, with each page measuring 0.00425 of an inch. Although LaPorte maintains the difference in thickness between pages 1 and 2 is statistically significant with "only a 5% chance that the difference in the average of the 8 measurements taken from each page was due to chance," LaPorte Report at 11 and n. 19, LaPorte nevertheless concludes only that the measurements "demonstrate that the paper used for pages 1 and 2 *may* have originated from a different source." *Id.* at 11 (italics added). Further, when asked at his deposition whether he agrees with LaPorte's measurements showing a difference in thickness between both pages of the Work for Hire Document, Tytell stated the different measurements obtained by LaPorte are "not enough to definitely say that the two pages were of a different caliper," explaining that the different instruments used by LaPorte and Tytell could account for the different measurements each obtained. Tytell Dep. Tr. at 129-30. The equivocal statements made by both LaPorte and Tytell regarding the thickness of each page of the Work for Hire Documents fail to establish the conclusions reached by LaPorte and Tytell are irreconcilable. That LaPorte did not take the position that the two pieces of paper comprising the Work for Hire Document were unquestionably from different sources is further demonstrated by LaPorte's deposition testimony statement agreeing with the proposition that "the difference in thickness of two pieces of paper doesn't make them

necessarily pieces of paper that came out of a different ream. . . ." LaPorte Dep. Tr. at 223. Plaintiff's attempt to discredit LaPorte's findings by challenging the accuracy of LaPorte's measurement of the thickness of the paper on which the two pages of the Work for Hire Document were printed thus fails.

In further opposing Defendants' Motion to Dismiss, Plaintiff also relies on Stewart's analysis of the paper comprising the Work for Hire Document. Plaintiff's Response at 17. Plaintiff particularly points to Stewart's finding that "[t]est results indicate that the toner found on page 1 matches that found on page 2," Stewart Report ¶ 92, and "dates from the 2000-2005 time period and not later than that." Plaintiff's Response at 17. Stewart, however, clarified at his deposition that his conclusion that the toners "match" indicates that "they matched at the level of analysis of TLC," but that there are other tests that Stewart did not conduct on the toners, including tests that "could find differences in other components of the toner . . .." Stewart Dep. Tr. at 317. Stewart agreed that differences in other toner components would mean the toners did not match. *Id.* Stewart further agreed that a determination that the toner used on both pages of the Work for Hire Document were "consistent" "is not a very strong conclusion because there is a possibility that there's some other printer out there we are not aware of." *Id.* at 318.

Moreover, even if it could be conclusively established that pages 1 and 2 of the Work for Hire Document were printed by the same printer using the same toner and paper, such conclusion nevertheless would be consistent with Defendants' assertion that both pages of the Work for Hire Document are recently created forgeries. Plaintiff's argument on this issue does not require Defendants' motion be denied.

### d. Page One Substitution Theory and Staple Holes

Plaintiff maintains, Plaintiff's Response at 36, the "page-one substitution" theory had been Defendants' position in this action since Defendants' expert forensic document examiner, Tytell, analyzed the Work for Hire Document on July 14 and 15, 2011.  As explained by Plaintiff, according to the "page-one substitution theory," the first page of the Work for Hire Document is a forgery, and the use of multiple type styles or fonts and the pattern of ink usage indicate the two pages were prepared at different times with the second page being authentic, but the first page being a forgery that was substituted for the original first page of the document.  *Id.* (citing Report of Tytell (Doc. No. 330) ("Tytell Report"), at 13).[45]

Tytell's conclusions, however, do not, as Plaintiff asserts, state the page-one substitution theory; rather, Tytell concluded only that the "two-page Work for Hire document is not consistent with the normal preparation of a two-page document."  Tytell Report at 12.  Tytell continues that "the use of multiple type styles and the pattern of ink usage indicate preparation of the two pages at different times."  *Id.*  Tytell, however, never suggests that page 1 of the Work for Hire Document is a recent creation crafted by Plaintiff and stapled to the second page of the authentic contract signed by Plaintiff and Zuckerberg on April 28, 2003, solely to create the appearance of a single integrated contract supporting Plaintiff's claim to a one-half interest in Facebook.  In other words, Tytell simply does not specifically opine that the original first page of the

---

[45] Plaintiff actually references "Tytell Report at 13," which does not exist as the Tytell Report consists of only 12 pages.  The only logical explanation for the incorrect reference is that on the document header for page 12 of the Tytell Report created by the court's Case Management/Electronic Court Filing ("CM/ECF") system, page 12 is denominated as page 13.

purported contract was replaced with a different page that was a forgery and presented with the original second page as the complete contract.

Rather, according to the record, the page 1 substitution theory was first discussed by <u>Plaintiff</u> in his declaration filed November 24, 2011 (Doc. No. 230) ("Plaintiff's Nov. 24, 2011 Declaration"), averring "[t]he unauthenticated digital image Defendants intend to rely on in this case that is referenced above, appears to have an identical page two to the Facebook Contract[46] attached to the Complaint, however, <u>it appears to have a different page one that has been substituted into that document by someone</u>."  Plaintiff's Nov. 24, 2011 Declaration ¶ 12 (underlining added).  Similarly, Plaintiff's retained expert Stewart attempts to project the page-one substitution theory onto Lesnevich.  Stewart Report at 13, ¶¶ 22-23 (stating although evidence supports that page 1 of the Work for Hire Document was originally executed, *i.e.*, initialed as regards certain handwritten emendations relating to Facebook, at the same time as page 2, the first page of the StreetFax Document was not the original first page of the purported Facebook Contract, that is, the Work for Hire Document) ¶ 86 (". . . I found no basis to support a conclusion that page 1 of the Facebook Contract [Work for Hire Document] had been substituted for a now missing page."); and ¶¶ 87-93 (discussing physical analysis and various testing established both pages 1 and 2 of the Work for Hire Document were created at the same time, using the same printer and toner).

Stewart also discusses statements made by LaPorte regarding the possibility that a different page 1 was originally stapled to page 2 of the Work for Hire Document,

---

[46] Plaintiff's adopted name for the Work for Hire Document.

and later removed and replaced, Stewart Report ¶¶ 158-181. However, neither LaPorte nor Lyter specifically concludes that the Work for Hire Document is composed of a fake page 1 stapled to an authentic page 2. *See* LaPorte Report at 3 ("There is no evidence to refute the possibility that another page, other than page 1 of the Work for Hire Document, was originally stapled to page 2 and removed at a later time."), and 20 (refuting statement by Plaintiff's expert Blanco that he "determined that the staple holes on both pages [of the Work for Hire document] align demonstrating that these two pages [ ] have only been stapled one time wherein they were actually stapled together," by explaining that "purported alignment of staple holes on two pieces of paper does not 'demonstrate' that those pages have been stapled only one time. It is quite possible to detach a multi-page document, attach a new page, and staple through the pre-existing staple hole so that it appears the entire document was only stapled once."); Forensic Report of Lyter (Doc. No. 328) ("Lyter Report") at 5 ("In my experience, a single set of staple holes does not mean that a document was stapled only once or even necessarily together. It is quite possible to create a set of staple holes that appear to match on two pieces of paper when in fact stapling the documents more than one time.").

A plain reading of Defendants' Memorandum filed in support of their Motion to Dismiss reveals Defendants' argument is that Plaintiff "had created the forged Work for Hire Document by doctoring the text of page 1 of the StreetFax Contract, adding in provisions purportedly giving him ownership of Facebook, then appended the doctored page 1 to the authentic page 2 of the StreetFax Contract (or a close facsimile thereof) – the page that contained Zuckerberg's signature." Defendants' Memorandum at 2 (underlining added). Accordingly, nothing in the record establishes that Defendants'

fraud argument is predicated on the page 1 substitution theory articulated by Defendants' experts, or that the second page of the Work for Hire Document is, without question, authentic.

Plaintiff also attempts to demonstrate the genuine nature of the Work for Hire Document based on the evidence of only a single set of staple holes in the Work for Hire Document as discussed in a report by forensic document examiner Blanco, retained by Plaintiff as an expert in connection with this action.[47] On July 15, 2011, Blanco analyzed the Work for Hire Document, including the handwritten interlineation and purported signatures and initials of Plaintiff and Zuckerberg, based on which he prepared his expert report (Doc. No. 459)[48] ("Blanco Report").[49]

In connection with Plaintiff's staple hole argument, Blanco discusses the fact that each page of the Work for Hire Document has only one set of staple holes, each set in alignment with the other, supporting Plaintiff's assertion that the two pages were originally stapled together and not that the first page was later substituted with a replacement page. Blanco Report ¶¶ 10-44. This is consistent with the copy of the Work for Hire Document attached as an exhibit to the Amended Complaint, on which

---

[47] Defendants also attempt to discredit Blanco's findings based on his "checkered past," Defendants' Reply at 22-23; however, the undersigned does not find the various incidents Defendants reference in support of this argument support Defendants' categorical disregard of the Blanco Report and, as such, the court also does not consider Plaintiff's statements submitted in the unsolicited sur-rebuttal filed by Plaintiff in an attempt to rehabilitate Blanco as an expert witness. *See* Plaintiff's Sur-Rebuttal ¶¶ 23-26.

[48] The Blanco Report was originally filed as Doc. No. 415, but because it contained confidential information, was stricken from the record and refiled in redacted form on July 2, 2012 (Doc. No. 459).

[49] Much of the Blanco Report focuses on refuting the illusory page-one substitution theory which, as discussed, Discussion, *supra*, at 70-73, has been asserted only by Plaintiff and, as such, fails to advance Plaintiff's opposition to Defendants' Motion to Dismiss.

what appears to be a staple is visible on the first page in the upper left-hand corner.
Amended Complaint, Exh. A. According to Blanco, had the original page of the Work
for Hire Document been removed and replaced with an altered page, a second staple
would be required to attach the replacement first page to the original second page,
such that only one set of staple holes would be on page 1, but two sets of staple holes
would be on page 2, one set made by the original staple and the second set made
when the replacement page 1 was stapled to the original second page. Blanco Report
¶¶ 41-42. Blanco maintains the only way to avoid making a second set of staple holes
on the second page when stapling the replacement first page to the original second
page would be to attach the new staple by hand so as to line up the new staple with the
original staple holes on the second page, a feat which is nearly impossible to
accomplish without some indicia of the intended deceit, including that hand-stapling
would not result in a clean puncture to the first page, possibly causing small tears
around the staple holes, and the faint "detent" marks, made when the staple legs make
contact with the stapler's bottom plate or "anvil" which bends the staple legs inward
toward each other, would not align. *Id.* ¶¶ 13-17. There are several problems with
Blanco's staple hole argument.

First, even if Defendants were arguing the page-one substitution theory,
Plaintiff's staple hole argument presumes that the two pages comprising the authentic
contract originally were stapled together. In other words, it is a distinct possibility that
the two pages comprising the authentic contract were never stapled together, allowing
for a recently fabricated first page to be substituted for the original first page and then
stapled to the original second page, resulting in only one, original staple and one set of

74

perfectly aligned staple holes.  Second, as discussed, Discussion, *supra*, at 71-75, the staple hole argument is proffered in opposition to the page-one substitution theory which Defendants are not pursuing.  Furthermore, the staple-hole argument does not foreclose the possibility that both pages of the Work for Hire Document are recent forgeries, stapled together at the time of their creation, which creation was intended solely to aid Plaintiff in this action.  Accordingly, Blanco's staple-hole theory is not probative of anything relevant to the authenticity of the Work for Hire Document but, rather, is a red herring.

### e.    Handwriting Analysis

Plaintiff attempts to establish the Work for Hire Document's authenticity based on similarities Blanco found between Zuckerberg's purported initials on page 1 of the Work for Hire Document, and the undisputed specimens of initials Zuckerberg provided pursuant to the July 1, 2011 Expedited Discovery Order for expert analysis in this case.  Blanco Report ¶¶ 103-07.  Defendants maintain Blanco observed only "general similarities that one would <u>expect</u> to find in the forged Work for Hire Document because those initials were traced in an effort to make them look like Zuckerberg's."  Defendants' Reply at 21 (underlining in original, and citing Supplemental Lesnevich Report at 16-18).

In his original report dated March 12, 2012 ("Initial Lesnevich Report") (Doc. No. 329),[50] Lesnevich, Defendants' handwriting expert, conducted handwriting analysis on

---

[50] Filed as Southwell Declaration Exh. E.

the first page of four images of the Work for Hire Document in question, including: (1) Q-1 (image in TIF file format e-mailed from Plaintiff to Argentieri on June 27, 2010; (2) Q-2 (image attached to Plaintiff's Complaint filed June 30, 2010); (3) Q-3 (image created by Aginsky during his January 13, 2011 examination of the document); and (4) Q-4 (image taken by Tytell during Defendants' July 14, 2011 examination of the document presented by Argentieri). In the Supplemental Lesnevich Report (Doc. No. 472-1), Lesnevich focused on the signatures and handwritten dates on the second page of the same four images, and also analyzed seven known handwriting specimens of Zuckerberg, including (1) K-1 (undated 28 signatures and 11 sets of initials of Zuckerberg); (2) K-2 (three Zuckerberg signatures from Securities and Exchange Commission filings dated May 12 and August 8, 2005); (3) K-3 (original StreetFax Specifications Document with signatures and handwritten dates by both Plaintiff and Zuckerberg and Zuckerberg's initials dated April 28, 2003); (4) K-4 (two signatures of Zuckerberg and additional handwritings dated July 29, 2004); (5) K-5 (two signatures and additional writings of Zuckerberg dated July 29, 2004); (6) K-6 (Zuckerberg signature dated July 29, 2004); and (7) K-7 (10 signatures of Plaintiff provided to Defendants on December 2 and 23, 2011).[51]

In the Initial Lesnevich Report prepared based on his analysis of the first page of each of the four questioned images, Lesnevich identified six categories containing a total of 20 dissimilarities found among the handwritten interlineations. The categories of dissimilarities include (1) slant/slope of individual letters and numbers, Initial Report

---

[51] The letter "Q" is used to designate exhibits of documents whose authenticity is questioned, whereas the letter "K" is used to designate exhibits of documents whose authenticity is known.

at 3-10; (2) letter formation or design, *id.* at 11-14; (3) letter spacing or placement, *id.* at

15-20; (4) beginning/ending strokes, *id.* at 21-22;  (5) height-relationship, *id.* at 23-26;

and (6) alignment of the handwritten interlineations with certain typeface letters, *id.* at

27-29.  Because Q-1 and Q-2 contained the same dissimilarities on page 1 as

compared to Q-3 and Q-4, Lesnevich concluded Q-1 and Q-2 are images made from

one version of the Work for Hire Document ("first version"), whereas Q-3 and Q-4 are

images made from a second version of the Work for Hire Document ("second

version").[52]

After preparing the Initial Lesnevisch Report, Lesnevich continued to examine

the four images of the Work for Hire Document in question, focusing on the signatures

and handwritten dates on the second page of each of the four images, on which the

Supplemental Lesnevich Report is based, observing three categories containing 12

dissimilarities, including dissimilarities as to (1) beginning/ending strokes, Supplemental

---

[52] The court conceives at least one plausible explanation for the creation of a second version of the Work for Hire Document after the action was commenced.  In particular, the first version, *i.e.*, Q-1 and Q-2, is the same version that Plaintiff e-mailed to Argentieri and which was then filed as an exhibit to the original complaint, whereas the second version, *i.e.*, Q-3 and Q-4, is what was presented for expert analysis by Aginsky in January 2011 and by Defendants' experts in July 2011.  The first version could have been created according to the page-one substitution theory, with Plaintiff taking the original second page of the StreetFax Document, containing authentic signatures for both Plaintiff and Zuckerberg, and then creating a new first page containing the references to Facebook.  Plaintiff would then have presented the first version as the original contract signed by the parties on April 28, 2003.  Plaintiff, however, upon learning that the document would be subjected to expert forensic examination that could ascertain whether both pages of the document were printed on the same printer using the same paper and toner would have appreciated that need for consistency in the paper and toner used for both pages.  As such, Plaintiff could have printed out a fresh copy of the Work for Hire Document, onto which Plaintiff then traced from the original StreetFax Document (or from the first version) the handwritten interlineation, initials and signatures, fabricating a new 'original' for which both pages were printed using the same paper and toner, and which was presented to Aginsky and Defendants' experts for forensic examination.  Aginsky, however, likely explained to Plaintiff the need for ink analysis to determine the age of the ink used to create the handwritten interlineation, initials, and signatures, to ascertain whether they were, as Plaintiff was alleging, more than two years old.  Upon hearing this explanation, Plaintiff would have perceived of the need to accelerate the aging of the ink, and attempted to do so by exposing the second version to an intense light source prior to the scheduled examination of Defendants' experts.

Lesnevich Report at 6-7 and Figs. 21-26; (2) letter formation or design of the letters, *id.* at 8-9 and Figs. 27-40; and (3) letter spacing or placement on the document, *id.* at 10 and Figs. 41-42.  Consistent with the dissimilarities found among the four images of page 1, Q-1 and Q-2 contained the same dissimilarities on page 2 as compared to Q-3 and Q-4, corroborating the Initial Lesnevich Report's conclusion that Plaintiff has proffered at least two different versions of the Work for Hire Document.  Lesnevich thus concluded in both his initial and supplemental reports that Plaintiff had provided at least two different versions of the Work for Hire Document for expert inspection, explaining that Q-1 and Q-2 are images of the first version, and Q-3 and Q-4 are images of the second version.  Initial Lesnevich Report at 30; Supplemental Lesnevich Report at 23.

