```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4               v.                      12 Cr. 876 (VSB)

 5   PAUL CEGLIA,
                                         Conference
 6                 Defendant.

 7   ------------------------------x

 8                                       New York, N.Y.
                                         January 30
 9                                       4:00 p.m.

10   Before:

11          HON. VERNON S. BRODERICK

12                                       District Judge

13

14          APPEARANCES

15

16   PREET BHARARA
          United States Attorney for the
          Southern District of New York
17   ALEXANDER J. WILSON
     JANIS ECHENBERG
18        Assistant United States Attorneys

19

20   ROBERT ROSS FOGG
     GIL D. MESSINA
          Attorneys for Defendant
21

22   GIBSON, DUNN & CRUTCHER LLP
          Attorneys for Facebook and Mark Zuckerberg
23   BY:  ORIN SNYDER
          ALEXANDER H. SOUTHWELL
24

25   PAUL CEGLIA (tel.)
```

```
 1              (Case called)

 2          THE COURT:  Will the parties please note your

 3    appearance for the record.  I want to hear from Mr. Fogg, but

 4    we haven't been able to get through to the defendant, and I'm

 5    not going to proceed without him.  Why don't the parties

 6    identify themselves, parties and also the attorneys from

 7    Facebook, if they could identify themselves for the record.

 8          MR. WILSON:  Good afternoon, your Honor.  Alexander

 9    Wilson and Janis Echenberg for the government.

10          THE COURT:  Good afternoon.

11          MR. FOGG:  Good afternoon, your Honor.  Robert Ross

12    Fogg representing Mr. Ceglia.

13          MR. MESSINA:  Good afternoon, your Honor.  Gil Messina

14    representing Mr. Ceglia.  I filed a pro hac vice motion this

15    morning.  I was advised that my certificate of good standing

16    was out of date by one day, so I will be correcting that

17    directly.

18          THE COURT:  So you know what that means, Mr. Messina,

19    they may have bounced your request.  For purposes of this

20    appearance, I will allow you to appear, with the understanding

21    that you will fix that by the next appearance.

22          MR. MESSINA:  I will do that.

23          MR. SNYDER:  Orin Snyder and Alexander Southwell,

24    representing Facebook and Mark Zuckerberg.

25          THE COURT:  Mr. Fogg.
```

1              MR. FOGG:  Your Honor, we have been trying to contact

2     my client via the phone.  He was aware that we were going to

3     make our appearance.  We lost contact coming into the building.

4     I'm not too sure why there is a delay or at least a failure to

5     answer the phone.  We did try to also send out an email, but

6     the email may take a little while for him to respond.

7              Judge, with that said, I know this Court says that it

8     will not proceed unless he is present.  I don't want to delay

9     the proceedings.  There are very sensitive issues here.  I

10    would like to proceed in his absence, and I will speak on his

11    behalf.

12             THE COURT:  Here is the problem.  As I understand the

13    law, he has every right to be here at every proceeding that

14    affects his criminal case.  As I understand it, he hasn't

15    waived his appearance.

16             MR. FOGG:  No, he hasn't.

17             THE COURT:  In connection with this.  While I

18    appreciate and I understand wanting to move things forward so

19    that we could deal with things, I just am not willing, without

20    his explicit waiver, to go forward.  As you mentioned, there

21    are a series of motions that we are going to be talking about.

22    I was going to try and deal with the subpoena first.  I'm

23    assuming that is the one issue the Facebook lawyers are here

24    for, so if they need to go, they can go.

25             It looks like we are ready to go.

1              MR. FOGG:  I'm sure he appreciates your position on

2      that, and I'm sure he would like my position to have been the

3      same.

4              THE COURT:  This happened, it is on the record, but

5      I'm not going to mention it.

6              THE DEFENDANT:  Hello.

7              THE COURT:  Is this Mr. Ceglia?

8              THE DEFENDANT:  Yes, this is him.

9              THE COURT:  This is Judge Broderick.  First of all, am

10     I pronouncing your name correctly?

11             THE DEFENDANT:  Yes, sir.  "Ceglia" is fine.

12             THE COURT:  Mr. Ceglia, we are here.  We have a court

13     reporter.  Mr. Fogg is here and Mr. Messina is here.  The

14     government attorneys are here as well as attorneys from

15     Facebook.  We are ready to proceed with today's conference.

16     OK?

17             THE DEFENDANT:  Yes, sir.

18             THE COURT:  What I would like to try and do is deal

19     with the subpoena issue first.  I don't know who is prepared to

20     speak.  As I understand it, there has been some discussion

21     between the government and Mr. Fogg concerning the scope of the

22     subpoena and that there is at least some agreement.  I want to

23     get a sense.  Is there agreement across the board or is there

24     still dispute as to that?  Then I will hear from Facebook's

25     attorneys to find out whether they are in the loop on this.

 1              MR. WILSON:  Yes, your Honor.  As to the new subpoena

 2     that was filed yesterday by Mr. Ceglia, the government has no

 3     objections to any of the requests contained in that most recent

 4     version.

 5              THE COURT:  Then, Mr. Fogg, what I guess I need to

 6     determine is the most recent one, as I understand, and perhaps

 7     I'm reading this incorrectly, is I thought to address some of

 8     the concerns.  In other words, this isn't additive.  This is

 9     something that you are putting forth as a means to move the

10     ball forward, so to speak.

11              MR. FOGG:  Yes, your Honor, that is correct.  On

12     October 24th we submitted to the Court and to the government a

13     motion along with an email and a request for subpoena.  It is

14     my understanding -- not just my understanding, it is very

15     clear -- that the government is adamant they felt that was too

16     broad.  We then narrowed it down and then presented it back.

17              They felt at that time, through motion practice, from

18     what I see, that my request under 1 and 2 were significantly

19     reduced down.  At least that is my opinion; I feel it was.  The

20     government can always state their position on it.  Only

21     recently I have been able to narrow it down, narrow it down

22     even further, be more specific such that Mr. Wilson and Ms.

23     Echenberg were fine with the third request.

24              Based on no objection by the government and my

25     request, which I believe has been significantly narrowed in

1    scope and specifically targeted, we put forth the request for

2    the issuance of a subpoena, Judge.

3              THE COURT:  All right.  At least with regard to the

4    government and the defense, there is no issue with regard to

5    the subpoenas that the defense is requesting at this time?  In

6    other words, there is nothing for me to decide vis-a-vis the

7    government and defense?

8              MR. FOGG:  That's my position.  I can't speak for the

9    government.

10             THE COURT:  Mr. Wilson?

11             MR. WILSON:  The government has no objection to the

12   issuance of those subpoenas.  I don't know that there is

13   anything to decide vis-a-vis the government and Mr. Ceglia at

14   any time.  The government has standing to contest the

15   subpoenas.  Facebook, as the recipient, has standing as well.

16   But no, the government is not opposing this new motion.

17             THE COURT:  I want to know if I need to rule on

18   something.  I was prepared to rule on things.  But I'm

19   perfectly happy that the parties have conferred and have come

20   to some sort of agreement, at least the parties.

21             Now I will hear from Facebook.  Mr. Snyder.

22             MR. SNYDER:  Your Honor, unfortunately, although Mr.

23   Fogg and Mr. Messina know our phone numbers, our email

24   addresses, and how to reach us, they, for whatever tactical

25   reason, failed to meet and confer with us about the subpoena,

1    despite the fact that Mr. Southwell met and conferred

2    extensively with defense counsel concerning the second and the

3    first, certainly the first subpoena.  The first time we saw the

4    subpoena was this morning and have not had an opportunity to

5    fully review it or confer with our clients.  On its face, it

6    appears to us to remain overbroad and outside the bounds of

7    rule 17(c).

8            What we would respectfully request is the opportunity

9    to provide to the Court in writing promptly by next Friday our

10   written objections so that the Court has on the record OUR

11   position and we have a meaningful opportunity to respond.

12           THE COURT:  I suggest between now and next Friday that

13   you take some more time, look through the subpoena, go over it

14   with your client.  I understand from what you said you haven't

15   had an opportunity to do that.  See if there are things that

16   you are willing to concede on so that the issue is narrowed

17   sufficiently or if there is, quite frankly, room that you think

18   there is to negotiate it down, speak with Mr. Fogg.  You can

19   include the government in those discussions.  Obviously, if you

20   still feel you need to put something in on Friday, absolutely

21   do that.

22           Mr. Fogg, how much time would you need to respond?

23           MR. FOGG:  Your Honor, if I may, on the first

24   instance, I do object to the attorneys for Facebook to be

25   present in the case, present at the table, to address the

1    Court, and also to submit documents to the Court.  At this

2    present time there is a subpoena request.  There is no issuance

3    of a subpoena.  They do not have standing yet to contest.  They

4    should wait to receive if they do receive.

5         THE COURT:  I understand your argument.  The problem

6    is that I think that would be inefficient.  In other words, in

7    part because having done this, what would have happened is we

8    would have been back here anyway.  You would have negotiated

9    with the government, you would have then served the subpoenas,

10   they would have had a certain amount of time to respond, and we

11   would have been here anyway.

12        I understand the objection with regard to this.  I

13   understand also, and I appreciate the process, that the two

14   parties consulted, they have reached an agreement.  But I do

15   believe that since Facebook is going to be the recipient of the

16   subpoena, although I understand what you are saying, I think

17   this is a more efficient way to proceed, since this is the way

18   it had been going when I got the case.

19        What I would ask the parties to do is to meet and

20   confer and see if you can reach an agreement.  If not, I will

21   get Facebook's submission in a week.  Mr. Fogg, how much time

22   do you need?

23        MR. FOGG:  Time to do what, Judge?

24        THE COURT:  If they are objecting to the subpoena, it

25   would be your response to their objection.  In other words, as

1  I understand it, Mr. Snyder has given an indication that at

2  least his preliminary view was that it was overly broad.

3          MR. FOGG:  How many weeks did Mr. Snyder take?

4          THE COURT:  Just a week.

5          MR. FOGG:  Then I will take a reciprocating week to

6  respond.

7          THE COURT:  OK.

8          MR. FOGG:  If we could limit the correspondence to

9  your Honor on the issue of the subpoena and no prior actions or

10  any other facts that might bias or prejudice the Court, it will

11  be greatly appreciated.  The last submission that was provided

12  to the Court delved into facts that are not before the Court

13  just yet, before a trial ever occurs.

