F2HJCEGC                         Teleconference

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                 v.                          12 Cr. 876 VSB

5    PAUL CEGLIA, a/k/a
     Sealed Defendant 1,
6
                      Defendant.
7
     ------------------------------x
8

9

10                                           February 17, 2015
                                             11:37 a.m.
11

12

13   Before:

14                      HON. VERNON S. BRODERICK,

15                                           District Judge

16
                             APPEARANCES
17
     PREET BHARARA,
18        United States Attorney for the
          Southern District of New York
19   ALEXANDER JOSHUA WILSON,
     JANIS ECHENBERG,
20        Assistant United States Attorneys

21   ROBERT ROSS FOGG,
          Attorney for defendant Ceglia
22
     GIBSON & DUNN,
23        Attorneys for Facebook, et al.
     BY:  ALEXANDER H. SOUTHWELL, Esq.
24        ORIN SNYDER, Esq.
                    Of counsel
25

F2HJCEGC                          Teleconference

1              (Teleconference in Chambers)

2              THE COURT:  Hi.  This is Judge Broderick.  I have a

3   Court Reporter here.  This is Judge Broderick.  Can you hear

4   me?

5              THE CLERK:  Hold on!

6              THE COURT:  Hi.  This is Judge Broderick.  Can you

7   hear me?

8              MR. WILSON:  Yes, Alexander Wilson and Janis

9   Echenberg.

10             MR. FOGG:  Your Honor, Mr. Ceglia waived his

11  appearance for this, Judge.

12             MR. SNYDER:  Your Honor, Orin Snyder with Alex

13  Southwell for Facebook and Mark Zuckerberg.

14             Good morning.

15             THE COURT:  Good morning.  First, I am here with a

16  Court Reporter.  My Law Clerk Doug Lieb is here also.

17             Let me review for the parties the materials that I

18  have in connection with today's hearing.

19             A VOICE:  If I may, you seem to be at a distance.  I

20  am having trouble hearing on the phone.

21             THE COURT:   It is not the distance.  It is the

22  government quality of phone.  I am fairly close to the phone.

23  I will try to speak up.

24             A VOICE:  You need to increase your budget.

25             THE COURT:  Good luck!

F2HJCEGC                    Teleconference

1          A VOICE:  Yes.

2          THE COURT:  I have the February 6th, 2015 letter from

3    Gibson Dunn with the various attachments.  I have Mr. Fogg's

4    February 13th letter again with some attachments.  I also have

5    Gibson Dunn's letter of February 16th.  Is there anything that

6    I am missing?

7          A VOICE:  Not for myself, Judge, other than the fact

8    your Honor has stated you did not want to have any surreplies

9    or replies.  Therefore, I believe the 16th letter should be

10   disregarded.

11         THE COURT:  I mean --

12         MR. SNYDER:  Nevertheless, we are here.

13         THE COURT:  Okay.  So first, let me just review for

14   you some things, some things that I believe are not in dispute.

15         That is the first issue raised; in other words, that

16   subpoenas would be issued to Facebook and to Mr. Zuckerberg.

17   As I understand it, there is no dispute related to that still

18   remaining.  Is that accurate, Mr. Southwell?  And Mr. Snyder?

19         MR. SNYDER:  Yes, your Honor.

20         THE COURT:  Okay.  So let me hear from Facebook's

21   counsel and then I'll hear from Mr. Fogg.

22         MR. SNYDER:  This is Mr. Snyder.  We appreciate the

23   court giving us the opportunity to be heard this morning.  We

24   left the conference before your Honor with the court's clear

25   directive we meet and confer about the subpoenas, and we did so

F2HJCEGC                         Teleconference

1   extensively in good faith.

2            We agreed to voluntarily produce the categories of

3   documents that we understood the defendant to be seeking, and

4   it turns out that the defendant, in fact, seems to be seeking a

5   broader category of materials than previously indicated in both

6   his subpoenas and representations to us and your Honor which I

7   will address in a moment.

8            The defendant rejected our offer in the

9   meet-and-confers, and we find ourselves before the court.  The

10  primary difference between the parties right now concerns

11  Ceglia's third request which we believe is patently overbroad

12  under the controlling authority and Rule 17 (c).  With respect

13  to the first two requests, we respectfully accept the

14  defendant's request for any and all agreements between the

15  parties.  There is no substantive disagreement there.

16           We were prepared to accept the defendant's broad

17  definition of "agreements," but we have also explained, though,

18  that those two requests are effectively moot because Facebook

19  and Mr. Zuckerberg don't have any agreements, as the defendant

20  broadly defines them, other than the one they have already

21  provided to the defendant, that is, the authentic Street Fax

22  contract.  We don't have anything to produce responsive to

23  those requests.

24           The heart of the dispute relates to the third request.

25  As the court will see, it appears the defendant is using the

F2HJCEGC                    Teleconference

1   criminal discovery process to obtain evidence for ongoing civil

2   cases, and we believe that is a misuse of the criminal

3   discovery process.  It is worse than a fishing expedition

4   because it is not just seeking broad categories of information

5   for use in a criminal case, but to use in at least two ongoing

6   civil matters.

7         What is telling is that the defendant cites to no case

8   law in support of a request of this nature.  They just say we

9   want, we want, we want.  We have laid out in our February 6th

10  letter that a request for all e-mails between a third party and

11  any other individual, even if those requests are limited to a

12  specific category of information or specific time-frame simply

13  fail to satisfy the specificity requirement in Rule 17 (c).

14        We cited your Honor to the Nixon case and to the Libby

15  case, and the Libby case is particularly illustrative because

16  there the defendants sought, like the defendant here, all

17  communications, but in that case it was been between any

18  employee of the New York Times and eight specific individuals.

