USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/30/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

- against -

PAUL CEGLIA,

Defendant.

12-CR-876 (VSB)

ORDER

VERNON S. BRODERICK, United States District Judge:

Before me is the Motion filed by walled-off Assistant United States Attorney Niketh Velamoor (the "Wall AUSA") on behalf of the Government for disclosure of documents withheld under a claim of privilege by certain former civil attorneys of Defendant Paul Ceglia ("Ceglia"). (Doc. 70.) For the reasons stated below, I conclude that most but not all of the documents whose disclosure the Government seeks fall within the crime-fraud exception to the attorney-client privilege.[1] Accordingly, the Motion is GRANTED IN PART and DENIED IN PART. However, no documents may to be produced to the prosecution team at this time, and this Order may not be shared with the prosecution team at this time. As explained below, both Ceglia and the Wall AUSA will have one week to file any document-specific objections to my rulings below. After any such objections are finally resolved, the documents may be disclosed and this Order will be filed on the public docket.

[1] Although I refer throughout this Order to the crime-fraud exception to the privilege, the exception applies equally to the attorney work product doctrine, which has also been asserted by Ceglia's former lawyers. *See In re Richard Roe, Inc.*, 68 F.3d 38, 40 n.2 (2d Cir. 1995). For purposes of my analysis, the distinction between the attorney-client privilege and the attorney work product doctrine is immaterial, and my findings apply equally to both.

## I. Background and Procedural History

Ceglia is charged with one count of mail fraud pursuant to 18 U.S.C. § 1341 and one count of wire fraud pursuant to 18 U.S.C. § 1343. (*See* Doc. 10 ¶¶ 8, 10.) The Indictment alleges that Ceglia and Mark Zuckerberg ("Zuckerberg") entered into a legitimate contract on April 28, 2003, pursuant to which Zuckerberg agreed to perform computer programming work for Ceglia in exchange for a fee (the "StreetFax Contract"). (Doc. 10 ¶ 5.) This work was allegedly unrelated to Zuckerberg's development of the popular social networking site Facebook. (*See id.*) The Indictment alleges that Ceglia engaged in a scheme to defraud Facebook, Inc. ("Facebook") and Zuckerberg and to "corrupt the federal judicial process." (*Id.* ¶ 4.) In furtherance of this scheme, Ceglia allegedly altered the StreetFax Contract with Zuckerberg to make it appear that Zuckerberg had agreed to provide Ceglia with at least a 50 percent ownership interest in Facebook (the "Facebook Contract"). (*Id.* ¶ 5.) Ceglia then filed a civil lawsuit against Facebook and Zuckerberg to assert this purported ownership interest. (*Id.* ¶ 6).[2] Ceglia also allegedly fabricated purported email exchanges with Zuckerberg allegedly related to the Facebook Contract to support his suit. (*Id.* ¶ 7.) Ceglia was represented in the civil suit by, among other firms and attorneys, Kasowitz Benson Torres & Friedman LLP ("Kasowitz") in March 2011 and DLA Piper LLP (US) ("DLA Piper") from roughly April 2011 through June 2011.[3]

---

[2] Ceglia's civil action was initially filed in the Supreme Court of the State of New York and was removed to the United States District Court for the Western District of New York. The district court granted Facebook and Zuckerberg's motion to dismiss for fraud on the court, finding that "clear and convincing evidence establishes" that the purported contract introduced by Ceglia "is a recently created fabrication." *Ceglia v. Zuckerberg*, No. 10-CV-569A, 2013 WL 1208558, at *4 (W.D.N.Y. Mar. 26, 2013), *report and recommendation adopted in full*, 2014 WL 1224574 (W.D.N.Y. Mar. 25, 2014). Ceglia is currently appealing the civil action's dismissal to the Second Circuit. *See* No. 14-1365 (2d Cir. filed Apr. 30, 2014). Ceglia also filed a federal civil action in the Western District of New York seeking to enjoin this criminal prosecution in this District on First Amendment grounds. That action was also dismissed, *see* Doc. 71, *Ceglia v. Holder*, No. 13-CV-256-A (W.D.N.Y. Mar. 25, 2014), and Ceglia is also currently appealing its dismissal before the Second Circuit, *see* No. 14-1752 (2d Cir. filed May 21, 2014).