For example, Lesnevich documented dissimilarities between the questioned image of Zuckerberg's initials appearing on the Work for Hire Document, which Lesnevich refers to as "Q-3," and the known handwritten specimens of Zuckerberg's initials submitted in connection with this motion, specifically K-1, and K-3, taken from the original Specifications Document, dated April 28, 2003, and other documents, some of which are confidential and subject to the July 13, 2011 Protective Order (Doc. No. 86).  Lesnevich found "multiple dissimilarities in ending strokes between the questioned 'MZ' initials on Q-3 and the 'MZ' initials on K-3," with such strokes on Q-3 ending "abruptly, creating blunt ending strokes, which are indicative of traced writing," in contrast to K-3 on which the ending strokes "end rapidly, creating tapered ending strokes, which are indicative of natural writing."  Supplemental Lesnevich Report at 16 and Fig. 55.  Lesnevich also observed "slant/slope dissimilarity between the'MZ' initials on Q-3 and the 'MZ' initials on K-1 and K-3," being "the crossbar of the letter 'Z' slants

sharply downward from left to right" on Q-3, in contrast to each set of known 'MZ' initials

found in K-1 and K-3, where "the crossbar of the letter 'Z' either slants upward from left

to right or is approximately horizontal." *Id.* at 17 and Figs. 56-58. Lesnevich further

detected vertical-alignment dissimilarities between the questioned 'MZ" initials on Q-3,

and the known 'MZ' initials on K-1 and K-3. *Id.* at 18. In particular, on page 1 of Q-3,

"the beginning point of the initial stroke of the 'Z' and the left-end of the crossbar of the

'Z' are vertically aligned," whereas on each set of the known 'MZ' initials found in K-1

and K-3, "the left-end of the crossbar of the 'Z' is set further to the right than the

beginning point of the initial stroke of the 'Z.'" *Id.* at 18 and Figs. 59-61.

Lesnevich also examined the handwritten signatures, signature dates, and

initials on Q-3, being one of the two copies of the second version of the Work for Hire

Document and, more specifically, the image taken by Plaintiff's expert, Aginsky, during

Aginsky's January 13, 2011, physical examination of the Work for Hire Document, and

compared such handwritings to known handwriting exemplars of Zuckerberg.

Lesnevich "observed significant evidence of changes in direction, hesitation, unnatural

writing movement, poor line quality, angular writing movements, differences in letter

formation and design, and beginning stroke dissimilarities in the questioned Zuckerberg

signature and date of signature on Exhibit Q-3." Supplemental Report at 34. Lesnevich

concluded "that the questioned Zuckerberg signature and date of signature on Exhibit

Q-3 were slowly drawn and not naturally written." *Id.* In particular, Lesnevich found

with regard to Zuckerberg's signature (1) line quality dissimilarities, Supplemental

Report at 11-12 and Figs. 43-45; (2) dissimilarities in letter formation or design of

letters, *id.* at 13 and Figs. 46-49; (3) hesitation, *id.* at 14 and Figs. 50-53; and (4)

retouching dissimilarities, *id.* at 15 and Fig. 54. As to Zuckerberg's initials, Lesnevich found (1) tapered and blunt ending strokes, Supplemental Report at 16 and Fig. 55; (2) slant/slope dissimilarities, *id.* at 17 and Figs. 56-58; and (3) vertical-alignment dissimilarities, *id.* at 18 and Figs. 59-61. Lesnevich also compared Ceglia's signature and date of signature on Q-3 to known Ceglia handwriting exemplars, and concluded "the questioned Ceglia signature and date of signature on Exhibit Q-3 were slowly drawn and not naturally written." Supplemental Report at 19. In particular, Lesnevich found dissimilarities as to (1) pen pressure and line quality, *id.* at 19-20 and Figs. 62-66; (2) tapered and blunt ending strokes, *id.* at 21 and Figs. 67-68; and (3) re-touching, *id.* at 22 and Fig. 69.

As in the Initial Lesnevich Report, Lesnevich again concluded that Plaintiff "has proffered at least two different physical documents as the Work for Hire document," Supplemental Report at 23, and with respect to Q-3, the questioned Zuckerberg signature, initials, and date of signature on the purported contract "are unnaturally written tracings that were not written by Mark Zuckerberg," *id.* at 23-24, and the questioned Ceglia signature and signature date on the purported contract "are unnaturally written tracings" that "could have been modeled off of another source," including Q-1 and Q-2, *id.* In short, Lesnevich determined Zuckerberg's purported signature and date on page 2 and initials on page 1 of the Work for Hire Document were "tracings" not written by Zuckerberg. *Id.* at 24-25.

In opposition, Plaintiff largely relies on Blanco's analysis of the Work for Hire and StreetFax Documents, based on which Blanco concluded the Work for Hire Document "is an authentic, unaltered document." Blanco Report ¶ 232. According to Blanco, the

evidence examined establishes that pages 1 and 2 of the Work for Hire Document were executed together "as a companion document," that no evidence justifies or supports Defendants' page-one substitution theory that the first page of the Work for Hire Document is a recently created page inserted in place of the first page of the original two-page document. *Id.* As discussed, however, Discussion, *supra*, at 70-73, Defendants are not, as Plaintiff repeatedly asserts, pressing the so-called "page-one substitution theory," and the Blanco Report is irrelevant insofar as Blanco attempts to discredit Lesnevich's work on this basis.

Blanco's attempts to attribute some of the discrepancies Lesnevich observed among the four questioned writings, Q-1 through Q-4, to distortions caused by repeated printing, copying and scanning of the original Work for Hire Document, Blanco Report ¶¶ 57-74 and Exhs. 11-14, fail to rebut Lesnevich's findings.[53] Blanco points to the differences in image quality that are readily observable, as Lesnevich found, between Q-1, Q-2, Q-3, and Q-4. Blanco Report ¶¶ 57-60 and Exh. 11. That each of the questioned images is of a different quality, however, is not disputed.

From Q-1, Blanco scanned the handwritten interlineation three times, progressively using scanning technology with fewer "pixels per inch" ("PPI"), resulting in deteriorating print resolution or quality. Blanco Report ¶ 61 and Exh. 12. According to Blanco, depending on the resolution used to print the sample, the dissimiliarities

---

[53] Lesnevich maintains the dissimilarities observed cannot be explained by the scanning and copying of the Work for Hire Document which can alter the quality of a document. See Supplemental Lesnevich Report at 6 ("These dissimilarities are not attributable to image-quality variations between documents. Rather, the differences between the handwriting on the Questioned Documents were generated at the time of the documents' creation, and not at the time of reproduction.").

observed by Lesnevich are enhanced or obscured, such that the dissimilarities fail to support Lesnevich's determination that the four questioned exhibits were from two different physical documents. *Id.* ¶¶ 61-62 and Exh. 12. Although a plain look at Blanco Report Exh. 12, does confirm that, as Blanco found, when the handwritten interlineation is reproduced using a method with fewer PPI, its resolution is so diminished as to make it difficult to detect the dissimilarities Lesnevich found, the resolution of the handwritten interlineation does not appear of such poor quality in Q1, Q2, Q3, or Q4. Nor does Blanco explain that a poor quality resolution can be improved through subsequent reproduction through a method with increased PPI. As such, Blanco's demonstration of the effect of PPI on print resolution, while interesting, is irrelevant and fails to rebut Lesnevich's findings.

Blanco's attempt to establish that the handwritten interlineation from Q-1 matches the handwritten interlineation from Q-3, Blanco Report ¶¶ 64-65 and Exh. 13, through use of a "progression overlay" in which the interlineation appearing in Q-1 is rendered red, cropped, and positioned over the interlineation appearing in Q-3 fails for three reasons. First, even with the handwritten interlineation in Q1 rendered red, the numerous dissimilarities noted by Lesnevich are still readily observable. Second, the interlineation resulting from the "progression overlay" does not establish that the two interlineations "match" but, rather, merged and does not match either Q-1 or Q-3. This can best be observed by looking at the "M" in the word "May" for which the legs are neither parallel, as Lesnevich observed in Q-1, Initial Lesnevich Report at 6, nor splayed as Lesnevich observed in Q-3, *id.*, but are somewhere between the two. Moreover, Blanco's assertion that the discrepancies detected between these two copies

of the handwritten interlineations disappear when one is placed over the other such that they actually "match" is completely inconsistent with Blanco's argument that discrepancies exist, but can be explained by the repeated processing of the Work for Hire Document.  Plaintiff thus fails to successfully challenge on this ground Lesnevich's findings that Plaintiff has submitted two different versions of the Work for Hire Document to the court and to the experts for analysis in this action.

Plaintiff also attributes the variations between the copy of the Work for Hire Document attached to the Amended Complaint and the purported original Work for Hire Document produced for inspection on July 14, 2011 ("the purported original"), to the reproduction techniques used to prepare the copy of the  purported original to be attached to the Amended Complaint, subsequent electronic filing of the copy with the Amended Complaint, then downloading and printing the Amended Complaint.  Plaintiff's Response at 33-35.  Insofar as Blanco relies in support of this argument on samples of changes to typed text that can result from such document processing, Blanco Report ¶¶ 66-69 and Exh. 14, rather than observed differences in handwritten interlineations, such samples are irrelevant because the authenticity of the typed text is not challenged in this manner.

Although Blanco reports on the many similarities he observed with regard to Zuckerberg's signature, Blanco's analysis does not address the many dissimilarities between the four images observed by Lesnevich the significance of which are readily appreciated by the eye of one not trained in such sciences.

Blanco compares known handwriting specimens of both Zuckerberg and Plaintiff to the handwritten interlineation on page 1 of the Work for Hire Document, concluding

the handwritten interlineation was written by Plaintiff, and not by Zuckerberg. Blanco

Report ¶¶ 108-11. The parties, however, do not dispute that there was a handwritten

interlineation on the contract they signed on April 28, 2003, and that Plaintiff wrote the

interlineation.[54] *See* Amended Complaint ¶ 22 (alleging that "[e]xcept for the

handwritten interlineations made on April 28, 2003, Ceglia made no changes to the

agreement after printing it on April 25, 2003."); Plaintiff's Response at 13 (citing Blanco

Declaration ¶ 233 listing 18 reasons disputing the page-one substitution theory,

including that "Paul Ceglia wrote the hand printed interlineation on page 1 of the

Facebook Contract."). As such, not only is this finding completely irrelevant to whether

Zuckerberg signed and initialed the Work for Hire Document, it also does not suggest

that the Work for Hire Document is the authentic contract.

Blanco also points to dissimilarities in handwritten letters attributed to Zuckerberg

and Plaintiff, including samples of Zuckerberg's initials and signature written by Plaintiff

at his attorney's request, Blanco Report ¶¶ 112-34, as proof that Plaintiff could not have

forged Zuckerberg's signature or initials. This sophomoric assertion, however, blinks at

the essence of Defendants' Motion to Dismiss, *i.e.*, that Zuckerberg's signature and

initials appearing on the Work for Hire Document were forged by either tracing or

copying the signature and initials from the authentic document, such that similarities

between Zuckerberg's signature and initials, even if forged, and Plaintiff's signature and

initials would not be expected. This argument presumes that Defendants are arguing

---

[54] The court notes the interlineation handwritten on the first page of all copies of the Work for Hire Document reads "Providing web designer is finished by May 24, 2003," which is almost identical to the handwritten interlineation on the first page of the StreetFax Document, except that the verb "is" is replaced with "has" such that the interlineation reads "Providing web designer has finished by May 24, 2003."

that Plaintiff forged Zuckerberg's signature and initials on the Work for Hire Document, ignoring the distinct possibility that someone other than Plaintiff may have perpetrated the asserted forgeries which, again, would explain a lack of similarities between Plaintiff's signature and the purported Zuckerberg signature.  The argument also ignores the reality that anyone attempting to forge another's handwriting would be unlikely to use his own handwriting.

Furthermore, Plaintiff dismisses the "trace-forgery" theory as nonsensical, arguing there is no plausible explanation why someone would trace his own signature. Plaintiff's Response at 13-14 (citing Blanco Declaration ¶ 233).  It is, however, a distinct possibility that Plaintiff did not have in his physical possession the original contract executed by the parties on April 28, 2003 but, rather, only a scanned copy which may have been the StreetFax Document containing the handwritten interlineation, signatures and initials.  As such, Plaintiff could have created an "original" by printing the scanned copy of the authentically executed document, in which case the handwritten interlineation, signatures, and initials would have appeared printed using ink jet toner, rather than handwritten with ballpoint ink, and then printed an unsigned copy of the same document that Plaintiff allegedly printed on April 25, 2003, to be signed by Plaintiff and Zuckerberg, and then traced from the print-out of the scanned, executed copy both Plaintiff's and Zuckerberg's signatures onto the newly printed unsigned copy. This is consistent with Blanco's determination, Blanco Report ¶¶ 151-59, that the handwritten interlineation on page 1 of the Work for Hire Document matches or aligns with the latent impression, *i.e.*, the indentation created on a piece of paper placed underneath another piece of paper on which something is handwritten, of the

handwritten interlineation detected on page 2 of the Work for Hire Document, but does not match the handwritten interlineation on page 1 of the StreetFax Document. Put another way, if Plaintiff wrote the handwritten interlineation on the StreetFax Document, he, or someone assisting Plaintiff, may not have traced Plaintiff's own handwriting, but simply traced the interlineation from the printed scan of the StreetFax Document onto the first page of the Work for Hire Document, creating the indentation on the second page that was underneath the first page as Blanco found.

Accordingly, the handwriting analysis performed by Blanco, as reported in the Blanco Report, fails to establish the authenticity of the Work for Hire Document. In contrast, the findings in the Supplemental Lesnevich Report support Defendants' argument that Zuckerberg's initials and signatures on the Work for Hire Document were forged.

### f.    StreetFax LLC References

In further support of their Motion to Dismiss, Defendants point to the fact that the Work for Hire Document, purportedly signed on April 28, 2003, contains references to an entity that did not exist until August 2003, *i.e.*, "StreetFax LLC." Defendants' Memorandum at 42. According to Defendants, Plaintiff, when creating the assertedly fake Work for Hire Document in preparation for the instant action, inserted the references because Plaintiff forgot when StreetFax LLC was incorporated. *Id.* Defendants maintain this "historical anomaly" is "yet another tell-tale sign of fraud." *Id.* (citing *Shangold*, 275 Fed.App'x. at 73-74). As Defendants observe, Defendants' Reply at 13, Plaintiff has not responded in opposition to this argument.

86

Although the reference to "StreetFax LLC" in the Work for Hire Document,
ostensibly signed by Plaintiff and Zuckerberg several months before the entity was
created in August 2003 is not, by itself, sufficient to find the Work for Hire Document is
a forgery,[55] such unchallenged evidence does point toward determining the document is
fraudulent.

### g. Backdated Versions of Work for Hire Document

As further evidence that the Work for Hire Document is a recently created
fabrication, Defendants rely on the fact that despite reviewing hundreds of electronic
devices produced by Plaintiff, Stroz Friedberg did not find a single electronic copy of the
Work for Hire Document, but did find seven versions of the Work for Hire Document
that are similar, but not identical, to the version attached to the Amended Complaint,
with metadata anomalies found in all seven versions indicating tampering through
backdating and other forms of manipulation, and which Defendants maintain are "test
forgeries" Plaintiff created before creating the Work for Hire Document in preparation
for commencing this action. Defendants' Memorandum at 42-45 (citing Stroz Friedberg
Report at 10, and 33-38). Plaintiff has not responded to this argument.

Stroz Friedberg initially comments on the absence of a single exact electronic
copy of the Work for Hire Document given that Plaintiff maintains he printed the
document and e-mailed it on two occasions prior to commencing this action, including

---

[55] The court contemplates the reference to "StreetFax LLC" could reflect Plaintiff's intention to incorporate the business; however, absent any indication from Plaintiff in some admissible form, such as an affidavit from Plaintiff, such contemplation is only conjecture.

to Argentieri on June 27, 2010, and to StreetFax employee Petersen on June 29, 2010, thereby establishing the the document existed in electronic form just prior to commencing this action, such that Stroz Friedberg expected to find a copy of the document somewhere within the Ceglia Media Plaintiff was required to produce. Stroz Friedberg Report at 33. Instead of an exact copy of the same version of the Work for Hire Document that was attached to the Amended Complaint, however, only seven unsigned similar, but not exact, versions of the document were found, all containing metadata anomalies indicative of backdating and document manipulation. *Id.*

For example, Stroz Friedberg discovered on a floppy disk produced by Plaintiff one of the seven documents, "SFWebWorkForHireMZ.doc," for which the metadata shows a "last-written" date, *i.e.*, the date the file content was last modified, of April 24, 2003, which is later than its "last-accessed" date, *i.e.*, the date the file was last opened, of April 22, 2003. Stroz Friedberg Report at 33-34. Because it is not possible to modify the contents of a file without opening the file, is impossible to have a last modified date later than a last accessed date for the same document and, thus, such inconsistency is indicative of backdating or manipulation of a computer's system clock. *Id.* at 33-34. Further metadata analysis revealed this file was copied onto the floppy disk on or after February 18, 2011, using a computer on which the system clock had been backdated so as to give the appearance the document was created on the earlier date. *Id.* at 34-35.