14          THE COURT:  I recognize that emotions may be high

15  among not necessarily the parties, but I'm not going to be the

16  fact-finder.  I understand that.  We are dealing with the

17  subpoena.  Mr. Fogg, I heard what you said, but I still want

18  the parties to meet and confer on this.  I'm not characterizing

19  submissions one way or the other.  But you are all members of

20  the bar, and I'm looking to try and see if we can come up with

21  some solution to the subpoena issue.

22      I would like any letters to be addressed to the

23  subpoena issues as they stand.  I recognize that one side or

24  the other may believe that the other side is putting extraneous

25  information in the submission.  I'm not going to make a

determination as to that one way or the other. I'm just going to look for the facts that I need in order to make a determination with regard to the subpoena issue.

What I would do is I would say simultaneous submissions. Well, actually not simultaneous. Facebook would submit and then you will get a week. No reply. If I have any questions, I'll schedule a phone conference and we can deal with that and I'll rule from there. Otherwise, I'll just rule.

MR. FOGG: That will be fine, your Honor.

THE COURT: Fantastic.

MR. SNYDER: We are delighted to meet and confer and will do our best to not have to come before your Honor again. Hopefully, we can compromise.

THE COURT: I'm here to resolve disputes. I just want to make sure that the when the parties are at a point where they can't proceed anymore and there is in fact a dispute.

MR. SNYDER: Thank you, your Honor.

THE COURT: Thank you.

Mr. Ceglia, the attorneys are stepping out of the well and they are conferring with Mr. Fogg and exchanging contact information. This is what the delay is.

THE DEFENDANT: Thank you, your Honor.

MR. FOGG: Thank you, your Honor.

THE COURT: Sure. What I thought I would do is go through the motions as I have them. I have some questions with

1    regard to some of them, Mr. Fogg.  Others I'm prepared to rule

2    on today.  Then I also have some questions, logistical

3    questions, about the trial.  I think that should be it from my

4    standpoint.

5          I'll go through the motions.  Mr. Fogg, obviously,

6    just let me know if I miss one, because there were several of

7    them.

8          First, with regard to the motion to dismiss the

9    indictment on the grounds of duplicity, I don't remember, but I

10   thought there may have been a similar type motion that Mr.

11   Ceglia made.  But even if he didn't, I would deny that motion.

12   It is not duplicitous to charge both a substantive offense and

13   an aiding and abetting offense under section 2 of the United

14   States Code in the same count.  Aiding and abetting is not a

15   distinct offense from the underlying offense.  It is simply a

16   distinct way of committing the underlying charged offense.  If

17   you want a cite for that, it is United States v. Smith, 198

18   F.3d 377.

19         Nor is it duplicitous to charge multiple mailings or

20   wire transmissions in a single count of mail fraud or wire

21   fraud where there are multiple acts or part of a single

22   continuing scheme.  For that I would refer you to United States

23   v. Aracri, 968 F.2d 1512.

24         The prohibition against duplicitous indictment is

25   rooted in considerations of fairness and adequate notice to the

1    defendant.  Particularly in the context of mail and wire fraud,

2    where the mailing or transmission is essentially just a

3    jurisdictional predicate, there is no unfairness to the

4    defendant in charging multiple predicate acts within one

5    overall scheme in a single count.  That is United States v.

6    Fruchter, 104 F.Supp.2d 289.

7         That is the motion to dismiss the indictment on

8    duplicity grounds.  I will come back to the motion to dismiss,

9    because I think there will be some discussion with regard to

10   the motion to dismiss the indictment on First Amendment

11   grounds.  I want to make sure I completely understand the

12   parties' relative positions on that.

13        The motion to squash subpoenas issued to Mr. Ceglia's

14   previous attorneys and to exclude documents produced in

15   response thereto on the basis of misuse of the grand jury, it

16   is my understanding that the government issued grand jury

17   subpoenas after the indictment had been brought down by Mr.

18   Ceglia.

19        I would deny that motion on the following basis.  It

20   is presumed that a post-indictment grand jury subpoena had a

21   proper purpose.  United States v. Sasso.  That is 59 F.3d 341.

22   Mr. Ceglia, under the relevant case law, must overcome the

23   presumption with particularized proof that the subpoenas were

24   issued chiefly for an improper purpose.  United States v. Punn,

25   737 F.3d 1.

1          Mr. Ceglia has provided no proof of improper purpose,

2     or to the extent the proof is provided, I find that is

3     insufficient.  As I understand it, what has been pointed to is

4     the mere fact, temporal fact, that the subpoenas were issued

5     after Mr. Ceglia was indicted.  I also find that the case is

6     distinguishable from the In re Grand Jury Subpoena Duces Tecum

7     which is dated January 2, 1985, which is 767 F.2d 26.  I will

8     refer to that as the Simels case.

9          In that case, as I understand it, the government only

10    issued a grand jury subpoena after its trial subpoena was

11    challenged.  Here that is not the case.  I find that Mr. Ceglia

12    has failed to overcome the presumption that the subpoenas had

13    been issued for a proper purpose, so his motion is denied on

14    that basis.

15         I should note that it is not unusual that the

16    government might continue an investigation after initial

17    indictment, whether that is in connection with trying to

18    determine whether there are other defendants who might be

19    brought into the case or whether or not there are other actual

20    substantive charges that could be brought.

21         MR. MESSINA:  If your Honor please?

22         THE COURT:  Yes.

23         MR. MESSINA:  One comment, if your Honor please.  Do I

24    take it from your Honor's ruling that the decision in the In re

25    Grand Jury Subpoena Duces Tecum case that a grand jury subpoena

1    issued after the fact for the sole, dominating purpose of

2    preparing an already pending indictment for trial is an

3    insufficient showing as a matter of law or that that has not

4    been made here?

5         THE COURT:  I'm saying you didn't make a sufficient

6    showing with particularized proof that the subpoena issued in

7    this case is an abuse of the grand jury.

8         MR. MESSINA:  We did in the submission to your Honor

9    quote from Mr. Velamoor's brief, where he indicated that the

10   subpoenas were issued for the purpose of providing evidence to

11   the trial team.  It was on that basis that we made the motion.

12        THE COURT:  As I understand it, and maybe I'm wrong,

13   Mr. Velamoor is the wall attorney.  I don't know the exact

14   quote, but I don't think it is unusual that there is a grand

15   jury subpoena issued after an indictment has come down.  As I

16   understand the Simels case, it was after they issued a trial

17   subpoena.  They then followed it with a grand jury subpoena.

18   That is not the situation here, as I understand it.

19        MR. MESSINA:  It is not my intent to argue with your

20   Honor.  I just wanted to know that those were facts that you

21   had taken into account.

22        THE COURT:  Yes.

23        MR. MESSINA:  Thank you.

24        THE COURT:  The subpoena on Mr. Ceglia's behalf is

25   still an open issue.  We will get the briefing on that and I

1      will make a decision on that once the briefing is completed.

2              On the motion to suppress Mr. Ceglia's post-arrest

3      statements, Mr. Fogg, Mr. Messina, as I understand it, there

4      are either no such statements or there are no such statements

5      that the government is planning on seeking to admit.  Is there

6      something I'm missing there?  In other words, I don't believe

7      there are any statements, so I was going to deny that request

8      as moot.  I just wanted to make sure factually I have that

9      correct.  Are there any statements that the government is

10     seeking to admit?

11             MR. WILSON:  No, your Honor.

12             THE COURT:  Mr. Fogg, are there any statements that

13     you are aware of that you believe the government is in

14     possession of?

15             MR. FOGG:  If there are no statements that the

16     government wishes to submit, statements of my client, then I

17     don't believe that there will be an issue, it is moot.

18     However, if they do decide later on, I would like the

19     opportunity to raise that.

20             THE COURT:  I think under rule 16 if there are

21     statements to the defendant made to law enforcement officers,

22     they are required to be produced.  Obviously, I would hear you

23     on that with regard to their production and any motion you

24     would have to suppress those statements, and I would also hear

25     you on the issue of whether or not the statements have been

1   timely produced depending upon when they get produced.  I will

2   hear that issue if and when it comes up.

3           MR. FOGG:  If and when, yes, Judge.

4           THE COURT:  Now, on the motion for a bill of

5   particulars, Mr. Patton had I believe made a motion on a bill

6   of particulars.  There is a question that I have.  At the July

7   22nd conference, the government agreed with defense counsel, I

8   think, that the government's theory was that Mr. Ceglia

9   doctored page 1 and attached it to -- the line may have been

10  yours, Mr. Fogg, but I think the government indicated they had

11  nothing to add -- attached it to --

12          MR. FOGG:  I'm sorry, your Honor.  At that time I was

13  not on the case.

14          THE COURT:  I'm sorry.  Then it must have been Mr.

15  Patton.  You're right.

16          MR. FOGG:  Yes, your Honor.

17          THE COURT:  -- the real page 2.  On that basis Judge

18  Carter denied the request for a bill of particulars with regard

19  to this page 1/page 2 issue as moot.  I would like to hear what

20  the government's position with regard to page 2.  I think in

21  your memorandum of law, on page 25, note 7, there was an

22  indication that the government represented in the brief that

23  you have never taken a position on the authenticity of the

24  second page of the contract that was put forward in the civil

25  case.

1          MR. WILSON:  Yes, your Honor.  It may have been a

2    misunderstanding of Judge Carter's that it would have been

3    better if everyone had caught and corrected it at the time or

4    it may just be a misunderstanding now.  The government does

5    not, has not, and it is not clear at this point that we ever

6    will take a position on the question of whether page 2 was

7    authentic and page 1 is forged and attached to the original

8    page 2 or if page 2 is also a fabricated document that happens

9    to exactly match the terms of what the government represents is

10   the true contract.  That is not a moot issue, your Honor.

11   Although, we have other issues with it that I can take up or

12   wait for Mr. Fogg to address.

13         THE COURT:  I think I understand what you are saying.

14   Let me characterize it in this way.  You are not saying that

15   literally he took the electronic page 2, at least the

16   allegation, and then attached a page 1 to it.  You are saying

17   that is what happened, as opposed to maybe he retyped it, maybe

18   someone else retyped it, who knows.  The words may be the same,

19   I don't know, I have not compared it, but you're saying with

20   regard to authenticity it is in fact the same page 2 that was

21   from the, I can't remember --

22         MR. WILSON:  The StreetFax.

23         THE COURT:  -- the StreetFax contract?

24         MR. WILSON:  Not exactly, your Honor.  There is in

25   fact a physical contract that Mr. Ceglia presented in the civil

1    case that he represents as being what has been called the work-

2    for-hire contract that he says is the authentic one.  I think

3    really Mr. Ceglia -- and I wasn't part of that case, I have

4    just read the magistrate judge's report on it -- has at various

5    times tried to argue that Facebook was selecting one of two

6    theories, which was that the whole two-page document he has put

7    forward is fabricated or the second page is original and only

8    the first page is fabricated.