19        There, like here, the defendant's request was about a

20  specific topic and it is for communications within a specific

21  time-frame, but the district court still denied the subpoena as

22  failing to satisfy the specificity requirement because the

23  third parties as to whom the subpoena in that case applied

24  comprised a multiplicity of individuals, many of whom it was

25  unknown would ever be witnesses in the case.

F2HJCEGC                        Teleconference

1          Given the narrow confines of Rule 17 (c), the district

2    court rejected that as nothing more than an improper fishing

3    expedition.  Here we have two aggravating factors:

4          One, the subpoena here is even more invasive and

5    expansive than the one deemed a fishing expedition in Libby

6    because the defendant is seeking all communications between Mr.

7    Zuckerberg and any third party, not just a denominated third

8    party.  That lacks specificity, and worse, it is now clear he

9    is using this Rule 17 subpoena to aid him in both an ongoing

10   Second Circuit appeal, and then even more improperly, Mr.

11   Messina, who I am not sure is counsel here any more or at all,

12   I haven't seen his notice of appeal, but assuming he is still

13   counsel to the defendant in this criminal case, is bizarrely

14   representing a defendant in an ongoing civil malicious

15   prosecution case pending across the street in the Supreme Court

16   of New York, where Facebook and Mr. Zuckerberg have sued Mr.

17   Argentieri and other lawyers and law firms for malicious

18   prosecution all arising out of the bringing of a civil lawsuit.

19         Mr. Messina is representing one of the main defendants

20   in that case, the original lawyer for Mr. Ceglia in a civil

21   case, Paul Argentieri.  What makes this bizarre, Mr. Argentieri

22   may well be a witness in this criminal case.  What is clear by

23   recent actions taken by Mr. Messina, including petitioning the

24   Second Circuit, he has an ulterior motive here in seeking

25   invasive, broad discovery, in violation of Rule 17 (c).

F2HJCEGC                    Teleconference

1          We think over-breadth and lack of specificity could be

2    addressed, and we tried to be constructive.  We proposed to

3    Mr. Ceglia this third request be limited to all e-mails between

4    Mr. Zuckerberg and any person involved in any way with Mr.

5    Zuckerberg's relationship with Mr. Ceglia.

6          We spelled out and identified six people who I think

7    undisputed were the people on Mr. Ceglia's side who were at

8    Street Fax with whom Mr. Zuckerberg dealt, and our proposed

9    request included an individual named Jeff Kaven, K A V E N, and

10   your Honor may recall it was Mr. Kaven's August 18, 2003 e-mail

11   to Mr. Zuckerberg that was foundational to Mr. Ceglia's

12   December 17th request.  We invited defense counsel to offer any

13   revisions to our proposal, add any names if our six denominated

14   names were not sufficient, but they rejected out-of-hand and

15   forced this dispute.

16         So the key thing here is we believe that the defendant

17   regards the discovery process in his criminal case and in civil

18   cases to be complementary, and he is now seeking in a criminal

19   case broad discovery of a civil nature that he wants to use in

20   his civil cases.

21         You'll recall, your Honor, Mr. Ceglia sought a

22   criminal bill of particulars in this Court to get more

23   information about the Page 1, Page 2 issue that he is fixated

24   on in the civil cases, and so we believe that both on its face

25   the subpoena is overbroad and lacks the requisite specificity

F2HJCEGC                    Teleconference

1    and should be quashed for that reason alone.

2            Additionally, given the evidence that Mr. Messina and

3    the defendant are using Rule 17 and service of ongoing civil

4    litigations, we believe that provides another basis for

5    quashing or limiting the subpoena.

6            Finally, your Honor, the second issue here concerns

7    the type of communications that the defendant is now

8    requesting, and in his December 17th motion the defendant's

9    third request was for all e-mail communications with Mr.

10   Zuckerberg and any third party concerning Ceglia between a

11   specified time date, not to all communications.

12           As your Honor will recall, January 29th, on the eve of

13   the last hearing, the defense submitted a revised third request

14   which he didn't share with us.  During the hearing your Honor

15   asked Mr. Fogg point blank whether the revised third request

16   was additive, A D D I T I V E, to the other report.  Mr. Fogg

17   told the court the request was not additive, and he proceeded

18   to represent to your Honor, on Page 5, Lines 20 to 24 of the

19   transcript, the revised January 29th third request was

20   "significantly narrowed" from the December request such that

21   the attorneys for the government withdrew their objection to

22   the issuance of the proposed subpoena.

23           In fact, that is not the case.  In fact, Mr. Fogg has

24   now told us his third request was actually seeking a far

25   broader category of communication and e-mails.  He now wants

F2HJCEGC                    Teleconference

1   all communications, and that was not narrowing.  There is no

2   real way to understand the request was a narrowing when it

3   seeks by definition a far broader category of communications

4   than the December 17th request.  We believe that all

5   communications between unlimited class of people, many of whom

6   definitionally are not identified, is just inappropriate under

7   Rule 17 (c).

8          Both based on the breadth of the subpoena and the

9   expansion of the subpoena from e-mails to communications, we

10  think that the subpoena is overbroad.  To the extent the court

11  deems it appropriate to order issuance of the third subpoena

12  request in some fashion that strikes an appropriate balance

13  between Rule 17 and the case law, we respectfully submit that

14  it should reach only e-mail communications that the defendant

15  originally sought between Mr. Zuckerberg and the persons who

16  were actually involved in his relationship with Ceglia, the six

17  individuals.  Seven individuals we denominated.

18         Thank your Honor.  Obviously, we will answer any

19  questions.

20         THE COURT:  Okay.  As I understand the revision from

21  e-mail, I think it now reads, I think, electronic

22  communications.