[3] During his representation by Kasowitz and then by DLA Piper, Ceglia was also represented by other attorneys,

This criminal case was originally assigned to the Honorable Andrew L. Carter, Jr., and Ceglia was initially represented by the Federal Defenders of New York. In response to grand jury subpoenas for documents relating to their representation of Ceglia, DLA Piper and Kasowitz produced privilege logs dated April 2, 2013, and June 20, 2013, respectively.[4] (*See* Doc. 70 Exs. 3, 4.) Pursuant to an agreement between the Government and Ceglia, through Ceglia's counsel at the time, the documents subject to these claims of privilege were produced to Ceglia and to the Wall AUSA. (*See* Doc. 27, at 3:23-4:8, 4:18-25.) The Wall AUSA is an Assistant United States Attorney in the Southern District of New York who is not part of the Ceglia prosecution team. The Wall AUSA, separately and independently from the Ceglia prosecution team, reviewed the potentially privileged documents to determine whether the Government would engage in litigation to attempt to defeat the claim of privilege and obtain the documents. (*See id.*) The Wall AUSA is prohibited from communicating any information related to the potentially privileged documents to any member of the Ceglia prosecution team. This is a common procedure for litigating asserted claims of privilege in this District.

The Wall AUSA filed the instant Motion on behalf of the Government on September 15, 2014. (Doc. 70.) The Government's position in the Motion was, in essence, that all of the documents withheld under a claim of privilege were within the crime-fraud exception because Ceglia's entire lawsuit was fraudulent and all of the documents were generated in connection with that lawsuit. (*See id.*) On the same day the Motion was filed, Ceglia relieved the Federal Defenders of New York as counsel and retained private counsel. (*See* Docket Entry of Sept. 15,

---

including local counsel in the Buffalo area. When I refer to "counsel" generally in this Order, I intend to refer to Ceglia's legal team as a whole at any given time.

[4] I previously denied Ceglia's motion to suppress all of the potentially privileged documents on the basis of alleged misuse of the grand jury subpoena power. (*See* Doc. 135, at 12:13-13:20.)

2014.) On September 30, Ceglia's present counsel filed an opposition to the Motion with several supporting declarations. (Doc. 80.) The Government filed a reply on October 6. (Doc. 83.) On October 21, the Wall AUSA advised that DLA Piper had declined to turn over certain remaining documents to the Wall AUSA for his review because Ceglia's counsel had objected. (Doc. 92.)

On October 23, Judge Carter determined that there was probable cause to believe that a crime or fraud had been committed, and that he would conduct an *in camera* review of the potentially privileged documents to determine whether they were in furtherance of the crime or fraud. Judge Carter ruled:

> [A]s the Second Circuit laid out in *United States v. Jacobs*, [117 F.3d 82, 87 (2d Cir. 1997),] the government must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed, and that the communications in question were in furtherance of the fraud or crime.
>
> I believe that I have a factual basis that the government has demonstrated for a showing of probable cause to believe that a fraud or crime has been committed. As to the second part, that I do not have yet. It seems to me that it would be appropriate for me to conduct an *in camera* review because the fact that there is probable cause to believe that a fraud or crime has been committed does not mean that all of the documents that are mentioned are subject to the crime fraud exception, or that any of the documents that have been admitted are subject to the crime fraud exception.

(Doc. 93, at 19:25-20:15.) Judge Carter determined that he would "conduct a lengthy, rigorous, *in camera* review of all of these documents to determine whether the second prong of the crime-fraud exception applies." (*Id.* at 22:16-18.) The Wall AUSA then provided the documents in his possession to the Court. Judge Carter subsequently ordered DLA Piper to produce the remaining documents it had withheld directly to him for *in camera* review, (Doc. 103), which it did. Those documents were later provided to the Wall AUSA and to Ceglia.

Judge Carter transferred this case in an exercise of his discretion to manage his docket, and the case was reassigned to me on January 8, 2015. (*See* Docket Entry of Jan. 8, 2015.) I held a telephonic conference on January 20, 2015 with the Wall AUSA and Ceglia's counsel.

(*See* Docket Entry of Jan. 20, 2015.)[5] At that conference, I ruled, as Judge Carter had previously, that there was a factual basis for a showing of probable cause that Ceglia's civil lawsuit against Zuckerberg had little or no legal or factual basis and was carried on substantially for the purpose of furthering a fraud. I also explained that I had conducted a preliminary *in camera* review to determine which documents were actually in furtherance of the fraud. There were over 22,000 pages of documents. Many of the documents were duplicative, others were already in the public domain, and some addressed purely logistical matters, such as the scheduling of conference calls, which are irrelevant to this case and likely not privileged at all. *See United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 504 (2d Cir. 1991) (privilege protects only disclosures necessary to obtain informed legal advice). Still others addressed the distribution of fees among counsel and payment to consultants, both of which are also irrelevant and likely not privileged. *See In re Grand Jury Subpoena Served upon John Doe*, 781 F.2d 238, 247-48 (2d Cir. 1986) (disclosure of fee information not privileged absent special circumstances).