In particular, "SFWebWorkForHireMZ.doc," an active file ("the active file"), sits on top of and overwrote two deleted files on the floppy disk, such that the active file occupies space on the floppy disk which was previously occupied by the two deleted

files, "Work For Hire ContractMZ.doc" and "Work for hire SF template.doc" ("the deleted files") requiring the deleted files that previously occupied the same space on the floppy disk be deleted before the active file was created or copied onto the disk. Stroz Friedberg Report at 34. When a file is overwritten, its last accessed date timestamp should reflect the date of the deletion. *Id.* at 35. According to the metadata associated with the active file and the two deleted files, however, both deleted files were last accessed, *i.e.*, deleted, on February 18, 2011, yet the active file purportedly was created on May 2, 2003, an impossibility, absent some system clock manipulation or file fabrication, given the floppy disk space where the active file sits was supposedly formerly occupied by the deleted files. *Id.* at 34-35. Other evidence in the record indicates the active file was created on May 2, 2003, which is inconsistent with its earlier "last written" date of April 24, 2003, which is further inconsistent with an even earlier "last accessed" date of April 22, 2003. *Id.* Based on these anomalies, Stroz Friedberg determined that the active file was copied to the floppy disk on or after February 18, 2011, using a computer with a system clock backdated to May 2, 2003, and then subsequently accessed on a computer with a system clock backdated to April 22, 2003. *Id.* at 35.

Stroz Friedberg discovered the six other versions of the Work for Hire Document on a CD produced by Plaintiff in Sarasota, Florida, including "work for hire SF template.doc," "Copy1_work for hire SF template.doc," "Copy1_XWRL0003.TMP," "Work for Hire Contract MZ.doc," "XWRL0004.TMP," and "Copy1_Work for Hire ContractMZ.doc." Stroz Friedberg Report at 35. All six of these documents display a similar metadata anomaly as the active file being that the "last printed" date for each of

89

these six files is February 15, 2011, whereas the "last modified" date is April 25, 2003. *Id.* According to Stroz Friedberg, because the embedded "last printed" date is updated whenever a document is printed, and that date is maintained as the "last printed" date only if the file is saved at the same time it is printed, a file's "last printed" date cannot be later than its "last modified" date absent system clock backdating; rather, each of these six documents was printed on or after February 15, 2011, while this litigation was pending, and accessed and saved on a computer with a system clock backdated to April 25, 2003. *Id.* at 35-36.

All seven of the electronic versions of the Work for Hire Document also contain margin and formatting alterations indicative of Plaintiff's fraud. Stroz Friedberg Report at 36-37. For example, the margins and formatting on page 1 of each of these documents have been manipulated by manually reducing white space, thereby allowing more text characters to fit on each page. *Id.* For example, in the "Work for Hire ContractMZ.doc" document, the margin between the columns on page 1 is 0.03 inches, in contrast to page 2 where the margin between the columns is 0.32 inches. *Id.* at 36. Defendants assert such margin and formatting manipulation was intended to permit Plaintiff to add to the first page of the document the references to "The Face Book" found in the Work for Hire Document. Defendants' Memorandum at 44-45.

Defendants further rely on Stroz Friedberg's discovery that the "Last 10 Authors" metadata associated with "Work for Hire ContractMZ.doc" reveals the steps taken by Plaintiff in constructing the Work for Hire Document "through a trial-and-error process of insertions, deletions, and other manipulations." Defendants' Memorandum at 44 (citing Stroz Friedberg Report at 39-40). In particular, the document originated as a file

named "page1feb4threepm.doc," saved in a desktop computer folder named "Maybe got it\Page 1." Stroz Friedberg Report at 40. The document was then saved as a new file named "MP1and2.doc" in a new desktop folder "merged," then renamed as "Zuck Contract.doc" and moved to desktop folder "Finished Docs," then renamed as "Work for Hire Contract.doc" and saved directly to the computer desktop and to a removable media device, such as a floppy disk, as "Work for Hire ContractMZ.doc" with the author "Paul C." *Id.* Stroz Friedberg maintains, based on its experience in electronic forgery cases, this sequence of events, including the names and paths in the "Last 10 Authors" metadata suggests an attempt to construct a fraudulent document, specifically,

> the user "Paul C." created a two-page modified version of the Work for Hire Document, purportedly dated April 28, 2003, by merging separate pages together. The file name also indicates that the initial document was created or edited at 3:00 p.m. on February 4[, 2011]. The earliest entry in the Last 10 Authors metadata shows the document as a file in a folder called "Maybe got it\Page 1."

*Id.*

According to Stroz Friedberg, the document's last printed date of February 15, 2011 is inconsistent with the document's last modified date of April 25, 2003, indicating backdating or system clock manipulation. *Id.* Finally, Stroz Friedberg asserts the fact that the first path present in the Last 10 Authors metadata shows the file was saved in a folder on the desktop of a user named "GRACE," yet none of the Ceglia Media contain a profile for a user named "GRACE," indicates the "Work for Hire ContractMZ.doc" file was edited on a computer that was never produced for inspection, or that was produced but from which the "GRACE" user profile had been deleted. *Id.*

As stated, Plaintiff has not provided any argument in opposition to these findings.

91

Plaintiff's silence on this point can be construed as acquiescing in Stroz Friedberg's findings and conclusions. *See Felske*, 2012 WL 716632, at * 3; *Goodwin*, 2011 WL 2117595, at *12; *Gonzalez*, 2001 WL 1217224, at * 11.

### h.     Hex Editor

Defendants argue that Stroz Friedberg's digital forensic examination of the Ceglia Media revealed evidence that a "hex editor" or similar tool[56] was used on the Ceglia Media to test modifying and manipulating Microsoft Word® ("MS Word" or "Word") documents without leaving a digital footprint or record in the computer. Defendants' Memorandum at 6, and 45 (citing Stroz Friedberg Report at 41-43). Plaintiff has not responded in opposition to this assertion, nor have Defendants offered further argument in reply.

As explained by Defendants, use of a hex editor program allows a user to edit the binary contents, *i.e.*, the raw data that makes up a computer file, rather than the file's text, and such data manipulation is difficult, if not impossible, to detect through traditional digital forensic analysis. Defendants' Memorandum at 6 and 45 (citing Stroz Friedberg Report at 41-43 and Aycock Declaration ¶¶ 11-15). Several of the electronic documents Plaintiff produced contain evidence of hex editor use.  Aycock Declaration ¶ 12 (citing Stroz Friedberg Report at 41).  Specifically, the names, contents and metadata associated with six MS Word files Plaintiff produced on a CD in Sarasota,

---

[56] "A *hex editor*, also called a *binary file editor* or *byte editor*, is a type of program that allows a user to view and edit the *raw* and exact contents of *files*, that is, at the *byte* level, in contrast to the *higher level* interpretations of the same contents that are provided by other, higher level application programs." *Hex Editor Definition*, http://www.linfo.org/hex_editor.html (italics in original) (last visited March 26, 2013).

Florida, indicate such files "were used to test the effects of modifying a Word document with a hex editor or similar tool."  Stroz Friedberg Report at 41.  Such files names include "text to copy over to the test doc.doc," "doc to paste into.doc," "test doc2.doc," "test doc.doc," "test doc4.doc," and "test doc3.doc."  Stroz Friedberg Report at 41; Aycock Declaration ¶ 13.  These documents are saved in file folders named "worktocopyinto," "work to pasteoutof," and "beginning folder."  Stroz Friedberg Report at 41; Aycock Declaration ¶ 14.  The contents of each of these documents indicate the documents were created to test the effects of various actions in a Word document given that each document is a one-page Word document with particular repeating phrases including "this is a word doc that has been newly created.  I will test how the coding comes onto the hexeditor;" "text to copy over to the test doc;" "this is the doc to past into;" and "this is the test doc that \i am going to now paste into."  *Id.*  According to Stroz Friedberg, such documents are commonly used by electronic forgers to test and conceal the effects of electronically manipulated documents through use of a hex editor or similar tool.  Stroz Friedberg Report at 42.

Stroz Friedberg also discovered evidence of the use of a hex editor or similar tool on one of the seven backdated versions of the Work for Hire Document, namely, the file "SFWebWorkForHireMZ.doc."  Stroz Friedberg Report at 42.  In particular, the associated metadata shows the document's "Last 10 Authors" displays differently when viewed programmatically as opposed to manually, with the embedded metadata only available when the document is viewed with the use of a digital forensic tool, without which "the metadata is misaligned and not fully available . . . . suggest[ing] that changes have been made to the file in such a way that do [*sic*] not preserve its structure,

93

including its metadata fields, which is indicative of the use of a hex editor or similar tool to manipulate the file."  *Id.* at 42-43.

Plaintiff's complete silence on this point suggests acquiescence in Defendants' argument.  *See Felske*, 2012 WL 716632, at * 3; *Goodwin*, 2011 WL 2117595, at *12; *Gonzalez*, 2001 WL 1217224, at * 11.


### 2.    Supporting E-mails Quoted and Referenced in Amended Complaint

Defendants challenge as inauthentic the supporting e-mails allegedly exchanged between Plaintiff and Zuckerberg as quoted and referenced in the Amended Complaint. Defendants' Memorandum at 45-50.  It is undisputed that Plaintiff did not retain the supporting e-mails in their original or "native" format, and Plaintiff's failure to do so is Defendants' first ground for disputing the supporting e-mails' authenticity.[57] Defendants' Memorandum at 45-46.  Defendants assert the supporting e-mails were originally created as MS Word documents on a "backdated" computer to appear as if created at times consistent with Plaintiff's claims, but that Plaintiff "bungled" the backdating of the MS Word documents by failing to taking into account Daylight Savings Time, two of the files have a "last written date" of October 21, 2003, *i.e.*, indicating changes were last made to the document prior to the dates they purportedly were sent, and despite claiming the e-mails, including the text and the headers, were

---

[57] Stroz Friedberg's examination of seven different webmail accounts used by Plaintiff confirms that none of the supporting e-mails quoted or otherwise referenced in the Amended Complaint were identified in their native format among the accounts, suggesting they did not exist in 2003.  Stroz Friedberg Report at 32.

"copied-and-pasted" from the Microsoft Network ("MSN") webmail account into the Word documents, there are various inconsistencies establishing the supporting e-mails were not "copied-and-pasted" but, rather, were newly created in MS Word format, establishing they did not exist in 2003. *Id.* at 46-47. Defendants also rely as establishing the fraudulent nature of the supporting e-mails on several historical inaccuracies contained in such e-mails, *id.* at 47-48, on the failure to locate any of the supporting e-mails on Harvard's e-mail server which stored all Harvard student e-mails, such as Zuckerberg's, at the relevant time in 2003, *id.* at 48-50, and on the opinion rendered by Defendants' expert and forensic linguist Gerald McMenamin ("McMenamin"). *Id.* at 50.

In opposition, Plaintiff points to the fact that of the 112 e-mails allegedly exchanged between Plaintiff, Zuckerberg, and "related parties," during 2003 which Plaintiff maintains he later copied into MS Word files and stored on floppy disks, 51 of the e-mails were also found by Defendants in Zuckerberg's Harvard e-mail account, which demonstrates the authenticity of all 112 e-mails, including the supporting e-mails. Plaintiff's Response at 39. Plaintiff relies on the examination by his computer expert Jerry Grant ("Grant"), as confirming the copies of the supporting e-mails copied into the MS Word files "were found in the 2003-2004 time frame," and that without knowing the accuracy of the clock on the computer into which the floppy disks were inserted, it is not possible to establish the existence of the anomalies Defendants assert were discovered. *Id.* Plaintiff also challenges Defendants' experts as unqualified to render their respective opinions. *Id.* at 39-41. Plaintiff asserts Defendants concealed relevant evidence found on Zuckerberg's computer and electronic devices. *Id.* at 43. Plaintiff

95

dismisses the various formatting and time zone inconsistencies found by Defendants'
experts as inconsequential, attributing the inconsistencies to the use of different
computers and programming. *Id.* at 44-46.  In further support of their motion,
Defendants argue that Plaintiff has failed to counter Defendants' "overwhelming
evidence" that the supporting e-mails are fake, including that such e-mails exist only in
the form of MS Word text documents, created on a computer with a backdated system
clock, containing incorrect time zone stamps, inconsistent abbreviations and formatting
in fields that are automatically generated, and that Plaintiff does not dispute the factual
historical inaccuracies including when Facebook was initially launched.  Defendants'
Reply at 23.  Nor does Plaintiff provide any explanation as to why none of the
supporting e-mails were found in Zuckerberg's Harvard e-mail account. *Id.*

### a.    Back-Dating Anomalies

Plaintiff claims that, in accordance with Plaintiff's standard business practice, he
preserved the supporting e-mails by cutting and pasting them into three MS Word
documents which he then saved to computer floppy disks.  Plaintiff's Declaration filed
June 17, 2011 (Doc. No. 65) ("Plaintiff's June 17, 2011 Declaration") ¶¶ 11-12
(discussing saving "copies of numerous emails that [Plaintiff] exchanged with Mark
Zuckerberg in 2003 and 2004," many of which are quoted in the Amended Complaint);
Declaration of John H. Evans ("Evans"), Managing Consultant in Project Leadership
Associates ("PLA") Legal Solutions Practice Group, filed June 17, 2011 (Doc. No. 61)
("Evans Declaration"), ¶¶ 8-11 (explaining how, in connection with this action, Evans
reviewed floppy disks Plaintiff provided to PLA, one of which contained three

96

documents including "Mark harvard emails up to dec.doc" for which the embedded metadata indicated the document was created and last revised on December 30, 2003, "mark feb emails.doc" for which the embedded metadata indicates the document was created and last revised on Feb. 14, 2004, and "Mark emails july04.doc" for which the embedded metadata indicates the document was created and last revised on July 23, 2004); Plaintiff's Declaration filed November 17, 2011 (Doc. No. 225) ("Plaintiff's Nov. 17, 2011 Declaration"), ¶¶ 3-8 (Plaintiff averring that in 2003 and 2004, the contents of his account with MSN webmail were routinely deleted by MSN "to maintain user account sizes," causing Plaintiff to preserve the e-mails exchanged with Zuckerberg in 2003 and 2004, including the text and header information, by cutting and pasting the e-mails from Plaintiff's MSN webmail account into MS Word documents that were saved to floppy disks). Defendants maintain these supporting e-mails have not been preserved in their native electronic format, *viz.*, the format in which the e-mails were originally sent or received, such as a webmail e-mail account, because the e-mails are fake and were created by Plaintiff who simply typed text into a MS Word document, declaring such document as containing the typed heading and text of such e-mails. Defendants' Memorandum at 45. In support of this argument, Defendants rely on expert discovery.

First Defendants point to Stroz Friedberg's determination that the supporting e-mails were created on a backdated computer.[58] Defendants' Memorandum at 46 (citing

---

[58] As explained by Stroz Friedberg, undisputed by Plaintiff, "[t]he effect of backdating is to obscure the true date and time at which computer activity, such as the creation or modification of documents, occurred. Backdating can be accomplished by setting the system clock on a computer hard drive to an earlier date, such that activity that occurs on the hard drive while the computer is in a backdated state will appear to have occurred at that time." Stroz Friedberg Report at 24.

Stroz Friedberg Report at 23-26 and Exhs. I-K.  According to Stroz Friedberg, Plaintiff

produced three unique MS Word documents, entitled "Mark emails july04.doc," "Mark

harvard emails up to Dec.doc," and "mark feb emails.doc," containing the text of 27 of

the purported mails, with all three such documents backdated.  Stroz Friedberg Report

at 24.  In particular, the MS Word document "Mark emails july04.doc" contains the text

of three supporting e-mails supposedly sent and received between April 6, 2004 and

July 22, 2004, yet the metadata associated with the document establishes two deleted

copies of the document have "file created," "last modified," and "last accessed"

timestamps of October 21, 2003, which is a date earlier than the e-mails purportedly

were sent in July 2004.  *Id.* at 24-25.  Because is it "highly unlikely" that Plaintiff would

have named this file "Mark emails july04.doc" if it actually were created and last

modified in October 2003, Stroz Friedberg asserts "[t]his metadata anomaly likely

resulted from at least one copy of the file named 'Mark emails july04.doc' having been

saved using a computer with a system clock backdated to October 21, 2003."  *Id.* at 25.

The document "Mark harvard emails up to Dec.doc" contains the text of nine

purported e-mails supposedly sent and received between July 2003 and November

2003, and "contains the same metadata anomaly as the file named 'Mark emails

july04.doc.'" Stroz Friedberg Report at 25.  Specifically, of the seven entries related to

this file, all stored on the same floppy disk produced in Chicago, Illinois, one entry

relates to an active file and the remaining six relate to deleted versions of the file.

Although the active file has "file created," "last modified," and "last accessed" times of

July 23, 2004, the same timestamp categories for two of the deleted files are October

21, 2003.  *Id.*  As with the "Mark emails july04.doc" file, a document that was created,

last modified, and last accessed on October 21, 2003, could not contain authentic e-mails from November or December 2003, as indicated by the title "Mark harvard emails up to Dec.doc." *Id.* Rather, the only plausible explanation for the timestamp inconsistencies is that the files were saved onto the floppy disks using a computer whose system clock had been backdated. *Id.* Significantly, the same backdate, October 21, 2003, appears with regard to "Mark harvard emails up to Dec.doc" and "Mark emails july04.doc." *Id.*

The third file named "mark feb emails.doc" contains the text of 15 e-mails purportedly exchanged between January 1, 2004 and February 7, 2004, with a purported file creation date of July 23, 2004. Stroz Friedberg's review of the floppy disk containing this file, provided by Plaintiff in Chicago, Illinois, detected a record of a deleted version of the file "mark emails 082903.doc" with a last accessed date of February 18, 2011, indicating the file was deleted on or after this later date. Stroz Friedberg Report at 26.