9         My understanding is that even in that civil action no

10   one has ever said that it is just page 1 that is fabricated and

11   just page 2 is authentic.  The government doesn't believe that

12   there is any reason why we are required or in all likelihood

13   are going to select a theory.  The relevant fact for purposes

14   of this case is that in the course of the scheme to defraud the

15   defendant presented a forged or fraudulent contract as a whole.

16   The material terms which related to the ownership of Facebook

17   are on page 1.

18        THE COURT:  All right.  I'll hear from Mr. Fogg/Mr.

19   Messina.

20        MR. FOGG:  Your Honor, if I may.  The problem that

21   comes up in the discussions with Mr. Patton, reading the

22   previous submissions, I see vacillation.  What I see is it is

23   either page 1, it is page 2, it is the whole one, it is not the

24   whole one.  There are other cases presently pending before the

25   Court of Appeals where there are certain allegations of only

F1uscegc

1    page 1, and then it turns into page 2.

2         THE COURT:  I'm sorry.  You are referring to other a

3    civil case?  Specify exactly what you are referring to.

4         MR. FOGG:  Yes, Judge.  There was an injunction case

5    in Buffalo which I was a part of.  There was also the civil

6    suit.  Both of those cases are now pending before the Court of

7    Appeals.  Within responses to those, there have been

8    indications of whether or not it's page 1 or page 2 or both.

9    There have been other allegations.  There is a lawsuit that

10   just recently came out that was suing the attorneys for Mr.

11   Ceglia where there was another presentment of a theory of what

12   is and what is not.

13        In this particular case we weren't too sure what that

14   meant in the transcript on that date in July.  We didn't know

15   what that truly meant.  Before that, there was an indication

16   that we were of the impression that page 2 was a copy of the

17   original authenticated contract that Mr. Zuckerberg says it is

18   and on page 1 were alterations.

19        If that is the case, Judge, we should probably just

20   preclude the contract altogether.  Otherwise, let's give me

21   some understanding so I can prepare for this case.  As I

22   stated, there are several different tests depending on which

23   position they take.

24        THE COURT:  As I understand the government, the

25   position they are taking is that the contract that was

1    submitted, which is a two-page contract, as I understand it,

2    they are saying as a whole was fraudulent.  You should correct

3    me if I am wrong.  In other words, there was never a contract,

4    two-page contract, that contained the contents, the entire

5    contents, of that contract that is at issue in this case.

6           What is going on in the civil case and positions taken

7    by the civil attorneys or whatever, and I don't know what

8    exactly is going on there, but I think what they are saying is

9    with regard to the second page, the words may be the same as

10   from the StreetFax contract, but the contract as a whole is

11   what they are alleging is improper even though what they are

12   saying is page 1 has material terms of the contract that they

13   say are fraudulent.

14          MR. FOGG:  Judge, if that is the case, then my request

15   on the bill of particulars A through D would actually satisfy

16   that issue.  I understand the Court's interpretation of the

17   government's position that they put forth today, which is

18   different from what they put forth on previous days in this

19   isolated case.

20          Excluding all other cases in the world, in this

21   particular isolated case we were at one point page 1 and page 2

22   is a copy of, which tells me is that the signature is the same

23   as Mr. Mark Zuckerberg.  These are the things up we are looking

24   for.  I need to prepare a test.  I need to hire experts, I need

25   to hire witnesses, and they each require a different test.

```
 1            THE COURT:  I don't know whether the government is
 2   taking the position that it is or is not the signature.  I
 3   don't even know if anybody is in the possession of the actual
 4   original contract so that the ink or whatever could be tested.
 5   I don't know.
 6            I have your papers here.  You mentioned your bill of
 7   particulars A through D.  What are those requests?
 8            MR. FOGG:  Page 7, docket 113.
 9            THE COURT:  Page 7.
10            MR. FOGG:  "A.  State with specificity whether page 2
11   of the StreetFax is an original or authentic contract as
12   alleged by the government.
13            "B.  State with specificity whether the signature of
14   Mark Elliot Zuckerberg appearing on the signature line of page
15   2 is an original or a copy of the authentic signature of mark
16   Elliot Zuckerberg?
17            "C.  State with specificity whether page 1 of the
18   StreetFax is an original or a copy of authentic contract as
19   alleged by the government.
20            "D.  State with specificity whether the initials of
21   Mark Elliot Zuckerberg appearing approximately mid page of the
22   first column of page 1 is an original or a copy of the
23   authentic initials of Mark Elliot Zuckerberg."
24            THE COURT:  With regard to the first one, "State with
25   specificity whether page 2 of the StreetFax contract is an
```

1   original or a copy of the authentic contract," I don't know

2   what "an original" means in this context.  Are you saying are

3   the words are the same?  You are asking whether he just took a

4   copy of page 2 from the StreetFax contract and attached it to a

5   page 1 that the government alleges are material terms that were

6   just made up?

7           MR. FOGG:  Judge, I would ask the government that

8   question.  The government should be explaining.  They need to

9   explain.  I can't explain what I perceive they are trying to

10  accuse my client of.  I can't do that.

11          THE COURT:  I think what they are saying is the

12  overall contract is a fraud.

13          MR. FOGG:  If page 1 is some sort of copy, I want to

14  know that.  Excuse me.  If page 2 is some sort of copy of what

15  they allege to be -- they say the StreetFax contract is an

16  authentic contract.  That's what they say.  The StreetFax

17  contract contains two pages, page 1 and page 2.

18          On the second page of the StreetFax contract, I have

19  looked at it and I believe at one time in the complaint they

20  actually said that Mr. Zuckerberg gave a statement that page 1

21  was the only thing that was changed.  If that is the case, page

22  2 remains the same.  Whether it is a scanned copy, a

23  photostatic copy, a faxed copy, it is the same as the original.

24  If that is the case, I want them to say that.  I want them to

25  state that.  I need to know how to proceed to defend my client.

1            THE COURT:  I'll hear from the government.

2            MR. FOGG:  Thank you.

3            MR. WILSON:  Your Honor, if I may.  First of all, here

4    is what the government has alleged.  We have alleged a scheme

5    to defraud in which the defendant maintained, falsely, that he

6    had a contract to be the 50 percent or sometimes 80 percent,

7    and I sometimes other percentages, owner of this.  As part of

8    that fraud, he submitted to the court and to various other

9    parties a fraudulent contract that contained terms saying he

10   was the 50 percent owner of Facebook, which was never a

11   contract entered into and was a fabrication.

12           The government is not alleging a crime of fabricating

13   or not fabricating page 2.  It is not even alleging a crime of

14   fabricating page 1.  This is not a forgery case.  This is a

15   scheme to defraud.  The defendant is not entitled to the exact

16   theory of the case the government will pursue at trial or the

17   particular arguments it will make about specific pieces of

18   evidence as part of a bill of particulars.

19           Let me say this.  He has the contract the government

20   claims is authentic.  That is the StreetFax contract that has

21   been produced.  He was the original source of the contract we

22   claim is fraudulent.  The terms of each of those two are what

23   they are.  It is clear by comparing them which terms are the

24   same and which are different.

25           As to the physical status of the fraudulent contract,

1   the government does not think it has a burden to prove anything

2   about that in particular, and it certainly doesn't think it is

3   obligated to disclose anything about its views on that or

4   concede any facts about that in advance of trial.

5          THE COURT:  I am not sure I'm in a hundred percent

6   agreement on that.  I don't know whether there has been any

7   expert disclosure or not.  Do you plan on calling an expert?

8   Again, I don't know whether there is literally an original or

9   not.

10         MR. WILSON:  To be clear, your Honor, there is a

11  purported original that has been submitted by Mr. Ceglia in the

12  civil case that is now in the government's position.  I

13  wouldn't claim that I know it is original.  It is a forged

14  document, so "original" has little meaning in that context.

15         THE COURT:  All I'm asking is expert testimony with

16  regard to the initial, with regard to the signatures, with

17  regard to ink that was used.  At this point is the government

18  planning on calling an expert?

19         MR. WILSON:  The government has not made a

20  determination on that yet.  One of the issues we would like to

21  raise to your Honor is a deadline for expert disclosures.  One

22  issue is with respect to what the defendant claims to be

23  unfairness here.  If the defendant believes that it supports

24  his innocence, that the signature is the same, he thinks that

25  it is, he can call an expert to say that.

1          The government cannot be forced to stipulate to facts

2     that he thinks are helpful so he doesn't have to prove it.  He

3     has no burden.  The government will prove what it proves and

4     not prove what it doesn't prove.  But he can't force is into a

5     stipulation as to particular pieces of evidence.

6          THE COURT:  I do think the expert question will

7     inform.  The defendant doesn't have to bring forth any proof.

8          MR. WILSON:  Of course, your Honor.

9          THE COURT:  One thing that informs him is whether or

10    not the government is going to call an expert.  He still

11    wouldn't be required to produce anybody, but he may want to

12    consider getting an expert to at least have an expert on his

13    side.  Let's talk about timing of expert disclosure.

14          I think a lot, Mr. Fogg, of the things that you are

15    referencing will be satisfied if you find out the government is

16    retaining an expert in connection with page 2.  As I understand

17    it right now, with regard to the signature, whether it is

18    original or whether it is not, as I understand it, and correct

19    me if I'm wrong, the government hasn't made a determination

20    about that or whether or not that is something they are going

21    to try and prove one way or the other.

22          MR. WILSON:  That is absolutely correct.

23          MR. FOGG:  Your Honor, that's what is fascinating.  If

24    you hadn't done a test already, how could you determine in an

25    indictment and present it to a grand jury to say it is

1    fraudulent anyway?  If there has been no study or test done on

2    it, then how could you say it's fraudulent?

3            There is an authentic contract.  It is Mr. Ceglia's

4    contract.  I know that there is a difference.  I see that.

5    Right now I believe that question could be answered with their

6    position as far as which scientist they will be seeking to

7    prove what.  But it still doesn't answer the question totally.

8    I can only infer from their position as far as which scientists

9    or experts they may use.

10           As a point of fact, they can always ask Zuckerberg's

11   attorneys, who are present in court right now, they can always

12   ask what they accuse Mr. Ceglia of doing.