23         MR. SNYDER:  Yes, your Honor, that's correct.

24         THE COURT:  And so, Mr. Fogg, I guess I have several

25  things I would like you to address.

F2HJCEGC                    Teleconference

1          The first is use of any documents that are produced in

2     connection with this subpoena; in other words, this is for use

3     in the criminal case.  I assume it will be subject, the

4     documents, or should be subject to the protective order that is

5     already in place in this case.  If that is not the case -- and

6     it may not be because Facebook is not a party to that

7     agreement -- I think that the parties need to work out some

8     understanding because as I understand the other documents that

9     have been produced in this case, they have been produced in

10    connection with, you know, subject to the protective order.

11         First, Mr. Fogg, I would like you to address the use

12    of these documents.

13         Second, I would like to hear from you on this e-mail

14    versus electronic communication issue.  I would like to hear

15    some from you on the more generalized third request; in other

16    words, that doesn't specifically list individuals but merely

17    says anyone who had communications relating to the agreements

18    between Mr. Zuckerberg and Mr. Ceglia.

19         Okay, I'll hear from you now.

20         MR. FOGG:  Thank you, Judge.

21         The document use, Judge, that was your first issue you

22    wanted me to address, I am representing Mr. Ceglia on the

23    criminal case.  I have represented Mr. Ceglia initially on the

24    injunction, where in Buffalo I sought an injunction, the

25    magistrate there, the district court there to enjoin the U.S.

F2HJCEGC                              Teleconference

1   Attorneys from prosecuting.

2          Since the decision from Judge Arcara was to deny my

3   motion, subsequent to that I was hired as the criminal defense

4   attorney on this case, in which I was instructed from the

5   magistrate in Buffalo to bring my First Amendment issue before

6   your Honor, which we have.

7          As far as the civil case, I am not involved in the

8   civil case.  As far as its use, my intended use is in the

9   criminal case only.  As far as all of the other documents that

10  have been presented by the government, I believe Mr. Wilson and

11  Ms. Echenberg, we had a brief conversation with regard to use,

12  and I believe I think it would be fine with the government and

13  fine with the defense that it will be placed under the

14  protective order and follow the procedures are that are in

15  place.  If it is to be used anywhere else or shared with anyone

16  else, we'll follow the procedures with regard to the same and

17  contact the government and make any applications to the

18  government.  If there is a difference, we will make application

19  to the court.  I don't have any objection with regard to that.

20         My position is that I've seen the actual expert

21  reports.  I have read them.  I have looked over them.  I have

22  seen some reports from the government from previous.  It

23  appears to me the contract is original.  If that is the case,

24  Judge, then we go straight to the e-mail versus electronic

25  communication issue.

F2HJCEGC                    Teleconference

1          Does that satisfy the court's question on the first

2     issue?

3          THE COURT:  It does.  Particularly you have no problem

4     with these documents being subject to the same sort of rules

5     that apply to the other documents that have been produced and

6     it will be produced pursuant to the protective order.  That

7     does address my question.  Go ahead.

8          MR. FOGG:  I will go on to the second question, the

9     issue the court wanted me to address, e-mail versus electronic

10    communication.  The problem that I have, your Honor, is that in

11    that one e-mail which came from the government marked

12    "Confidential Information," Mr. Zuckerberg specifically stated

13    any IM's.  IM, meaning instant message, meaning he sent him an

14    instant message.

15          That is a different form of communication than e-mails

16    in and of themselves.  For Gibson Dunn, Mr. Zuckerberg,

17    Facebook to want to restrict it to e-mails tells me something

18    that is far more telling than anything they've argued, is that

19    there may be some other electronic communications or other

20    communications that may be telling.

21          Now, if I believe that the contract is legitimate,

22    then as in every negotiation, as I stated in my previous letter

23    to the court, in this particular case Mr. Zuckerberg and

24    Mr. Ceglia came across negotiations.  They talked, they

25    drafted, they drafted proposals.  Now, agreements, a meeting of

1    the minds, yeah, that is what we would like to have as well,

2    but the whole idea is that they're saying that never did they

3    discuss involvement of Facebook in the Street Fax issue.

4          Now, there was an agreement, there is no dispute

5    Mr. Ceglia and Zuckerberg came across an agreement with coding.

6    The coding used in this case is the same as Facebook.  They

7    came across another agreement and discussed it further.  Mr.

8    Zuckerberg discussed it along with other individuals.

9          As far as instant messages, that would have to be

10   included.  As far as any written documents, I'd lake to have

11   those as well.  As far as all communications, well, they are

12   what they are.  What we are looking for, Judge, is are these

13   communications, and this one particular e-mail, he specified

14   instant messages.

15         Why would that be a problem?  That should not be a

16   problem.  In fact, I do believe -- I am not too sure, but I

17   checked it with my clients, that attorneys for Zuckerberg and

18   Facebook have already done a search of 28 other devices and

19   they found information.

20         This is not too burdensome, not too onerous for them,

21   and they've already done searches, except they were instructing

22   their experts not to reveal that information, not to give a

23   report, and we have not received one.

24         What is really bad is that in the other cases which I

25   was not involved with, my client said he never saw this e-mail,

F2HJCEGC                      Teleconference

and because of that fact, it was withheld.  I looked at the

transcript, and in the transcript Mr. Snyder told the court --

and the court asked what is wrong with giving Mr. Ceglia these

copies that related to the agreements, any documents and

e-mailed mails related to the agreement?  Mr. Snyder said there

is nothing wrong and we'll do that.  However, they didn't do

that because this was never disclosed in that case.

          Now, it is important to capture the communications

because in the communications, just as you see here, Mr.