Therefore, to enable me to conduct a meaningful, substantive *in camera* review in a timely fashion, I ordered the Wall AUSA to use his judgment and discretion to weed out documents that would clearly have no utility to the prosecution team.[6] Specifically, I ordered the Wall AUSA to produce a new, more limited set of documents for *in camera* review that: (1) eliminated duplicates, materials in the public record, and materials pertaining to fees, logistics, and other non-substantive matters; (2) created subfolders for (a) communications to or from

---

[5] The transcript of this conference is not on the docket because I discussed the substance of the potentially privileged documents. Ceglia also participated in this telephone conference.

[6] Part of the reason for having a walled-off AUSA conduct an independent review of potentially privileged documents, rather than simply having the prosecution team litigate the issue without ever seeing the documents, is to enable the walled-off AUSA to use his judgment and discretion to litigate over only those documents that may be genuinely useful to the Government and may fall within an exception to the privilege.

Ceglia, (b) materials related to the retention of consultants and experts to address the authenticity of the documents Ceglia allegedly forged, and (c) materials relating to counsel's withdrawal; and (3) excluded documents that would clearly have no utility to the prosecution team.

On February 6, 2015, the Wall AUSA provided me with a significantly narrower set of documents, placed into the subfolders described above, for *in camera* review. This set of documents (the "Narrowed Set") was also provided to Ceglia. The Narrowed Set reduced the number of documents subject to the Government's Motion for disclosure from approximately 2,600 to approximately 400. I have completed my *in camera* review of the Narrowed Set and now set forth my findings.

## II. Legal Standard

Pursuant to *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997), *abrogated on other grounds by Loughrin v. United States*, 134 S. Ct. 2384, 2388 n.2 (2014), a party wishing to invoke the crime-fraud exception to the attorney-client privilege must demonstrate that there is a factual basis for a showing of probable cause to believe that a crime or fraud has been committed and that the communications at issue were in furtherance of the crime or fraud. However, a special prima facie showing is required where "the very act of litigating is alleged as being in furtherance of a fraud." *In re Richard Roe, Inc.* ("*Roe II*"), 168 F.3d 69, 71 (2d Cir. 1999). Under those circumstances, which apply in this case, the party invoking the crime-fraud exception must make a prima facie showing of "probable cause that the litigation or an aspect thereof had little or no legal or factual basis and was carried on substantially for the purpose of furthering the crime or fraud." *Id.* I have already concluded, as did Judge Carter, that the Government has made a prima facie showing of probable cause that Ceglia's lawsuit had little or no factual or legal basis and was carried on substantially to further a fraud.

The prima facie showing having been made, I then can exercise my discretion to conduct an *in camera* review of the materials subject to the claim of privilege. *See Jacobs*, 117 F.3d at 87. Next, I must make a factual finding whether the specific documents I review actually fall within the crime-fraud exception. *See id.* The crime-fraud exception strips the privilege from only those communications or work product "that relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir. 1994) (internal quotation marks omitted). There must be a "purposeful nexus" between the communication or document and the fraudulent activity. *Duttle v. Bandler & Kass*, 127 F.R.D. 46, 56 (S.D.N.Y. 1989) (quoting *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986)). The communication or document "need only reasonably relate" to the subject matter of the purported fraud. *In re Bairnco Corp. Sec. Litig.*, 148 F.R.D. 91, 101 (S.D.N.Y. 1993). Attorney communications and work product may be in furtherance of a crime or fraud even if the attorney is unaware of the client's ill intent. *See Duttle*, 127 F.R.D. at 53.

In the particular context of fraudulent litigation, "[i]f the litigation objectively lacked a factual or legal basis, some communications or work product generated in the course of such litigation might, after a rigorous *in camera* review by a court for relevance, fall within the crime-fraud exception." *Roe II*, 168 F.3d at 72. For instance, "a client's directing an attorney to make large numbers of motions solely for purposes of delay would be discoverable," or, "where a party suborns perjury by a witness to bolster a claim or defense, [c]ommunications or work product relating to that witness might also be discoverable." *Id.* However, "[g]iven that the attorney-client privilege and work product immunity play a critical role in our judicial system" and that the exceptions thereto must be narrowly construed, communications and work product are not within the crime-fraud exception merely because they were prepared in connection with

fraudulent litigation. *Id.* at 71.