There is a further inconsistency regarding the amount of free disk space available on the floppy disk containing the third file. Because the deleted version of the "mark emails 082903.doc" was 17,128 bytes in size, the floppy disk should have available free space of at least that amount given that no files have been added to or modified since February 18, 2011; however, the free space available on the disk is only 2,048 bytes, such that the actual amount of available disk space reflects extensive usage inconsistent with the dates and timestamps of the disk's metadata. Stroz Friedberg Report at 26. According to Stroz Friedberg, "[t]his anomaly demonstrates that data was added to the floppy disk on or after February 18, 2011 and that the dates

99

and times of files on this floppy disk are not accurate and have been backdated." *Id.*

Stroz Friedberg additionally explains that the deleted file "mark emails 082903.doc" sat

on the floppy disk in the same location where the active file "mark feb emails.doc" now

sits and, because data can only be written to available disk space, the "mark feb

emails.doc" file could not have been saved to the floppy disk until "mark emails

082903.doc," which previously occupied the same space on the disk, was deleted. *Id.*

Because "mark emails 082903.doc" was not deleted until on or after February 18, 2011,

the "mark feb emails.doc" file must have been added to the disk after that date, such

that the purported July 23, 2004 creation date for the file is incorrect and further

evidence of backdating with the "mark feb emails.doc" file most likely created on the

floppy disk using a computer for which the system clock was backdated to July 23,

2004. *Id.* Accordingly, there is strong evidence that all three of the MS Word

documents containing the supporting e-mails appended to and referenced in the

Amended Complaint were backdated.

Stroz Friedberg's examination of the Ceglia Media also discovered within the text

of the supporting e-mails evidence of fabrication including incorrect time zone stamps

and inconsistent formatting. Stroz Friedberg Report at 27-31. With regard to the time

zone stamps, Stroz Friedberg explains that the "Date" line for each e-mail containing

the date and time the e-mail purportedly was sent is "a line that is normally

automatically added to an email by the computer's system clock." *Id.* at 27. The end of

each "Date" line includes the time zone from which an e-mail is sent, formatted to

reflect the hours and minutes from Coordinated Universal Time ("UTC"),[59] as "+ HHMM" or "- HHMM." *Id.* In other words, "HH" refers to hours and "MM" refers to minutes from UTC, with the designation of "+" or "-" indicating whether the time zone is before or after UTC. *Id.* For example, within the continental United States, Eastern Standard Time ("EST") is represented as "-0500" and Eastern Daylight Time ("EDT") is represented as "-0400." *Id.*

According to Stroz Friedberg, because Eastern Standard Time was in effect in the United States from October 26, 2003 to April 4, 2004,[60] the time zone stamp for an authentic e-mail sent during that period of time from within a location in the Eastern Time Zone,[61] assuming an accurate computer system clock, would be "-0500." Stroz Friedberg Report at 27. However, all but one of the 27 purported e-mails, including all e-mails purportedly sent between October 26, 2003 and April 4, 2004, contain the time

---

[59] "Coordinated Universal Time (UTC) is the basis for civil time in many places worldwide. Many devices for measuring and showing time use this 24-hour time scale, which is determined using highly precise atomic clocks. Time zones around the world are expressed as positive or negative offsets from UTC. The hours, minutes, and seconds that UTC expresses is kept close to the mean solar time at the Earth's prime meridian (zero degrees longitude) located near Greenwich, England." Coordinated Universal Time (UTC) Explained,http://www.timeanddate.com/time/aboututc.html (last visited March 26, 2013).

[60] Daylight savings time is established by statute, 15 U.S.C. § 260a, of which the court takes judicial notice. Until 2006, daylight savings time in the United States began at 2:00 A.M. on the first Sunday in April and reverted to standard time on the last Sunday in October. *See United States v. Wilson*, 451 F.2d 209, 214 (5th Cir. 1971) (taking judicial notice that daylight saving time was in effect in Texas on specific date); and *Empire Fire and Marine Ins. Co. v. Continental Cas. Co.*, 426 F.Supp.2d 329, 333 (D.Md. 2006) (taking judicial notice of 15 U.S.C. § 260a and that daylight saving time was in effect on specific date). Accordingly, standard time was in effect for the period of October 26, 2003, which was the last Sunday in October 2003, to April 4, 2004, which was the first Sunday in April 2004.

[61] The court takes judicial notice that Harvard, Wellsville, New York, and Florida, are all within the Eastern Time Zone. *See In re Gemstar-TV Guide International, Inc. Securities Litigation*, 209 F.R.D. 447, 451 n. 7 (C.D.Cal. 2002) (taking judicial notice that relevant cities were located in different time zones).

zone stamp "-0400" representing Eastern Daylight Time which was not then in effect.[62]
Stroz Friedberg Report at 27 and Exhs. J (print-out of "Mark harvard emails up to
Dec.doc" file) and K (print-out of "mark feb emails.doc" file). There is no place within
the Continental United States from which an e-mail could have been sent with a time
zone stamp of "-0400" during this period of time when standard time rather than
daylight savings time was in effect, unless the computer used to send the e-mail had an
inaccurately set system clock. *Id.* at 27-28. A plain review of these e-mails reveals
Facebook is discussed in many of the 26 e-mails whose authenticity is questioned,
purportedly exchanged between October 26, 2003 and April 4, 2004 bearing incorrect
UTC time zone stamps. Stroz Friedberg Report Exhs. J and K. Similarly, included
among the copies of e-mails purportedly exchanged between Plaintiff, Zuckerberg, and
various StreetFax employees, which Plaintiff maintains he copied-and-pasted from his
MSN webmail account into MS Word documents, and filed by Plaintiff in connection
with an unrelated motion in this action, Plaintiff's Memorandum in Support of Motion for
Order Prohibiting Defendants from Reliance on Argument that Ceglia Emails are Frauds
in any Dispositive Motion Filed During or at the End of Expedited Discovery, Exh. A
(Doc. No. 224-1), are e-mails with incorrect UTC time zone stamps, in which Facebook
is discussed. *See*, *e.g.*, Doc. No. 224-1 at 8-9 (six e-mails purportedly exchanged
between Zuckerberg and Plaintiff, dated between Feb. 2 and 7, 2004, each bearing
incorrect UTC time zone stamp "-0400" when correct time zone stamp would be "-0500"
and discussing launch of Facebook with Plaintiff suggesting changes to improve

---

[62] Not all e-mails submitted as exhibits in the record show UTC time zone stamps.

Facebook and a possible related merchandising proposal).  The suspicious origins of the questioned e-mails is further heightened by the fact that because a computer's system clock automatically adjusts for daylight savings time, that the same UTC time zone stamp anomaly is seen in e-mails purportedly sent by both Plaintiff and Zuckerberg between October 26, 2003 and April 4, 2004, indicating the system clocks were improperly set in the same manner on at least two computers, one used by Plaintiff and the other by Zuckerberg, is, to say the least, unlikely.  Further demonstrating the implausibility that both Plaintiff and Zuckerberg were exchanging e-mails between October 26, 2003 and April 4, 2004, using computers whose system clocks failed to automatically toggle correctly between standard time and daylight savings time is that the e-mails from Zuckerberg's Harvard e-mail account whose authenticity is not questioned show correct UTC time zone stamps for this same period of time.  *See*, *e.g.*, Southwell Reply Declaration Exh. M (indisputedly authentic Nov. 19, 2003 e-mail from Plaintiff responding to attached Nov. 19, 2003 e-mail from Zuckerberg, which bears correct UTC time zone stamp of "-0500" in which only StreetFax is discussed); Rose Declaration Exh. D (indisputably authentic November 15, 2003 e-mail from Plaintiff to Zuckerberg responding to attached November 15, 2003 e-mail from Plaintiff to Zuckerberg discussing receipt of payment (consistent with StreetFax Document's payment terms) bearing correct time zone stamp of "-0500 (EST)").

In opposition to Defendants' Motion to Dismiss on this ground, Plaintiff relies on the report of his expert, Jerry Grant, as "confirm[ing] that the copies of the emails were placed into the MS Word files in which they were found in the 2003-2004 time frame."

Plaintiff's Response at 39.  A review of Grant's Declaration filed November 17, 2011 (Doc. No. 226) ("Grant Nov. 17, 2011 Declaration"), however, establishes that although Grant avers he received 41 floppy disks which he reviewed, Grant only thoroughly examined two of the floppy disks that he had determined, upon initial review, to be relevant to this action.  Grant Nov. 17, 2011 Declaration ¶¶ 9-10.  It is not possible to determine whether the floppy disks Grant thoroughly analyzed were among the three Stroz Friedberg examined.  Although Grant maintains the forensic analysis he performed, including analysis of, *inter alia*, file allocation tables, file and metadata dates and times created, modified and accessed, metadata fields and time edited, fonts used, disk space allocated, unallocated and slack, temporary and carved files, and file header information, revealed nothing indicating fraud, Grant Declaration ¶ 11, Grant fails to directly rebut any of the findings by Stroz Friedberg that the e-mails proffered by Plaintiff are fake; rather, as Grant clarified at his June 29, 2012 deposition, his analysis centered on identifying whether any "impossibilities" existed among the purported e-mails, such as the use of a font that did not exist in 2003.  Grant Dep. Tr.[63] at 88 (admitting his opinion was limited to not finding anything that rendered the MS Word files containing the purported e-mails "impossible").  Grant further admitted he never opined or concluded that any of the purported e-mails are authentic. *Id.* at 176 ("I did not state any authenticity on any of them.  And even in this one, I can't state that it's authentic.  I can just state that because it has the proper formatting of HTML that would have come up in a web browser address field, that that doesn't indicate fraud.").

---

[63] References to "Grant Dep. Tr." are to the page of the transcript of Defendants' June 29, 2012 deposition of Grant, portions of which are filed as Southwell Reply Declaration Exh. Q.

Finally, Grant admitted that reviewing text documents, such as Plaintiff's purported e-mails, within MS Word files made it impossible to determine whether the document "was fraudulent because it's text inside a word processing document." *Id.*

In a later declaration filed June 4, 2012 (Doc. No. 418) ("Grant June 4, 2012 Declaration"), Grant attempts to counter Stroz Friedberg's conclusions regarding apparent document backdating and inconsistencies with regard to formatting and time zone stamps. Grant does not dispute Stroz Friedberg's discovery of the incidents of apparent backdating and formatting and time zone stamp inconsistencies; rather, Grant maintains that because Stroz Freidberg and Grant were only able to examine the purported e-mails as MS Word text documents, it is impossible to know the precise reason for the backdating, formatting inconsistencies, and incorrect time zone stamps. Grant June 4, 2012 Declaration ¶¶ 13-22. Significantly, Grant avers that he is unable to discern whether the purported e-mails were "copied-and-pasted" from Plaintiff's MSN webmail account, as Plaintiff maintains, repeatedly asserting that the purported e-mails are "simply text inside a word processing document" which has no "direct connection with an actual clock or setting," such that "[w]ithout having the actual environment that the documents were created in, other possibilities for these anomalies cannot be ruled out." *Id.* ¶¶ 19-20. This is consistent with Stroz Friedberg's statements that without an examination of the physical computer that contained the Seagate Hard Drive, which Plaintiff failed to produce, it is not possible to ascertain whether any discrepancies existed between the true date and time, and the date and time settings of the system clock. Stroz Friedberg Report at 43 n. 19, and 47. Simply, Grant neither opines the Work for Hire Document or Plaintiff's e-mails are authentic, nor does he contradict Stroz

105

Friedberg's conclusion that the documents are fraudulent.

Plaintiff also attempts to minimize the significance of this discrepancy by pointing to a document which Plaintiff had designated in a privilege log as "Item 379" and which Plaintiff was ordered by the undersigned to produce to Defendants.  April 19, 2012 Decision and Order (Doc. No. 357).  Item 379 is an April 19, 2011 e-mail from Argentieri to Plaintiff with the subject "Fwd: Follow-up" and containing a compilation of assorted e-mails exchanged between Plaintiff, Argentieri, several attorneys previously retained by Plaintiff and one Jason Holmberg ("Holmberg"), who has assisted Plaintiff and Argentieri, with attachments.  According to Plaintiff, several of the e-mails within the compilation comprising Item 379 contain similar UTC time zone stamp anomalies which Defendants have never challenged, indicating that such anomalies are not indicative of fraud.  Plaintiff's Response at 46-47.  A review of Item 379 confirms, as Plaintiff asserts, the existence of similar UTC time zone stamp anomalies; however, all such anomalies are found in e-mails originating from computers owned or used by Plaintiff, his mother Vera Ceglia, or Holmberg.  *See*, *e.g.*, Item 379 at 5 (March 9, 2011 e-mail from Holmberg to Aaron Marks, Esq. ("Marks"), an attorney with the Kasowitz firm which Plaintiff unsuccessfully attempted to retain in connection with this action, with UTC time zone stamp "-0400" indicating EDT, which was not then in effect, instead of "-0500" which would be consistent with EST); 10 (March 3, 2004 e-mail from Vera Ceglia to Kole, with UTC time zone stamp "-0400" incidating EDT, which was not then in effect); 81 (March 11, 2011 e-mail from Holmberg to Marks, with UTC time zone stamp "-0400" indicating EDT, which did not go into effect until March 13, 2011). *Compare* Item 379 at 11 (April 15, 2011 e-mail from Marks at the Kasowitz firm to Jerry Trippitelli at DLA

Piper, with UTC time zone stamp "-0400" indicating EDT which was then in effect), and at 13 (two March 31, 2011 e-mails, one from Valery Aginsky to Marks, and the other from Terrence M. Connors at Connors Vilardo to Marks, both bearing UTC time zone stamp "-0400" indicating daylight savings time which was then in effect).[64]  No such UTC time zone stamp anomalies are found among the e-mails originating from counsel who have since withdrawn from representing Plaintiff, with the exception of four e-mails from Marks sent to Holmberg between March 8 and 11, 2011, and all with UTC time zone stamp "-0400" indicating EST which was not in effect until March 13, 2011.  *See* Item 379 at 147 (March 11, 2011), 152 (March 10, 2011), 155 (March 10, 2011), and 157 (March 8, 2011).[65]  All other e-mails from Plaintiff's former counsel contain correct UTC time zone stamps, as do some e-mails from Plaintiff.  As such, the existence of similar UTC time zone stamp anomalies on some of the e-mails within Item 379 from Plaintiff, Holmberg, and Plaintiff's mother is consistent with all such e-mails having been sent from the same computer with the inaccurately set system clock.[66]

---

[64] The court takes judicial notice that in 2011, daylight savings time began on March 13.

[65] Although incorrect UTC time zone stamps are indicative of an incorrectly set system clock, they are not necessarily indicative of fraud.

[66] Plaintiff also asserts "Plaintiff's parents were never involved in sending e-mails to Plaintiff's lawyer Jim Kole at any time."  Plaintiff's Response at 37.  Such assertion is contradicted by two e-mails within Item 397 from Plaintiff to Kole for which the e-mail headers indicate the e-mails are "From: 'vera ceglia'," both e-mails are dated "Wed, 3 Mar 2004," with incorrect UTC time zone stamps of "-0400."  Item 397 at 10.  These two e-mails appear in Item 379 as attachments being forwarded on March 30, 2011, from Brian Halpin with Capsicum to Marks and Michael S. Shuster, both with the Kasowitz firm, indicating the two e-mails were from a "loose internal drive."  *Id.* at 9-10.  Significantly, the subject line for the two e-mails are "page 1 of 2 for Streetfax contract w mark," and "2 of 2 for streetfax contract," *id.* at 10, which are the same subject lines as for the e-mails to Kole at Sidley Austin, discovered by Stroz Friedberg with the attached StreetFax Document pages.  Whether the "loose internal drive" refers to the Seagate Hard Drive is not clear.  Moreover, as discussed, Discussion, *infra*, at 108, the computer into which the Seagate Hard Drive had been inserted has never been produced, such that it is impossible to determine the accuracy of its system clock. Together, these facts can logically be interpreted as demonstrating Plaintiff

As Stroz Friedberg explains,

> Significantly, Mr. Ceglia did not produce the computer that once contained the Seagate Hard Drive. As such, Stroz Friedberg was unable to analyze the date and time of the system clock of the computer containing the Seagate Hard Drive. Dates and times on digital media are set according to the computer clock of the computers used to access them. One step in the digital forensic process is to document, whenever possible, the date and time of a computer's system clock. This provides digital forensic examiners the ability to ascertain and account for any discrepancies between the date and time settings of the system clock and the true date and time. Because Mr. Ceglia did not produce the computer containing the Seagate Hard Drive, Stroz Friedberg was unable to determine whether that computer's clock was accurate.

Stroz Friedberg Report at 47.

*See also id.* at 43 n. 19 (noting Plaintiff "did not produce the physical computer that once contained the Seagate Hard Drive . . . . which might have contained information about the system clock settings . . . ."). Defendants have thus established it is highly probable or reasonably certain that the supporting e-mails were created on a computer with a back-dated system clock.