13           THE COURT:  It's irrelevant, quite frankly, what the

14   civil attorneys believe and don't believe.  What is relevant is

15   going to be what evidence comes in in this case, what experts

16   are used in this case, and what they say.  As I understand it

17   right now, neither side has decided whether to call experts

18   with regard to the initials and signatures and the like.

19   Whether or not either side decides to do that is up to them.

20           But you are entitled to disclosure from the government

21   if they do intend to call experts.  I want that disclosure to

22   be sufficiently in advance of trial that we are not going to

23   delay anything.

24           MR. WILSON:  Your Honor, we had come today to propose

25   some deadlines.  One of those would be 60 days in advance of

27

F1uxeegg

1     the trial date for the expert disclosures, which would be March

2     5th.

3                THE COURT:  Have you discussed that with Mr. Fogg?

4                MR. WILSON:  We have not had a chance before.

5                THE COURT:  Mr. Fogg, I know this is the first time

6     you are hearing it.  March 5th.

7                MR. FOGG:  I would have to also take some action after

8     I hear of that.  I would be hoping for a few more days.

9                THE COURT:  February 18th.  OK?

10               MR. FOGG:  February 18th for?

11               THE COURT:  Their disclosure of experts.  I haven't

12    looked at the rule, but it should provide an understanding in

13    general terms of what the expert will testify.

14               MS. GREENBERG:  Of course, your Honor.  I think that

15    is required by the rule, and we will provide that.

16               Your Honor, to the extent there are going to be

17    experts for the defense side that are only determined after

18    seeing our disclosures, fair enough.  But I think to the extent

19    that the defense knows they intend to call experts, they are

20    obligated to notify us.  We request that those be made

21    simultaneously.

22               I will particularly note in that respect, your Honor,

23    that unlike the government, the defendant has litigated this

24    issue, in particular the issues he is raising here, in the

25    civil case and so should have some knowledge of who he intends

1   to call.

2           MR. FOGG:  Actually, Judge, the government has

3   litigated this issue in New York.  The U.S. Attorney's office

4   was litigating the issue in New York and still are on appeal.

5           As far as my client testifying --

6           THE COURT:  In a criminal case?

7           MR. FOGG:  Not in a criminal case, no.

8           THE COURT:  In a civil case?

9           MR. FOGG:  In a civil case, Judge, in the injunction

10  case which involved the criminal case.

11          THE COURT:  All right.  I'm sorry.  Go ahead.

12          MR. FOGG:  The issue is our right to whether or not we

13  would like to testify, whether or not we would like to bring

14  forth our own evidence.  We haven't done that yet.  Like the

15  Court said, if we see the experts, then we may want to

16  challenge it.

17          THE COURT:  The government's request goes to whether

18  there are experts that you know you are going to call.  In that

19  case, you should disclose them.

20          MR. FOGG:  Should we review the experts that the

21  defense discloses, and once we make the decision --

22          THE COURT:  Why don't we say March 5th.

23          MR. FOGG:  March 5th would be fine, Judge.

24          THE COURT:  Then we will come back.  I think that will

25  go a long way to resolving the issue with regard to these

1    particular bill of particulars requests.  In my view, that

2    would resolve it.  As the government has stated, their theory

3    is that it is a two-page contract and the contract, as part of

4    a scheme to defraud, was being utilized in that fashion.

5          With regard to the motion for the bill of particulars,

6    I am denying that at this time.  If there is a need to revisit

7    it, we can revisit that at a future date.

8          I think I may have skipped over.  Or did I?  Did I

9    already deal with the nontestifying co-conspirators?

10         MR. FOGG:  No, you have not.  I guess that is another

11   question to ask.

12         THE COURT:  As I understand it, the government has not

13   alleged that there is a conspiracy.  Does the government intend

14   to submit statements of others under the theory that they are

15   co-conspirators?

16         MR. WILSON:  Not at the present time, your Honor.  If

17   we discover that that is going to change, we will immediately

18   inform the Court and move on that issue.

19         THE COURT:  Mr. Fogg, to the extent that changes

20   similarly with regard to the post-arrest statements, I will

21   hear you at that time, if the government's position does

22   change.  Also at that time I will hear from you on how that

23   evidence might get presented.  By that I mean as an evidentiary

24   matter how I would proceed at trial with regard to any

25   co-conspirator statements.

30

```
 1              MR. FOGG:  Judge, time period of notice?  I would hate
 2    to have notice at the eleventh hour.
 3              THE COURT:  You mean notice about whether there are
 4    co-conspirators from whom they are going to offer testimony?
 5              MR. FOGG:  And statements, Judge, yes.
 6              THE COURT:  Here is the problem with the statements.
 7    Aren't the statements nontestifying?  OK.
 8              MR. WILSON:  Your Honor, maybe it makes sense to jump
 9    into the middle of setting some deadlines right now, since it
10    keeps coming up.
11              THE COURT:  Yes.
12              MR. WILSON:  The government would propose that
13    anything along those lines be closed in the form of a motion in
14    limine by the government, and then Mr. Fogg will have a chance
15    to respond.  As you know, right now, your Honor, there is no
16    conspiracy alleged, so there are no co-conspirators.  I suspect
17    this issue is going to be moot.
18              To the extent there are co-conspirators and we are
19    going to seek to introduce testimony or evidence about their
20    statements when they are not testifying, I think it is probably
21    most efficient to do it.  We had been thinking about motions in
22    limine on April 15th, but depending on when your Honor wants to
23    set a final pretrial conference.  That will give us a few
24    weeks, two and a half, three weeks, to address all these
25    issues.
```

```
 1              THE COURT:  I'm thinking that maybe we need a little

 2   bit more.  Co-conspirator statements is a little different.  I

 3   would hope by then you will have an idea.

 4              MR. WILSON:  Your Honor, I think it is vanishingly

 5   unlikely that we are going to be seeking to identify someone as

 6   a co-conspirator in this case and then introduce their

 7   statements on that basis.

 8              THE COURT:  The date you proposed?

 9              MR. WILSON:  Was April 15th, your Honor.

10              THE COURT:  I'm going to push that up.  April 1st.

11   Only real motions, no joke motions.  That is for motions in

12   limine.

13              I recognize that things may come up during the trial.

14   While I understand that this is the date I'm setting for

15   motions in limine, I anticipate that I will probably be getting

16   letter briefs during the trial with regard to specific pieces

17   of evidence as statements come in.  But I want the real motions

18   in limine set with regard to what you would expect.

19              With regard to 404(b), I want the motions with regard

20   to that.  With regard to 609, I would want to get the motions

21   that you know in advance for evidence that you know you are

22   going to put in that would typically be done on a motion in

23   limine.

24              While we are on timing, Brady, Giglio, Jencks Act,

25   what is the government's intention with regard to that?  I
```

1   apologize, you may have already gone over this with Judge

2   Carter.  I read through the transcript, but I don't remember

3   seeing a date.

4          MR. WILSON:  We haven't, your Honor.  With respect to

5   Brady, of course, the government will produce it as we learn of

6   it, in conformance with our standard obligations.

7          Respect to both Giglio and 3500 at this point, the

8   office intends, as is our normal default practice, to produce

9   it the Friday before trial.  As we get closer, if we discover

10  there is an unusually large amount of 3500 or Giglio in this

11  case, which I think we are not anticipating at this point, we

12  will confer with defense counsel and make arrangements to

13  provide it sooner if that is going to be required for them to

14  effectively review it.

15         At this point, at least, your Honor, we believe that

16  the Friday before trial, as usual, is appropriate and is what

17  we would intend to do.

18         MR. FOGG:  What is the trial date, Judge?

19         THE COURT:  May 4th.

20         MR. WILSON:  Yes, your Honor.

21         MR. FOGG:  That's what day?

22         THE COURT:  That is Monday, Monday the 4th.

23         MR. FOGG:  So over the weekend?

24         THE COURT:  Hold on.  We are not done yet.  As you

25  know, Mr. Fogg, I don't under the rule have the ability to

1    compel it earlier.  Rather than coming back, what I would

2    suggest is this.  The trial starts May 4th.  I don't know how

3    voluminous the 3500 material is going to be.

4            If the government could produce starting on Friday,

5    April 4th, the witnesses you anticipate conceivably for that

6    first week, at a minimum for the first week of trial, that

7    obviates Mr. Fogg's concern that in addition to preparing an

8    opening and doing whatever, he is going to now maybe get a

9    whole bunch of 3500 material at that time.

10           MR. WILSON:  Your Honor, I think we may want to come

11   back to you on one issue that immediately occurs to me.  I

12   don't think, given the pattern in this case, we are going to be

13   comfortable simply turning 3500 over without an enhanced

14   protective order as to the 3500.  That is not the final

15   position of the government, it is my suspicion.

16           If we can confer with Mr. Fogg, then we will write the

17   Court.  We may come back and say we actually think that is too

18   much time.  I don't want to commit to this yet, your Honor.  I

19   think we will work towards that in principle.

20           THE COURT:  Think about it.  I don't know exactly what

21   the government's concerns may or may not be.  There may be

22   certain restrictions that could be date restrictions that are

23   lifted after a certain period of time going forward.

24           That raises another issue that I wanted to raise with

25   the parties with regard to the documents that have been marked

1    in this case.  As I understand it, certain of the documents

2    have been stamped confidential.

3           MR. WILSON:  Correct, Judge.

4           THE COURT:  I don't know whether the parties have

5    discussed what their intention is when those documents are

6    being offered in court.

7           MR. WILSON:  Your Honor, I think the current

8    protective order does not cover trial.  Absent some additional

9    action by the parties, and the government obviously has a

10   standard practice for looking at these matters, we would not

11   anticipate any restrictions on them once they are being put

12   forward as trial exhibits.

13          THE COURT:  My initial view is that there would be

14   none.  I think the parties need to talk about how they are

15   going to offer these documents.  To the extent possible, I

16   would rather avoid the need to have some sort of curative

17   instruction about why they are stamped "confidential."  I don't

18   know whether it is possible to redact that or what you would

19   do.

20          MR. WILSON:  Your Honor, we will look at the various

21   options.  We will probably just use versions that are not

22   marked confidential at trial.  But we will confer with defense

23   counsel.

24          THE COURT:  Yes.  There may be documents that have

25   been marked on both sides that they do wish to be confidential.

1    To the extent there is personal identifying information, that

2    is a separate issue.  What I'm talking about are just general

3    trial exhibits.

4            This is not a civil case.  It is not a trade secrets

5    case.  This is a criminal case.  The public has a right to have

6    access to certain things.  I will hear you on a document-by-

7    document basis.  That was one of the issues I wanted to raise

8    as a general matter.