Zuckerberg says that I have not seen Paul this pissed off since

Mr. Zuckerberg sent Paul a revised contract with all the

penalty provisions.  So looking at the e-mail, Mr. Zuckerberg

drafted up another contract or the contract or whatever

contract, but he drafted the contract, changed provisions of a

previous contract and then sent it to Mr. Ceglia.

          Now, Mr. Zuckerberg on another occasion had said that

he received the contract from Mr. Ceglia.  What is surprising

is Mr. Orin Snyder said this is one and the same.  Well, if

that is the case, if you believe the contract is not genuine,

then every document you should have should reflect that and

that would make it inculpatory.

          As I reviewed the expert testimony, expert report, it

looks extremely authentic.  If that is the case, there is

exculpatory information here.  I would like it for this case.

As far as expanding past e-mails, to restrict it to e-mails is

F2HJCEGC                        Teleconference

1    kind of foolish because in this particular e-mail there was a

2    different kind of communication used that he specified here.

3    So all electronic communications, and this is not a difficult

4    thing to do especially in this day and age.

5              THE COURT:  That answered my question.

6              (Simultaneous voices)

7              THE COURT:  First, Mr. Fogg, were you done?

8              MR. FOGG:  With the second issue?

9              THE COURT:  Were you done or was there more you wanted

10   to say?  And then I will hear from Mr. Snyder.

11             MR. FOGG:  There was the other issue, Judge, the third

12   request and the list of individuals.

13             With regard to that issue that the court wanted me to

14   review or at least to talk about, Judge, I did touch on it a

15   little bit in the previous answer, but in this particular case,

16   Judge, Mr. Zuckerberg had discussions with his co-founders, had

17   discussions with his key employees, had discussions with the

18   first president, and the first president was Sean Parker.  He

19   even had discussions with investors and even his parents.

20             If this is the case, Judge, we can't limit it,

21   especially limit it to what Mr. Snyder has done.  All Mr.

22   Snyder has done is say hey, look, we'll talk to Mr. Ceglia's

23   employees.  If you look at another disclosure, Mr. Zuckerberg

24   had a profound disrespect for Mr. Ceglia, and that was

25   demonstrated in one of the e-mails he called him an idiot.  Why

F2HJCEGC                        Teleconference

 1   would he talk to my client's employees?  There is nothing to be
 2   had there.
 3            Now, to limit it to any individuals?  This is not --
 4   it would not be burdensome to them to seek this information.
 5   These individuals may not be called to testify, but Mr.
 6   Zuckerberg will be called to testify.  These e-mails, whether
 7   they're to a third person or not, they're statements Mr.
 8   Zuckerberg has made in these e-mails, in these instant
 9   messages, in these electronic communications, so it should not
10   be limited to any particular individual.
11            As far as this is important for us, it is important
12   because we say the contract's legitimate, authentic.  There are
13   reports that say that.  We believe Mr. Zuckerberg, who also
14   knows it to be legitimate, had made discussions, comments on
15   the terms and provisions and the coding which is exculpatory.
16            That is the basis for our request.
17            THE COURT:  Okay.
18            MR. FOGG:  Does that answer the court's questions with
19   regard to 1, 2 and 3?
20            THE COURT:  It does.  Mr. Snyder.
21            MR. SNYDER:  May I be heard?
22            Mr. Fogg's argumentation just now I think underscores
23   perfectly why his expansive and expanding request for a broad
24   category of electronic communications is just entirely improper
25   under Rule 17 (c).

Mr. Fogg's last comment where he speculates that Mr. Zuckerberg's discussions with investors and with co-founders and with employees must have somehow touched upon his client. He goes on to name Sean Parker illustratively, which is absurd. That wouldn't pass muster under Rule 26, under the liberal civil discovery standards.  It certainly doesn't come close to Rule 17 (c).

The test, of course, is not merely burden.  The test is under Rule 17 (c), Nixon and Libby and the other cases, whether it is specific, admissible and relevant, and the specificity requirement, of course, is a feather-piece of the legal standard, and specific in the context of Rule 17 (c) means far more than Mr. Fogg's random speculation that dozens or hundreds of investors and employees with whom Mr. Zuckerberg must have had communications may somehow touch on Mr. Ceglia.

Again that doesn't pass muster under 26, Rule 26 of the civil procedure.  It doesn't even come close under Rule 17 (c).  Mr. Fogg's own verbiage I think inadvertently made that point.  He used the word "may" repeatedly.  He said these communications may be telling, these communications may show, I think they may indicate, they must.

That is just rank speculation and underscores why broad discovery into Mr. Zuckerberg's IM's or other communications with potentially hundreds of people is inappropriate, and not surprisingly, although given ample

F2HJCEGC                    Teleconference

opportunity, Mr. Fogg has not cited a single case from this

circuit, this district or any other court where a criminal

defendant has been given this kind of expansive, invasive

discovery into all communications between a crime victim and

third parties based on speculation that there must be somehow

impeachment or exculpatory evidence in there.  If that were the

case, he would be able to obtain, as he seems to want,

everything Mr. Zuckerberg wrote to anyone and call it a day.

          I just to correct two things on the record.  The

coding of Facebook does not resemble in any important,

material, significant or discernable way the so-called coding

of the Street Fax site, that I might add never became

operational and was an abject failure.

          Secondly, I have one more correction of the record.

Mr. Fogg continues to misrepresent -- and I use that word

advisedly and thoughtfully -- of the discovery order in the

underlying civil case.  He continues to say that the August

18th e-mail between Mark Zuckerberg and Mr. Kazin, K A Z I N,

was not produced to Ceglia in the civil case, and he faults us

for that and he creates the false impression somehow that was

improper.