## III. Discussion

To summarize the above, in the context of allegedly fraudulent litigation, a particular document or communication is in fact in furtherance of the alleged fraud if it: (1) is created in furtherance of the litigant's fraudulent purpose, even if the person who creates it did not know the purpose was fraudulent, and (2) reasonably relates to the fraudulent portion of the litigation. Ceglia's allegedly fraudulent purpose was to recover money from Facebook to which he was not entitled. The portion of Ceglia's litigation that was fraudulent was the Facebook Contract and allegedly forged emails that formed the basis for the suit. Thus, communications and work product are within the crime-fraud exception if they were created to further Ceglia's recovery on the Facebook Contract and are reasonably related to the Facebook Contract or the purported emails with Zuckerberg.

The documents in the Narrowed Set generally fall into several categories, which I enumerate below. Of course, some documents may relate to multiple categories, particularly when they contain multiple emails addressing multiple subjects in a long chain. I have placed documents in the categories in which I believe they fit best. However, the categories are simply a tool to allow me to explain my findings in an efficient manner, and do not independently have legal significance. I will proceed category by category, describing the nature of various documents within the category and explaining why I find that those documents do or do not fall within the crime-fraud exception. Documents from the DLA Piper production are identified by Bates stamp number only. Documents from the Kasowitz production are identified by Bates stamp number preceded by the letters "KAS."

### A. *Communications Involving Ceglia and Documents Attached Thereto*

The Narrowed Set includes email correspondence between Ceglia and his counsel. Some of this correspondence pertains directly to the conduct of the litigation and its core legal subject matter. For example, Ceglia reviewed and commented on drafts of pleadings, reviewed and commented on drafts of his own sworn declarations, and responded to his attorneys' questions about the location of various documents and electronic equipment that counsel and/or Ceglia deemed important to the litigation. These exchanges and the documents attached thereto directly furthered Ceglia's allegedly fraudulent purpose of recovering damages from Facebook and were related to the Facebook Contract and allegedly forged emails that were at the center of the civil suit. Therefore, they are within the crime-fraud exception.[7]

Some of the correspondence between Ceglia and his counsel relates to the withdrawal of attorneys. Kasowitz withdrew as counsel in late March 2011 on the stated basis that it had determined that the Facebook Contract was not genuine. On April 11, 2011, when Kasowitz learned that DLA Piper had appeared in the civil case on Ceglia's behalf, Kasowitz forwarded DLA Piper a letter that vigorously and plainly expressed Kasowitz's view that Ceglia's legal claims relied on documents of questionable authenticity. (*See* Documents 02446, 02447.) DLA Piper, as well as the Buffalo firm of Lippes Mathias Wexler Friedman LLP ("Lippes"), withdrew as counsel in late June 2011 on the stated basis that their attorney-client relationship with Ceglia had irrevocably broken down. This apparently occurred after they were unable to obtain from Ceglia certain materials they believed were necessary to the conduct of the litigation.[8]

---

[7] These documents are: 00088, 00089, 00095, 00096, 00286, 00338, 00345, 00377, 00378, 00382, 00676, 00735, 01402, 02066, 02070, 02081, 02087, 02088, 02091, 02103, 02113, 02467, 02468, 03045, 13008, 18007, 18080, 18868, 19003, 19004, 19336, 19337, 19560, 20021, 20164, 20448, 20539, 20580, 20586, 20628, 20652, 20704, 20706, 20718, 20775, 21321, 21346, 21373, 21458, 21467, KAS252, KAS376, KAS378, and KAS382.

[8] I make no findings regarding the reasons for any firm's withdrawal. I simply offer this explanation as background to provide necessary context for the discussion that follows.

One of the email exchanges involving Ceglia that pertains to attorney withdrawal, Document 02443, is within the crime-fraud exception. In this email exchange, Ceglia responds to Kasowitz's April 11 letter to DLA Piper questioning the authenticity of the Facebook Contract. Ceglia asserts, in essence, that Kasowitz was compromised by contact with lawyers for Facebook and reaffirms the authenticity of the allegedly forged contract: "We have had the Floppies reviewed by a well respected New York forensics team and the results were just fine[;] this is an outrageous allegation!" I find that this communication was intended to further Ceglia's allegedly fraudulent purpose because it is most naturally understood as an effort to persuade his new legal team at DLA Piper that the allegedly forged documents were legitimate, and to discredit the views of his former attorneys. It was also reasonably related to those documents because it discusses them, or at least the medium in which they were stored.