### b. Formatting Anomalies

During its examination of the supporting e-mails, Stroz Friedberg also detected numerous formatting consistencies with regard to the e-mails' headers. Stroz Friedberg Report at 29-31. According to Stroz Friedberg, because e-mail headers are "automatically generated when an e-mail is created, not typed by the user," the inconsistent formatting indicates the supporting e-mails were not, as Plaintiff maintains, copied-and-pasted from Plaintiff's webmail accounts but, rather, were individually typed

---

failed to produce the computer into which the Seagate Hard Drive had resided because a forensic examination of such computer would have revealed it to have an inaccurate system clock that was consistent with backdating files.

by Plaintiff directly into Word documents. *Id.* at 29. Although numerous formatting inconsistencies were observed, three are discussed in detail including (1) the number of spaces after "From:" varies from one to two; (2) the number of spaces after "To:" varies from one to three; and (3) the abbreviation of Tuesday as either "Tues" or "Tue". *Id.* at 29-31. Stroz Friedberg further noted that not only should these internal inconsistencies not exist if the purported e-mails were actually copied-and-pasted from an authentic source, but the "Tues" abbreviation for Tuesday is inconsistent with MSN's abbreviation of Tuesday as "Tue" such that "Tues" should not appear in any e-mail copied-and-pasted from MSN as Plaintiff asserted he did. *Id.* at 31. Another anomaly in the e-mail header formatting includes a varying number of spaces after the paragraph symbol which immediately follows the time zone indicator, which should be consistent if copied-and-pasted from an authentic source. Stroz Friedberg Report at 31. The last anomaly on which Stroz Friedberg remarks is the presence of a space between the end of Zuckerberg's e-mail address, *i.e.*, mzuckerb@fas.harvard.edu, and the closing angle bracket ">" which, if the supporting e-mails were actually copied-and-pasted, would not be there. *Id.* According to Stroz Friedberg, these anomalies establish the supporting e-mails were not copied-and-pasted from Plaintiff's MSN webmail account into an MS Word document but, rather, were typed into the MS Word document at a later time, contrary to Plaintiff's representations. *Id.*

　　With regard to the inconsistent abbreviation of Tuesday as "Tues" and "Tue," particularly focusing on two e-mails dated "Tue, 6-April 2004" and "Tues, 3 Feb. 2004," Stroz Freidberg Report at 30-31, Figs. 12 and 13, Plaintiff theorizes that MSN may have "changed its computer programming and attendant abbreviation scheme between

February and April 2004," and that Plaintiff's use between February and April 2004 of different internet browsers to copy-and-paste the e-mails could also account for the inconsistent abbreviations.  Plaintiff's Response at 44.   Stroz Freidberg, however, explains that MSN has abbreviated Tuesday only as "Tue" such that "the abbreviation 'Tues' should not appear in any e-mails copied-and-pasted fro MSN."  Stroz Friedberg Report at 31.  Further, Plaintiff has proffered no evidence that he actually used different internet browsers between February and April 2004, nor that the use of different browsers could cause the internally inconsistent abbreviation of the word Tuesday. Given these facts, Plaintiff's argument borders on flippant.

Even without being able to examine the "actual environment that the documents were created in" so as to rule out other possibilities for the numerous anomalies, Grant does not attempt to explain why so many anomalies would be found among the purported e-mails if, as Plaintiff maintains, they were merely copied-and-pasted from Plaintiff's MSN webmail account.  Grant's averment, Grant June 4, 2012 Declaration ¶ 23, that the relatively short, two to three minutes, "total editing time" for each of the three MS Word files Plaintiff purportedly created to archive the e-mails, *i.e.*, Mark emails july04.doc, Mark harvard emails up to Dec.doc, and mark feb emails.doc, "is more consistent with a copy/paste function than individual typing/editing of a document due to the amount of text," fails to establish that each of these three documents was only accessed one time, to copy-and-paste text from e-mails into the respective MS Word files; it is quite possible the editing time pertains only to the last time Plaintiff accessed the files, which in all likelihood would have been much shorter than the time it took Plaintiff to create the files.  In short, Grant's opinions regarding the files containing

the supporting e-mails fail to rebut the conclusions reached by Stroz Friedberg concerning the metadata and formatting inconsistencies.  As such, the record establishes the existence of numerous formatting inconsistencies that are best explained as indicative of fraud.


### c.      Historical Inaccuracies

Defendants maintain the text of the challenged supporting e-mails contain historical errors of fact, the more "glaring" of which includes that in one of the supporting e-mails, purportedly sent by Zuckerberg at 8:27 A.M., on February 4, 2004, the date Facebook "launched," Zuckerberg advised that Thefacebook.com had "opened for students today" and invited Plaintiff to "take a look" at the website.  Stroz Friedberg Report, Exh. K.  Plaintiff purportedly responded two hours later, at 10:30 A.M., in an e-mail congratulating Zuckerberg and opining "[t]he site looks great!"  *Id.*  Defendants point to several publications in support of their assertion that although Thefacebook.com was launched on February 4, 2004, a point consistent with Zuckerberg's own averment, Zuckerberg Declaration filed August 30, 2010 (Doc. No. 29-2), ¶ 25 ("On February 4, 2004, I launched Facebook, which at time was called 'Thefacebook.com,' as an online directory for students at Harvard . . . ."), the website was not "live" until that afternoon.  *See* David Kirkpatrick, *The Facebook Effect* 30 (2010), Southwell Declaration Exh. J ("On the afternoon of Wednesday, February 4, 2004, Zuckerberg clicked a link on his account with Manage.com.  Thefacebook.com went live."); and Alan J. Tabak, *Hundreds Register for New Facebook Website*, Harvard Crimson, Feb. 9, 2004, Southwell Declaration Exh. K ("After about a week of coding,

Zuckerberg launched thefacebook.com last Wednesday afternoon.").  Further, Plaintiff would not have been able to access the website without a Harvard e-mail account, available only to Harvard students and staff.  *See* Kirkpatrick, *The Facebook Effect* 31 (explaining when Thefacebook.com launched "there were some big restrictions: you couldn't join unless you had a Harvard.edu email address . . . . [which] made Thefacebook exclusive . . . .").  It is significant that Plaintiff offers no explanation for these inconsistencies.

These unexplained factual inaccuracies are more evidence that the Work for Hire Document and the associated supporting e-mails alleged by Plaintiff are recently created fabrications.

### d.    Harvard E-mail Server

During the course of expedited discovery, Defendants' digital forensics experts Stroz Friedberg obtained from Harvard's e-mail server data from Zuckerberg's Harvard e-mail account, the entire contents of which Stroz Friedberg copied, reviewed and preserved including both sent and received e-mails existing at various times ("Harvard E-mail Data").  Rose Declaration ¶¶ 1- 2.  In total, Stroz Friedberg obtained four separate copies of Zuckerberg's Harvard e-mail account, including as it existed on (1) April 15, 2011 ("April 2011 Harvard E-mail Data"); (2) October 1, 2010 ("October 2010 Harvard E-mail Data"); (3) November 3, 2003 ("November 3, 2003 Harvard E-mail Data"), and (4) February 2, 2012 ("February 2012 Harvard E-mail Data").  *Id.* ¶ 2.  Stroz Friedberg aggregated the data from the four separate Harvard E-mail Data sources, including the text and available metadata for each e-mail, loaded the data into Stroz

Friedberg's secure review platform, thereby permitting the data to be searched for, *inter alia*, an e-mail's sender, recipient, and date sent, as well as keywords taken from the purported supporting e-mails Plaintiff quotes and references in the Amended Complaint. *Id.* ¶ 4. It is significant that not one of the supporting e-mails quoted or referenced in the Amended Complaint was found in the data Stroz Friedberg obtained from Zuckerberg's Harvard e-mail account. *Id.*

In searching Zuckerberg's Harvard E-mail Data, however, Stroz Friedberg did locate "approximately 300 email communications between and among" Zuckerberg and people associated with Street Fax ("Harvard - StreetFax e-mails"). Rose Declaration ¶ 5. Of particular significance is that none of the Harvard - StreetFax e-mails contains any reference or otherwise relates to Facebook, Thefacebook.com, "The Face Book," "The Page Book," or any other website created by Zuckerberg. *Id.* ¶ 7. Rather, the topics of the Harvard - StreetFax e-mails are limited to the StreetFax project, and Plaintiff's payments to Zuckerberg for work performed on the StreetFax project. *Id.* ¶¶ 5-7, and Exhs. B through L.

Furthermore, the supporting e-mails portray Plaintiff as frustrated with Zuckerberg's delay in performing work on the StreetFax project, and threatening to contact Zuckerberg's parents to advise them their son was squandering the money Plaintiff had paid for programming and coding work that Zuckerberg failed to perform, but eventually agreeing to Zuckerberg's suggestion that Plaintiff drop his claim to 80% ownership in Facebook from the originally agreed to 50% ownership provided Zuckerberg finished his part of the StreetFax project. Amended Complaint ¶¶ 32-55. In contrast, the Harvard - StreetFax e-mails indicate Zuckerberg, frustrated from not being

paid by Plaintiff for programming and coding Zuckerberg provided for the StreetFax project, threatened to cease working on the StreetFax Project and to disable finished portions of the StreetFax project's website, and that Plaintiff repeatedly requested Zuckerberg's patience in receiving payment while Plaintiff attempted to raise the money Plaintiff owed to Zuckerberg. Rose Declaration Exhs. B through L.

In opposing Defendants' Motion to Dismiss, Plaintiff asserts that he copied-and-pasted into documents stored on floppy disks 112 e-mails exchanged between and among himself, Zuckerberg, and related parties, 51 of which were located in Zuckerberg's Harvard e-mail account, and that "[t]he presence of nearly half of Plaintiff's copied e-mails on the Harvard server demonstrates they represent authentic communications between the two parties." Plaintiff's Response at 39. Plaintiff does not oppose Defendants' assertion in reply, Defendants' Reply at 24, that not only do these 51 e-mails fail to mention Facebook, but the e-mails are also consistent with the factual narrative Defendants present regarding the business relationship between Plaintiff and Zuckerberg.[67] The complete absence of the supporting e-mails from the Harvard E-mail Data retrieved from Zuckerberg's Harvard e-mail account, without more, begs the question of their authenticity. When the context of the supporting e-mails is also considered, which is consistent with the text of the StreetFax e-mails, the StreetFax

---

[67] Notably, according to one of the supporting e-mails from Zuckerberg to Plaintiff dated April 6, 2004, Amended Complaint ¶ 51, Zuckerberg offered to return to Plaintiff the $2,000 Plaintiff allegedly paid Zuckerberg in total under the Work for Hire Document, which is inconsistent with the $9,000 Plaintiff paid Zuckerberg as discussed in the undisputed e-mails from Zuckerberg to Petersen and Plaintiff. Rose Declaration Exh. F (January 25, 2004 e-mail from Zuckerberg to Petersen stating "[t]o date I have received $9k out of a total $19.5k that was owed to me."), and H (February 21, 2004 e-mail from Zuckerberg to Plaintiff stating "I am owed $19,500 - $9000 = $10,500"). Zuckerberg's supposed offer to return $2,000 is also inconsistent with the three checks totaling $9,000 Zuckerberg received from Plaintiff. Discussion, *supra*, at 46-48.

114

Document, and the $ 9,000 in payment Zuckerberg received from Plaintiff for work on StreetFax, any remaining hint of authenticity is annihilated.

In support of Plaintiff's assertion, Plaintiff's Response at 41-42, that Defendants have failed to include in their October 2010 production of e-mails recovered from Zuckerberg's Harvard e-mail account a collection of Harvard e-mails dated to November 2003, Plaintiff references portions of Rose's deposition testimony, particularly, Rose's responses to questions regarding the absence of e-mails between Plaintiff and Zuckerberg recovered from the Harvard e-mail server for several weeks preceding and following the execution of the contract on April 28, 2003, specifically, from March 2003 until June 2003.  Plaintiff's Response at 42 (citing Rose Dep. Tr. at 42 and 186).  A fair reading of such deposition testimony, however, fails to establish that the absence of relevant e-mails during that period of time indicates Defendants have concealed evidence; rather, the absence of such e-mails corroborates Defendants' assertions that the supporting e-mails purportedly from that period of time were fake.


### e.    Linguist Analysis

Finally, Defendants retained the services of McMenamin who performed a stylistic analysis of the supporting e-mails, determining Zuckerberg's authorship of the e-mails is improbable.  Defendants' Memorandum at 50 (citing Declaration of George R. McMenamin (Doc. No. 50) ("McMenamin Declaration") ¶ 4 ("Opinion: It is probable that Mr. Zuckerberg is not the author of the QUESTIONED writings.")).  In particular, McMenamin compared 11 questioned excerpts from the supporting e-mails attributed to Zuckerberg ("the Questioned writings"), to 35 e-mails known to be authored by

Zuckerberg ("the Known writings"). McMenamin Declaration ¶ 8. After analyzing both the Questioned and Known writings, McMenamin identified 11 stylistic features present in the Questioned writings and determined whether such features are also present in the Known writings. *Id.* ¶ 9. Of the 11 style markers analyzed, McMenamin found two similarities, *i.e.*, the markers were present in both the Questioned and Known writings, and 9 differences, such that the markers were present in either the Questioned or Known writings, but not in the other. *Id.* ¶ 12. McMenamin explains that although no single of the nine differing markers "is idiosyncratic to these writers . . . . [i]t would be improbable to find a single writer who simultaneously demonstrates both the Questioned and Known set." *Id.* ¶ 13. McMenamin concluded that the style marker differences were "sufficiently significant . . . to constitute evidence that Mr. Zuckerberg is not the author of the excerpted QUESTIONED references." *Id.* ¶ 14.

The style markers McMenamin analyzed pertained to punctuation, spelling, syntax, and discourse. McMenamin Declaration ¶ 11 and Exh. B. With regard to punctuation, McMenamin observed four absent apostrophes indicating contraction or possession in the 11 Questioned writings, but none in the 35 Known writings, and that the suspension points, *i.e.*, a series of periods indicating interruptions or breaks in thought, used in the Questioned writings have spaces between them, but there are no spaces between the suspension points used in the Known writings. McMenamin Declaration Exh. B. In the spelling category, McMenamin observed the technical terms "backend" and "frontend" appear a total of 11 times as one word in the Known writings, but in its single appearance in the Questioned writings, "backend" is written as two words. *Id.* In the Questioned writings, the word "internet" begins with a lower-case "i"

116

and "cannot" appears as two words, in contrast to the Known writings where "Internet" is capitalized and "cannot" is written as a single word. *Id.* With regard to syntax, McMenamin found "[r]un-on sentences constitute a strong and relatively frequent pattern" in the 11 Questioned writings, but none are present in the 35 Known writings, a "wholly distinct" set of single-word "sentence openers" present in the Questioned writings as compared to the Known writings, the presence of ambiguous use of pronouns in the Questioned writings, but none in the Known writings, and the absence of a comma separating long "if-clauses" in the Questioned writings, but not in the Known writings. *Id.* The only two style markers analyzed that were the same in both the Questioned and Known writings were the commencement of apologies with "Sorry" and the use of "Thanks!" to conclude a writing. *Id.*

In opposition, Plaintiff references an article in which the former president of the International Association of Forensic Linguists, Ronald R. Butters ("Butters"), questions whether McMenamin could, based on the "slender evidence" reviewed, establish it was unlikely Zuckerberg authored the Questioned writings. Plaintiff's Response at 49 (citing Ben Zimmer, *Decoding Your E-Mail Personality*, New York Times, July 23, 2011, http://www.nytimes.com/2011/07/24/opinioin/sunday/24g. Defendants have not replied in further support of McMenamin's findings.

The court may take judicial notice of standard English language. *S.K.I. Beer Corp. v. Baltika Brewery*, 443 F.Supp.2d 313, 318 (E.D.N.Y. 2006). A careful reading of McMenamin's Report establishes that the Known writings are grammatically correct, whereas the Questioned writings contain various grammatical errors. Although the absence of some of the grammatical errors in the Known writings could be explained by

the use of spell-checking and grammar-checking computer programs, such as the proper use of apostrophes, and correct spelling of words, others errors, such as the run-on sentences, ambiguous pronoun usage, and failure to include a comma following a dependent "if clause" are not readily correctable through such programs. The compound sentences McMenamin cited containing "long if clauses" should include a comma after the "if-clause," but only those found in the Known writings do so. *See The Chicago Manual of Style*, 14th ed. § 5.30 (1993) (explaining clauses comprising a compound sentence should be separated by commas unless the clauses are short and closely related). Further, Butters' criticism of McMenamin's work fails to account for McMenamin's finding that the set of single-word sentence openers used in the Questioned writings is completely distinct from the set of single-word sentence openers in the Known writings, McMenamin Report Exh. B, neither set being more correct or preferred than the other.

Considered as a whole, the stylistic differences McMenamin observed between the two sets of writings indicate the author of the Known writings possessed a better grasp of proper English usage and grammar than the author of the Questioned writings. As such, the stylistic differences point to a highly probable conclusion that the Questioned writings were not authored by Zuckerberg.

To summarize, based on the evidence in the record, it is highly probable and reasonably certain that the Work for Hire Document and the supporting e-mails were fabricated for the express purpose of filing the instant action. Plaintiff's arguments in opposition largely consists of self-defeating inconsistencies, serving only to establish

118

the fraudulent nature of the Work for Hire Document and supporting e-mails.

Defendants have thus established by clear and convincing evidence the Work for Hire

Document and supporting e-mails are fabrications such that Defendants' Motion to

Dismiss should be GRANTED, and the case dismissed with prejudice.  Nevertheless,

because the case is before the court for a report and recommendation, in the interest of

completeness, the court considers Defendants' alternative argument that the action be

dismissed to sanction Plaintiff for spoliation of evidence and litigation misconduct.