9            MR. MESSINA:  If your Honor please?

10           THE COURT:  Yes.

11           MR. MESSINA:  Your Honor, the protective order is a

12   one-way street.  The government can mark whatever it deems

13   appropriate confidential.  For the defendants, of course, there

14   is no term in that protective order with respect to that.

15           All of the Zuckerberg emails that have been produced,

16   including those that he did while he was employed by Mr. Ceglia

17   and relate exclusively to work that he did for Mr. Ceglia, that

18   are more than 10 years old and have no commercial value and no

19   legitimate basis for nondisclosure, have all been marked

20   confidential.  We have a problem with that.

21           In particular, we have before your Honor today this

22   issue about one email that relates to work that was done on

23   August 18, 2003, I believe, that we would like to have released

24   from the confidentiality designation.  I don't know if that is

25   on your Honor's agenda, but we haven't been able to reach an

1    agreement on that.

2           THE COURT:  One of the reasons I was raising the

3    confidentiality issue is because my view is if a document is

4    going to be used in connection with the trial, it is not

5    confidential.  It is coming in, it is a physical exhibit, it is

6    being offered.  Whether you have to come off the designation or

7    whether you just say that the exhibits marked are only used in

8    connection with this litigation, whatever it is, the parties

9    need to consider, both sides, what documents you are going to

10   use and how that is impacted by the confidentiality agreement

11   between the parties, and come some sort of resolution.

12          With regard to documents currently marked

13   confidential, aside from motion practice where you might want

14   to submit documents for my review, at this time why do you need

15   the government to go through and -- if there are specific

16   documents, I guess you can talk to them about that.  Why do

17   they need to at this juncture remove the confidentiality?  In

18   other words, what use do you want to put it to other than to

19   submit motions here?

20          MR. MESSINA:  As a practical matter, if the documents

21   are going to be used during the trial and they are going to be

22   publicly aired, I don't view that as an issue.  We do have one

23   document, though, where that is an issue, and indeed it is

24   contemplated by the protective order that if there is a

25   dispute, the parties would in good faith and the government

1    will recognize it has an obligation not to keep things secret

2    that aren't supposed to be kept secret.

3            We have one document.  I will be candid with the Court

4    about this.  We have one document in this case.  And I am one

5    of the attorneys on the civil action, the injunction action and

6    the civil action that is before the Second Circuit right now.

7    There is one email that I mentioned, the August a 18, 2013

8    email, that should have, in our view, unquestionably have been

9    produced in the civil case.

10           We believe that it is important to bring that document

11   to the attention of the Second Circuit because it indicates,

12   contrary to representations that were made by Zuckerberg and

13   Facebook in the district court in Buffalo, that he had a

14   contract, he made a contract, and he sent a contract to Mr.

15   Ceglia.  That is what that email indicates.

16           We believe it is important that the Second Circuit

17   know that, because none of this information was produced, nor

18   was that email, in the case below.

19           One last point.

20           THE COURT:  Go ahead.

21           MR. MESSINA:  The protective order says, as all the

22   ones I have seen do, it can only be used in connection with

23   this litigation.  If your Honor is disinclined or reluctant to

24   order the release of that email from the confidentiality

25   designation, I would at least ask for leave to be able to

1    present it to the Second Circuit under seal.

2            THE COURT:  Have the government and defense been able

3    to talk about just this particular email?

4            MR. WILSON:  Your Honor, this is the email that was

5    submitted in violation of the confidentiality order.

6            THE COURT:  I understand.

7            MR. WILSON:  And came off it.  We had a conversation

8    about it at that time.  We had a conversation about this

9    particular issue, I think it was early last week, at which time

10   we were first alerted that apparently this email had been

11   shared with the civil lawyers handling Mr. Ceglia's case, which

12   was another violation of the confidentiality order.  At that

13   time we asked Mr. Fogg to put in writing if he was requesting

14   it under the confidentiality order or whatever he wanted to do.

15           We got that late on Friday.  Maybe it was midday on

16   Friday.  I think we then replied, saying we would look at the

17   issue this week and ask for any authority he had.  We never got

18   any authority on why this would be appropriate.  We still have

19   it under consideration.

20           I think at this point we would be happy to try and

21   have a final conversation.  I frankly don't anticipate we are

22   going to reach a resolution, and they can submit the issue to

23   your Honor.

24           THE COURT:  I want to know by a week from today.

25           MR. WILSON:  We won't even need that much, your Honor.

1    A week would be great.

2           If I can make one point that I do want to raise on

3    this issue?

4           THE COURT:  Go ahead.  Then I have a question.

5           MR. WILSON:  Your Honor, first of all, it is not

6    really about releasing the confidentiality designation.  The

7    confidentiality designation applies only for purposes of the

8    protective order.  No one does anything with this until they

9    have either agreed with the government or come to the Court to

10   have a resolution.  There is no question that they are

11   entitled, whether or not we agree once we have had a good faith

12   conversation, to submit to the Court requesting it.

13          THE COURT:  Sure.

14          MR. WILSON:  The issue here, your Honor, seems to be

15   that the very purpose of the protective order, as in so many of

16   these, is to avoid people using the discovery process in the

17   criminal case for other issues, for example, to circumvent

18   civil discovery.

19          I don't think the protective order precludes the

20   defendant in this case, who is plainly a party to both, from

21   submitting whatever the appropriate avenue would be saying that

22   there is a document that in these general terms is X, Y, and Z

23   that he has become aware of that should have been produced and

24   seeking whatever relief he wants.  The government doesn't have

25   an objection to that.

1        But this is criminal discovery that is not broadly

2  available to Mr. Ceglia to file in his civil litigation.

3        THE COURT:  Here is the issue with regard to this

4  specific document, not with regard to everything.  I recognize

5  that going through everything would be extremely time-

6  consuming.  With regard to this specific document, I understand

7  the issue of only used in the criminal case versus used

8  otherwise.  But there are other reasons for to have

9  confidentiality, other reasons why these things have been

10  stamped confidential.  Correct me if I'm wrong about that.

11       MR. WILSON:  No, your Honor.  I can give it to you in

12  two seconds.  The broader issue here, your Honor, is the victim

13  in this case is private email.  He is a public figure.  There

14  is substantial press and public interest in his life.  Based on

15  past experience, there is a concern, I'm sure by him but more

16  importantly by the government on behalf of the interests of the

17  victim here, that his public business not be broadcast to the

18  world by Mr. Ceglia, who has attempted to defraud him and has a

19  significant interest in compounding this by finding anything

20  unflattering in those emails and publicizing it to the world.

21  That is the core concern with his emails generally.

22       THE COURT:  With regard to this specific email, what I

23  would like you to do is take a look at the contents of the

24  email.  Think about the protective order and why it was entered

25  into, what the terms of the protective order are, and figure

1   out the government's view, twofold, whether you view it as

2   confidential in content under the protective order or whether

3   you view it as confidential and the argument is that it should

4   just be used in connection with this litigation.

5         That is what I would like you to consider.  In

6   whatever submission you make, I would like to get your views on

7   both of those issues.  OK?

8         MR. WILSON:  Yes, your Honor.

9         MR. FOGG:  That is one week, Judge?

10        THE COURT:  Yes.  Let me ask this.  Was this document

11  shared with the civil lawyers?

12        MR. FOGG:  No, it was not, Judge.

13        THE COURT:  Other than, obviously, both of you are

14  involved.  I understand that.

15        MR. FOGG:  That's correct.  We both are involved and

16  we both represent Mr. Ceglia.  I'm not on that case, the civil

17  case, at all.  I was on the injunction case and I was part of

18  the whole proceedings that was going on in Buffalo in tandem.

19  As a matter of fact, I live in Buffalo.

20        THE COURT:  The only thing I'm concerned with is

21  whether ît was shared.

22        MR. FOGG:  Between Gil and myself, and Mr. May, who is

23  also part of Gil's office.

24        MR. WILSON:  Your Honor, to be clear, the problem here

25  is that Mr. Messina, despite having filed here pro hac vice,

42

1    certainly before today and even today, wasn't counsel of record

2    in the criminal case.  He is the counsel of record in the civil

3    case.

4         Putting your civil lawyer onto your criminal team so

5    that he gets access doesn't really solve the government's

6    problem.  Maybe that is something we need to revisit with the

7    protective order.  But I think it is plainly contrary to the

8    order in technical terms, because Mr. Messina was not counsel

9    of record, and certainly in the spirit of the thing.

10        THE COURT:  I will hear from Ms. Echenberg and then

11   from you.

12        MS. ECHENBERG:  I want to give a little bit of a

13   historical perspective also.  When the defendant agreed to this

14   protective order, he was represented by David Patton of the

15   Federal Defenders.  There was no civil attorney at all on the

16   case.

17        When Mr. Fogg came on the case and we were talking

18   about whether an adjournment was necessary, I made a point to

19   the Court that it was my understanding that he had some

20   involvement in the civil case.  He corrected me and said no, he

21   did not have involvement in the civil case, only in the

22   injunction, that he had no knowledge of what was happening in

23   the civil case.

24        We had proceeded under the understanding that there

25   was a true separation between the civil case and the criminal

1   case.  Mr. Messina has sat at counsel table at prior

2   appearances.  I have asked him on multiple occasions if he was

3   entering an appearance in this case.  He said that he intended

4   to but he hadn't until today.

5          To give your Honor some context, we do have some

6   concerns that there is some overlap that was not intended when

7   the parties had agreed to this protective order.

8          THE COURT:  Mr. Messina, as I understand it, are you

9   going to be counsel and trying this case with Mr. Fogg?

10         MR. MESSINA:  I will, your Honor.  The protective

11  order is not as limited as my colleagues have indicated.  It is

12  not only for counsel of record but also those who are assisting

13  Mr. Fogg, as I have been right long, who have a retainer

14  agreement with Mr. Ceglia, which I did and do.

15         MR. FOGG:  Your Honor, Ms. Echenberg's statements are

16  correct.  The first day was in September.  I appeared with Mr.

17  Messina and Mr. Ceglia.  We appeared and announced ourselves on

18  the record.  At every appearance thereafter, which has only

19  been a few, Mr. Messina has been by my side.