          In fact, as Mr. Fogg must know by now because we have

pointed it out in writing, if he was under a misapprehension

before that Facebook was only required by Magistrate Judge

Foschio, F O S C H I O, in the underlying civil case to produce

F2HJCEGC                    Teleconference

1    certain correspondence between Mark Zuckerberg on the one hand

2    and Street Fax and people associated with Street Fax on the

3    other from Mr. Zuckerberg's Harvard e-mail account, that is the

4    July 1, 2011 order that is operative in that case.  So I just

5    wanted to make sure that that correction was made.

6            So in sum, we have proposed what we believe is a

7    reasonable and appropriate narrowing of the third request that

8    would require Mr. Zuckerberg to produce e-mails between himself

9    on the one hand and people associated with Street Fax on the

10   other relating to Mr. Ceglia.

11           And we believe that we have agreed, obviously, to

12   comply with the subpoena on compulsory process and we believe

13   that that is an appropriate outcome here.  Thank you again,

14   your Honor, for letting us be heard.

15           THE COURT:  Sure.

16           MR. FOGG:  Your Honor, if I may?

17           THE COURT:  Just briefly, Mr. Fogg, because I am ready

18   to rule.

19           MR. FOGG:  I understand, Judge, crime victim status

20   hasn't been granted, and that is number one.  You already know

21   that.  I sent that letter out.

22           Your Honor, there are issues with regard to this case.

23   Mr. Kazin had a conversation with Mr. Zuckerberg about an

24   agreement.  This is what we're looking for.  If there is no

25   agreement, as they say, then why the fight?  Why the hide?

F2HJCEGC                      Teleconference

1        The issue of whether or not Mr. Snyder told me what he

2   believed he meant to say or what the court said, that is not an

3   issue for me.  That is not an issue for this criminal case.

4   The only problem I have is that if we're going to play hide the

5   ball under the cup, then I don't want to play the game.

6        The whole idea is I don't want to play with semantics

7   of wording where an officer goes and searches your house and

8   you say look, you don't need to compel to do it, I will allow

9   you to do it, but don't search this room.  Why?  Because there

10  is something in that room I don't want you to have.

11       That is the purpose of the subpoena.  That is why we

12  are looking for it.  It is specific, it is relevant and

13  material, Judge, and it is also admissible.  As far as Libby,

14  yeah, we understand that.  We meet those criteria.  I have put

15  that out there.

16       As far as "may," I don't know what Zuckerberg has done

17  or what you're trying to hide.  All I know is if you think this

18  is not a contract, then allow the subpoena to issue.  The

19  reason why I wanted the subpoena to issue is because I didn't

20  believe we'd get what we want.  I believe there will be playing

21  around, wordsmithing, and that is the reason I am asking for

22  this.  It is, it is extremely specific, extremely relevant.  I

23  am not looking for letters; I am looking for electronic

24  communications only because in that day and age, at that time

25  that is what the young folks did.  Thank you.

F2HJCEGC                         Teleconference

1           THE COURT:  All right.  This is what we are going to

2    do.  I am going to authorize Mr. Ceglia's most recent proposed

3    17 (c) subpoenas, with certain modifications as they're

4    attached to Exhibit A of Mr. Fogg's February 13th letter.  As I

5    mentioned, the one issue is already taken care of, the issue of

6    subpoenas issued to Facebook and Mark Zuckerberg.

7           Also Facebook has proposed some non-substantive edits

8    for clarity to the definition of "agreement."  Because those

9    changes are non-substantive, by Facebook's own admission, they

10   do not alter the category of materials being subpoenaed and I

11   will not require that specific modification.

12          Now, the only substantive disagreement, as I

13   understand it and as the parties have indicated, is with regard

14   to Subparagraph 3.  Mr. Ceglia seeks all electronic

15   communications from January 1, 2003 to July 29th, 2004 between

16   Mr. Zuckerberg and any person that relate or make reference to

17   agreements with Mr. Ceglia.  Facebook consents in most

18   respects, but argues the request must be limited to Mr.

19   Zuckerberg's electronic communications, or I should say say

20   e-mails with six specific individuals.

21          I find Mr. Ceglia has demonstrated the relevance,

22   admissibility and specificity of materials he wishes to

23   subpoena under United States versus Nixon.  Facebook does not

24   dispute the relevance of e-mail communications with Zuckerberg

25   and third parties, certainly the six they have identified with

F2HJCEGC                        Teleconference

1    regard to Mr. Ceglia.  Mr. Zuckerberg and Facebook dispute

2    whether Nixon's specificity and admissibility requirements have

3    been satisfied.

4            Now, Zuckerberg's electronic communications, and I

5    will -- with regard to whether it is e-mails or electronic

6    communications -- I will accept the electronic communications

7    because, as Mr. Fogg has pointed out, the reference was made to

8    IM messages I think in the e-mail which he referred to.

9            Now, Mr. Zuckerberg's electronic communications about

10   his agreement with Mr. Ceglia may be admissible for impeachment

11   if they contain inconsistent statements.  They may also be

12   admissible on themselves if they discuss the actual contract at

13   issue.  In fact, Facebook concedes Mr. Zuckerberg's

14   communications with several identified third parties who may or

15   may not be witnesses in this case would be admissible.  His

16   communications with other third parties do not become

17   inadmissible merely because those third parties have not yet

18   been identified.

19           With regard to specificity, although the subpoena

20   seeks all electronic communications with all third parties, it

21   does so within a specific time-frame and with a highly limited

22   subject matter; in other words, the issue of the agreements.

23   In some circumstances, material that cannot be described fully

24   can still be properly subpoenaed as long as there is sufficient

25   likelihood it contains relevant and admissible information

1    under Nixon.