The remaining email exchanges with Ceglia related to counsel's withdrawal—Documents 00047, 00071, 06263, and 18083—are not within the crime-fraud exception because they are not in furtherance of Ceglia's allegedly fraudulent purpose. These exchanges involve counsel telling Ceglia that they will no longer represent him and, thus, that they will no longer advance his purposes, fraudulent or otherwise. Unlike the email exchange contained in Document 02443, Ceglia responds non-substantively in each case.

Finally, some of the email communications between Ceglia and his counsel are not related to the legal substance of the civil suit. They may discuss Ceglia's emotions or simple logistical matters. Therefore, they are not specifically in furtherance of Ceglia's allegedly fraudulent purpose or reasonably related to the allegedly forged contract and emails, and they are not within the crime-fraud exception. These documents are: 00125, 03084, 19088, 20064, 20073, and 23581.

### B. *Communications Involving Jason Holmberg on Ceglia's Behalf and Documents Attached Thereto*

The Narrowed Set contains several email exchanges with counsel from the early stages of the litigation that principally involve an individual named Jason Holmberg ("Holmberg"), who was apparently a friend and business associate of Ceglia. These are Documents 01867, 01871, 01981, and 02092. Holmberg worked to recruit a major firm to take on Ceglia as a client by circulating a document that summarized Ceglia's case and described the evidence of Ceglia's purported ownership interest in Facebook, including direct and indirect references to the Facebook Contract and allegedly forged emails. Holmberg also emailed the Facebook Contract itself to Kasowitz on Ceglia's behalf.

These documents are probably not privileged at all because Holmberg was an unrepresented third party. The privilege likely does not extend to Holmberg's communications with counsel and is likely waived with respect to communications with Ceglia in Holmberg's presence. *See, e.g., United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999). Assuming *arguendo* that the documents are privileged, they fall within the crime-fraud exception because they expressly refer to and/or incorporate the Facebook Contract, and their sole apparent purpose was to initiate the allegedly fraudulent litigation to enable Ceglia to recover on that contract. Either way, I find the disclosure of Documents 01867, 01871, 01981, and 02092 to the Government is appropriate.

### C. *Communications Between and Among Counsel and Documents Attached Thereto*

#### 1. Relating to Retention

The Narrowed Set contains two February 2011 email exchanges, one with an attachment, between Jeffrey Lake ("Lake"), a San Diego attorney who represented Ceglia, and an attorney at

DLA Piper before DLA Piper began representing Ceglia. In these exchanges, Lake encourages DLA Piper to take on Ceglia as a client. These documents—Documents 22292, 22294, and 22305—directly advance Ceglia's purpose of recovering damages on the Facebook Contract through litigation, and they contain express representations about the validity of the Facebook Contract. They are within the crime-fraud exception and disclosure is appropriate.

One document that simply discusses the mechanics of substituting DLA Piper in for another firm, Document 20543, does not reasonably relate to the allegedly fraudulent contract or emails and is not within the exception; therefore, this document should not be disclosed.

**2. Relating to Withdrawal**

As explained above, after DLA Piper appeared in the civil suit on Ceglia's behalf, Kasowitz forwarded DLA Piper a letter explaining why it had withdrawn from the representation and raising the possibility that attorneys who continued to represent Ceglia might be in violation of their ethical obligations.[9] Kasowitz also forwarded its prior email correspondence with Ceglia on to DLA Piper. The Narrowed Set contains Kasowitz's post-withdrawal communications to DLA Piper. The communications from Kasowitz appear to have been specifically intended to thwart Ceglia's allegedly fraudulent purpose by, in substance, attempting to discourage DLA Piper from representing him. Because Documents 01946, 01950, 02060, 02148, 02446, 02447, and KAS326 were directly and deliberately at odds with Ceglia's allegedly fraudulent purpose rather than in furtherance of it, they are not within the crime-fraud exception and should not be disclosed.