### C.      Spoliation and Litigation Misconduct

Defendants argue their Motion to Dismiss could be granted based solely on

Plaintiff's spoliation of evidence and litigation misconduct.  Defendants' Memorandum

at 51.  Defendants specifically argue Plaintiff attempted to artificially age the Work for

Hire Document so as to thwart Defendants' analysis of the document's ink, destroyed

six USB devices, including one containing image files entitled "Zuckerberg Contract"

that had been stored in a folder entitled "Facebook Files," concealed evidence he was

ordered to produce, submitted false declarations under oath, and directed his attorneys

not to comply with court orders.  Defendants' Memorandum at 51.  Plaintiff

characterizes Defendants' spoliation claims as spurious, Plaintiff's Response at 61-64,

and maintains that insofar as Defendants seek dismissal to sanction Plaintiff for

litigation misconduct, Plaintiff has already been sanctioned for the same conduct such

that dismissal would be a duplicate sanction.  *Id.* at 64.  In further support of their

Motion to Dismiss on this ground, Defendants maintain Plaintiff created multiple

versions of the Work for Hire Document, "baked" the version presented to Defendants'

experts by exposing the document to light for extended periods of time to interfere with and prevent certain ink analysis, and destroyed a USB device containing evidence highly relevant to this action. Defendants' Reply at 27-34. Defendants further maintain that dismissal as a sanction is sought only with regard to those acts of litigation misconduct for which Plaintiff has not already been sanctioned. *Id.* at 34-35.

### 1.    Spoliation

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Company*, 167 F.3d 776, 779 (2d Cir. 1999) (citing *Black's Law Dictionary* 1401 (6th ed. 1990)). Sanctions for spoliation of evidence may be imposed either under Fed.R.Civ.P. 37(b) when the spoliation occurs in violation of a court order, *id.* (citing Fed.R.Civ.P. 37(b)(2); *John B. Hull, Inc. v. Waterbury Petroleum Prods. Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988)), or pursuant to the court's inherent power to control litigation. *Id.* (citing *Chambers*, 501 U.S. at 43-45; *Sassower v. Field*, 973 F.2d 75, 80-81 (2d Cir. 1992)). The proper sanction for spoliation "should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Id*. (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). Ideally, a spoliation sanction should be designed to: (1) deter spoliation; (2) place the risk of an erroneous judgment resulting from the spoliation on the party who engaged in the spoliation; and (3) "restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'" *Id*. (citing and quoting *Kronisch*, 150 F.3d at 126).

Nevertheless, "outright dismissal of a lawsuit . . . is within the court's discretion." *West*, 167 F.3d at 779 (quoting *Chambers*, 501 U.S. at 45). "Dismissal is appropriate if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party." *Id.* (citing *Jones v. NFTA*, 836 F.2d 731, 734 (2d Cir. 1987)). Dismissal, however, being an extreme sanction, "'should be used only in extreme circumstances, usually after consideration of alternative, less drastic sanctions.'" *Id.* (quoting *John B. Hull, Inc.*, 845 F.2d at 1176).

A party seeking sanctions for spoliation of evidence must prove three elements, including "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (citing *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-12 (2d Cir. 2001)). *See Kronisch*, 150 F.3d at 126 (for a sanction to be awarded for spoliation of evidence, the party having control over the evidence must have had an obligation to preserve it when the evidence was destroyed). Here, the record establishes Plaintiff engaged in sufficient spoliation of evidence to support outright dismissal of the action.

### a.      Multiple Versions of Work for Hire Document

Defendants, based on handwriting expert Lesnevich's analysis of four images of the Work for Hire Document, argue Plaintiff created at least two different physical versions of the Work for Hire Document, which Plaintiff has proffered as the same

121

document.  Defendants' Memorandum at 52-56.  As discussed, Discussion, *supra*, 75-76, the four images of the Work for Hire Document Lesnevich analyzed include (1) Q-1, a TIFF image sent by Plaintiff to his attorney, Argentieri, on June 27, 2010 in anticipation of filing the original complaint; (2) Q-2, an image attached to the original complaint filed June 30, 2010; (3) Q-3, an image taken by Aginsky during his January 13, 2011 examination of the Work for Hire Document; and (4) Q-4, an image taken by Defendants' forensic document examiner Tytell during Defendants' July 14, 2011 examination of the Work for Hire Contract presented by Argentieri.  In both his initial and supplemental reports, Lesnevich concluded that Plaintiff had provided at least two different versions of the Work for Hire Document for expert inspection, explaining that Q-1 and Q-2 are images of the first version, and Q-3 and Q-4 are images of the second version.  Initial Lesnevich Report at 30; Supplemental Lesnevich Report at 23. Lesnevich's findings, unsuccessfully rebutted by Plaintiff, *see* Discussion, *supra*, at 76-86, establish that multiple copies of the Work for Hire Document were created, yet only one has been produced in discovery, the one produced to Defendants' experts in July 2011.  While the production of additional original Work for Hire Documents would likely support dismissal of the instant action as based on fraud, the evidence persuasively establishes that other versions of the Work for Hire Document did exist, but have not been produced.

### b.    "Baking" of Work for Hire Document

Defendants maintain that after Plaintiff created the second version of the Work for Hire Document, which was provided to Aginsky for physical, non-destructive

examination on January 13, 2011, Plaintiff "baked" the Work for Hire Document, thereby darkening the paper, giving it an aged appearance and attempting to thwart ink analysis.  Defendants' Memorandum at 52.  According to Defendants, the Work for Hire Document Plaintiff produced for inspection on July 14, 2011, is not the same document as the one from which the copy attached to the Amended Complaint was made.  *Id.* The discoloration is evident on the entire front side of each page of the Work for Hire Document with the exception of two small rectangular "tabs" at the top of each page. *Id.* at 57.  According to Defendants, the tabs indicate the areas on each page that were covered while the rest of the page was intentionally exposed to an excessive light source, resulting in "tan lines."  *Id.*  Indentations corresponding to the tabs were also discovered by Defendants' experts LaPorte and Tytell, indicating Plaintiff used clips or clothespins to hang or secure the document so as to expose it to light.  *Id.*

In opposition, Plaintiff asserts Defendants damaged the Work for Hire Document by overexposing the document to "intense ultra-violet (UV) and other light sources." Plaintiff's Response at 63.  In further support of Defendants' Motion to Dismiss, Defendants reference sworn statements establishing the purported original Work for Hire Document was already damaged when Argentieri presented it for inspection on July 14, 2011, and statements by Plaintiff's own experts fail to establish otherwise. Defendants' Reply at 29-31.  Defendants further maintain Plaintiff's assertion that Lesnevich found the scanned version of the Work for Hire Document attached to the Amended Complaint was "unsuitable for expert examination" misrepresents the actual determination that Lesnevich would be unable, based on only a scanned image, to "determine the authenticity of the questioned written text and signatures" on the second

page of the Work for Hire Document, but that Lesnevich never stated the scanned image was altogether unsuitable for handwriting examination. *Id.* at 27-29 (citing Declaration of Gus R. Lesnevich filed June 2, 2011 (Doc. No. 51) ("Lesnevich Declaration"), ¶ 18. With regard to the discoloration of the purported original Work for Hire Document presented to Defendants on July 14, 2011 in connection with expedited discovery, the court first addresses Plaintiff's assertion, Defendants' Response at 63, that the court's denial of Plaintiff's motion for sanctions (Doc. No. 188) not because the court disagreed with Plaintiff's assertion that Defendants' had spoliated the Work for Hire Document, but because "[t]he discoloration of the document is itself not a form of spoliation," establishes the court found Defendants had caused the discoloration. Plaintiff has misconstrued the court's comment, which was intended to clarify that the mere fact the paper on which the Work for Hire Document was printed was discolored was irrelevant to the document's authenticity.

The record establishes that the Work for Hire Document was damaged sometime between January 13, 2011, when it was examined by Plaintiff's expert forensic chemist and document dating specialist Aginsky, and July 14, 2011 when it was presented to Defendants' experts for analysis. Specifically, when presented to Aginsky on January 13, 2011, the text on the purported original Work for Hire Document was printed "with an office machine system utilizing black toner." Aginsky Declaration ¶ 6; Aginsky Interrogatory Responses (Southwell Declaration Exh. P), Response to Interrogatory No. 3 (specifying January 13, 2011 as the date Aginsky received the Work for Hire Document from Plaintiff). The handwritten interlineation on page 1 and the two signatures and dates on page 2 were all "written with black ballpoint

ink." Aginsky Declaration ¶ 6. Further, Aginsky's nondestructive visual, UV, IR absorption and IRL examinations of the document revealed both pages were printed on white paper. *Id.* ¶ 8. Although Plaintiff attributes the discoloration and damage to the purported original Work for Hire Document to Defendants' experts, asserting they overexposed the document to various light sources during this examination, Plaintiff's Response at 63-64, the record establishes that when presented for inspection by Defendants' experts on July 14, 2011, forensic document examiner Tytell and typeface and print technology expert Romano, both of whom were present when the document was first produced, have provided sworn statements of their first-hand accounts confirming the document already "had an off-white cast and faded, tan-colored ink at the time." Defendants' Reply at 29-30. *See* Declaration of Peter V. Tytell, filed November 28, 2011 (Doc. No. 238) ("Tytell Declaration") ¶¶ 14-4 (averring he was present on July 14, 2011, at the law offices of Harris Beach for Defendants' inspection of the Work for Hire and Specifications Documents and, as soon as Argentieri placed the documents on the table at 9:11 A.M., Tytell observed the ink on the Work for Hire Document was neither black, nor of normal density, and the front of each page "had an off-white or ivory case, while the reverse of each page was a relatively brighter white."). In his expert report, Tytell states that

> Upon my initial review of the Work for Hire document it was immediately apparent that the ink of all the handwritten material was a faded brown or light tan, almost transparent in some places. The deteriorated condition of the ink was not consistent with what I expected based on the images previously reviewed or the description previously provided, or indeed what would be expected of any eight-year old document kept under normal storage conditions.

Tytell Report at 4.

Tytell continues that based on Aginsky's description in his declaration that the writing

ink on both pages of the Work for Hire Document was "black ballpoint ink," and the

appearance of the handwriting in the previously-filed images of the document, Tytell

"had anticipated seeing black ballpoint ink of normal density;" in contrast, the ink on the

purported original Work for Hire Document Tytell observed "on the morning of July 14

was neither black nor of normal density." *Id.* (citing Aginsky Declaration ¶ 6). Tytell

further describes the presence of two small tab marks located at the top edge of each

page of the purported original Work for Hire Document, indicating some clips or

clothespins were used to secure the pages while they intentionally were exposed to

environmental conditions in an attempt to artificially "age" the document and interfere

with or completely thwart the anticipated forensic chemical ink analysis by Defendants'

experts.[68] *Id.* at 8-9 & n. 11. Similarly, Romano reports that

> I had two immediate visual observations of the "WORK FOR HIRE" document
> when Mr. Argentieri presented it for examination on the morning of July 14, 2011.
> First, the ink writing appeared significantly more degraded and faded than it did
> in the "WORK FOR HIRE" scan attached to Plaintiff's First Amended Complaint.
> Second, the paper was discolored and had an off-white cast."

---

[68] That Plaintiff anticipated Defendants' forensics experts would perform ink analysis on the
purported original Work for Hire Document is evident by the fact that Defendants had requested, on June
2, 2011, permission from the court to conduct ink-aging testing, *see* Docs. Nos. 44, 45 and 53, which
testing would require the extraction of ink samples from the purported original Work for Hire Document
using a tiny hole-punch, for which permission was granted in the July 1, 2011 Expedited Discovery Order.
Plaintiff was further aware by Aginsky's assertions, based on his January 13, 2011 visual and non-
destructive analysis of the document, that ink samples would have to be extracted and chemically
analyzed to determine the age of the ink. Although Aginsky conducted only the non-destructive analysis of
the document on January 13, 2011, Aginsky understood at that time that at a later date, he would take
samples from the Work for Hire Document on which he would perform chemical analysis. Aginsky Dep.
Tr. at 19. Aginsky spoke to Plaintiff in person on January 13, 2011. *Id.* at 37, 118. Aginsky discussed
with Plaintiff and Plaintiff's attorneys being retained in this action as an "ink-aging specialist" which
Aginsky understood meant he would conduct ink-aging testing "based on the analysis of PE." *Id.* at 63.
Plaintiff thus knew by January 2011, more than six months before the purported original Work for Hire
Document was produced to Defendants, of the availability of testing procedures that could date the age of
an ink, and that without some acceleration of the ink-aging process, or intervention to thwart such testing,
Defendants' experts would discover that the Work for Hire Document was a recently created fabrication.

Romano Report at 3.

In opposition, Plaintiff relies on statements by his experts Stewart and Blanco that the Work for Hire Document was not altered when Argentieri presented it to Defendants on July 14, 2011. Neither Stewart nor Blanco, however, was present when the document was produced to Defendants' experts on July 14, 2011. Stewart Dep. Tr. at 168-69, 171, 174, 180 (agreeing scanned image of Work for Hire Document taken by Tytell immediately after Argentieri presented it for analysis by Defendants' experts at 9:18 A.M. on July 14, 2011, showed ink that "appeared faded and the document appears brownish" and "is markedly dissimilar from the appearance of the ink that Dr. Aginsky photographed earlier in the year" and Stewart "ha[d] no reason to dispute that he [Tytell] was looking at a tanned document with discolored ink."); Blanco Dep. Tr.[69] at 117-19 (admitting the ink on the Work for Hire Document Argentieri presented on July 14, 2011 for inspection could have been faded and Blanco had no reason to believe Tytell lied in asserting that the ink was faded).

Defendants do not deny using a Video Spectral Comparator ("VSC") to analyze the Work for Hire Document. *See* LaPorte Report at 6, 17. A VSC is described by LaPorte as "an instrument equipped with cameras, lights, and filters that allow a forensic document examiner to conduct detailed examinations, while controlling both the wavelength of light being used and the wavelength or region being viewed with the aid of the camera." LaPorte Report at 6. *See also id.* at 17 (describing a VSC as "an apparatus used for magnification and illumination by various light sources"). The VSC

---

[69] References to "Blanco Dep. Tr." are to the page of the transcript of Defendants' July 25, 2012 deposition of Blanco, portions of which are filed as Southwell Reply Declaration Exh. P (Doc. No. 589-16).

specifically uses ultraviolet ("UV"), infrared reflectance ("IRR"), and infrared luminescence ("IRL") illumination energy sources to evaluate the properties of an ink. *Id.* at 6.

Insofar as Plaintiff asserts Defendants' experts damaged the Work for Hire Document in July 2011 "via excessive exposure to various sources of intense light over four days," through use of the VSC, Plaintiff's Response at 19 (citing Declaration of Larry F. Stewart filed June 4, 2012 (Doc. No. 416) ("Stewart Declaration") at 31), the court first observes that Stewart actually maintains "Defendants' experts chose to repeatedly expose the documents to intensive lights and humidity over the first two days of analysis.  This was done for many hours and repeated many times, unnecessarily.  This type of repeated exposure was redundant and appears to be the source of the damage to the contract."  Stewart Declaration ¶ 130.  This would be consistent with Blanco's statement that despite being present when the Work for Hire Document was presented to Defendants' experts for inspection on July 14, 2011, it was not until 5:00 P.M. on July 15, 2011 that Blanco was allowed to examine the document, at which time Blanco "observed deterioration (fading/yellowing) of the Facebook Contract pages and I also noted that the writing pen inks were virtually gone. . . . The extent of ink evaporation and deterioration on both pages of the Facebook Contract sheets was extensive."  Blanco Report at 173.

Nevertheless, Blanco's assertion that the "probable cause" of the yellowing and deterioration on the front sides of both pages of the Work for Hire Document was Defendants' experts' excessive document processing and mishandling, including excessive exposures to various lighting sources, humidity and heat, Blanco Report ¶¶

173, 176-77, is unsupported.  Despite having been retained by Plaintiff as a forensic document examiner, Blanco only explains that excessive exposure to heat, light and humidity can cause deterioration and yellowing, but nowhere within Blanco's Report is there any indication as to how much of such exposure is necessary to be considered excessive and to cause the observed damage.[70]  Blanco's quote from a book described as "a recognized primer and technical authority in the field of Forensic Document Examination" for the proposition that "'a short exposure to a powerful source of ultra-violet radiation is likely to do far more harm than months of exposure to ordinary daylight,'" Blanco Report ¶ 186 (quoting Wilson R. Harrison, M.Sc., Ph.D., *Suspect Documents: Their Scientific Examination*, 1958, at 82, 89-90, 458-59), falls short.  That despite the discoloration of the paper and fading of the ink, LaPorte was still able to successfully conduct PE testing on the ink, the results of which indicated the ink was "fresh," *i.e.*, less than two-years old, is inconsistent with the document having been exposed for a prolonged period to a "powerful source of ultra-violet radiation" such as that used in the forensic testing equipment by Defendants' experts on July 14 and 15, 2011, but, rather, with having been placed in sunlight or under household lighting, with clamps or clothespins holding the document in place, for a longer period of time.

Although Defendants admit analyzing the Work for Hire Document using a VSC,

---

[70] Although Blanco maintains one study showed that "'every hour of UV irradiation accelerates the aging by approximately 182 days,'" Blanco Report ¶ 186 (quoting Donna M. Grim, B.S., Jay Siegel, Ph.D., and John Allison, Ph.D., *Evaluation of Laser Desorption Mass Spectrometry and UV Accelerated Aging of Dyes on Paper as Tools for the Evaluation of a Questioned Document*, JOURNAL OF FORENSIC SCIENCE, Nov. 2002, at 1-3, 5-8), the quoted portion of the article does not disclose what UV setting is necessary to accelerate the aging at this rate.  Nor did Blanco, who maintains he saw the UV settings on the VSC unit Defendants used in analyzing the Work for Hire Document, attempt to replicate the damage Plaintiff attributes to Defendants' purported abusive analysis.  Given the short period of time, measured in hours, over which Blanco suggests the damage to the Work for Hire Document occurred, Blanco would not have been constrained by time from replicating the damage.