20         The court, Judge Carter, asked specifically whether or

21  not he would be on the case, and he did say he was.  That was

22  prior to that.  Procedurally, he has just now gotten the notice

23  of appearance, only because I had to pester him and remind him,

24  and also Ms. Echenberg has also brought that up through some

25  other communications.

```
 1              THE COURT:  To be clear, you are in the case.  Again,
 2    I haven't looked at the protective order to even think about
 3    this issue, but the parties should think about that in
 4    connection with going forward.  Again, it is in this
 5    litigation.
 6              I'm not sure if there is a way to avoid, if you see
 7    something, saying I want to use this.  I don't that necessarily
 8    there is a way to avoid that.  I will leave it at that.  I may
 9    have a question in the future, but right now I'll just leave it
10    at that.  You need to get your appropriate pro hac papers in
11    immediately.
12              MR. MESSINA:  I will have the papers for your Honor on
13    Monday.
14              THE COURT:  Let's try and get through.  I'm on a bench
15    trial and trying to get back to that.  We have done
16    co-conspirators, we have done bill of particulars.  Are there
17    any informants?
18              MR. WILSON:  No, your Honor.
19              THE COURT:  That is denied.  There is no indication
20    that there are any informants in the case.  In any case, rule
21    16 does not require that the government furnish the name of any
22    witnesses, least of all confidential informants, absent a
23    specific showing of materiality.
24              With regard to supplemental discovery, my
25    understanding is that the government has indicated it will
```

1  provide the discovery, supplemental discovery, as it gets it,

2  as it realizes it is going to use it at trial.  Is that right?

3          MR. WILSON:  Correct.

4          THE COURT:  Let me ask this, Ms. Echenberg and Mr.

5  Wilson.  Do you have discovery currently in your possession

6  that you have not turned over that you intend to utilize?

7          MS. ECHENBERG:  No, your Honor.

8          THE COURT:  All right.  I will deny that at this time.

9  The government has indicated on the record here that they don't

10  currently have any discovery in their possession that they

11  intend to turn over and utilize at trial.

12          We have dealt with the motions for Brady, Giglio, and

13  Jencks.

14          With regard to the rough notes and the like, my

15  understanding is that the government has represented that the

16  agents and personnel have been instructed to retain and

17  preserve documents.

18          MR. WILSON:  Correct, your Honor.

19          THE COURT:  Mr. Fogg/Mr. Messina, is there anything

20  else you need in that regard?  They can and should maintain

21  evidence.  There is litigation pending.  Is there anything else

22  you think I need to do with regard to that?

23          MR. FOGG:  Would that be turned over at the same time

24  as Giglio and Jencks?

25          THE COURT:  I assume if there are going to be agents

1    who will testify and it is Jencks Act material, they will turn

2    it over.

3         MR. WILSON:  Your Honor, to the extent the notes are

4    Giglio or Jencks, they will be turned over with Giglio or

5    Jencks.  To the extent they are not otherwise discoverable, I

6    take the defendants to be asking for them and the government's

7    position is he doesn't get them.  The mere fact that they are

8    notes doesn't confer some other requirement to turn them over.

9         THE COURT:  Mr. Fogg, what I hear the government

10   saying is if there are people who they are not calling as

11   witnesses who may have been involved in the investigation in

12   some way who have some notes, if it doesn't have Giglio in it,

13   they are not going to be turning it over.  If you have at some

14   future date specific applications you want to make because they

15   are individuals, I will hear you on that.  But as a general

16   matter, I don't believe that they are required to turn that

17   over.

18        Grand jury transcripts.  Let me ask this, Mr. Fogg.

19   Besides the desire to get the grand jury minutes, what is the

20   basis?  I didn't really see it in your papers.  As I read the

21   law, you have to establish a particularized need for the grand

22   jury materials.

23        MR. FOGG:  Yes, Judge.  As I first stated previously,

24   if the grand jury is based on simply a mere allegation that,

25   hey, the contract is a fraud, without any proof of some

1     fraudulent action or characteristics, I would say that there

2     would be a problem with sufficiency.  If the grand jury

3     testimony is based on improper testimony or the absence of a

4     key witness to actually give the proffered information, I would

5     say there is a problem with legal sufficiency.

6           If in fact there is something to that effect, which I

7     state that there is, then I would ask, Judge, that the Court

8     review them in camera and come to a decision as far as their

9     release.

10          THE COURT:  I don't think there is a requirement under

11    the law absent a particularized need shown by the defendant.  I

12    haven't seen anything with regard that, with regard to the

13    grand jury minutes.  The grand jury reviews the materials the

14    government puts forth in front of the grand jury.  I don't

15    think the government is obligated to put every witness before

16    the grand jury.  In fact, the law provides, at least federally,

17    that the government can utilize hearsay evidence in the grand

18    jury proceeding.

19          In this matter, I don't believe that there is any

20    particularized need for disclosure that's been developed by the

21    defense or that there has been any sort of misconduct before

22    the grand jury.  So, at this time I'm denying that request for

23    the grand jury transcripts.

24          Voir dire and experts.  I think we have a schedule for

25    expert disclosure, so I'm not going to rule on that at this

1    stage.  We can take that up once you get notice of what, if

2    any, experts each side is going to call.  I don't believe there

3    are any recordings in this case.

4            MR. WILSON:  There are a handful of prison calls which

5    the government has produced.  I don't think at this point we

6    anticipate using any of them, your Honor.  If we do, we will

7    flag it a little bit early for Mr. Fogg so he can make sure

8    that he is content with the audibility.

9            THE COURT:  They have been produced?

10           MR. WILSON:  Yes, your Honor.

11           THE COURT:  Mr. Fogg, this is what I would suggest.

12   Audibility is can you hear them.  I don't know.  I haven't

13   listened to these tapes.  I have no idea whether you can hear

14   what is being said or not.  You can wait.  As I hear the

15   government, they haven't decided whether or not they are going

16   to use them.

17           If you believe there is an issue about audibility, I

18   don't know how many tapes there are and I don't want to create

19   work for you, but if there are only a handful, you can listen

20   to them.  That way we can tee up the audibility issue and maybe

21   even the issue about whether or not they are going to be used.

22   At this stage it doesn't sound like, although they have been

23   turned over, the government intends to use them.

24           As I mentioned, there may be in limine type motions

25   that get made during trial, and there is a date for in limine

1    motions that we have set in this matter already.  With regard

2    to other motions, I'm denying that request absent leave showing

3    good cause.  Right now there have been motions that have been

4    filed by Mr. Patton, there have been motions there have been

5    filed by you, Mr. Fogg, in connection with this.

6         I'm not saying you can't file.  What I'm saying is

7    this isn't going to be a parade of motions.  I want to hear in

8    advance what the motion would be, and then I'll decide whether

9    or not to grant leave to file the motions.  Quite frankly, I

10   think that serves your purposes also.  If you file the motion

11   and create a 10-page brief, I may decide not to even consider

12   the motion, because it is too late.  OK?

13        MR. FOGG:  That will be fine, your Honor.

14        Judge, we spoke of those issues that are still

15   outstanding that the Court will reserve.  Those are the only

16   things on which I would say a motion might be made, but I doubt

17   as much.  I think we are covering everything, unless of course

18   some other issue arises that I would in good faith address the

19   Court.

20        THE COURT:  I understand things come up, maybe some

21   supplemental discovery that may cause you to want to make a

22   motion.  I understand that.  I'm just saying I want to hear

23   about it in advance.

24        In my civil practice, if there is a motion that you

25   would like to make, it will be like a pre-motion letter.  You

1    have three pages to tell me what the motion is.  The government

2    has three business days to respond.  Then I will take the issue

3    up probably in a phone conference concerning whether or not I

4    think the motion can be filed.

5            I think with regard to pretrial motions, I understand

6    that there may be evidentiary issues that you are going to

7    raise.  This is separate and apart from that.  All right?

8            MR. FOGG:  Yes, Judge.

9            THE COURT:  I think the only thing left is the motion

10   relating to Noerr-Pennington.  Am I correct on that?

11           MR. WILSON:  I think so, yes, your Honor.

12           THE COURT:  As I understand it, and I want to make

13   sure that I am correct on this, neither side has filed a

14   criminal case where the Noerr-Pennington doctrine has been

15   utilized.  Government?

16           MR. WILSON:  That's correct, your Honor.  As far as

17   the government knows, that is an open question.

18           THE COURT:  Mr. Fogg?

19           MR. MESSINA:  If I may, your Honor?

20           THE COURT:  Yes.

21           MR. MESSINA:  The answer to that question is we have

22   not specifically or directly found such a case.  However, if I

23   can make one clarifying statement.

24           THE COURT:  OK.

25           MR. MESSINA:  Noerr-Pennington has, as the Court

1    knows, been expanded well beyond the antitrust context, and

2    there are cases out of this circuit that say it can be

3    applicable in any context appropriately.  Noerr-Pennington

4    arose in the antitrust context.  The antitrust context was

5    primarily and has been primarily a criminal statute.

6             THE COURT:  I understand that antitrust law can be

7    done other criminally or civilly.  But in the cases that it has

8    been utilized in, as I understand it, in the antitrust context

9    they have all been civil cases.

10            MR. MESSINA:  Those cases that we have found have all

11   been civil cases.  The point that I want to make is the reason

12   why there may be a dearth of authority, or perhaps even

13   complete absence of authority, and the reason why this may be a

14   case of first impression is because there have been no criminal

15   prosecutions brought where there is a Noerr-Pennington

16   immunity.  If you dovetail that with the argument that was made

17   before Judge Carter previously under Pendergraft, it seems to

18   me pretty clear that that would be an empty exercise.

19            THE COURT:  My question is this.  This is just me

20   thinking off the top of my head.  I don't know whether there

21   have been cases where there is an allegation that the entire

22   litigation was fraudulent, but certainly there are cases where

23   individuals have been charged with perjury in connection with

24   civil cases.

25            I hear what you are saying.  I'm just not sure in that

1       context whether the perjury that might be involved could be

2       considered in the whole litigation.  It hasn't been raised

3       criminally, but that doesn't mean the factual situation where

4       an attorney could come up with the idea hasn't been brought

5       forth.

6               MR. MESSINA:  Right.  There is an obvious distinction

7       between the perjury case and a criminal case brought because

8       the underlying action was objectively based.  It is a pretty

9       high standard, and it is completely different in many material

10      respects from a perjury charge.

11              THE COURT:  It can be, depending.  If, for example,

12      there is a verified complaint signed by the client or an

13      affidavit as the basis of the complaint, or whatever -- I

14      understand what you are saying.

15              MR. FOGG:  Your Honor, if I may, I would like to let

16      you know that In re Richard Roe 2 and Richard Roe 1 were

17      actually criminal cases.  They came out and became criminal

18      cases.  They were cases in which the defendant was accused of

19      inciting litigation.  That case was then dropped.