2            Under the present circumstances, Mr. Ceglia cannot

3    reasonably be expected to describe the content of the

4    subpoenaed communications with more precision.  Facebook relies

5    on United States versus Libby, but Libby, I find Libby to be

6    readily distinguishable.  The only similarity between this case

7    and Libby is Mr. Ceglia seeks documents potentially involving a

8    multiplicity of third parties.  However, the subpoena rejected

9    in Libby involved all communications by any employees -- excuse

10   me -- any employ of the New York Times with any eight third

11   parties, some of whom were non-witnesses.  In addition, the

12   topic there was generally Joseph Wilson.  Here the topic is

13   much more specific, in that it relates to agreements, and also

14   that it relates to communications with someone who is clearly

15   going to be a witness here.

16           As I mentioned, Mr. Zuckerberg is clearly going to be

17   a witness.  Furthermore, all communications are specifically

18   related to the core subject matter of this prosecution, the

19   agreement between Mr. Zuckerberg and Mr. Ceglia.  However, the

20   proposed subpoena is overly broad in that it seeks all

21   electronic communications no matter where they reside.  This

22   language could improperly require Facebook to produce documents

23   outside of its custody or control.  Therefore, Paragraph 3 of

24   the proposed subpoena shall be altered to read as follows:

25           "All electronic communications of Mr. Zuckerberg in

F2HJCEGC                         Teleconference

1   your custody, possession or control, with their attachments,

2   between January 1st, 2003 and July 29th, 2004, that relate or

3   make reference to agreements no matter what forms in which they

4   exist."

5           So that is the ruling of the court.  Is there anything

6   that requires additional clarity?

7           MR. FOGG:  Nothing further, your Honor.

8           MR. SNYDER:  No, your Honor.  Thank you very much.

9           THE COURT:  Okay.

10          MR. SNYDER:  Did you want me to redraft the order or

11  the court will --

12          THE COURT:  You should revise your subpoenas to be

13  consistent with what has been discussed here today.

14          MR. FOGG:  I understand.

15          THE COURT:  If it turns out there is some

16  disagreement, then you can come back to me.  Hopefully, it is

17  clear enough what I've ruled.

18          MR. FOGG:  Understand, Judge.

19          THE COURT:  That concludes the first item that I

20  wanted to discuss.

21          The second item, Mr. Fogg, I have your letter with

22  regard to -- and Mr. Snyder and Mr. Southwell, we are about to

23  actually discuss a separate issue that arose with regard to

24  testing.

25          MR. SNYDER:  We'll get off the phone.  Thank you so

F2HJCEGC                    Teleconference

1    much for your time.

2            MR. SOUTHWELL:  Thank your Honor.

3            THE COURT:  Take care.

4            So I have the government's letter of February 13th.

5    Is everybody still there?

6            MR. FOGG:  Yes, your Honor.

7            THE COURT:  I have the government's letter of February

8    13th and Mr. Fogg's response of February 16th as well as I also

9    printed out a copy of the discovery order on consent.  I have

10   several questions, and then I'll hear briefly from the parties,

11   and then I have a suggestion for how we proceed going forward.

12           My first question is actually for the government with

13   regard to the discovery.

14           MR. FOGG:  Your Honor, if I may?

15           THE COURT:  Yes.

16           MR. FOGG:  Can we dial back in?

17           Is that a possibility?

18           THE COURT:  I guess we could.  I am not sure why.  I

19   thought I heard the parties from Facebook drop off.  Quite

20   frankly, Mr. Fogg, let me finish.  Even if they wanted to stay

21   on the phone, if we were in court, they would be entitled to be

22   there.

23           MR. FOGG:  True.

24           THE COURT:  Anybody, anybody would be.  The simple

25   fact is that the expediency -- and really I decided to do this

F2HJCEGC                    Teleconference

1   on the phone so I wouldn't require the parties to appear before

2   me personally.

3           MR. FOGG:  Thank you.

4           THE COURT:  They would be entitled to sit in the

5   courtroom and listen regardless, as would members of the

6   public.  Again, I decided to have this conference on the phone

7   so that we can deal with it as expeditiously as possible.

8           MR. FOGG:  I understand, Judge.  That is fine.  I

9   understand.

10          THE COURT:  So I have the letter of February 13th, the

11  government's letter, and Mr. Fogg, your response with two

12  attachments.

13          MR. FOGG:  Yes.

14          THE COURT:  My question for the government relates to

15  the discovery order on consent because the discovery ordered

16  actually refers to the possibility of videotaping any testing

17  that might be done, and I guess when did the government become

18  aware that the Secret Service doesn't permit videotaping?

19          The second question is, is it the government's

20  position that the Secret Service, that their rules would

21  prevent me from ordering videotaping?  I'll hear from you on

22  those issues.

23          A VOICE:  (Unintelligible)

24          THE COURT:  If you could, is that Mr. Wilson?

25          MR. WILSON:  Yes, Mr. Wilson.

F2HJCEGC                          Teleconference

1          THE COURT:  Go ahead.

2          MR. WILSON:  The government learned on February 9th

3     when we inquired, at defense counsel's request, about the

4     possibility of videotaping or them being present for the

5     testing of the lab personnel, and that is when we were told

6     that videotaping and personal presence during the testing

7     process was not permitted, but they could observe the taking of

8     the samples and the preliminaries through a glass in some

9     facility that the lab has.

10          As to the second question your Honor asked, I suppose

11    the first answer is your Honor obviously can order anything

12    you're inclined to do.  I think both the policy and as a

13    practical matter the set-up simply may not permit it.

14          I don't know if you want me to address this, but more

15    to the point, it is not something the defense is entitled to

16    and it would not be appropriate to require in this instance,

17    and there has been no showing of any kind that it is warranted,

18    but that may be a secondary question your Honor has deferred.