The Narrowed Set also contains a variety of documents in which Ceglia's new counsel,

[9] The letter itself was addressed to Paul Argentieri, a Buffalo lawyer who was part of Ceglia's legal team. But the email was sent to all attorneys at DLA Piper and Lippes who had appeared on the Ceglia matter, in addition to Argentieri.

including DLA Piper, debate, prepare, and ultimately issue their response to the April 11 Kasowitz letter. Emails in which Ceglia's lawyers circulate the materials forwarded by Kasowitz among themselves are also included. There are also several emails in which counsel discusses a further response to Kasowitz after additional exchanges with Kasowitz later in April. Unlike Kasowitz's communications, these communications do have a "purposeful nexus" to Ceglia's allegedly fraudulent activity: their purpose is to refute the allegation that the Facebook Contract is forged and to allow Ceglia to pursue his claims with the assistance of counsel. These documents are reasonably related to the allegedly fraudulent contract because the contract is their primary subject. Therefore, these documents are within the crime-fraud exception and should be disclosed.[10]

Additionally, the Narrowed Set contains internal communications among counsel related to the June 2011 withdrawal of DLA Piper and Lippes. These communications—Documents 00027, 00028, 00080, 21660, 21665, 21689, and 22684—are strategic discussions among counsel about how best to withdraw and how best to inform their client. Ceglia's counsel does not appear to be affirmatively seeking to thwart his allegedly fraudulent purpose at this point, as Kasowitz had been in April 2011. Nonetheless, I find that these documents do not have a "purposeful nexus" to the alleged fraud because their purpose was to terminate any further involvement by counsel with Ceglia and in the allegedly fraudulent purpose. Therefore, Documents 00027, 00028, 00080, 21660, 21689, and 22684 are not within the crime-fraud exception and should not be disclosed.

Finally, after DLA Piper and Lippes withdrew, they forwarded materials on to successor

[10] These documents are: 01424, 02251, 15144, 15309, 18106, 18699, 18701, 18827, 18879, 18892, 18894, 18896, 18905, 18911, 20458, 20464, 22031, 22035, 22039, 22043, 22069, 22075, 22078, 22092, 22118, 22154, and 22868.

counsel and coordinated with successor counsel to ensure full compliance with court orders requiring document production in connection with Facebook's motion to dismiss for fraud on the court. These communications—Documents 00001, 00003, 19018, 19021, 19022, 19023, 19024, and 19025—discuss the authenticity of the Facebook Contract and generally further Ceglia's ongoing pursuit of the litigation through his successor counsel. Therefore, they have a nexus to Ceglia's allegedly fraudulent purpose and are within the crime-fraud exception and should be disclosed.

**3. Relating to the Conduct of the Litigation and Litigation Strategy**

The Narrowed Set contains a number of internal emails among counsel, with attachments, that relate to central aspects of Ceglia's civil suit. In these emails, Ceglia's lawyers discuss, among other issues, their strategy surrounding their filing of an amended complaint, their tactical approach to obtaining discovery from Facebook, the substantive content of various motions and declarations, and the conclusions reached by retained consultants and experts. They also discuss their own efforts to obtain documents they believe to be important from Ceglia, including and especially an electronic version of the Facebook Contract. These documents are all directly related to the core legal subject matter of Ceglia's civil suit and further his purpose to recover on the Facebook Contract. They are also reasonably related to the Facebook Contract because they discuss evidence supporting the contract's authenticity, filings asserting the contract's authenticity, the Facebook Contract itself, or some combination thereof. These documents are therefore within the crime-fraud exception and should be disclosed.[11]

A few additional documents—Documents 00577, 13071, and 20507—relate to media

[11] These documents are: 00434, 00437, 00440, 00488, 00492, 00519, 00521, 00523, 00534, 00539, 00543, 00549, 00708, 01053, 01186, 01393, 02263, 02722, 02838, 06875, 06876, 11371, 12784, 12851, 13004, 13008, 13011, 13067, 15021, 17778, 17779, 17831, 18118, 18119, 18277, 18278, 18654, 19778, 21749, 21869, 22213, 22214, 23204, 23483, 23486.

strategy in particular. Although I acknowledge that these documents are less directly tied to Ceglia's effort to recover on the contract in court, public relations strategy is surely part of overall litigation strategy in high-profile litigation. The documents reflect Ceglia's counsel's deliberations about how best to respond publicly to Facebook's public assertions that the Facebook Contract is a forgery. Therefore, these documents further Ceglia's purpose of recovering on the allegedly fraudulent contract and reasonably relate to it, and they are within the crime-fraud exception and should be disclosed.