Plaintiff fails to dispute LaPorte's assertion that despite the fact that, with the exception of the small rectangular tab areas at the top of each page, the entirety of both 8 ½ x 11 inch pages of the Work for Hire Document was discolored, the entirety of the document would not fit under the VSC at the same time.  LaPorte Report at 17.  Specifically,

> The VSC only projects light and other energy sources such as UV and IR over a portion of the document at any single time.  You cannot fit the entirety of the document under the light source in the VSC so that it is being equally exposed with the same intensity.  Therefore, if any of the damage were caused by the VSC then there would be varying degrees of damage and discoloration on different portions of the paper.  Moreover, the UV bright rectangular "clip" areas at the top of the page are utterly inconsistent with damage by the VSC or other laboratory lights.

LaPorte Report at 17.

Nor does Plaintiff rejoin LaPorte's assertion that

> the [StreetFax] Specifications document underwent the same examinations using the same equipment as the Work for Hire Document.  The paper and ink of the Specifications document, however, were not degraded in any manner similar to the Work for Hire document.  The ink and paper of the Specifications document was [*sic*] typical of an 8-year-old document upon its presentation to Defendants' experts.  The ink and paper of the Work for Hire document was [*sic*] not.

*Id.*

Moreover, Plaintiff's insinuation that Defendants' experts engaged in conduct designed to age the Work for Hire Document flies in the face of the reality of the situation at hand, namely, the premise of Defendants' Motion to Dismiss is that the Work for Hire Document is a recently created fabrication.  As such, the idea advanced by Plaintiff that exposing the Work for Hire Document to excessive light sources, which would accelerate the ink's drying and evaporation, thereby increasing the document's apparent age, could somehow produce any result in favor of Defendants is simply

preposterous.[71]  To the contrary, the only party who conceivably could benefit by extensive exposure of the Work for Hire Document to extreme lighting or heat conditions would be Plaintiff if such exposure had caused the level of the common ink solvent, 2-phenoxyethanol (PE), to evaporate such that LaPorte's PE testing would show the solvent-loss ratio was less than 25%, indicating the document was more than two years old.  To imply, as does Plaintiff's contention, that Defendants' credentialed experts were grossly negligent in examining the Work for Hire Document so as to impair the very purposed of their analysis is plainly absurd.

The evidence in the record thus establishes that when examined by Aginsky on January 13, 2011, the purported original Work for Hire Document was comprised of white paper, not remarkably yellowed or discolored, on which all handwritten interlineations and signatures appeared in black ballpoint ink, yet when presented to Defendants' experts for inspection on July 14, 2011, the Work for Hire Document was damaged such that the paper was yellowed and the ballpoint ink used in the handwritten interlineations was faded and brown, although not completely dried so as to have ceased aging.  The only reasonable explanation for the damaged appearance of the purported Work for Hire Document when presented to Defendants' experts on July 14, 2011, is that Plaintiff, having become aware on January 13, 2011, that the document would undergo forensic analysis, including ink-aging testing of the ball-point ink, to determine the document's age, attempted to accelerate the document's aging by

---

[71]  As LaPorte explains, "[n]or would the degradation evident on the Work for Hire document increase the level of PE in the ink I sampled."  LaPorte Report at 8.

131

exposing the document to light,[72] possibly sunlight or a tanning booth, for an extensive period of time, necessitating the use of clamps, clothespins, or weights to hold the document in place while the document essentially obtained a suntan, while the portions of the Work for Hire Docment that were covered by the clamps or weights holding the document in place, as well as the document's reverse side, were shaded and remained white. Although the resulting damage to the purported original Work for Hire Document was not sufficient to prevent much of the forensic testing, such as the PE test, paper analysis, and handwriting analysis, it did preclude TLC testing of the ballpoint ink and, thus, a complete analysis of the ballpoint ink was not possible. *See* Aginsky Declaration ¶ 12 (explaining that PE and TLC testing "perfectly complement each other"); and LaPorte Report at 15 n. 23 (explaining although LaPorte was able to perform GC/MS testing on the ink used in the handwritten interlineation, "TLC analysis of the ink was rendered practically ineffective due to the condition of the ink on the Work for Hire document. This prevented a determination of whether the inks chemically 'matched' one another or known inks from a particular manufacturer. Accordingly, the deteriorated condition of the ink prevented any identification or dating techniques based on TLC analysis."). Thus, Plaintiff, by exposing the Work for Hire Document to a light source for an extended period of time in an attempt to age the document and interfere with or thwart the forensic chemical analysis of the ballpoint ink Aginsky had explained

---

[72] It is undisputed that the damage to the Work for Hire Document was caused by a source of light, rather than heat. *See, e.g.*, Southwell Declaration ¶ 15.c.iv-v (citing LaPorte Report at 9 (attributing the "severe degradation" of the Work for Hire Document's ballpoint ink to "deliberate exposure" to sunlight or "another intense energy source for a prolonged period."); and Plaintiff's Response at 63 (stating Plaintiff has presented proof that the Work for Hire Document was discolored when "Defendants' experts over-exposed the Facebook contract to intense ultra-violet (UV) and other light sources.").

would be used, has spoliated the Work for Hire Document such that a complete analysis of the ballpoint ink is not possible.

### c. Missing USB Drives

Defendants argue that while the instant action has been pending, Plaintiff willfully and in bad faith destroyed six Universal Serial Bus ("USB") devices[73] after Defendants learned of their existence and this court ordered them produced. Defendants' Memorandum at 57. Plaintiff's use of the six USB devices was discovered during Stroz Friedberg's forensic examination of the Ceglia media, *i.e.*, Plaintiff's digital media.[74] *Id.* at 58. Located on the devices was a folder labeled "Facebook Files" in which were stored electronic image files entitled "Zuckerberg Contract page 1.tif" and "Zuckerberg Contract page 2.tif," in the same TIFF format as the electronic image files of the StreetFax Document Plaintiff attached to his e-mails to Kole in 2004. *Id.* According to Defendants, given that the titles and formats of these two files that were stored on the USB devices are the same as those Plaintiff sent to Kole, "it is virtually certain that the storage devices contained electronic images of the document central to this case." *Id.* Defendants further assert that Plaintiff's destruction of the devices was intentional given that Plaintiff used one of the devices as recently as April 4, 2011, and three were used while this litigation was pending. *Id.* (citing Stroz Friedberg Report at 49-50).

---

[73] Plaintiff does not dispute the description of "USB devices" as "removable data storage devices used to save and transport data." Stroz Friedberg Report at 49.

[74] Stroz Friedberg's analysis of the Ceglia Media was conducted between July 15 and 22, 2011, in three locations, including Chicago, Illinois, Sarasota, Florida, and Buffalo, New York. Stroz Friedberg Report at 7.

In opposition, Plaintiff does not deny destroying the USB devices after this action was commenced, and prior to discovery, nor does Plaintiff deny the devices contained the files identified by Stroz Friedberg as relevant to this action; rather, Plaintiff argues that his destruction of the devices should be excused because the files on one of the missing USB devices were images of the Work for Hire Document, which Plaintiff had already produced to Defendants.  Plaintiff's Response at 62-63.  Plaintiff draws an analogy of a USB device to a filing cabinet, asserting that neither should be subject to production solely because it may have once contained files pertinent to the case.  *Id.* at 63.  Plaintiff further maintains only two of the six devices were ever attached to computers Plaintiff owned.  *Id.*

In further support of their Motion to Dismiss, Defendants maintain that Plaintiff's arguments regarding the USB devices amount to a "binding admission" that he intentionally destroyed a USB device containing relevant evidence.  Defendants' Reply at 32.  According to Defendants, Plaintiff's assertion that the files on the destroyed USB devices were duplicates of images of the Work for Hire Document Plaintiff had already produced to Defendants, as opposed to scanned images of the StreetFax Document, even if true, does not preclude the possibility that the destroyed files could have been different scans of the Work for Hire Document which would be additional evidence of Plaintiff's fraud.  *Id.*  Defendants also maintain that although only two of the devices were ever attached to a computer owned by Plaintiff, the remaining four devices were attached to computers in Plaintiff's possession, custody, or control, and were subject to this court's expedited discovery order.  *Id.* at 33.

According to Stroz Friedberg, whenever a USB device is plugged into a

computer, the computer's operating system records the connection. Stroz Friedberg Report at 49. Upon conducting their forensic examination of Plaintiff's electronic media, Stroz Friedberg discovered six USB devices had been connected to Plaintiff's computers or hard drives, but Plaintiff had not produced any of the USB devices. *Id.* at 49. Three of the six USB devices had been attached to Plaintiff's electronic media since this action was commenced on June 30, 2010, with one such device, the Seagate FreeAgent GoFlex USB Device ("Seagate device"),[75] having been connected to Plaintiff's Toshiba Satellite laptop computer as recently as April 4, 2011. *Id.* at 49-50. Stroz Friedberg explains that "[l]ink files are shortcuts to files or folders" and "contain embedded information about the files or folder they target." *Id.* at 50. On Plaintiff's Toshiba Satellite laptop computer, Stroz Friedberg discovered "link files" to files entitled "Zuckerberg Contract page1.tif" and "Zuckerberg Contract page 2.tif" and the link files' embedded metadata showed the files stored in a folder named "Facebook Files" on a removable device, such as a USB device. *Id.* Further, the metadata for both image files showed the images were created on July 9, 2010, after this action was commenced. *Id.*

Plaintiff's bald assertion, Plaintiff's Response, that his destruction of the USB devices was harmless because the files on one of the missing USB devices were

---

[75] The Seagate device is not the same as the Seagate Hard Drive, which Stroz Friedberg identified as "[a] 120 gigabyte Seagate ST3120025A internal hard drive," explaining such "an internal hard drive is a drive that is designed to be used within a computer, not as an external device," Stroz Friedberg Report at 7, in contrast to a UBS device which is specifically designed to be temporarily attached to a hard drive for data storage and transport, *id.* at 49-50.

already produced to Defendants is disingenuous.[76]  As Defendants maintain, Defendants' Reply at 32, without the USB devices, it is impossible to know precisely what the devices contained.  Even if, as Plaintiff asserts, the files on the lost USB devices must have been duplicates of those already produced to Defendants with the same file names and file size, the lost files still could have been different scans of the document that would further confirm Plaintiff's fraud.  Simply put, absent the opportunity to analyze the six USB devices, it is impossible to ever know what they contained.  Furthermore, Plaintiff's assertion that only two of the six USB devices identified by Stroz Friedberg were ever attached to a computer Plaintiff owned is especially specious given that USB devices are intended to facilitate the transfer of files from one computer to another, without differentiating between whether a particular computer is owned by the user or not.  That the files were destroyed prior to the commencement of expedited discovery, as Plaintiff admits, supports an inference that the files contained information harmful to Plaintiff's case and were destroyed by Plaintiff to prevent Defendants'

---

[76] The court notes that in his August 29, 2011 Declaration (Doc. No. 139-2) ("Plaintiff's Aug. 29, 2011 Declaration"), Plaintiff, in compliance with the August 18, 2011 Order (Doc. No. 117), lists the various files relevant to this action, organized according to the law firm or expert firm at which each such file is located.  The list includes scans of the first and second pages of the Work for Hire Document dated April 28, 2003, respectively named "Zuckerberg Contract page1.tif" and "Zuckerberg Contract page2.tif" with both files located at Stewart Forensics Consultants, LLC, in San Luis Obispo, California.  Plaintiff's Aug. 29, 2011 Declaration ¶¶ 47, 49-50.  At his deposition, Rose was provided with an exhibit prepared by Stewart purportedly showing a comparison of the file names and file sizes identified in the embedded metadata properties of two link files showing files named "Zuckerberg Contract page1.tif" and "Zuckerberg Contract page2.tif" were once on the missing USB drive, with the file name and file size of the two files produced in discovery as memorialized in Plaintiff's Aug. 29, 2011 Declaration ¶¶ 47, 49-50, and Rose agreed it was likely they were the same files.  Rose Dep. Tr. at 202-07.  At Rose's deposition, however, Defendants' attorneys objected that they had not previously been provided with the exhibit and, as such, had no opportunity to verify the information it contained.  *Id.* at 206.  Given the high stakes in this case, that the two files were likely to be the same is insufficient to assure Defendants, absent an examination of the missing and spoliated files, that the files were in fact the same, thereby obviating actual prejudice to the Defendants.

access.

More disturbing is that Plaintiff admits that files relevant to this litigation were stored on the missing USB devices. If, as Plaintiff asserts, the files were already produced to Defendants, Plaintiff's production establishes Plaintiff understood the files to be relevant, such that their willful destruction was in violation of this court's August 18, 2011 Order.

### d.  Reinstallation of Windows

Defendants argue Plaintiff twice attempted to delete electronic data from the Seagate Hard Drive by reinstalling the Windows operating system, thereby overwriting the existing data, obscuring the fact that the Seagate Hard Drive contained the authentic contract, *i.e.*, the StreetFax Document. Defendants' Memorandum at 59-60 (citing Stroz Friedberg Report at 46-47). In opposition, Plaintiff asserts that Defendants have misrepresented the relevancy of the Seagate Hard Drive to this action given that the Seagate Hard Drive belonged not to Plaintiff, but to his parents, and that Defendants have not produced any evidence that Plaintiff reinstalled the Windows operating system on the computer at issue. Plaintiff's Response at 50-51. Plaintiff further maintains Defendants have failed to identify any evidence purportedly destroyed by the reinstallation of Windows on any computer that Plaintiff ever accessed. *Id.* at 51-52. Defendants, in further support of their motion, maintain that not only has Plaintiff failed to rebut this argument, but the recently-produced "Kasowitz Letter"[77] reveals

---

[77] Southwell Reply Declaration Exh. R.

Plaintiff's motivation for reinstalling Windows on the Seagate Hard Drive a second time during the pendency of this litigation was the discovery by Capsicum, Plaintiff's former digital forensic expert, of the StreetFax Document on March 29, 2011.  Defendants' Reply at 33.

As explained by Stroz Friedberg, undisputed by Plaintiff,

The installation date of a Windows operating system is tracked in a computer's registry which is comprised of a series of files.  The reinstallation of an operating system is a destructive action that may have the effect of overwriting existing data on a hard drive. . . . the reinstallation of an operating system can be done in an effort to destroy or conceal data.

Stroz Friedberg Report at 46.

According to Stroz Friedberg, the Windows operating system was reinstalled on the Seagate Hard Drive on two occasions during the instant action's pendency.  Stroz Friedberg Report at 46.  Although the reinstallation of an operating system can be performed in a manner that does not delete documents on a computer's hard drive, even under such circumstances the reinstallation can cause the loss or deletion of potentially valuable information such as system settings or log files, and may overwrite deleted files or documents that may otherwise be recoverable.  *Id.* at 46 n. 20.

Specifically, the forensic image of the Seagate Hard Drive created by Plaintiff's previous expert, Capsicum, on March 29, 2011, shows a Windows operating system installation date of December 29, 2010.  Stroz Friedberg Report at 46.  The purported Windows operating system installation date when imaged by Stroz Friedberg on July 15, 2011, in Sarasota, Florida, however, is December 27, 2010, two days earlier than that reflected in the image captured by Capsicum on March 29, 2011.  *Id.* at 7, 46-47.  As explained by Stroz Friedberg, this discrepancy demonstrates "the Windows

138

operating system was reinstalled on the Seagate Hard Drive for a second time, sometime after the imaging occurred on March 29, 2011. This reinstallation occurred at a time when the system clock of the computer containing the Seagate Hard Drive was backdated to December 27, 2010." *Id.* at 47 (underlining in original). Because Plaintiff did not produce the computer that had contained the Seagate Hard Drive, Stroz Friedberg was unable to analyze the date and time system of that computer's clock to determine its accuracy. *Id.* That the second reinstallation was backdated is established by the fact that, if the December 27, 2010 reinstallation date were genuine, the reinstallation would have appeared in the registry captured on March 29, 2011, when the December 29, 2010 reinstallation was detected.

It is significant that Plaintiff does not deny that the Windows operating system was reinstalled on the Seagate Hard Drive. Rather, Plaintiff repeats his assertion that the Seagate Hard Drive belonged to his parents and was never in his possession, custody or control. Plaintiff's Response at 50-51. As discussed, however, Discussion, *supra*, at 38-39, such assertion is flatly inconsistent with Plaintiff's previous actions and statements establishing otherwise. Moreover, the concerns raised by Marks, Plaintiff's former counsel at the Kasowitz firm, regarding Capsicum's recovery from the same Seagate Hard Drive of documents establishing page 1 of the Work for Hire Document is a fabrication, would have provided Plaintiff with a motive to reinstall the Windows operating system in a desperate attempt to overwrite the authentic contract, *i.e.*, because the reinstallation of Windows on December 29, 2010, failed to overwrite on the Seagate Hard Drive the StreetFax Document which Capsicum discovered on March 29, 2011 presuming, erroneously, that Capsicum's discovery of the StreetFax Document

139

would be suppressed as privileged.  Not only has Plaintiff not denied that Windows was

reinstalled on the Seagate Hard Drive, Plaintiff has not proffered any reason for the

reinstallation either on December 29, 2010, or again after Capsicum imaged the

Seagate Hard Drive on March 29, 2011, and before Stroz Friedberg imaged it on July

15, 2011.  It is, however, impossible to know exactly what evidence was lost by the

overwriting of the Windows operating system on two separate occasions after the

instant action was commenced.  Plaintiff thus engaged in spoliation of evidence by

reinstalling the Windows operating system two times after commencing this action.