20              So, it was born out of a criminal case; however, it

21      went on to be one with regard to the grand jury.  Even though

22      it never got a chance to be addressed as a criminal case, it

23      never nourished as a criminal case, the same actions came out

24      of that case.

25              THE COURT:  My question is, is there any guidance for

1   me?

2          MR. FOGG:  No, Judge, outside of the plethora of case

3   history from the Supreme Court.  It tells you, first of all,

4   that in civil litigation you have immunity.  And if you've got

5   immunity, then you have to determine sham.

6          Outside that guidance, I cannot see a case, and the

7   government has not pointed to a case, where they have

8   prosecuted someone solely on the basis of filing litigation.

9   They have not done that.  And we can't find a case where they

10  have actually made that prosecution.

11         THE COURT:  A couple of things.  This motion had

12  already been made and decided by Judge Carter.  The time for

13  reconsideration had passed.  Let me review what I understand

14  Judge Carter said at a March 7th conference.  He stated

15  follows.

16         "Both sides seem to agree that the Noerr-Pennington

17  doctrine shields litigation activity in a commercial context

18  except where litigation is a sham.  The government asserts that

19  the litigation is in fact a sham and that Ceglia is not

20  entitled to immunity as a result.

21         "Ceglia, in turn, has urged me to hold a hearing, and

22  I have determined that I am not going to hold such a hearing.

23  It does appear to me that if Noerr- Pennington immunity is

24  something I'm going to have to determine, it would be more

25  appropriately raised at the end of the trial once all of the

evidence is in.

"It is inappropriate for me to make factual determinations about the government's evidence at this early stage.  Therefore, Ceglia's motion to dismiss the indictment is denied."

That was from the March 7th conference.

On a procedural matter -- and then I'll give you an opportunity, Mr. Fogg/Mr. Messina, to be heard on this particular issue -- "Pursuant to local criminal rule 49.1, any motion for reconsideration must be filed within 14 days of the court's determination of the original motion and must "set forth concisely the matters or controlling decisions which counsel believes the court has overlooked?"

Mr. Ceglia's December 18th motion to dismiss on First Amendment grounds is, in substance, precisely the same motion as Mr. Ceglia made through his previous counsel, and Judge Carter denied that motion on March 7th.  It is therefore a motion for reconsideration, comes well after the 14-day deadline, and does not identify any facts or controlling decisions that Judge Carter ostensibly overlooked.

Mr. Ceglia's motion to dismiss can therefore be denied as untimely and not in conformity with rule 49.1, and it would be dismissed on that basis.

Mr. Fogg, this may be putting the horse behind the cart, so to speak.  I didn't see anything that Judge Carter

1    overlooked or missed that you identified in your papers.  Is

2    there anything that you believe is a controlling case or

3    something that Judge Carter overlooked?  He had your briefs.

4    Was a there some case or something you believe he did not

5    consider?

6         MR. MESSINA:  Thank you, your Honor.  The initial

7    motion that was brought before Judge Carter was based primarily

8    upon U.S. v. Pendergraft at 18-1001(b).  It was not focused on

9    the First Amendment.  Judge Carter was concerned, as your Honor

10   is concerned, about the applicability of this argument in a

11   First Amendment context and in a criminal case.

12        We have indicated and cited in document 120, which is

13   our reply memorandum of law, references to the First Amendment

14   right to petition as it interrelates with Noerr-Pennington.

15   That is the Matsushita case, Matsushita v. Loral Corp.  After

16   saying that there is the First Amendment right to petition, it

17   goes into whether or not the underlying litigation was

18   objectively baseless.

19        We think there is a correlation between those two that

20   Judge Carter did not address.  He essentially said from the

21   bench that he didn't feel that he had enough information at

22   that time to address.

23        This is not really a digression, your Honor, but it is

24   sensitive from my perspective because I have never done this

25   before.  Judge Carter has recused himself from this case.  I

56

1    understand he has done it on some conflict basis.  I don't know

2    what that conflict is.  I don't know when it started.  I don't

3    know whether it implicates any of these decisions that he has

4    made.  But if he felt it necessary to recuse himself and have

5    your Honor sit in his stead in this case --

6              THE COURT:  By the way, it is not in his stead.  I am

7    the judge on this case.

8              MR. MESSINA:  Understood.  I didn't mean to denigrate

9    your position.

10             THE COURT:  It's fine.  It has been transferred to me.

11             MR. MESSINA:  Transferred.  The question becomes

12   whether or not this defendant is therefore entitled to have

13   these motions reviewed de novo or perhaps even made again.  I

14   don't think that this is necessary.  But this is an important

15   enough motion where additional cases have been submitted to

16   your Honor and there is an indication that the courts are

17   moving in this direction to protect First Amendment right.

18             Once that First Amendment right is impaired to the

19   extent that a defendant who should not have to stand trial

20   under the Constitution is forced to stand trial and then to

21   have his rights vitiated, if you will, or the violation of his

22   rights vitiated after the trial, that is irreparable harm which

23   he should not have to undergo.

24             I would respectfully request that this motion in its

25   entirety be reviewed by your Honor de novo.  If your Honor is

1    inclined to go ahead and deny the motion, we haven't made a

2    firm decision on this, but we may move to stay in order to take

3    that up to the Second Circuit.

4         THE COURT:  First, let me deal with the issue of

5    recusal.  A judge can decide to have a case transferred for

6    whatever reason he or she wants.  There had been issues raised

7    by the defense with regard to several of Judge Carter's law

8    clerks and their one affiliation or the other.  It had nothing

9    to do with the motions.  What it had to do with was Judge

10   Carter reviewing his docket and deciding it would be better for

11   his docket if the case was transferred to another judge.  That

12   is why I have the case.

13        Although, quite frankly, the time is running late, I

14   am going to deal with the substance of the motion.  I was

15   planning on doing it from the bench.  I will write something in

16   light of your comments here today.  Again, I'm not entirely

17   clear that this is something that you could take up, but it is

18   something that you could do.

19        The one question I do have for you is once the

20   determination is made that the indictment itself has passed

21   muster, what additional steps do you perceive that a court is

22   obligated to then take on?  There are other cases where the

23   First Amendment is implicated, where someone has made certain

24   statements, for example, statements that might be viewed as

25   threats, indictments in those cases?

```
1           My question is, after the determination has been made

2    that the indictment is sufficient, and maybe you pointed this

3    out in your briefing, what is it in addition to that that you

4    feel is necessary?  Again, I will write something on this for

5    the parties.

6           MR. FOGG:  Your Honor, if I may?

7           THE COURT:  Yes.

8           MR. FOGG:  Judge, I never intended the motion to be a

9    motion for reconsideration.  I do know the time restrictions.

10   That was not the point.  The point was simply that the judge

11   had made a decision, as he did for other decisions, to deny but

12   with the thought of we may revisit.  Here it is denied, but you

13   can bring that up after trial.  If immunity is truly immunity,

14   then why are we here for trial?  That was the basis of that,

15   and there were two instances of why I did that.

16          THE COURT:  But as I read Noerr-Pennington, it is

17   immunity from liability.

18          MR. FOGG:  Liability from what, Judge?

19          THE COURT:  It is in the civil context.  It is

20   liability in connection with a civil case.  In other words, you

21   can't bring the suit --

22          MR. FOGG:  The Supreme Court has never limited the

23   immunity on that.  They have never limited it.  In this

24   district itself, that was the other issue.  The other issue was

25   the Matsushita case.  That case, Judge, is actually controlling
```

```
 1   right here.  We have had other cases, PRE cases.  I have cited
 2   all the cases, Judge.
 3           Based on that notion, Judge, especially that one case,
 4   and the fact that Judge Carter, not your Honor but Judge
 5   Carter, had made the statement that there are triable issues of
 6   fact, a grand jury will decide whether there is probable
 7   cause --
 8           THE COURT:  There is no summary judgment in criminal
 9   cases.
10           MR. FOGG:  There isn't, Judge.  What I'm saying is the
11   probable cause basis is probable cause whether it is civil or
12   criminal.  The probable cause in a criminal case is whether or
13   not there is probable cause to believe that a crime was
14   committed and that the defendant committed it.  That is its
15   basic terms.
16           The probable cause that would have to be determined
17   under sham is whether no reasonable litigant would have an
18   objective basis to actually bring this case.  That is
19   different.  It is not whether or not there is probable cause
20   that there is a sham, because that is not what it is.  It is
21   probable because whether it is objectively baseless.
22           THE COURT:  Here the criminal statute is mail fraud/
23   wire fraud.  The government has alleged that there was a scheme
24   to defraud.  It is not the same.  I understand what you are
25   saying, but it is not the same thing.  Conceptually, I
```

1    understand what you are saying.  As I said, we are going to

2    write on that.  You will have a decision.

3              MR. FOGG:  The only thing I would ask your Honor, I'm

4    sorry, based on that notion is if that is the case and we go

5    for it, that we preclude all statements regarding litigation.

6    If that is the case, Judge, because litigation, documentation,

7    and activity is immune unless you, your Honor, lift the

8    immunity by declaring it's a sham, that's what the Supreme

9    Court has said, if that's the case, then the litigation

10   activity should not even be a part of this case and be

11   precluded.

12             THE COURT:  It is a criminal matter.  At this time I'm

13   not going to do that.  I don't see a basis to do that.  I

14   haven't really thought about it.  It sounds like an in limine

15   motion.  If you want to make it as an in limine motion, that's

16   fine.

17             It sounds like you are saying you shouldn't be able to

18   introduce evidence that there was a prior litigation that this

19   was based on.  I haven't thought about that, but that sounds

20   evidentiary to me.  That sounds like it is a motion in limine.

21   I have set the timing issue, and I was planning on addressing

22   Noerr-Pennington, the substantive issue, and I will do that in

23   a decision.