19          As to whether it is physically possible, I don't think

20    we have the final answer.  I suppose someone can bring a

21    camcorder in and do something.  I don't know what their

22    position would be if you ordered it, whether they would want us

23    to do any more than that.

24          THE COURT:  As I understand, the current position is

25    that representatives of the defense, Mr. Fogg and any -- I

F2HJCEGC                        Teleconference

1    think it was up to five people --

2                MR. WILSON:  Three, your Honor.

3                THE COURT:  -- three people would be entitled to

4    observe from whatever viewing platform the Secret Service has

5    in connection with this laboratory.  Is that accurate?

6                MR. WILSON:  Yes, your Honor.  Just to be clear, the

7    government's understanding, as reflected on the letter on

8    Friday, has been clarified slightly.  Let me make sure we are

9    clear.

10               They will be able to be present to witness the taking

11   of samples, which is the destructive portion of the testing

12   here where the document is actually altered in any way by the

13   taking of these small samples.

14               In our letter we had expressed our understanding we

15   thought there would be no other need for them to be working

16   with the full document once the samples were taken.  We tried

17   to confirm that on Friday and were unable to get a final

18   answer.  We have now gotten one, which is that is not

19   necessarily true.  There may be, depending on what they're able

20   to do once they see the document and can evaluate the exact

21   tests that are possible, certain tests which would involve

22   looking at the document itself, which would not be observed by

23   defense counsel and their representatives, but those would be

24   non-destructive tests, so they have no effect on the integrity

25   of the document.  Obviously, the Secret Service will carefully

document via photograph the state of the document at all stages of the proceeding.

THE COURT:  Okay.

MR. WILSON:  That is not exactly what was in the government's letter.  I wanted to make sure there was no misunderstanding on that point.

THE COURT:  Mr. Fogg, I'll hear from you.

MR. FOGG:  Judge, my question would be what testings would be done.  My major concern is yes, the destruction of the contract.  I believe there are very few samples that are left, and that was put in my letter.  That is the greatest concern because then as far as any testing that defense may want to do for the criminal case, we may be limited in our ability to test.

The only thing I request is if we could at least secure an expert to tell us, you know, what is the probability. There may be two or three samples that may be left as far as the signature or the ink.  I would like to at least know this before, beforehand so this way we're more aware of the issue.

One of the things that what I'd like to do is when they take samples, I would like for us to be able to take samples.  I think that is kind of paramount.  The destruction issue is what we are looking to prevent here.  I think that is the major issue, Judge.

MR. WILSON:  If I may briefly respond to one aspect of

30

1    that?

2              THE COURT:  Yes.

3              MR. WILSON:  Your Honor, I think the issue from the

4    government's perspective is that the defendant has taken

5    samples of these very documents in connection with the civil

6    case and has had them reviewed by retained experts.

7              The defense has already had his opportunity to review

8    these things.  The Facebook had the opportunity to review

9    these.  It is the government that is the only relevant party

10   who hasn't had the opportunity to take samples.  Certainly we

11   will take all possible steps depending on the amount of

12   available ink.  I think, your Honor, it is just the ink.  There

13   is plenty of toner and paper that can we samples without a

14   problem.  I don't think the defense argues otherwise.

15             With respect to the various ink handwritten samples,

16   it is not clear to us at this point if there is enough ink for

17   the Secret Service to test.  That is one of the things they're

18   going to need to evaluate once the document is in their hands.

19   They will certainly at our direction take all possible steps to

20   ensure that they take the minimum that they need to test and

21   leave anything available if the defense wants to do further

22   testing.

23             If there is only enough material left for one set of

24   tests, it is our view the government is entitled to do it.

25   They have had their opportunity.  Mr. Fogg may know better than

F2HJCEGC                           Teleconference

1    I whether they still have samples or whether they have, they
2    obviously have, if they used them, the results of the tests
3    they've already done.
4          One other thing that I would say, your Honor, even if
5    your Honor thinks that is an insufficient opportunity and even
6    if this was a live issue, it is one that can be addressed and
7    resolved once the testing has been done.  If the defense thinks
8    they had a basis to argue that the evidence should be precluded
9    because they did not have a fair opportunity to conduct their
10   own tests, it seems to the government that that is a separate
11   issue to be addressed down the line.
12         In the first instance, there is either enough samples
13   to test once, twice or not, and if it is once, the government
14   should do it and the defense can make whatever arguments they
15   can make.  There are no grounds to preclude us from doing our
16   testing because they may not be able to do the testing.  At
17   best maybe -- I don't think there is a legal basis, but the
18   argument shouldn't be it shouldn't come in, not that the
19   government is entitled to know what the results of its test
20   would be.
21         THE COURT:  This is what I am going to rule.
22         I think the government can go forward with the
23   testing.  I would like the parties to meet and confer
24   concerning sort of the process and procedure.  Mr. Fogg, the
25   government has indicated that yourself, and I don't know

1    whether it is three additional or three total people from the

2    defense can view the destructive part of the testing.

3          If there are other aspects of the testing that you

4    want more information on, you should meet and confer over the

5    next week to get whatever information you think you need so

6    that you can communicate, if you have an expert, with your

7    expert concerning not only the destructive test, but whatever

8    other test might actually occur depending upon those initial,

9    those initial tests.

10          I think the issue for me is not whether or not the

11   government can do the testing.  It is what the end result is

12   going to be, and that goes to, Mr. Wilson, your point that if

13   the defense has an application either because they feel they

14   haven't had adequate expert disclosure or because they were not

15   provided an opportunity because the destructive test didn't

16   allow, won't allow them to have any material left to test, that

17   is a separate issue.  What I do with regard to that is a

18   separate issue.