### D. *Communications with Forensic Consultants and Documents Related Thereto*

The Narrowed Set contains three emails, with attachments, between lawyers at Kasowitz and a forensic consultant retained by Kasowitz to assess the authenticity of the Facebook Contract.[12] These communications principally discuss an email containing a different version of the contract—the StreetFax Contract—between Ceglia and Zuckeberg that was recovered from a hard drive belonging to Ceglia. Kasowitz later concluded that this second version of the contract demonstrated that Ceglia's version—the Facebook Contract—was forged. At the time of these communications, however, it appears that the forensic consultant was working to obtain evidence to support the validity of Ceglia's claims and to prove the authenticity of the Facebook Contract. Accordingly, these communications—Documents 02062, 02077, 03240, 03241, 03242, 03244, and 03245—have a purposeful nexus to Ceglia's alleged fraud and are reasonably related to the allegedly fraudulent contract. They are within the crime-fraud exception.

Later, DLA Piper retained forensic consultants to evaluate and prove the authenticity of the Facebook Contract and of the purported forged email exchanges with Zuckerberg. The

[12] For whatever reason, these documents are part of the DLA Piper production set even though they pertain to Kasowitz's retention of an expert.

Narrowed Set contains a large number of email communications between counsel and forensic consultants, with attachments, discussing this ongoing work. Some of these documents involve forensic analysis of the authenticity of the Facebook Contract and purported forged email exchanges. Others discuss the contents of floppy disks, compact discs, and computer hard drives furnished by Ceglia, which the forensic consultants searched for emails with Zuckerberg and for electronic versions of the Facebook Contract. Many report on the metadata associated with files on those disks and computer drives and provide information about when certain files were added, modified, and deleted. Others discuss the authenticity of emails from Zuckerberg concerning his dealings with Ceglia that had been produced by Facebook in the litigation. Still other documents discuss drafts of declarations to be filed on Ceglia's behalf in the litigation. These materials all share the common aim of identifying, retrieving, and presenting evidence to prove the authenticity of the Facebook Contract and the emails in the litigation. Therefore, these documents are directly in furtherance of Ceglia's allegedly fraudulent purpose and are directly related to the allegedly forged contract and emails. They are within the crime-fraud exception and should be disclosed.[13]

A small number of documents pertain to the consultants' retention agreements, or to the logistics of transferring materials between the consultants retained by Kasowitz and those

---

[13] These documents are: 02228, 02230, 03239, 06038, 06096, 06114, 06121, 06123, 06129, 06266, 06269, 06272, 06273, 06441, 06545, 06546, 06562, 06563, 06573, 06575, 06590, 06607, 06608, 06609, 06629, 06634, 06635, 06640, 06643, 06805, 06829, 06867, 06868, 06962, 06973, 06974, 06976, 06978, 06985, 06986, 07146, 07151, 07577, 08408, 08413, 09356, 09361, 11214, 11229, 11233, 11247, 11248, 11256, 11271, 11275, 11300, 11302, 11352, 11375, 11388, 11406, 11424, 11432, 11449, 11886, 11988, 12004, 12169, 12217, 12230, 12328, 12745, 12757, 12824, 12825, 12828, 12839, 12841, 12912, 12924, 13093, 13104, 13257, 13322, 13421, 13455, 13458, 13463, 13565, 13566, 13567, 13569, 13574, 13576, 13587, 13588, 13592, 13594, 13596, 13604, 13608, 13612, 13615, 13618, 13619, 13638, 13684, 13685, 13711, 13735, 13760, 13845, 13850, 13854, 13855, 13860, 13863, 13865, 13867, 13869, 13871, 13873, 13875, 13877, 13879, 13881, 13883, 13885, 15242, 15246, 15248, 15241, 15257, 15266, 15268, 15272, 15349, 17698, 17703, 18112, 18113, 18192, 18193, 18236, 18302, 18304, 18349, 18375, 18411, 18468, 18470, 18513, 18561, 18609, 18732, 18733, 18734, 18735, 18736, 18737, 18738, 22445, and 22448.

retained by DLA Piper. These documents—Documents 14788, 14797, 14806, 18693, and 18696—are not reasonably related to the allegedly fraudulent contracts or emails and are not within the crime-fraud exception and should not be disclosed.

### E. *Communications and Documents Relating to Private Investigator's Investigation of a Potential Witness*

In June 2011, DLA Piper hired a private investigator (the "Investigator") to travel to Asheville, North Carolina to investigate a potential witness (the "Potential Witness"). The Potential Witness is one of Ceglia's former associates who was involved in the website project unrelated to Facebook, called StreetFax, for which Ceglia allegedly hired Zuckerberg. The Potential Witness and Zuckerberg had email contact and exchanges regarding StreetFax in 2003 and 2004.