### e. Deletion of Electronic Copies of Work for Hire Document and Other Electronic Evidence

Defendants argue that by intentionally destroying the USB devices and

reinstalling the Windows operating system on the Seagate Hard Drive, Plaintiff has

deleted all electronic copies of the version of the Work for Hire Document attached to

the Amended Complaint, precluding Stroz Friedberg from finding any electronic copy of

that version of the document on any of the Ceglia Media.  Defendants' Memorandum at

61.  According to Defendants, the absence of an electronic copy of the version of the

Work for Hire Document that Plaintiff scanned and sent as an attachment to e-mails to

Argentieri on June 27, 2010, and to StreetFax employee Karin Petersen on June 29,

2010, establish that prior to filing the instant action, Plaintiff did possess an electronic

copy of the Work for Hire Document.  *Id.*  As such, Plaintiff's failure to produce such

copy, and Stroz Friedberg's inability to locate one, can only be explained by Plaintiff's

destruction or concealment of the electronic copy.  *Id.*  Plaintiff does not directly

respond to this argument, which failure Defendants point to in further support of their Motion to Dismiss. Defendants' Reply at 34.

The record establishes that during court-ordered expedited discovery limited to determining the Work for Hire Document's authenticity, no exact copy of the Work for Hire Document was found on any of the pieces of the Ceglia Media Plaintiff produced, including three computers, three hard drives, 174 floppy disks, and 1087 compact disks ("CDs"), although Stroz Friedberg did identify seven unsigned electronic documents on the Ceglia Media that are variants of the Work for Hire Document, all of which are backdated so as to appear as if created at earlier dates. Stroz Friedberg Report at 10, 33. Nevertheless, Stroz Friedberg did received from Argentieri a copy of the Work for Hire Document attached to a June 27, 2010 e-mail message from Plaintiff to Argentieri. *Id.* at 10. The same copy of the Work for Hire Document was attached to a June 29, 2010 e-mail from Plaintiff to Petersen. *Id.* Stroz Friedberg maintains that because the Work for Hire Document was attached to Ceglia's two e-mails to Argentieri and Petersen, Stroz Friedberg expected an exact electronic copy of the Work for Hire Document would be found among the Ceglia Media, but it was not. *Id.* Instead of an exact copy of the Work for Hire Document that was attached to Ceglia's e-mails to Argentieri and Petersen, Stroz Friedberg found seven unsigned versions of the Work for Hire Document, that "are very similar but not identical to the Work for Hire Document" attached to the Amended Complaint, for which metadata anomalies indicate backdating and document manipulation. *Id.* at 33.

Further, Stroz Friedberg's examination of the Ceglia Media revealed the deletion of additional relevant electronic files while this action was pending, including floppy

disks containing records of deleted files entitled "mark emails 082903," "Work for Hire ContractMZ.doc," and "Work for hire SF template.doc."  Stroz Freidberg Report at 47. The "last accessed" dates for each of these three files was February 18, 2011, indicating the files were deleted on or after that date, while this action was pending. *Id.*

Plaintiff also permitted the deletion of a Yahoo! webmail account and its contents with the address "landlubber39@yahoo.com" which was closed after the original Complaint was filed, on August 4, 2010, at Plaintiff's request, without taking any action to preserve the contents of the webmail account.  Stroz Friedberg Report at 48. Similarly, Stroz Friedberg identified the existence of a webmail account with the address "getzuck@gmail.com," the internet history for which demonstrated the Ceglia Media was used on April 18, 2011 to read an e-mail related to the activation of a Facebook account for the e-mail address getzuck@gmail.com.  *Id.*  This e-mail address was thus used in April 2011, and may have contained e-mails from that time, but a production of the webmail account Stroz Friedberg obtained from Google with Plaintiff's consent established the earliest e-mail in this account was dated January 28, 2012, nine months after its creation, strongly suggesting the account had been in use prior to that date, after this action was commenced, but the contents were not preserved.  *Id.*

Finally, Plaintiff's sole assertion in opposition, Plaintiff's Response at 58-61, that Zuckerberg's superior computer skills allowed Zuckerberg to hack into the computer on which the Seagate Hard Drive had been installed, infesting the hard drive with malware and viruses which would have interfered with the computer's clock, is flatly inconsistent with Plaintiff's assertion, *id.* at 57, that the computer on which the Seagate Hard Drive had been installed was stored in his parents' garage, without power, for more than two

142

years until Plaintiff's father, Carmine Ceglia, provided it to the experts in this action. Plaintiff's Response at 57 (citing Carmine Ceglia Declaration (Doc. No. 419), ¶¶ 6-7).

Defendants have thus established all three elements necessary for an award of sanctions based on spoliation of evidence, including that Plaintiff had control over and an obligation to preserve the spoliated evidence, that the evidence was spoliated with a culpable state of mind given that Plaintiff had to have understood the ramifications of his actions, and that the spoliated evidence was relevant to establishing either Plaintiff's claims or Defendants' defenses. *Residential Funding Corp.*, 306 F.3d at 107. Further, given that the court addresses the spoliation issue only in the alternative should the District Judge disagree with the recommendation that Defendants' Motion to Dismiss be granted because the StreetFax Document is authentic and the Work for Hire Document is a recently created fabrication, the only suitable sanction for such spoliation is dismissal of the action is established by the fact that such spoliation of the evidence has placed Defendants at an increased risk of an erroneous judgment, and it is not possible to restore Defendants to the position they would have been in absent the spoliation. *See Miller v. Time-Warner Communications, Inc.*, 1999 WL 739528, at *2-4 (S.D.N.Y. Sept. 22, 1999) (dismissing employment discrimination action based on plaintiff's spoliation of evidence, specifically, erasure of handwritten notes made on various documents during course of employment, and repeated perjury in pre-trial proceedings as evidenced by internally inconsistent statements). The sanction of dismissal is further supported by the what is at stake in this action, specifically, one-half the value of the social networking giant known as Facebook.

## 2.    Litigation Misconduct

Defendants argue Plaintiff has engaged in extensive litigation misconduct warranting dismissal of the action, including stonewalling and obstructive discovery, filing false declarations under oath, making frivolous assertions of privilege to conceal his wrongdoing, and directing his attorneys to disobey this court's orders, such that it took nine months to complete the court-ordered expedited discovery, requiring Defendants to file five motions to compel, all of which were granted.  Defendants' Memorandum at 62.  Defendants maintain such obstructionism continues as evidenced by (1) the recently discovered existence of four previously undisclosed webmail accounts, *id.* at 63 (citing Defendants' Memorandum of Law in Support of Their Fifth Motion to Compel and for Other Relief (Doc. No. 295) at 6); (2) Plaintiff's repeated defiance of this court's orders to compel, *id.*; (3) Plaintiff's concealment of evidence he was unable to destroy, *id.*; (4) frivolous assertions of attorney-client privilege, *id.*; (5) submitting multiple declarations containing statements later shown to have been false, *id.* at 64; (6) obtaining a misleading statement by deceiving a witness, *id.*; and (7) filing frivolous motions solely to harass Defendants.  *Id.*  In opposition, Plaintiff asserts Defendants are seeking dismissal based on misconduct for which this court has already imposed sanctions.  Plaintiff's Response at 64.  In further support of dismissal, Defendants clarify that the litigation misconduct for which Defendants seek dismissal includes only those actions for which Plaintiff has not already been sanctioned. Defendants' Reply at 34-35.

Insofar as Defendants seeks the sanction of dismissal for Plaintiff's failure to comply with court-ordered discovery, Fed.R.Civ.P. 37(b)(2) specifically provides for

144

such sanction. With regard to the remaining asserted instances of litigation misconduct, federal courts inherently possess those powers "'necessary to the exercise of all others.'" *Chambers*, 501 U.S. at 43 (quoting *United States v. Hudson*, 7 Cranch 32, 34, 3 L.Ed. 259 (1812)). "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates. . . . These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Id.* (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962)); *accord People by Abrams v. Terry*, 45 F.3d 17, 23 (2d Cir. 1995). "A court has the inherent power to supervise and control its own proceedings and to sanction counsel or a litigant for bad faith conduct." *Sussman v. Bank of Israel*, 56 F.3d 450, 459 (2d Cir.), *cert. denied*, 516 U.S. 916 (1995)). Nevertheless, "because of the 'very potency' of a court's inherent power, it should be exercised 'with restraint and discretion.'" *United States v. Int'l Bhd. of Teamsters*, 948 F.2d 1338, 1345 (2d Cir. 1991) (quoting *Chambers*, 501 U.S. at 44). Such restraint and discretion require "a particularized showing of bad faith to justify the use of the court's inherent power." *International Bhd. of Teamsters*, 948 F.2d at 1345. As such, it is within the sound discretion of the district court to impose sanctions, including the severe sanction of dismissal, against a party for conduct that abuses the judicial process. *Chambers*, 501 U.S. at 44-45. *See also Blum v. Schlegel*, 1996 WL 925921, at * 5 (W.D.N.Y. May 9, 1996) (dismissing, pursuant to court's inherent power, complaint to sanction plaintiff for violating protective order and litigation misconduct), *aff'd*, 108 F.3d 1369 (2d Cir. 1997) (unpublished opinion). In the instant

145

case, Defendants fail to establish the instances of litigation misconduct Defendants reference support the harsh sanction of dismissal.

Three of the instances of litigation misconduct Defendants reference could support some sanctions, albeit not the extreme sanction of dismissal of the action. In particular, Plaintiff, rather than disclosing four webmail accounts Plaintiff accessed while this litigation was pending, concealed their existence, including getzuck@gmail.com, landlubber39@yahoo.com, alleganypellets@gmail.com, and paulc@hush.com. Defendants' Memorandum at 63 (citing Defendants' Memorandum of Law in Support of Their Fifth Motion to Compel and for Other Relief (Doc. No. 295) at 6). Plaintiff has "repeatedly defied this Court's many orders to compel," with Plaintiff's former attorneys attesting that Plaintiff directed them not to comply with orders prior to withdrawing from the case. *Id.* at 63.

Second, in a declaration filed by one Robert Gianadda ("Gianadda Declaration") (Doc. No. 218), Gianadda explains that he is a videographer retained by both Plaintiff and Defendants to videotape the July 14-16, 19, and August 27, 2011 physical inspection of documents in Buffalo. Gianadda Declaration ¶¶ 1-2. According to Gianadda, following the videotaping, he was contacted by Plaintiff's attorney Dean Boland, Esq. ("Boland"), who inquired whether Gianadda observed anything "out of the ordinary" regarding the documents being examined. *Id.* ¶ 3. When Gianadda told Boland the documents "appeared white," meaning the documents were "whitish" rather than some other color, Boland placed Gianadda's statement in an affidavit for Gianadda's signature to create the impression that the Work for Hire Document, when first produced to Defendants on July 14, 2011, was not discolored. *Id.* ¶¶ 4-5. The

146

affidavit was filed on November 10, 2011 (Doc. No. 212).  It was only after Gianadda spoke with Defendants' attorneys that Gianadda came to realize he had been duped into making a statement in support of something that was not true.  *Id.* at 6-7.  Had Gianadda understood Boland's intentions with regard to the affidavit, *i.e.*, to establish that no discoloration was observed on the Work for Hire Document upon its initial production to Defendants' experts on July 14, 2011, Gianadda would not have signed it. *Id.* at 8-9.

Third, despite Plaintiff's averment in a declaration filed July 15, 2011 (Doc. No. 88) ("Plaintiff's July 15, 2011 Declaration"), that he had produced all computers in his possession, custody, or control, as well as an image of the Seagate Hard Drive, Stroz Freidberg advised Southwell on July 15, 2011 that the image of the Seagate Hard Drive had not been produced at the Electronic Asset inspection site in Chicago.  Declaration of Alexander H. Southwell, Esq. filed August 4, 2011 (Doc. No. 97) ("Aug. 4, 2011 Southwell Declaration"), ¶¶ 20-21.  Southwell contacted Plaintiff's then attorney Jeffrey Lake, Esq. ("Lake"), advising that contrary to Plaintiff's July 15, 2011 Declaration, the image of the Seagate Hard Drive had not been provided for inspection. *Id.* ¶ 21 and Exh. D.  Plaintiff ultimately produced the image of the Seagate Hard Drive for inspection on July 18, 2011. *Id.* ¶ 22.  Nor has Plaintiff ever produced the computer that contained the Seagate Hard Drive on which the StreetFax Document was found, thereby rendering it impossible for Stroz Friedberg to examine the contents of such computer to verify its system clock settings.  Stroz Friedberg Report at 43 & n. 19.

Although the three incidents described above could be considered as litigation misconduct, the remaining incidents are insufficiently described or supported.  In

particular, Defendants maintain Plaintiff concealed the existence of Jerry Grant ("Grant"), the computer expert Plaintiff retained who possessed copies of purported e-mails between Plaintiff and Zuckerberg, as well as Holmberg, who drafted and possessed the "Lawsuit Overview" document Plaintiff used in attempting to obtain legal representation in this action. Defendants' Memorandum at 63. Defendants, however, fail to pinpoint that part of the record supporting this claim, and have also failed to specify the "frivolous motions" Plaintiff allegedly filed "for the sole purpose of harassment." Defendants' Memorandum. at 64. Significantly, the court is not required to scour the record for evidence in support of a party's argument. *See Taylor v. Habrour Pointe Homeowners Association*, 690 F.3d 44, 48 (2d Cir. 2012) (the court is not permitted to "scour the record" to research a legal theory and serve as an advocate for one party over the other).

Although Defendants similarly fail to particularize the incident in which Plaintiff's own attorneys "attested under oath that Ceglia directed them not to comply with the Court's orders. . . . ," Defendants' Memorandum at 63, the court, taking judicial notice of the record, *see EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 205 n. 4 (2d Cir. 2012) (taking judicial notice of materials in the record and on the district court's docket), ascertains Defendants are referring to the Declarations filed October 7, 2011 of Jeffrey A. Lake, Esq. (Doc. No. 153-1) ("Lake Declaration"), and Nathan A. Shaman, Esq. (Doc. No. 153-2) ("Shaman Declaration"), in which both Lake and Shaman aver they had been instructed by Plaintiff not to comply with this court's August 18, 2011 Order (Doc. No. 17) directing, *inter alia*, Plaintiff produce all e-mail accounts and passwords. Lake Declaration ¶ 2; Shaman Declaration ¶ 3. Such conduct by Plaintiff was a basis

148

for Defendants' Third Motion to Compel (Doc. No. 154), which the court, in its November 3, 2011 Order (Doc. No. 208), has already addressed.

Insofar as Defendants assert Plaintiff asserted frivolous claims that the attorney-client privilege protected certain documents from disclosure, such as the e-mails from Plaintiff to Kole transmitting the StreetFax Document, and the "Lawsuit Overview" document created by Holmberg, Defendants' Memorandum at 63, Defendants have already engaged in motion practice relevant to such documents and e-mails and, thus, their opportunity to seek sanctions based on such misconduct has passed. *See* January 10, 2012 Decision and Order (Doc. No. 283) ("January 10, 2012 D&O") (granting Defendants' request for sanctions, ordering Plaintiff to pay $ 5,000 as civil contempt sanction, and attorney's fees Defendants incurred in attempting to obtain Plaintiff's email accounts information), and February 14, 2012 Decision and Order (Doc. No. 292) (awarding Defendants $ 75, 776.70 in attorney's fees in accordance with January 10, 2012 D&O).

With regard to Defendants' assertion that Plaintiff has "submitted multiple sworn declarations containing statements that have been shown to be false," Defendants' Memorandum at 64, some of the examples Defendants reference in support have already been addressed in earlier motions to compel, such that Defendants have already received relief with regard to such litigation misconduct, including Plaintiff's failure to identify all computers and electronic media within his possession. *See* August 18, 2011 Order (Doc. No. 117) (ordering Plaintiff to provide declaration identifying by name and location all computers and electronic media within his possession or control). As to Defendants' assertion that Plaintiff's attorney Argentieri submitted a false

declaration blaming Defendants for the spoliation of the Work for Hire Document, Defendants' Memorandum at 64, because the court addresses Defendants' litigation misconduct argument only in the alternative, it must be presumed for the sake of argument on this point that the District Judge disagreed with the undersigned's initial recommendation that Plaintiff, rather than Defendants, is responsible for the Work for Hire Document's altered appearance.

Accordingly, there is sufficient evidence of substantial spoliation to support dismissal as a sanction, but the alleged litigation misconduct is not sufficiently established to support dismissal of the action as a sanction.

### 4.        Motion for Judgment on the Pleadings

Defendants, contemporaneously with filing their Motion to Dismiss, also filed a motion seeking, in the alternative, judgment on the pleadings dismissing the action as time-barred or for laches (Doc. No. 320) ("Defendants' Motion for Judgment on the Pleadings").  Because the evidence in support of Defendants' Motion to Dismiss is so strong, the undersigned does not address the merits of Defendants' Motion for Judgment on the Pleadings including Defendants' arguments that the action was filed beyond the applicable statute of limitations, that Plaintiff's new claims fail to relate back to the date of the original Complaint, and that all the claims are barred by the doctrine of laches.  Defendants' Motion for Judgment on the Pleadings should be DISMISSED as moot.

## **CONCLUSION**

Based on the foregoing, Defendants' Motion to Dismiss (Doc. No. 318), should be GRANTED because clear and convincing evidence establishes the StreetFax Document is the authentic contract and the Work for Hire Document is a recently created fabrication; alternatively, the Defendants' Motion to Dismiss (Doc. No. 318), should be GRANTED based on Plaintiff's spoliation of evidence, but DENIED based on litigation misconduct.  Defendants' Motion for Judgment on the Pleadings (Doc. No. 320), should be DISMISSED as moot.  The Clerk of the Court should be directed to close the file.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:          March 26, 2013
                    Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     March 26, 2013
           Buffalo, New York

152