24             THE DEFENDANT:  Could I have a question, your Honor?

25             THE COURT:  I hesitate to say this.  I would say you

61

```
 1    can, but I don't think you should.

 2                THE DEFENDANT:  I appreciate it.

 3                THE COURT:  How about this.  Your lawyers are here.

 4                THE DEFENDANT:  I'm OK, your Honor.  I appreciate the

 5    advance warning.  I recognize that the government will be

 6    hearing my every word.

 7                THE COURT:  You don't have to say anything.  Anything

 8    you say here without consulting your lawyer -- I think you

 9    should speak to your lawyer.  OK?  What I'm saying to you --

10    and Mr. Fogg, you can speak with your client -- I think it is

11    better if you don't say anything, because you can't unring a

12    bell.  OK?

13                THE DEFENDANT:  Thank you, your Honor.

14                MR. WILSON:  Your Honor, could I briefly address,

15    since you are going to address the merits of this?  I

16    understand you have a time constraint, so I will do it

17    extremely quickly.

18                THE COURT:  Yes.

19                MR. WILSON:  A couple of quick points.  First, I think

20    there is a real question here as to whether Noerr-Pennington

21    ever applies in the criminal context or at least to these

22    statutes.  I think the statement that there has been no case

23    like that is just wrong.

24                It is not in our current briefing, because it was in

25    the last round of briefing.  We cited a number of cases of
```

1   similar prosecutions, in particular Eisen, which is a Second

2   Circuit case that affirmed that.  It is all in the briefing if

3   your Honor thinks that is germane.  I just wanted to make that

4   clear.

5           THE COURT:  We will consider all the briefing on that.

6           MR. WILSON:  The other quick issues.  First of all, to

7   be very clear, there is no absolutely no basis for the notion

8   that this is a preliminary issue that comes before trial

9   except, if it can be addressed, it's only in the civil context,

10   but on a motion to dismiss or summary judgment, like any other

11   issue.

12           To give you the case, and it is on page 13 of our

13   brief in footnote 5, it is California Motor Transport Company

14   v. Trucking Limited.  There the Supreme Court overturned a

15   dismissal, I think it was actually a grant of summary judgment,

16   on the Noerr-Pennington issue and remanded it for trial.  At

17   the end of trial, you can come out either way.  If Noerr-

18   Pennington applies, a jury might have to be instructed on it.

19   But it is an issue for the fact-finder like everything else.

20           One other issue, your Honor.  This goes to the

21   reconsideration standard but also to the merits.  The cases

22   that they have cited here I think are not on point, and your

23   Honor I'm sure has reviewed them or will review them.

24           More to the point they are district court cases, they

25   are not controlling.  The controlling case in this area in the

1    Second Circuit is In re DDAVP Direct Purchaser Antitrust

2    Litigation, 585 F.3d 677.  It is cited in our brief.  That is a

3    Second Circuit case which was an antitrust action, civil of

4    course, brought by essentially customers of a prescription drug

5    patent holder.

6         The patent had been procured by fraud.  They sued for,

7    among other things, the patent holder filing infringement

8    litigation against generic drug makers on the basis of this

9    fraudulently acquired patent.  The Second Circuit expressly

10   found that that that type of litigation constituted sham

11   litigation because of the underlying fraud.

12        That is controlling, it is on point, it is

13   inescapable.  Your Honor, in the government's view there is no

14   reason certainly at this stage to reach the question of whether

15   Noerr-Pennington could apply to the mail fraud statute, because

16   it is indisputable that the issues here fall squarely within

17   what has already been found to be sham litigation if Noerr-

18   Pennington did apply by the Second Circuit.

19        THE DEFENDANT:  I dispute that.

20        THE COURT:  Mr. Ceglia, I take it as a given that you

21   are disputing everything that the government says.  You should

22   let your lawyers speak on your behalf.  That is a wise thing to

23   do.  You should speak with your lawyers about any arguments

24   that you wish them to make after we get off the phone.  OK?

25        THE DEFENDANT:  Your Honor, no, I can't allow this

64

```
 1   transcript to go on without --

 2              THE COURT:  Wait, wait.

 3              THE DEFENDANT:  The government's position, quite

 4   frankly --

 5              THE COURT:  Mr. Ceglia --

 6              MR. FOGG:  Your Honor, may I address him on the phone?

 7              THE COURT:  Yes.

 8              THE DEFENDANT:  They are free in every civil

 9   litigation in the United States to simply choose the wealthy

10   people who they have connections with, who are sitting in the

11   back of that courtroom, and that that is a perfectly justified

12   application of the mail and wire fraud section, to interfere

13   with a civil litigation prior to any Court's ruling and to say

14   that they are free to simply take the evidence of one side and

15   indict the other party.  I find that to be absolutely anathema

16   to the Constitution.  Thank you, your Honor.

17              THE COURT:  Mr. Ceglia, you should speak with your

18   attorney.  If this is going to happen, in other words, you want

19   to say something, I would prefer that you be physically present

20   here.  It is very difficult for your attorney to speak with

21   you.  And you should not say anything.  You attorney is here

22   representing you.  All right?  They will talk with you about

23   this.

24              I understand you might have a desire to say something.

25   But if you were here, you would be able to write them a note
```

65

1    and they could say whatever you ask them to say or not based

2    upon their review and whether they felt it was appropriate.

3    Having you on the phone, in my view, is creating a problem for

4    me and for this trial and actually for your lawyers in

5    representing you.

6          So I ask you to consider what I'm saying going

7    forward.  If you feel that you aren't going to be able to not

8    say things, then I think perhaps you should talk to with your

9    lawyers about whether you should just be physically here so

10   that you are able to communicate with them.

11         Mr. Fogg, let me posit another thing.  I don't know

12   whether, as pro hac, you are entitled to get a card that would

13   allow you to bring your phone or an electronic device into the

14   court.  I recognize there may be travel things and maybe

15   additional costs associated with that.  But I really don't want

16   to have this situation happen at future conferences.  I don't

17   want to create issues where there should be none.

18         I ask you to think about it, talk to Mr. Messina,

19   speak with your client, and figure out a way.  I may actually

20   end up directing that Mr. Ceglia have to be here physically for

21   the conferences going forward.  OK?

22         MR. FOGG:  Yes, your Honor.

23         THE COURT:  I want to clarify one thing -- I am trying

24   to finish a civil case, and the lawyers and witnesses have been

25   waiting patiently for me -- that was raised, and there is a

1    record of that, and Judge Carter spoke about that, with regard

2    to his decision to transfer the case.

3         MS. ECHENBERG:  Your Honor may have already reviewed

4    the transcript, but I believe what Judge Carter said on the

5    record was that he did not believe there was any conflict.

6    That was also the government's view.  But he said in an

7    abundance of caution he was going to put another clerk who was

8    working on the matter at issue on the case.  It was then I

9    believe approximately a month later when the case was

10   transferred.  So we have no information that that was the

11   reason for the transfer.

12        THE COURT:  It is a timing issue.  As I understand it,

13   the trial was scheduled to go forward in March or something.

14   Judge Carter said, you are right, that he didn't believe there

15   was a conflict, but in light of the objection by the defense,

16   he was going to make a switch.  My understanding is the clerk

17   when had worked on the case was leaving, so the other clerks

18   were available.  There may have been some issues with regard to

19   them.

20        MR. FOGG:  Your Honor, if I may.  It was on the last

21   court date that the judge replaced the clerk and announced who

22   the clerk was on the case, and we were satisfied with that.

23        THE COURT:  Yes.  The problem is that clerk wasn't

24   going to be here through the trial.  So, the Judge, in managing

25   his docket, felt it wasn't efficient for him -- I don't want to

1    put words in his mouth.  All I will say is the clerk he was

2    going to put on it wasn't going to be able to be there for the

3    trial.

4         What I will say from my perspective as a judge, if I

5    have a clerk who has been working on a case, I would want them

6    to be there for the trial, not only, quite frankly, for my

7    benefit, because they have institutional knowledge, but also

8    quite frankly for their benefit.  So, I don't believe there was

9    any actual conflict.  The record will stand as it is.

10        Now, is there anything else that we need to deal with

11   today?

12        MR. WILSON:  Your Honor, just one scheduling issue.

13   We set the date for motions in limine to be filed but we didn't

14   talk about opposition or replies.  It probably makes sense to

15   do that quickly, if your Honor doesn't mind.

16        THE COURT:  The date we set for --

17        MR. WILSON:  April 1, 2015.

18        THE COURT:  Two weeks for a response, reply one week.

19   So it is April 1st, then the 15th for opposition, and then the

20   22nd for replies.  OK?

21        MR. WILSON:  Yes, your Honor.

22        THE COURT:  I don't want to discuss this right now,

23   but the parties need to consider, in light of the issue related

24   to Mr. Ceglia's prior counsel and representation, I don't know

25   who the witnesses are going to be.  As I read the issue of

1    crime-fraud exception, it applies to documents which are being

2    dealt with.  I'm not going to discuss the substance of it at

3    all.  This is for the government, and for the defense in a way.

4           Does either party anticipate, and I don't want an

5    answer now, calling any of the attorneys who had worked on

6    these cases and asking them about things that aren't contained

7    in documents, statements and the like, that could be considered

8    privileged?

9           If that is the case, and I'm not sure whether either

10   party has given this consideration, I think the same sort of

11   process needs to be set up with regard to statements.  In other

12   words, in my view, as a legal matter there is no necessary

13   distinction between how we should handle that and how we handle

14   the crime fraud statements with regard to documents.  Think

15   about that.

16          I don't know whether there was any plan to call any of

17   the lawyers other than to authenticate things.  To the extent

18   the parties hadn't thought about this issue, what I am saying

19   is you need to treat those issues in the same way.  I'm sure

20   that the lawyers, the civil lawyers, themselves are cognizant

21   of their obligations as prior attorneys for Mr. Ceglia.  I just

22   wanted to alert the parties that it occurred to me as I was

23   thinking about this issue that there may be statements that are

24   out there also.  I would like you to think about that issue.

25          There are a couple of things that will be coming in,

1    and I am going to schedule a conference before I get the in

2    limine motions.  We might be able to do it on the phone.  I

3    think I may need to deal with some issues anyway that may crop

4    up, including the subpoena issue and the potential one document

5    that the government is going to consider whether to remove the

6    confidentiality restrictions on.

7         Time.  Has time been excluded?

8         MS. ECHENBERG:  I believe multiple times it has been

9    excluded until trial.  It was Judge Carter's practice to put it

10   on the record.

11        THE COURT:  In light of the fact that I think, Mr.

12   Fogg, and you can correct me if I'm wrong, you are still

13   getting your sea legs, so to speak, and getting a sense of all

14   the documents and the like, and there are still outstanding

15   issues relating to motions, and to allow you to review the

16   discovery, although I don't believe it is necessary because I

17   believe that time has been excluded until May 4th, I would

18   exclude the time in the interests of justice.  I find that the

19   exclusion is necessary and outweighs the interests of the

20   defendant and the public in a speedy trial.

21        Is there anything else we need to deal with?

22        MS. ECHENBERG:  Nothing from the government.

23        MR. FOGG:  Nothing further, Judge.

24        THE COURT:  Thank you.

25        (Adjourned)