19          I will raise this, and I want to make one thing

20   entirely clear.  This testing is somewhat late in the day for a

21   case that was filed in 2012.  We're going to trial in May, make

22   no mistake about it, we're going to trial.  So I hope that the

23   testing is done quickly and is in the 30-day range rather than

24   the 60-day range.  I am not making any indication one way or

25   the other how I might rule, depending whatever the testing

results may be, but again my issue is I've got a trial, and we

are going to trial in May, and obviously the government

tomorrow, I believe, is to make expert disclosure.  I assume,

depending upon the results of the test, that those disclosures

will be supplemented.

        Now, is there anything else with regard to that?  Am I

missing something or is something not clear?

        MR. WILSON:  I have one issue from the government's

perspective, your Honor.  Certainly we are going to seek to

expedite these things beyond even the standard 30-day bottom of

their normal range, but just to clarify the meet-and-confer

process over the next week, of course, because time is an

issue, my understanding is that we can send down the document

and can, in consultation with the defense to ensure their

ability to attend, take the samples and begin that aspect of

the testing now?

        And again I'll have a week before we do any of the

external -- "external" is the wrong word -- non-destructive

portion of the testing?

        THE COURT:  Yes, you can send the document to the

Secret Service lab, but I want you to meet and confer over the

next week so that Mr. Fogg has an understanding of both with

regard to the timing of the destructive test, but then you

mentioned that there might be some additional testing that will

be done outside of non-destructive testing.  To the extent

F2HJCEGC                          Teleconference

1    you're able to give Mr. Fogg some understanding of what that

2    testing may be so that he can consult with his expert and weigh

3    in, that is the only thing I was indicating.

4              MR. WILSON:  This is probably me more than your Honor,

5    but just to be clear, the government's intention would be,

6    since DC has apparently opted to shut itself down because of a

7    little bit of snow today, we are going to be sending the

8    document down tomorrow and the lab will be able to take the

9    samples as early as tomorrow afternoon.

10             I take it that with a fair, good-faith consultation

11   with defense counsel, your Honor's not suggesting we need to

12   wait a week before we do that, so that the defense has an

13   opportunity to consult with their experts?

14             Are we allowed to go forward with that process with

15   fair accommodation to them being able to view it?

16             THE COURT:  They need to be able to view it, that's

17   correct.

18             MR. WILSON:  Fair enough, your Honor.

19             THE COURT:  Is there anything else?

20             MR. FOGG:  Your Honor, if I may?

21             THE COURT:  Yes, Mr. Fogg.

22             MR. FOGG:  So my understanding is that as of now, at

23   this present time, still February 18th is the date on which the

24   government is to provide a summary of the expert's proposed

25   testimony and reveal their experts.  Is that still the date?

F2HJCEGC                    Teleconference

1          THE COURT:  Say that again.  I am sorry.  The 18th was

2   the date?

3          MR. FOGG:  The 18th date for experts, Judge.

4          THE COURT:  That's correct.

5          MR. FOGG:  That has not changed?

6          My only concern, Judge, yes, Judge, we do have a trial

7   date.  I am not looking to delay it.  I would like to proceed

8   in a timely fashion.  However, I do want time to formally

9   respond to avoid any heavy burden of meeting the new evidence

10  from their testing.

11         If we could limit it, the amount of days and not bring

12  in 60 because 60 will be two months from now, bring it to one

13  or less than one month before trial, so if we could have a

14  deadline or if the court could think of a way to have us

15  prevent that?  And if so, Judge, we'll have to take that up on

16  a motion for preclusion, but I would rather not do that.

17         THE COURT:  I am not going to, because I have no idea

18  how long this takes or doesn't take, and I have been told 30 to

19  60 days.  If it happens shorter than that, great.  If it

20  doesn't happen within that time-frame, well, there may be

21  consequences because of that.

22         MR. FOGG:  I understand.  There is nothing further

23  from me, Judge.

24         MR. WILSON:  Your Honor, I have just one other issue.

25         My understanding is in the past, particularly since

F2HJCEGC                    Teleconference

1    the earlier rulings on the subpoena involved the coverage of a

2    protective order, and Mr. Ceglia himself has in the past

3    represented he was not fully informed by his counsel about what

4    was and wasn't covered by it, I assume Mr. Fogg will fully

5    report to Mr. Ceglia on the contents of the call and the

6    Court's rulings.  If we can have that confirmed on the record

7    so there is no question down the line Mr. Ceglia is aware what

8    was going on since he was not on the call today.

9              MR. FOGG:  That is a great assumption, correct.  That

10   is what I do for all my clients, and I will do it in this case

11   as well.

12             THE COURT:  There is a Court Reporter here, so there

13   is a record of exactly what transpired.

14             Now, Mr. Fogg, with regard to the return date --

15             MR. FOGG:  Yes, your Honor.

16             THE COURT:  -- on the subpoenas, why don't you speak

17   with Facebook and see what makes the most sense, if you can

18   speak with them.  Otherwise, I will just insert a date once you

19   have the subpoenas ready for my signature.

20             MR. FOGG:  Yes, Judge.  What I will do is send out an

21   e-mail requesting a suitable or preferable date, and I will

22   transfer that to the government and your Honor.

23             THE COURT:  Okay.  And also to Facebook because,

24   obviously, they are a responding party to the subpoena.

25             MR. FOGG:  Yes.

F2HJCEGC                          Teleconference

1           THE COURT:  Is there anything else we need to deal

2    with?

3           MR. WILSON:  Not for the government.

4           MR. FOGG:  Not for Mr. Ceglia.

5           THE COURT:  Okay.  All right.  Thank you very much for

6    getting on the call.

7           (Court adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25