In the course of preparing for and litigating his civil lawsuit against Zuckerberg, Ceglia made contact with the Potential Witness. It appears that the Potential Witness was represented by counsel and may have been at some point interested in obtaining part of any recovery against Zuckerberg, (*see* Documents 19671, 21617), but the Potential Witness later rebuffed Ceglia's inquiries after the lawyer for the Potential Witness met with Facebook's counsel, (*see* Document 19669). DLA Piper retained the Investigator and sent the Investigator to Asheville to determine whether the Potential Witness was a favorable or unfavorable witness: "We need to know if [the Potential Witness is] friend or foe ASAP." (Document 19657.) The Investigator performed surveillance on the Potential Witness and appears to have investigated whether the personal financial dealings of the Potential Witness were consistent with recently having received payment from Facebook. The Narrowed Set contains formal and informal reports produced by the Investigator, as well as email exchanges between counsel and the Investigator in which the Investigator responds to inquiries about the personal finances of the Potential Witness and

discusses previous conduct of the Potential Witness related to the civil litigation.

The purpose of investigating the Potential Witness was to determine whether the Potential Witness could corroborate Ceglia's purported ownership interest in Facebook and support Ceglia's claims regarding the authenticity of the Facebook Contract. Therefore, these communications and documents are in furtherance of Ceglia's allegedly fraudulent purpose. Although these communications and documents do not expressly discuss the Facebook Contract, I find that they are reasonably related to the Facebook Contract because they are an integral part of Ceglia's strategy to demonstrate the contract's authenticity. These documents are therefore within the crime-fraud exception to the privilege and should be disclosed.[14]

## IV. Conclusion

For the foregoing reasons, the Government's Motion, (Doc. 70), is GRANTED IN PART and DENIED IN PART. Specifically, the Motion is DENIED with respect to Documents 00027, 00028, 00047, 00071, 00080, 00125, 01946, 01950, 02060, 02148, 02446, 02447, 03084, 06263, 14788, 14797, 14806, 18083, 18693, 18696, 19088, 20064, 20073, 20543, 21660, 21665, 21689, 22684, 23581, and KAS326. The Motion is GRANTED with respect to all remaining documents contained in the Narrowed Set provided to the Court on February 6, 2015.

All of the documents from the law firms in question have been available to the Wall AUSA and Ceglia's counsel for months. However, because all of the briefing and argument on this issue to date has been at a general level and has not addressed specific documents, I will give both parties an opportunity to offer any objections they may have to my rulings with respect to specific documents. By Monday, March 16, 2015, Ceglia and the Wall AUSA may file letter

[14] These documents are: 00083, 19122, 19144, 19216, 19260, 19261, 19267, 19282, 19283, 19399, 19400, 19657, 19669, 19671, 19676, 19677, 19685, 19686, 21617, 21619, 21620, 21622, 21625, 21635, 22675, 22677, 22678, 22680, 22638, 23189, and 23190.

briefs of no more than five pages asserting any document-specific objections. Any letter briefs should be emailed directly to chambers and should not be filed on the public docket. This is not an opportunity for Ceglia to re-litigate Judge Carter's determination and my determination there is probable cause to conclude that his civil lawsuit lacked a factual or legal basis. Nor is it an opportunity for the Government to re-litigate Judge Carter's determination and my determination that not every document is within the crime-fraud exception simply because it was generated in connection with the allegedly baseless lawsuit. No opposition briefs will be permitted. If either party does not intend to file document-specific objections, or if either party believes I have inadvertently neglected to rule on any document within the Narrowed Set, they should so advise me as soon as possible.

Until I resolve any objections, no documents may be disclosed to the prosecution team, and this Order shall not be filed on the public docket and may not be shared with the Ceglia prosecution team or with any other persons. I am taking these precautions to ensure that the substance of a potentially privileged document is not inadvertently disclosed to the Ceglia prosecution team or to anyone else until I have finally determined that the document is not privileged because it falls within the crime-fraud exception to the privilege.

Ceglia's motion to strike the Government's reply, (Doc. 86), is denied, and the Clerk of Court is respectfully directed to terminate Doc. 86. The Government's letter motion, (Doc. 100), pertaining to Ceglia's motion to suppress the privileged documents on the basis of misuse of the grand jury subpoena power is moot, and the Clerk of Court is respectfully directed to terminate Doc. 100.

SO ORDERED.

Dated: March 8, 2015
New York, New York

Vernon S. Broderick
United States District Judge