1                        B. Rose

2    manipulation.

3              Absent that, I think, you know, we

4    would proceed as if it were the correct time,

5    but, you know, your confidence of not having all

6    of those external factors would be much less than

7    it is when you have external evidence that's all

8    consistent with the time.

9         Q.    Well, what about -- okay.

10             And you've been an expert in other

11   cases; right, an expert witness?

12        A.    I have not been an expert witness in

13   other cases.

14        Q.    This is the first time you have ever

15   even sat for a deposition?

16        A.    Well, I have sat for a deposition

17   before.

18        Q.    Have you ever been asked hypotheticals

19   at those depositions?

20        A.    Yes.

21        Q.    Okay.

22             So you know that's a fair question for

23   experts, hypotheticals?

24        A.    Yes.

25        Q.    So the hypothetical I asked you was if

1                         B. Rose

2   the three e-mail servers didn't exist, none of

3   that data existed, it's fair to say you'd have

4   less confidence in the creation date of those two

5   TIFF images; true?

6        A.    I mean, again, your hypothetical asks

7   me to discard the servers, it doesn't -- I mean,

8   we would look for other, you know, other evidence

9   outside of that.

10            Assuming the only thing I have -- maybe

11  this is your hypothetical -- the only thing I

12  have is the time appended by the computer

13  itself --

14       Q.    Yes, assume that.

15       A.    -- would I be as confident as I am in a

16  case where I also have consistent evidence from

17  external servers?

18            No, I would not be as confident.

19       Q.    And if you found evidence of a system

20  clock being manipulated along with only having

21  the date appended to that file, would you be even

22  less confident in the accuracy of that creation

23  date?

24       A.    I think that would depend on the system

25  clock manipulation and our evaluation of how it

                              B. Rose

 1
 2   would have affected that particular e-mail.

 3             These are all very context -- the

 4   problem with the hypotheticals is they are all

 5   very contextual, so it really depends on the

 6   other evidence, you know, in terms of if I have a

 7   system clock manipulation that appears to have

 8   impacted that time, I wouldn't be confident in it

 9   at all.

10       Q.    How would you know if a system clock

11   manipulation affected a particular file's

12   creation date?

13       A.    Well, if you -- I mean, if I can show

14   that at the time the file was created on the

15   computer the system clock was backdated, that

16   would be one way.

17       Q.    Are you aware that Mark Zuckerberg --

18   related to the TIFF images attached to the Kole

19   e-mail, your expert opinion in that report was

20   that that is the authentic contract between the

21   parties; true?

22       A.    The TIFF images, the StreetFax contract,

23   yes.

24       Q.    And you are aware that Mark Zuckerberg

25   has never offered a declaration in this case

1                          B. Rose

2    agreeing with that position, that that is the

3    authentic contract between the parties?

4        A.    I am not aware one way or the other of

5    what Mr. Zuckerberg has offered in the way of

6    declarations.

7        Q.    Are you aware that none of the other

8    experts in this entire case have offered an

9    opinion that the StreetFax contract is the

10   authentic contract between the parties?

11       A.    I don't know that one way or the other.

12       Q.    Now, we talked a little bit earlier

13   about rootkits and malware; you remember I was

14   discussing that?

15       A.    Yes.

16       Q.    And rootkits can be used by hackers,

17   you would agree?

18       A.    Rootkits can be used by hackers, I

19   would agree with that.

20       Q.    Can hackers take over the operation of

21   a computer, is that one of the things hackers

22   have the ability to do?

23       A.    It depends, again, on the specific

24   circumstances.  I mean, if they have the proper

25   access and, you know, that the software which

1                        B. Rose

2    would allow that kind of control is in place,

3    yes.

4        Q.    Does that kind of software exist for

5    them to do that, for hackers to do that?

6        A.    Does it exist in the world?

7        Q.    Yes.

8        A.    Yes.

9        Q.    Can hackers take over e-mail programs?

10       A.    What do you mean, take over e-mail

11   programs?

12       Q.    Intrude on someone's computer and send

13   out e-mails on their behalf.

14       A.    Yes.

15       Q.    Can hackers intrude on someone's

16   computer and deposit files onto that person's

17   computer?

18       A.    There's no questions about what hackers

19   are capable of doing in the world today, yes.

20             Yes.

21       Q.    Well, let's talk about back in 2004,

22   then.

23             Would you amend any of my answers if I

24   asked you those questions and said in 2004 can a

25   rootkit be used by a hacker, is there a different

1                      B. Rose

2    answer?

3         A.    I think the same general answer would

4    apply to 2004.

5         Q.    Very well.

6              Did your work on this case cause you to

7    learn that anyone involved in this case has some

8    ability for computer hacking?

9              MR. SOUTHWELL:   Object to the form.

10        A.    Could you rephrase that?

11        Q.    You analyzed a bunch of computers in

12   this case; right?

13        A.    Right.

14        Q.    Some were provided or produced by Paul

15   Ceglia; correct?

16        A.    Correct.

17        Q.    Some were produced by Mark Zuckerberg?

18        A.    Correct.

19        Q.    In part of your analysis of those

20   computers did you learn that anyone involved in

21   this case has hacking ability?

22        A.    Nothing in my analysis indicated that

23   anyone involved in the case had hacking ability,

24   no.

25        Q.    Are you aware from things outside of

1                          B. Rose

2    your analysis that Mark Zuckerberg has some

3    proficiency as a computer hacker?

4        A.    I am aware in a general sense that

5    Mr. Zuckerberg has been accused of some actions

6    which were called hacking in the past; I do not

7    have any information regarding his proficiencies

8    or his ability to do that.

9        Q.    Are you aware that his company Facebook

10   has a hacking contest every year amongst

11   employees?

12       A.    No.

13       Q.    Are you aware that Mr. Zuckerberg has

14   hired renowned hackers to be employees?

15       A.    I'm not aware of that one way or the

16   other.

17       Q.    Did you look for evidence of hacking on

18   Paul Ceglia's parents' computer where these TIFF

19   images supposedly originated from?

20       A.    We did not.

21       Q.    But even if you looked at it, is it

22   possible that a hacker who accessed a computer

23   could leave no trace of that intrusion?  Isn't

24   that possible?

25       A.    It is theoretically possible for a

1                         B. Rose

2    hacker to leave no trace.

3        Q.    Now, the StreetFax contract that we've

4    been talking about you found on two different

5    pieces of media; correct?  I think you say that

6    at the top of 15, page 15 of Exhibit 21?

7        A.    Yes, that's correct.

8        Q.    And let's just be clear for the Court,

9    because later on on that page -- correct me if

10   I'm wrong -- you say, you clarify that the

11   StreetFax contract was found on a hard drive that

12   you analyzed and a forensic copy of that same

13   hard drive that you analyzed.

14             Is that a fair statement?

15       A.    I don't think we're clarifying anything.

16   I think we're being very clear about the pieces

17   of media we analyzed.  The StreetFax contract was

18   on two different hard drives.  I think we're very

19   clear on that very page; right?  I think actually

20   in the first paragraph in the second sentence

21   that in fact one is a copy of a hard drive that

22   we made and was produced to us in July and the

23   other, again, was a copy we made of StreetFax in

24   July that we determined upon analysis was a

25   actually a forensic image of the hard drive, so

1                          B. Rose

2    we have the Seagate hard drive that's produced to

3    us, we have a Western Digital, we determined the

4    Western Digital hard drive was in fact a forensic

5    copy that had been previously made of that, and I

6    think we're very clear about that in the second

7    sentence.

8        Q.    So the forensic copy was that physical

9    hard drive that had that forensic copy on it,

10   that was not produced by Paul Ceglia, that was a

11   copy made of something he produced; true?

12       A.    Are you referring to the Western

13   Digital hard drive?

14       Q.    I'm referring to the forensic copy that

15   you mentioned on page 15.

16       A.    Okay.

17             The forensic copy was on a Western

18   Digital hard drive that was produced to us in

19   Chicago by Mr. Lake as part of the Ceglia media.

20   To me, that's produced by Paul Ceglia, so I would

21   say that both of them in fact were produced to us

22   by Paul Ceglia.

23       Q.    Now, the computer where these TIFF

24   images were found, did you read Paul Ceglia's

25   father's declaration that was filed in this case

1                          B. Rose

2    that was document number 419?

3        A.    I may have read it at one point in

4    time, I don't have a specific recollection of

5    that.

6        Q.    Well, let's assume, since you don't

7    have a recollection of that, that Mr. Ceglia's

8    father declared that his son, Paul Ceglia, the

9    plaintiff, never had access to the computer on

10   which the Kole e-mail originated, let's assume he

11   says that.

12       A.    Rather than assuming it, can we

13   actually look at a copy of the --

14       Q.    This is a hypothetical for now.

15             Let's just assume he said that, which

16   I'll represent to you he did say that in document

17   419, but I'll let you answer the question with an

18   assumption, you don't have to accept the fact as

19   true, we'll just do the hypothetical.

20             Would that change your opinion that

21   Paul Ceglia sent those e-mails if his father

22   declared under the penalty of perjury that Paul

23   Ceglia never had access to that computer?

24             MR. SOUTHWELL:   Mr. Boland, are you

25        referring to document 419?

1                         B. Rose

2              MR. BOLAND:  That's what my notes say,

3        yeah.

4              MR. SOUTHWELL:  Because that's not what

5        it says.  It doesn't say anything about he

6        never had access.  It asserts my son Paul

7        Ceglia never used the computer, which is

8        contrary to some earlier declarations he's

9        provided, but --

10             MR. BOLAND:  Let's clarify that.

11        Q.    Let's just say hypothetically Mr. Ceglia

12   does offer a declaration of the father, Carmine

13   Ceglia, saying that Paul Ceglia never had access,

14   never used, never got anywhere near that

15   computer.

16             Would that declaration change your

17   opinion regarding your conclusion that Paul

18   Ceglia sent those e-mails?

19        A.    Based on the forensic evidence, I think

20   it is clear that Paul Ceglia sent those e-mails.

21   I would not regard a statement like that from

22   Mr. Ceglia to be credible in light of the

23   evidence that's been uncovered in this case, so

24   no, it would not change my opinion.

25        Q.    And how did, in your opinion, based on

1                          B. Rose

2     your forensic analysis, how did Paul Ceglia send

3     this e-mail, meaning was he physically at the

4     computer and hit the keys on the keyboard to send

5     it or did he somehow remotely access the computer

6     and then send the e-mail that way?

7          A.     Again, given the fact that the files

8     were copied physically to the hard drive, I would

9     think the most likely explanation is in fact a

10    physical access to the computer, but, you know, I

11    can't eliminate remote access as a possibility.

12         Q.     So you're saying one's more likely?  Is

13    that your --

14         A.     I believe so.

15         Q.     And define the term "likely."  What

16    does that mean?  How did you rule out the

17    likelihood of remote access?

18         A.     Define likely?

19                I think if I had to from -- if you

20    asked me do I think he had physical access or

21    remote access, I think there's a greater

22    probability, meaning more likely that he had

23    physical access, that's likely.

24         Q.     And what's the forensic evidence that

25    supports that opinion?

1                          B. Rose

2        A.      Again, I think the copying of the

3    scanned image to the hard drive immediately

4    beforehand to me is more consistent with physical

5    access, but, again, you know, you're asking

6    whether remote access is possible?  Yes.

7             And I should say, you know, I mean, I'm

8    talking remote access theoretically.  You know,

9    whether under the circumstances and the

10   capabilities that, you know, Adelphia had at the

11   time in terms of whether it offered Web access

12   and all of that, that's a specific question as to

13   whether in these circumstances remote access is

14   possible, I don't know that.

15             As a general matter, I can't eliminate

16   remote access as a possibility.

17       Q.      Did your investigation reveal where

18   Paul Ceglia resided at the time that e-mail was

19   sent?

20       A.      Our forensic analysis of the Ceglia

21   media did not reveal where Mr. Ceglia resided at

22   the time this was sent.

23       Q.      And did it reveal where Paul Ceglia's

24   parents' computer was physically located at the

25   time those e-mails were sent?

1                          B. Rose

2       A.      There is some evidence that in 2010

3    that IP address was registered to the Buffalo,

4    New York, area, so I think there's some support

5    for the fact that the computer resided somewhere

6    in upstate New York, but in terms of drawing a

7    definitive conclusion about where that resided, I

8    can't do that from the forensics.

9       Q.      Well, you'd agree with me that your

10   conclusion about -- again, another

11   hypothetical -- your conclusion about Paul Ceglia

12   having most probably physical access to the

13   computer to send the e-mails, if he resided

14   outside the state of New York and was physically

15   outside the state of New York at the time those

16   e-mails were sent, the likelihood of him being

17   the one who sent the e-mails is very low, since

18   he wasn't physically accessing the computer at

19   that time; true?

20              MR. SOUTHWELL:   Object to the form.

21      A.      I completely disagree with that.

22              I mean, the question is not where did

23   he reside, the question is where he is at a

24   particular point in time.

25              I reside in New York, I visit my

B. Rose

1
2  parents frequently in Indiana, so I don't

3  think -- and I use their computer when I'm there,

4  so I don't think you can possibly conclude from

5  where somebody purportedly resides that there's a

6  low likelihood they were at their parents' house

7  or at a location where their parents resided at

8  any particular point in time.

9      Q.    Well, let's not use reside.  I'll be

10  more precise.

11           What if hypothetically on the date and

12  time these e-mails were sent he was not

13  physically in Buffalo, New York, he was in

14  another state, then what's the likelihood he sent

15  the e-mails then, what's the probability he was

16  the one who sent the e-mail?

17      A.    I wouldn't want to put a number on it.

18           Again, you know, remote access is

19  possible.  I think it is more likely explained by

20  physical access, but in terms of if Mr. Ceglia

21  was in a particular location, what's the

22  likelihood he sent the e-mails, I think it is

23  absolutely clear from all of the evidence in this

24  case, from the StreetFax e-mails themselves, from

25  the attempt to manipulate the Work For Hire

Page 115

B. Rose

1

2   document, attempt to create fraudulent Work For

3   Hire documents, from all the manipulation of the

4   computer we see in this case I think it is

5   absolutely clear that the StreetFax e-mails, that

6   those e-mails are genuine, were sent by Paul

7   Ceglia and contain the authentic contract, so I

8   think the probability that Mr. Ceglia sent those,

9   regardless of where he was at any particular

10   point in time, is exceedingly high.

11       Q.    So it's your testimony that if at the

12   precise moment those e-mails were sent he was in

13   Florida or New Mexico when these were sent from

14   New York, same probability he sent them as if he

15   was in Buffalo?

16       A.    His location would not change my

17   assessment that Paul Ceglia sent those because I

18   think the evidence is absolutely overwhelming.

19           The only thing that would do would

20   change my conclusion about the form of access to

21   the computer, it would not impact my

22   determination as to who sent it at all because,

23   again, the forensics in this case is absolutely

24   overwhelming.

25       Q.    Outlook Express, which was the e-mail

1                           B. Rose

2    account from which this was sent, has the

3    capacity to synchronize with a Web-based account;

4    true?

5        A.    As a general principle, yes, that's

6    true.

7        Q.    Do you find any evidence that this

8    Outlook Express account was unable to synchronize

9    with a Web-based account?

10       A.    No.  Again, you know, I don't know the

11   specifics in terms of versioning and how and what

12   particular data was syncing, you know, those can

13   vary across time, so I don't know how this version

14   of Outlook Express operated in conjunction with

15   an Adelphia account, but I have no reason to

16   believe that there wasn't some syncing capability

17   because that's generally something that Outlook

18   Express offers.

19       Q.    And when Outlook Express synchronizes,

20   when it's set up that way, with an external

21   e-mail account, it can synchronize and pull down

22   everything, the inbox, the deleted files,

23   attachments, et cetera; true?

24       A.    I think it depends, again, on how it's

25   set up to sync.  There is certainly a possibility

1                          B. Rose

2    that -- and by deleted items I assume you are

3    talking about deleted items that still physically

4    reside in some kind of trash bin or something.

5        Q.    Yes, that is possible.

6        A.    There are certainly programs that sync

7    everything, there are programs that sync only the

8    inbox, there are programs that sync the inbox and

9    the sent mail, there are programs which sync

10   everything, it really depends, and a lot of

11   programs can be configured in different ways, so,

12   I mean, as a general matter, if you're asking me

13   is it possible, do there exist programs in the

14   world that allow you to sync the entire contents

15   of a Web mail account to a program like Outlook

16   Express, yes, that's true.

17       Q.    And I'm asking about Outlook Express

18   specifically, does it have the capability to

19   synchronize with a Web-based e-mail account?

20       A.    It does, again, but, you know, what

21   items specifically are synced I think could vary

22   from version to version and from configuration to

23   configuration, so as to this version of Outlook

24   Express, I don't know.

25             As a general principle, yes, Outlook

1                          B. Rose

2    Express does sync with Webmail accounts.

3        Q.    So if I have an Outlook Express account

4    and I have it synchronizing with my Web-based

5    account and I'm nowhere near my office computer

6    which has Outlook Express on it, but I'm here at

7    the offices of Gibson, Dunn and I get online to

8    my Web-based e-mail, the one that's synchronizing,

9    and I send an e-mail out with a couple of

10   attachments.

11             Are you with me so far?

12       A.    Yes.

13       Q.    Okay.

14             And I go back to my office two days

15   later and turn on my computer and Outlook Express

16   is configured to synchronize my entire inbox and

17   sent e-mails with my Web-based account.

18             You'd agree with me that that function

19   would pull down from my Web-based account an

20   e-mail that I sent here at Gibson, Dunn along

21   with the attachments that I sent?

22       A.    So your hypothetical is if you from

23   Gibson, Dunn sent two e-mails using your Webmail

24   account and then you returned to your offices and

25   opened Outlook Express would it sync?

Page 119

1                          B. Rose

2              I mean, I think that would depend on

3    how it was configured.  My guess would be you

4    would actually probably have to access the

5    Webmail account being synced, and I don't know

6    that there's --

7         Q.    But depending on how it was configured,

8    that could happen?

9         A.    Again, I think if you went and you

10   accessed your Webmail account and it was set up

11   to sync, yeah, I would think that certainly would

12   be possible.

13        Q.    Let's talk about the -- you are

14   familiar with the getzuck e-mail account, it's in

15   your report?

16        A.    Yes.

17        Q.    And you claim there that Mr. Ceglia

18   deleted e-mails from that account.

19        A.    Can I go to the part of the report

20   where we discuss that?

21        Q.    Let me ask you, do you recall that

22   conclusion, that he deleted e-mails from the

23   account?

24        A.    I recall the conclusion that e-mails

25   had been deleted from the account, it is in my

Page 120

                        B. Rose

1

2    recollection that we had evidence that that

3    account had been in use through 2011 and that

4    there were no e-mails existing in the account

5    prior to sometime in January, so the logical

6    conclusion is that something has been deleted.

7        Q.    Now, by the phrase you just used, the

8    account was in use, you mean the account was

9    opened at a certain date, that's what you're

10   calling in use?

11       A.    That's not what I'm calling in use.

12             What I'm calling in use, I'm saying the

13   account was actually used, not just opened.

14       Q.    And used for -- in what way?

15       A.    I would have to refresh my recollection

16   with the report for the specifics.  I know it was

17   used -- it was used in some way in connection

18   with a receipt of something from Facebook or

19   something like that, we found evidence of that,

20   and so it was evidence of actual use and not just

21   the fact that the account was opened.

22       Q.    Let's look at page 52 of your -- of the

23   Exhibit 21 you have in front of you --

24       A.    52, the top page?

25       Q.    Yes.

Page 121

1                        B. Rose

2              And I think section D is where you talk

3     about deletion of data from the getzuck Webmail

4     account.

5              Do you see that?

6              MR. SOUTHWELL:  Are you referring to

7     Exhibit 1?

8              MR. BOLAND:  What did I say?

9              MR. SOUTHWELL:  You said Exhibit 21.

10             MR. BOLAND:  I'm sorry, Exhibit 1.

11             Thank you for the correction.

12             MR. SOUTHWELL:  And we're on page 52 in

13     the upper right?

14             MR. BOLAND:  Page 52.

15     A.      Yes.

16     Q.      So the activity that you found --

17     correct me if I'm wrong -- was that the Ceglia

18     media was used to read an e-mail on April 18,

19     2011.

20             Do you see that phrase there?

21     A.      Mm-hm.

22     Q.      And that was an e-mail received from

23     Facebook, actually, on the activation of a

24     Facebook account; right?

25     A.      Yes.

Page 122

1                          B. Rose

2         Q.     And do you know how Facebook accounts

3    get set up?

4         A.     Not specifically.

5         Q.     Do you know if Mr. Ceglia had to send

6    an e-mail to someone at Facebook to set up that

7    account, if you know?

8         A.     I don't know.

9         Q.     So what you do know is an e-mail was

10   received from Facebook, so there's one; right?

11        A.     Yes.

12        Q.     And there's no evidence you found of

13   any e-mails being sent from that account; true?

14        A.     I believe the evidence we have, again,

15   is the evidence that's outlined here, that that

16   e-mail address was used to receive an e-mail

17   related to the Facebook account, yes.

18        Q.     And so my question is, no evidence that

19   e-mails were ever sent from that account; true?

20        A.     Well, I don't know whether that's the

21   case because I don't know whether in fact the

22   post-January 28, 2012 e-mail included sent

23   e-mails or not.

24        Q.     I'm just saying your report doesn't

25   show any evidence that he ever sent an e-mail

Page 123

                              B. Rose

1

2    from that account.

3              True?

4       A.    Again, that's not relevant to our

5    report; right?

6              We received that e-mail data, we looked

7    at it for only two things; one, we reviewed it

8    for presumptively relevant materials that would

9    be produced to you and then subsequently to

10   Gibson, Dunn to pass privilege review.

11             We identified no such data in the

12   existing data.  We did know from an Internet

13   analysis from the Ceglia media that in fact that

14   e-mail was in use for the purposes of receiving

15   an e-mail from Facebook in April 2011 and despite

16   that there was no content for any of 2011 up to

17   January 28th of 2012.  That indicates to me the

18   e-mail's been deleted.  I don't know who deleted

19   it, I don't know what the activity was that led

20   to the deletion, I don't know how much data was

21   received or sent prior to January 28, 2012.

22             Your question to me was do I have any

23   evidence that it was used to send e-mail.

24             What I'm saying is it's possible that

25   we have sent e-mail from after January 28, 2012.

Page 124

1                          B. Rose

2  I don't know, because my only analysis of that

3  media, of that data was to see whether there were

4  presumptively relevant materials.

5      Q.    But I'm talking about your conclusion

6  that my client did have e-mails in that account

7  and he deleted them.

8            It's fair to say your report indicates

9  that he actually had e-mails which he deleted

10 from that account; true?

11     A.    Yes, based on the conclusion, again,

12 that we have evidence it was in use and there's

13 no e-mail.

14     Q.    All right.

15           Let's ask about the Harvard e-mail

16 account of Mr. Zuckerberg.

17           You are aware that there are no e-mails

18 at all in that account from -- related to

19 Mr. Ceglia and Zuckerberg from, the earliest one

20 being June 2003, you are aware of that, that's

21 the earliest e-mail?

22     A.    I have not done a date analysis of that

23 e-mail, no.

24     Q.    Well, your team worked to produce the

25 e-mail that was provided us from that account;

Page 125

1                         B. Rose

2    true?

3        A.    Correct.

4        Q.    And were you aware that the e-mail that

5    your team produced using a variety of search

6    terms which included my client's name and

7    Mr. Zuckerberg didn't produce a single e-mail

8    between those two individuals until June of 2003?

9    Are you aware of that?

10       A.    I am not aware of the content of that

11   production.

12       Q.    All right.

13             Well, let's say that that's what

14   happened, okay, let's use a hypothetical.

15             Are you aware that the contract in this

16   case, the paper contract that's being disputed

17   has a signing date of April 28, 2003?  Are you

18   aware of that?

19       A.    Again, I don't think I've seen the

20   paper contract.

21       Q.    Copies that you've seen.

22       A.    Yes, the copies I've seen have a signing

23   date of that date.

24       Q.    Okay.

25             And April is before June in the

Page 126

1                          B. Rose

2    calendar; right?

3        A.     Well, April 2003 is before June 2003.

4        Q.     Correct.

5               And would you agree with me, then, if

6    there are no e-mails that you were able to

7    recover, your team, from Mr. Zuckerberg's Harvard

8    account from April to June of 2003, that

9    Mr. Zuckerberg must have deleted them?

10              MR. SOUTHWELL:   Objection.

11       Q.     I am asking if that's your conclusion

12   based on that hypothetical, if there's no e-mails

13   from April of '03 when the contract was signed

14   between the parties and June of '03, which was

15   the first e-mail that we were provided, they must

16   have been deleted?

17       A.     That would not be my conclusion.

18       Q.     Very well.

19              But it is your conclusion that my

20   client had the getzuck e-mail account in use and

21   because there's no e-mails in it, it's been

22   deleted?

23       A.     Excuse me --

24       Q.     Just let me finish the question.

25       A.     Excuse me, you keep misrepresenting

Page 127

1                         B. Rose

2     what I said.

3               What I said was --

4       Q.    Sir, I'm asking the questions.   I

5     didn't finish my question.

6       A.    And I'm answering the question.

7               What I said was that this e-mail

8     account was in use prior to January 28, 2012,

9     there was data in there.

10              MR. BOLAND:  I am going to object to

11          this entire answer.  There's no question

12          pending.  I'm going to object to everything

13          he is saying and ask that it all be stricken

14          from the record.

15      A.    I absolutely was clear with you that I

16    can't say who deleted --

17              MR. BOLAND:  You know, if we need to

18          dial up the judge, Mr. Southwell, and ask

19          him to instruct the witness to answer

20          questions, I'll be happy to take a break and

21          do that.

22              MR. SOUTHWELL:  He answered your

23          question.  I'm looking at the transcript

24          right here, he answered your question.

25              Why don't you let him finish.

1                        B. Rose

2              MR. BOLAND:  I didn't finish my

3       question before he started speaking.

4              MR. SOUTHWELL:  There was a question, a

5       question mark and then he proceeded.

6       Q.    It's your position that Mr. Ceglia

7   deleted e-mails from the getzuck account?

8       A.    It is my position that e-mail was

9   deleted from the getzuck account.

10      Q.    So your answer is yes?

11      A.    My answer is not yes.

12            Your question was my position is

13  Mr. Ceglia deleted the e-mail.  I am being very

14  clear with you that my position is there was

15  e-mail in that account prior to January 28, 2012

16  that is no longer there, meaning that it was

17  deleted.

18            I'm offering no opinion whatsoever

19  -- let's be clear about this -- as to how that

20  e-mail was deleted or as to who deleted it, so

21  the answer to your question is no.

22      Q.    How many e-mails were deleted?

23      A.    I do not know what was deleted, I do

24  not know what content was in that account.

25            Again, what I know is that that account

1                         B. Rose

2    was in use prior to January 28, 2012, we know it

3    received at least one e-mail.  There is no data

4    in that account, so something has been deleted; I

5    can't tell you who deleted it, I can't tell you

6    what has been deleted because that e-mail is

7    gone.

8        Q.    When were the e-mails deleted from that

9    account?

10       A.    I cannot tell you that except to say

11   that it was prior to January 28th of 2012.

12       Q.    Can a person set up an e-mail account

13   and not ever send an e-mail using that account?

14       A.    Yes.

15       Q.    What evidence do you have that

16   Mr. Ceglia set up this account and actually sent

17   e-mails out to someone?

18       A.    Again, the only evidence we would have

19   is if the post-January 28, 2012 e-mail includes

20   sent e-mail.

21            I don't have that information in front

22   of me, I don't know whether that's the case or

23   not.  I don't have evidence right now that I can

24   rely on to tell you that Mr. Ceglia set up that

25   account and sent e-mail from it.

1                          B. Rose

2      Q.      In your report you talk about a Hex

3   editor.

4              Do you recall that?

5      A.      I do.

6      Q.      And it's true that your analysis did

7   not find -- well, let me back up.

8              A Hex editor is a computer program?

9      A.      Yes.

10     Q.      You did not find any evidence of a

11   computer program in the category of Hex editor

12   installed on any of the media that you analyzed?

13     A.      No.   We found evidence of the use of a

14   Hex editor, but you're correct, we did not find

15   the actual Hex editor installed on the computer,

16   which, frankly, is not surprising given that

17   people who use Hex editors generally delete them.

18     Q.      And the anomalies that you found that

19   you attributed to a Hex editor, is a Hex editor

20   the only program that can create those anomalies,

21   if you know?

22     A.      Can I go to the page where we discussed

23   the --

24     Q.      Very well.

25     A.      So, I mean, so I think it depends on

Page 131

1                         B. Rose
2    what anomalies you're talking about.  I mean, I
3    think what we discuss is the fact that there are
4    six documents which I think, you know, including
5    ones named test document, including ones which
6    have the content that says I'm going to
7    essentially test how the Hex editor worked, and
8    it's not a direct quote, and I would give you the
9    direct language, but it's been redacted from this
10   report, that leads to our conclusion that in
11   fact, you know, this is consistent with someone
12   using a Hex editor to try to forge a document.
13            As to the second anomaly, which is is
14   in this sfwebworkforhiremz.doc which is an
15   anomaly in the metadata, depending on whether it
16   was viewed through, you know, Metadata Assistant,
17   which is a common tool we use, or a forensic
18   program like EnCase.
19            I think, based on the evidence, the
20   only reasonable conclusion is that this was the
21   result of a Hex editor; whether that is the only
22   possible explanation for that I don't know.
23     Q.    And what other explanations are
24   possible?
25     A.    I don't know.

Page 132

1                              B. Rose
2        Q.     The Hex editor in this case you claim
3    was used to manipulate metadata on a file;
4    correct?
5        A.     In one instance.
6        Q.     Well, what was it used for in the other
7    instance?
8        A.     It was actually used to create a
9    fraudulent document, it was used to test how the
10   Hex editor worked, it was used to essentially, I
11   think, merge documents together to try to create
12   a fraudulent document that appeared as if it was
13   one document.
14              I would say, frankly, that based on all
15   the evidence that it was your client's attempt to
16   manipulate the Work For Hire document and create
17   a fraudulent document.
18       Q.     So the Hex editor was used to alter
19   metadata is one of your conclusions; right?
20       A.     Yes.
21       Q.     What other ways can metadata be altered
22   other than a Hex editor, or is that the only way,
23   if that's what your testimony is going to be?
24       A.     Again, I think the anomaly we see here,
25   which is it being -- it's not just manipulated

1                      B. Rose

2    metadata, it's what we see, which is that when

3    you view it in metadata assistant you essentially

4    get no metadata.

5              When you view it in a forensic tool,

6    what you see is the metadata, although it is

7    interspersed with machine code.  I think that

8    particular circumstance -- I don't know that

9    there is any explanation for that other than the

10   use of a Hex editor, but, again, if you are

11   asking me whether anything else is possible, I

12   don't know whether there are any other

13   explanations, I don't think there are any likely

14   explanations given those circumstance.

15       Q.    That's not my question.

16             What other ways can metadata be altered

17   is my question, generally.

18       A.    I mean, there are programs which allow

19   you to manipulate metadata.

20       Q.    For example, can you list some of those?

21       A.    I don't know the names of the programs.

22   I mean, there are some open source tools that do

23   it, I know there are some software versions you

24   can buy that allow you to do it, I don't know the

25   names.

1                    B. Rose

2      Q.     How about if I copy files from my

3  computer on a CD and give them to you and you

4  copy them out of your computer at your office,

5  can metadata change during that process associated

6  with those files?

7      A.     Metadata can change, yes.

8      Q.     And that's not intentional change, it

9  just happened in that process, the hypothetical

10  that I gave you?

11      A.     Are you talking about like an update of

12  a creation date or an access date?

13      Q.     Yes.

14      A.     That can happen through ordinary usage.

15             This particular circumstance cannot

16  happen through ordinary usage.

17      Q.     How did you rule out ordinary usage as

18  not a possible cause of that, how did you rule

19  that out?

20      A.     The ordinary update of a file -- I

21  mean, you're right, if I have last 10 authors

22  metadata and I go on and I change the document, I

23  am going to now be the first last 10 author and

24  one of the names is going to drop off, that is a

25  common alteration if I am going to write the

1                          B. Rose

2    document.

3              To have this, last 10 authors metadata

4    with all of these question marks that essentially

5    metadata assistant is returning me the idea that

6    there's no metadata here, that's an anomaly,

7    that's not caused by ordinary usage of a file,

8    and the fact that I can now view it in EnCase

9    Forensic and see what some of the metadata is,

10   including the file path, that indicates to me a

11   Hex editor was been used.  That is not -- this

12   pattern where metadata assistant cannot give me

13   any metadata does not happen merely because we

14   exchanged a file and somebody modified it.

15       Q.    So the only cause for that is a Hex

16   editor is your opinion?

17       A.    I think the only reasonable explanation

18   for these facts is that a Hex editor was used.

19       Q.    That's not my question.

20             Is that the only way that that happened?

21       A.    Again, I think I've answered this

22   before.  I don't know whether anything else is

23   theoretically possible.  I'm drawing a conclusion

24   based upon the evidence I see.  In this case I

25   don't think there's a reasonable explanation for

Page 136

1                          B. Rose

2    this other than the fact that a Hex editor was

3    used.

4              Theoretically possible?

5              I don't know one way or the other.

6        Q.    Those 15 to 20 computers of

7    Mr. Zuckerberg's that someone on your team

8    evaluated, was there evidence of Mr. Zuckerberg

9    using those computers to electronically

10   communicate with anyone?

11             MR. SOUTHWELL:  Objection, calls for

12       speculation.  He already said he was not

13       involved with that.

14       Q.    If you know.

15       A.    I am not aware one way or the other.

16             MR. BOLAND:  Can we take it about a

17       10-minute break?

18             MR. SOUTHWELL:  Are you close to being

19       done?

20             MR. BOLAND:  I don't know.  I'm going

21       to take a break and sort of assess where I'm

22       at.

23             MR. SOUTHWELL:  We can go off the

24       record.

25             (Recess taken.)

Page 137

1                       B. Rose

2              THE VIDEOGRAPHER:  The tape is rolling.

3  BY MR. BOLAND:

4     Q.    Mr. Rose, we are back on the record.

5              I want to go back over a couple of

6  things that, just a couple of questions on a

7  topic or two that we already discussed.

8              Did your team -- your team evaluated 15

9  or 20 computers that Mr. Zuckerberg used

10  historically; right?

11     A.    I don't know that I would it call my

12  team; Stroz Friedberg personnel did, yes,

13  correct.

14     Q.    I'll be clear, Stroz Friedberg

15  personnel, right.

16              I am not going to ask you again, but we

17  already determined you don't know who actually

18  did the analysis or who supervised; true?

19     A.    Correct.

20     Q.    Did Stroz Friedberg rely on the

21  analysis of those computers in coming to the

22  conclusions in your report that you filed in this

23  case?

24     A.    Well, we -- I mean, we didn't find

25  anything relevant on those devices so no, the

Page 138

B. Rose

1
2  answer is no.

3      Q.    If you had found something relevant on
4  those devices would you have inserted it into
5  this report?

6      A.    I don't know.  I mean, you know, we
7  were -- we were asked to look at the authenticity
8  or inauthenticity of the document and to examine
9  Ceglia media, so we had to consider how that fit
10  into what the Court had asked us to do, but in
11  general, if we had found something in there that
12  I think, you know, was, it was relevant, I think
13  we would have considered including it, certainly.

14      Q.    The Kole e-mail that we had some
15  discussion about, is it possible that someone
16  other than Paul Ceglia, physically possible that
17  someone else other than Paul Ceglia could have
18  sent that e-mail?

19      A.    Is it physically possible?

20            I suppose anything's possible.

21      Q.    So the answer is yes, it's possible?

22      A.    Yes.

23      Q.    I know you've concluded otherwise;
24  true?

25      A.    I think it's implausible, but it's

1                          B. Rose

2    certainly theoretically possible.

3         Q.    Have you ever in either your personal

4    or professional work used the copy-and-paste

5    function on some content on the Internet and then

6    pasted into a document?

7         A.    Yes.

8         Q.    And are you familiar with one of the

9    common programming file formats for the Internet

10   is HTML?

11        A.    Yes.

12        Q.    And when you've copied and pasted

13   stuff from the Internet to a document has that

14   process ever resulted in that content's

15   formatting being different in the document from

16   what it looked like on the Internet?

17        A.    Yes.

18        Q.    In the conversation we had about the

19   Hex editor, I need to be a little more precise in

20   my question about one of the areas there.

21             Can you detail for me, list for me the

22   computer forensics evidence that supports your

23   conclusion that the person who used the Hex

24   editor was Paul Ceglia?

25        A.    Can you repeat that question?  I'm

Page 140

1                              B. Rose

2      sorry.

3          Q.      Yes.   Let me clarify.

4          A.      Sure.

5          Q.      I am aware from your report that you

6      believe, at the very least, a Hex editor was used

7      to manipulate some metadata.

8                  Is that a fair statement?

9          A.      Yes.

10         Q.      It was used?

11         A.      Yes.

12         Q.      And you detailed the forensic evidence

13     that you believe supports that opinion.

14                 Now what I'm asking you is not the

15     forensic evidence that supports that it was used,

16     but what, if any, computer forensics evidence

17     supports the conclusion that Paul Ceglia used the

18     Hex editor?

19                 And I'm saying forensic evidence.

20         A.      Sure.

21                 So the six documents that were created,

22     their names, for instance, document created to

23     copy out of test doc, that I think is very

24     clearly a pattern to try to create a merged

25     forged document.   Whether that was done by -- I

Page 141

1                            B. Rose

2   think that was clearly done by someone with

3   motivation to create a fake document.  In this

4   case the person with the motivation to create a

5   fake document, the person with the greatest

6   motivation is obviously Mr. Ceglia, who is

7   attempting to rely on it to support a claim worth

8   a tremendous amount of money, and whether it was

9   actually Mr. Ceglia did that or somebody working

10  in concert with Mr. Ceglia, I don't know, but I

11  think it's somebody clearly with motivations to

12  create a false document and in this case I think

13  the person with the greatest motivation is

14  Mr. Ceglia.

15      Q.    And how do you know what his motivation

16  is?

17      A.    How do I know what his motivation is?

18      Q.    How did you determine what his

19  motivation is?

20            You just talked about his motivation.

21            How did you determine that?

22      A.    My understanding is he claims to, based

23  on a contract, own half of Facebook.  That seems

24  like clear motivation to me, but --

25      Q.    Clear motivation to do what?

Page 142

                              B. Rose

1        A.     He's made a claim for half of Facebook,

2    and clearly your motivation there is money,

3    right?  Facebook's a tremendously valuable

4    organization.  I think the motivation is money.

5             The motivation, then how do you get a

6    claim?

7             Well, he can't base it on the real

8    document, the StreetFax contract, because that

9    doesn't mention Facebook, so I think the

10   motivation to create a false document is to try

11   to create something which is not real and didn't

12   exist in 2003 and is not a contract between Mark

13   Zuckerberg, but which appears to be a contract on

14   which you can support a claim.

15            I mean, your motivation, your ultimate

16   motivation is money.  The actions taken are, you

17   know, all of this, it's not just the Hex editor,

18   but all of this evidence of manipulation of

19   documents and fraud in an attempt to support that

20   claim.

21        Q.     But you don't have any opinion --

22   you're not challenging any of the plaintiff's

23   experts' opinions that the paper, two-page paper

24   document is real?

1                          B. Rose

2        A.    I'm limiting to digital forensics, I

3    haven't considered the paper at all, I have no

4    opinion about that.

5        Q.    You are not challenging any of their

6    claims?

7        A.    I have no opinion about it whatsoever.

8        Q.    Are you challenging any of their claims?

9        A.    I have no opinion about it.

10       Q.    The question is not whether you have an

11   opinion.

12             Do you have any evidence to challenge

13   their claims?

14       A.    I'm not challenging or not challenging

15   their claims, I have no opinion about their

16   claims.

17       Q.    Now, you talk about my client's

18   motivation sort of is outside the realm of

19   computer forensics, it seems to me, wouldn't you

20   agree?

21             His motivation doesn't come out of

22   metadata or applications or whatever, that

23   doesn't communicate someone's motivation?

24       A.    I think that's correct, yes.

25       Q.    And you are speculating about his

1                       B. Rose

2  motive?

3      A.    Well, I'm not sure I understand that

4  question.

5            I mean, I think -- I think it is a

6  clear motive.  Whether that's actually what's

7  motivating him, I mean, I think it's a fairly

8  clear motive, but I'm not inside his head, if

9  that's your question.

10     Q.    If his paper contract, which you have

11 no opinion about -- let's have a hypothetical --

12 if the paper contract's authentic, then you'd

13 agree with me he doesn't have a motive to fake

14 electronic documents because he's got a real

15 contract.

16           Again, it's a hypothetical.  If the

17 paper contract is authentic, he has no motive to

18 create electronic documents?

19     A.    So hypothetically, if his paper

20 contract is authentic, I would say that's

21 correct, given the forensic evidence that in fact

22 all of this fraud was attempted, I would say, you

23 know, that the corollary to that is it seems

24 clear that the paper contract is not the genuine

25 contract.

1                        B. Rose

2      Q.     But my question is if you assume it is,

3   so we're not going to talk about it not being

4   authentic, we are assuming it is authentic, then

5   he has no motivation to manipulate electronic

6   files; right?

7      A.     I would say that no one has the

8   motivation to manipulate the files and we

9   wouldn't see it on here, but we do, so, I mean,

10  that tells me the contract's not real.

11     Q.     Let's talk about motivation.

12             If the paper contract is real you then

13  would agree with me Mark Zuckerberg has a

14  motivation to do something to call into question

15  the authenticity of that paper document.  Don't

16  you think he -- he would lose a lot of money too

17  if the paper contract is authentic, wouldn't he?

18             MR. SOUTHWELL:  Object to the form.

19     A.     I certainly -- I mean, I guess I don't

20  know personally what he would lose versus, you

21  know, Facebook, who owns what in terms of

22  their -- but I assume it would have a very

23  detrimental financial impact on him where he

24  would have to give up half of Facebook.

25     Q.     So my point is about the motivation

```
 1                        B. Rose
 2    comment.  If the paper contract's authentic then
 3    Mr. Zuckerberg, just like Mr. Ceglia in the
 4    opposite conclusion, has a motivation to try and
 5    fake evidence to prevent that contract from being
 6    enforced; correct?
 7         A.    True.  And I do think if we had seen
 8    fraud going the other way, right, that the
 9    motivation might play in.  If we'd seen, you
10    know, that evidence that the StreetFax contract
11    was in fact apparently a fraudulent document, I
12    would agree with you that, you know, maybe we
13    would factor in the motivation and that my
14    conclusion would be that if the StreetFax
15    contract that we found, if the forensics
16    indicated it was a fake document, I think a
17    logical conclusion would be Mr. Zuckerberg faked
18    it.
19               That's not what the forensics shows.
20    The forensics clearly shows that the StreetFax
21    contract is authentic, there is overwhelming
22    evidence that there's been fraud perpetrated here
23    both in the creation of purported e-mails and the
24    Work For Hire contract relied on by your client.
25               The same holds true there.  Our
```

Page 147

                              B. Rose
1
2    conclusion is that the likely person who would
3    engage in that kind of fraud is Mr. Ceglia.
4            Now, whether any specific action was
5    actually taken by Mr. Ceglia or was done by
6    someone, you know, sharing the same motivation or
7    working in concert with him such as use of the
8    Hex editor, again, I can't pinpoint an individual
9    for you, but I can say that, you know, I think,
10   again, Mr. Ceglia is a likely candidate just as
11   if the forensics had cut the other way,
12   Mr. Zuckerberg would be a logical candidate, but,
13   you know, it didn't.
14       Q.   Are you aware that Mr. Zuckerberg was
15   provided a signed copy of the agreement he
16   entered into with Mr. Ceglia at the time it was
17   signed?
18       A.   I am not.
19       Q.   Okay.
20            Are you aware that there are e-mails
21   missing from Mr. Zuckerberg's Harvard e-mail
22   account from periods of time where he was in
23   communication with Mr. Ceglia?
24       A.   I am not.
25       Q.   And the two TIFF images that make up

Page 148

1                    B. Rose

2   the StreetFax contract are digital images.

3            We've already talked about that; right?

4       A.    Yes.

5       Q.    And you don't know where they -- what

6   device they originated from for sure; correct?

7       A.    Again, not beyond saying they appear to

8   be scanned documents which were then created on

9   the hard drive, you know, on the morning of March

10  3rd, yes.

11      Q.    And so they could have been scanned at

12  any point prior to March 3rd?

13      A.    They could have been.

14      Q.    And what computer forensics evidence,

15  specifically computer forensics evidence about

16  those TIFF images tells you they are the

17  authentic contract between the parties?

18           Not all the other stuff, because I know

19  you've gone into that multiple times, just those

20  two TIFF images, what is all the computer

21  forensics data about those images which tells you

22  that's the authentic contract?

23      A.    So, I mean, as an initial matter, let

24  me just say that I think in terms of analysis of

25  the authenticity of the StreetFax contract it is

1                         B. Rose

2    impossible from our standpoint to divorce that

3    from the other evidence that's on the computer,

4    including evidence that the purported e-mails

5    were fake, that there was manipulation of

6    documents, there's backdating of the system clock

7    on multiple occasions.

8              Having said that, if you just analyze

9    that alone, and it's not what we do, right, we do

10   everything in context, but if you just look at

11   the TIFF images alone I think you have the fact

12   that it was found on a computer belonging to

13   Mr. Ceglia, it was e-mailed to his attorney, it

14   was e-mailed on March 3rd of 2004, it was

15   e-mailed through intermediary servers at Adelphia

16   and Sidley & Austin before residing at Sidley &

17   Austin.

18             The fact that Sidley & Austin

19   maintained a copy of the e-mail, so you have both

20   the sending side and the receiving side of a

21   contract, the fact that it was sent via e-mail

22   that says -- again, typed, but says Paul to his

23   attorney saying this is the contract with Mark,

24   the fact that you have the March 4th and 5th

25   e-mail chain where, again consistent with the

1                       B. Rose

2    small images you've talked about, Mr. Kole says,

3    I can't read this, there's a handwritten note,

4    all of that evidence shows me that this is a

5    genuine contract.

6               I mean, frankly, to me, having the

7    plaintiff produce a piece of media that contains

8    a contract that does not support his claim and

9    having the same e-mail that based on a forensic

10   analysis was purportedly sent to Sidley & Austin,

11   to have that be produced by Sidley & Austin, I

12   mean, even if you put all the other evidence

13   aside, that ends this case, I mean, that is clear

14   smoking-gun evidence that the StreetFax contract

15   is the authentic contract e-mailed from your

16   client to his lawyer at Sidley & Austin and

17   you've got both sides of the conversation

18   producing the same identical e-mail chain.

19     Q.    Let me try this way, because you are

20   not answering my question.

21               MR. SOUTHWELL:  Objection.

22     Q.    Here's a hypothetical, trying to make

23   this more precise.

24               If you found an e-mail between Paul

25   Ceglia and Jim Kole that had a photograph

1                         B. Rose

2    attached to it that showed Paul Ceglia's mother

3    walking on a wire between two buildings in

4    downtown New York, okay, like a wire walker,

5    would it be -- and you found all of the server

6    information that you just detailed that went from

7    here to here to here, all the servers, and Sidley

8    Austin had a copy of that e-mail on their server,

9    everything you've just said about that, would it

10   be your position that that image of his mother

11   walking on a wire 400 feet in the air is an

12   authentic picture of an event that actually

13   happened?  Would that be your position?

14        A.    Forgive me if I pause for a minute,

15   this is an awfully strange hypothetical.

16             So let's assume -- I mean, if I have an

17   e-mail and the e-mail says, Hey, Jim, this is my

18   mom tightrope walking, Paul --

19        Q.    There you go.

20        A.    -- I mean, I guess the question in my

21   mind would be is there any evidence she is

22   actually a tightrope walker; right?

23             I mean, it's sort of an odd

24   hypothetical because you have posited a photograph

25   of a woman doing something that very few people

1                          B. Rose

2   in the world could actually do, so the fact that

3   the image itself is fairly unrealistic, again,

4   you know, these are all fairly contextual

5   analyses, then I think it would lead me to

6   question whether -- I mean, it wouldn't lead --

7   it would clearly be an e-mail sent from, you

8   know, from, I think -- it wouldn't lead me to

9   question it was sent from Paul to Jim Kole, it

10   would lead me to question whether it was actually

11   a true image, but just because of the

12   strangeness, in this case, you know, it's a

13   hypothetical which is completely off point to the

14   actual case, which is you have a standard

15   contract being e-mailed from, you know, Paul to

16   his lawyer at Sidley & Austin and a subsequent

17   conversation about it.

18       Q.    Well, to be clear, the e-mail was

19   actually e-mailed from an account owned by Vera

20   and Carmine Ceglia; true?

21       A.    Well, let's be careful.

22            It is an account that is registered to

23   Carmine Ceglia.  The user name resolves to Vera

24   Ceglia and the e-mail is signed -- again, as you

25   pointed out, not a signature, but typed, is Paul.

1                          B. Rose

2      Q.     So do you feel you're qualified to

3   testify about the authenticity of images

4   generally when you see them attached to e-mails,

5   you can declare which images are authentic and

6   which images are not?

7              MR. SOUTHWELL:   Objection to form.

8      Q.     Just yes or no, are you qualified to

9   testify about it?

10     A.     It is not a yes-or-no question, it

11   would depend on the circumstances.

12              I mean, in a case like this where I

13   think you have obvious evidence of authenticity

14   and obvious evidence of fraud, it's a fairly

15   straightforward case.

16              In other cases I could see, you know,

17   you depending again on what the image was and

18   what the question was, in some cases I would say

19   yes and in some cases no, but it would depend on

20   what analysis was needed.

21     Q.     If I sent an e-mail to Mr. Southwell

22   and typed the message, Hey, check out this

23   contract, Alex, signed, and then typed in Bryan

24   Rose, is it your position that you sent that

25   e-mail?

1                        B. Rose

2              I would assume not.

3      A.     So you're -- if you sent an e-mail to

4  Alex and typed Bryan Rose, is it my position that

5  I sent that?

6              No.

7      Q.     No.  I sent a message saying, Alex,

8  this is Bryan Rose sending you a contract, and I

9  typed Bryan Rose, that's not from Bryan Rose is

10  it?

11     A.     Not if you sent it, no.

12     Q.     Correct.

13             Just because your name is typed at the

14  bottom doesn't mean it's sent from you; true?

15     A.     That's true.

16             Again, if you isolate -- if you isolate

17  any individual piece, it's possible to say there

18  are other possibilities, but, again, that's not

19  what we do.  We analyze the forensic evidence in

20  the entire context of the case, and so that is

21  one piece of evidence, the fact that it went to

22  Jim Kole is another piece of evidence, the fact

23  that Jim Kole had a handwritten note where he

24  responds is another piece of evidence, the

25  evidence of backdating is another piece of

Page 155

                           B. Rose

1

2  evidence.

3          This is all part of building a picture

4  of what happened, and so, I mean, if you pull out

5  any piece of evidence and say what's possible,

6  that's one thing.

7          That's not what we do.  We consider it

8  in the context of the entire case and we say what

9  are the reasonable explanations for this, and

10 given the forensic evidence in this case, the

11 only reasonable explanation is that the StreetFax

12 contract is authentic and that your client was

13 engaged in a massive fraud to attempt to generate

14 a fraudulent contract, that's the only reasonable

15 explanation for the digital forensics taken as a

16 whole.

17     Q.    You've made that clear.

18          Can we go to page 21 of your report,

19 which is Exhibit 11 --

20     A.    You mean the top level?

21     Q.    Yes.

22          You just mentioned a response from Jim

23 Kole.

24          This is the document you were referring

25 to; right?

Page 156

                          B. Rose

1

2      A.     Correct.

3      Q.     And can you -- I'm going to be real

4   specific.

5             Can you read the date and time of that

6   e-mail being sent allegedly from Jim Kole?

7      A.     Friday, March 5th, 2004, 11:44 a.m.

8      Q.     So that's a day later than the alleged

9   Kole e-mail was sent to him; true?

10     A.     I believe it's two days later, correct.

11  The Kole e-mails were sent by Mr. Ceglia on March

12  3rd, 2004.  This response appears to be on March

13  5th, 2004, so that's two days.

14     Q.     Even better.

15            Whose handwriting is on the document?

16            What computer forensics evidence tells

17  you who wrote that handwritten note?

18     A.     Based on the context the fact that it's

19  on an e-mail printed out by Jim Kole and the fact

20  that it is giving legal advice about a contract

21  that was put in front of him by Mr. Ceglia, the

22  context indicates to me that it's Mr. Kole's

23  handwriting, but we haven't -- we are not

24  forensic -- we are not handwriting experts and,

25  you know, I couldn't tell you ultimately who

Page 157

1                          B. Rose

2   wrote that.

3       Q.     And this is a reply to Paul's -- I'm

4   sorry, this is an e-mail from paulceglia@msn.com

5   at the top; right?

6               MR. SOUTHWELL:   Objection.

7               Can you just be specific?   You're

8       referring to the top from Ceglia to Kole on

9       March 5th or the ones below?

10      Q.     The very top of the e-mail where it

11  says from paulceglia@msn; isn't that correct?

12      A.     Which one, again, the top level e-mail?

13      Q.     The most top level --

14      A.     Yes, that is from paulceglia@msn.com.

15      Q.     Right.

16              Then let's go down into the body of the

17  e-mail, there's another e-mail referenced there

18  and there's the next word "from" and a colon and

19  "to" and a colon.

20              Do you see that?

21      A.     Are we talking about the e-mail

22  immediately below towards the top level, the

23  reply to, yes.

24      Q.     Yes.

25              And that's paulceglia@msn as well?

```
 1                         B. Rose
 2      A.    Correct.
 3      Q.    Let's go a little farther down
 4   underneath a little portion that says "original
 5   message" and under there it says "from," and you
 6   see that says paulceglia@msn again?
 7            MR. SOUTHWELL:  The one on March 4th?
 8      A.    March 4th, 2004 at 9:49 a.m., yes,
 9   that's correct.
10      Q.    So this, you would agree with me,
11   appears to be an exchange between, if it's
12   authentic, Mr. Kole and Mr. Ceglia who is
13   communicating using his msn account?
14      A.    Correct.
15      Q.    Okay.
16            And as you pointed out, the
17   communication that is the Kole e-mail came from
18   an account registered to Carmine Ceglia with the
19   user name Vera Ceglia?
20      A.    Correct.
21      Q.    And it's your position that this
22   represents a reply by Mr. Kole two days later to
23   the e-mail that came from the Adelphia account?
24            MR. SOUTHWELL:  Objection,
25      mischaracterizes.
```

1                         B. Rose

2        A.     That's not my position.

3               That is clearly a separate e-mail

4    chain, so the Kole e-mails -- the Kole e-mails

5    that were sent on March 3rd are not part of this

6    chain, so, you know, what it looks like,

7    Mr. Ceglia sends the March 3rd e-mails to

8    Mr. Kole, then opens up a new e-mail chain using

9    his msn account and they go back and forth based

10   on that, and so this is -- so it's not a direct

11   reply.

12               What I'm saying is based on the

13   content, right, it appears to be discussing the

14   contract that was provided on March 3rd, 2004,

15   including a reference to the fact that it can't

16   be read.

17        Q.     Do you know if it was actually

18   discussing that blurry TIFF image or another

19   blurry TIFF image?  Do you know?

20               Did your forensics analysis tell you

21   what blurry image they're talking about?

22        A.     We only have evidence of one blurry

23   TIFF image, so we have one blurry TIFF image or

24   two blurry TIFF images sent on March 3rd, 2004,

25   and a response here indicating that he's received

1                         B. Rose

2  blurry TIFF images, which we know he received,

3  right, because we know, A, Sidley & Austin still

4  has them and we know he forwarded them on, so,

5  yes, I'm basing that on the context here that

6  when he's referring to blurry TIFF images he's

7  referring to the blurry TIFF images we know he

8  received two days before.

9       Q.    And he is referring to the blurry TIFF

10 images he received from the Adelphia account is

11 your position about when you read this e-mail

12 here?

13      A.    That seems to me to be a reasonable

14 inference based on what we know, yes.

15      Q.    And how did you rule out someone

16 scanning --

17      A.    Again, I'm talking about what --

18      Q.    Let me finish the question, sir.

19      A.    Yes.

20      Q.    How did you rule out additional e-mails

21 with blurry TIFF images sent from Paul Ceglia's

22 msn account to Jim Kole and he's replying

23 regarding that, how did you rule that out?

24      A.    I haven't ruled that out.  What I'm

25 saying is what is the likely and reasonable

Page 161

1                           B. Rose

2    explanation.

3         Q.    How likely is it that an e-mail was

4    sent by Paul Ceglia from his msn account with

5    blurry attachments that he's responding to here,

6    how likely is that?

7         A.    Well, I think given the fact that we

8    know he sent blurry TIFF images two days before,

9    it's unlikely.

10              I don't know how to --

11        Q.    Why is it unlikely?  What do you know

12   about Mr. Ceglia's personal habits that make it

13   unlikely in that two-day period he did not send

14   blurry TIFF images to his lawyer by his msn

15   account?

16        A.    I think it's probably unlikely he's

17   sending multiple copies of blurry TIFF images,

18   but --

19        Q.    Why is it unlikely?  How did you

20   determine that?

21        A.    It seems to me people don't generally

22   do that, but, you're right, he could have sent a

23   thousand blurry TIFF images, it seems exceedingly

24   unlikely to me, but I have not ruled it out.

25        Q.    Why is it unlikely?

1                    B. Rose

2      A.    Again, I think I've answered that

3   question.  It seems to me that if you have a

4   reference to an attorney having been sent blurry

5   TIFF images and we know that two days before he

6   was sent blurry TIFF images that we know he

7   received, the likely explanation is that he's

8   referring to those TIFF images.  I have not ruled

9   out the fact that he's referring to other TIFF

10  images.

11     Q.    And there's an intervening two-day

12  period between the Kole e-mail and this one;

13  right?

14     A.    Correct.

15     Q.    And the Kole e-mail and this one were

16  sent with two different e-mail accounts?

17           I'm sorry, the Kole e-mail is sent with

18  an Adelphia account; true?

19     A.    The Kole e-mail was sent from -- yes.

20     Q.    And these exchanges with Mr. Kole are

21  sent by Mr. -- are with Mr. Ceglia at his msn

22  account; correct?

23     A.    Correct.

24     Q.    Okay.

25           So for two days some number of

1                          B. Rose

2    e-mails we will never know, right, went back and

3    forth between Mr. Kole and Paul Ceglia from his

4    msn account.

5              You don't know how many they sent back

6    and forth during those two days, do you?

7        A.    Well, I know -- I mean, based on the

8    evidence we have, it would appear to be as if the

9    e-mail chain here is four e-mails.

10             Whether, you know, how many more than

11   that, that puts a lower limit on it.  I can't

12   tell you how many e-mails would be in the entire

13   chain.

14       Q.    And they could have simultaneous

15   different threads going back and forth that

16   aren't even included here; right?

17       A.    They could.

18       Q.    So you don't know?

19       A.    I don't.

20       Q.    Now, your report also challenges

21   generally the authenticity -- let me back up.

22             Are you aware that there have been two

23   documents -- two categories of documents

24   submitted to the Court thus far as attachments to

25   pleadings that Mr. Ceglia is claiming are

```
 1                        B. Rose
 2   authentic, one of which is the two-page paper
 3   contract -- you're aware he's claiming that's
 4   authentic; right?
 5        A.    Yes.  You are referring to the Work For
 6   Hire, what we call the Work For Hire document?
 7        Q.    Yes.
 8        A.    Yes.
 9        Q.    And he's also attached to an amended
10   complaint copies of e-mails that he exchanged
11   with Mr. Zuckerberg which he's claiming are
12   authentic e-mails exchanged with Mr. Zuckerberg.
13             MR. SOUTHWELL:  Objection.  That's not
14        in evidence, he didn't attach any e-mails.
15        Q.    He attached documents to an amended
16   complaint purporting to be copied and pasted
17   e-mails between him and Mr. Zuckerberg.
18             MR. SOUTHWELL:  Take a look at the
19        complaint, there's nothing attached.
20        Q.    It's attached -- well, let's just
21   assume you've evaluated e-mails that he claims to
22   have exchanged with Mr. Zuckerberg; true?  You
23   took a look at them?
24        A.    We have evaluated Word documents
25   containing what appear to be cut and paste --
```

Page 165

1                        B. Rose

2      Q.    Well, my client admits they are copied

3  and pasted into the Word document, does he not?

4      A.    Well, I should say that are claimed to

5  be cut and pasted.

6          I mean, I am aware that Mr. Ceglia

7  claims to have Word documents containing e-mails

8  that purportedly support his claim.  We

9  identified in our forensic analysis three Word

10  documents that we believe to be those e-mails.

11     Q.    And you analyzed them?

12     A.    Correct.

13     Q.    And there's at least two areas of that

14  analysis which support -- and maybe there's more,

15  you can correct me -- your claim and your report

16  that those e-mails are fakes, so let's go over

17  them.

18          One of the areas is the Coordinated

19  Universal Time as it appears in those e-mails is

20  incorrect based on the fact that it was Daylight

21  Savings Time at the time they were sent; right?

22     A.    So, yes --

23     Q.    Is that the e-mails --

24     A.    There is a group of e-mails, I believe

25  it is sent between October 2003 and April 2004 at

B. Rose

1
2    which point Eastern Standard Time would have been
3    in effect and the offset that's in the e-mails
4    appear to be Eastern Daylight Time which is an
5    anomaly which shouldn't occur.
6        Q.    Right, that's one area.
7             And the second area you indicate in
8    your report is formatting and differences between
9    these e-mails, for example -- and I think you
10   might remember this one, in one of the e-mails
11   the word "Tuesday" is spelled out and in the
12   other one it's abbreviated, things like this is
13   one of the other ares that you indicate supporting
14   your belief that those are fraudulent; true?
15       A.    Yes, and that's inconsistencies that
16   they both between the way those should appear,
17   for instance, the way, you know, Microsoft
18   Hotmail would abbreviate Tuesday and the way it's
19   actually abbreviated in the e-mails themselves,
20   so Microsoft, you know, abbreviates it T-u-e, if
21   you cut and paste it out it should not say
22   T-u-e-s, and I know you asked questions earlier
23   about whether formatting differences can be
24   introduced during cut and paste; that's true,
25   but, for instance, the addition of an "s" is not

1                          B. Rose
2    a formatting difference that would occur, so I
3    think that's clear evidence of fraud.
4              There's also inconsistencies among the
5    documents themselves, so after the "from," colon,
6    sometimes there's one space, sometimes there's
7    two, after the "to" there are an inconsistent
8    number of spaces, there are various formatting
9    inconsistencies like that and, again, going back
10   to your point about copy and paste, to the extent
11   I copy and paste out Hotmail documents and the
12   formatting change, I would expect it to change in
13   a consistent way, I wouldn't expect the copy-and-
14   paste operation to, for instance, insert two
15   spaces after "to" sometimes and three in another
16   and one in another.
17        Q.    Why would you expect it to do it in a
18   uniform way?
19        A.    Generally -- because, again, when you
20   are cutting and pasting, if you are cutting from
21   the same source to the same source, what you
22   would expect to see is a consistent change.
23        Q.    Did Mr. Ceglia cut from the same source
24   to the same source?
25        A.    My understanding is he's cutting from

Page 168

1                        B. Rose
2    his Hotmail account, yes.
3        Q.     On what computer was he copying that
4    from?
5        A.     He is copying it from his account, it
6    wouldn't matter what computer he's copying it
7    from, you're copying from an Internet Webmail
8    account, the data is residing on Hotmail servers,
9    it wouldn't matter what computer he's using.
10       Q.     Would it matter what browser he's
11   using?
12              All browsers format Web mail the same;
13   is that your position?
14       A.     Well, so for the T-u-e-s, right, that
15   difference and --
16       Q.     No.  I'm asking you do all browsers --
17       A.     You asked me a question, I'm trying to
18   answer the question.
19              MR. BOLAND:  He is rephrasing the
20       question.
21              MR. SOUTHWELL:  He is answering your
22       question.
23       Q.     Do all browsers format Webmail accounts
24   the same?
25       A.     No.

Page 169

1                        B. Rose

2       Q.      What browser was Mr. Ceglia using when

3    he copied and pasted each one of these e-mails?

4       A.      I don't know.

5       Q.      How did Hotmail function when it came

6    to abbreviations of things like Tuesday in 2004?

7       A.      It abbreviated it T-u-e.

8       Q.      How do you know that?

9       A.      I think we've tested, we've seen the

10   way it format, Hotmail formulates Tuesday and it

11   is T-u-e.

12      Q.      In 2004 you ran tests to confirm that?

13      A.      My understanding is that we confirmed

14   that in fact that's the way Hotmail abbreviates

15   T-u-e.

16      Q.      Where do you get that understanding?

17      A.      So that understanding was passed --

18   that information comes from, I believe, directly

19   from Mike McGowan.

20      Q.      So it's your testimony that Mike

21   McGowan in 2004 tested the Hotmail server?

22      A.      No, that's not my testimony.

23      Q.      Okay.

24              How did he determine in 2004 that's how

25   Hotmail worked?

Page 170

1                        B. Rose

2      A.     I don't know how he determined that.

3      Q.     To the best of your recollection he's

4  the person who told you that that's how it worked

5  in 2004?

6      A.     Yes.

7      Q.     Okay.

8             Did anyone else from Stroz Friedberg

9  conduct any testing on how Hotmail might have

10  worked in 2004?

11     A.     I don't know the answer to that, I

12  don't know if the information came directly from

13  him.

14             I would also just note that how that

15  works in 2004 is one question.

16             I would also note that you would expect

17  it to work the same way in 2004 each time; in

18  other words, you wouldn't expect Hotmail in 2004

19  to sometimes abbreviate T-u-e, sometimes

20  abbreviate T-u-e-s.

21     Q.     Why would you not expect that?

22             Do you know how Hotmail operates?

23     A.     Because they don't configure themselves

24  back and forth like that, right, there's a

25  uniform configuration that they don't just run

1                          B. Rose

2    and change willy-nilly.

3        Q.    How do you know there's a uniform

4    configuration, what's your basis for that

5    statement?

6        A.    The Webmail account displays dates in a

7    consistent format.

8        Q.    What's your basis for that in 2004

9    Hotmail consistently displayed Webmail account

10   information?

11       A.    I think it is unquestionable that that

12   would be the way it would operate, but if you

13   feel -- I mean, and the idea somehow that

14   Hotmail, the way they set themselves up, right --

15   and these are all behind-the-scenes configurations

16   -- that they somehow had a configuration which

17   allowed T-u-e sometimes and T-u-e-s other times

18   as the display is completely implausible to me.

19       Q.    What's your basis for it being

20   implausible?

21       A.    I'm saying it's implausible.

22             These are behind-the-scenes

23   configurations that display uniformly over time.

24   Now, that's not -- I just -- it's implausible to

25   me that when you're talking about a series of

```
 1                    B. Rose
 2    documents from the same time frame, sometimes
 3    very close together, that they're going to
 4    display inconsistently is just implausible.
 5        Q.    Based on what?
 6        A.    It's my experience and my understanding
 7    of the way they operate.
 8        Q.    And do you have any experience with
 9    Hotmail back in 2004?
10        A.    I mean, I don't know.  I think I may
11    have been a Hotmail user back in 2004, but --
12        Q.    Were you or were you not?
13        A.    I don't recall.
14        Q.    And the version of Microsoft Word
15    used -- that contains these documents that this
16    data was pasted into, how was Microsoft Word
17    configured back at that time to handle the
18    pasting-in of data from a browser like a Webmail
19    account?
20        A.    I'm not sure I understand that
21    question.
22        Q.    What kind of changes could Microsoft
23    Word's program cause to data that's copied and
24    pasted from a Web mail account back in 2004?
25        A.    I don't know.
```

Page 173

1                     B. Rose

2      Q.    Did anyone from Stroz Friedberg try and

3  test the versions of Microsoft Word that these

4  documents were created in to see what changes

5  might occur, if you know?

6      A.    Not that I'm aware of.

7      Q.    Did you ask Microsoft for any advice on

8  how formatting changes might have occurred through

9  that process?

10     A.    We did not have any conversation with

11 Microsoft about that.

12     Q.    Did you contact Hotmail?

13     A.    No.

14     Q.    Did you attempt to configure a Hotmail

15 server the way it would have been configured back

16 in 2004, e-mail server?

17     A.    No.

18     Q.    And did you test even in the current

19 time, 2011, how data copied from different Web

20 browsers in Webmail accounts and then pasted into

21 Microsoft Word might result in different

22 formatting?  Did you run that test?

23     A.    I did not.  I don't know whether it was

24 done.

25     Q.    Now, the Coordinated Universal Time

1                         B. Rose

2   that appears in an e-mail if -- let's just say

3   2011 as a hypothetical, assume this is the case,

4   but I'll just ask you to assume it as a

5   hypothetical, that Daylight Savings Time, we went

6   from Standard Time to Daylight Savings Time

7   somewhere in March of 2011, the date's not

8   relevant to the question, is it the case that if

9   an e-mail is sent before that change of time, but

10  the person doesn't open it until after we've

11  changed into Daylight Savings Time, what

12  Coordinated Universal Time would appear in that

13  e-mail if it's opened at that time?  Is

14  Coordinated Universal Time reflective of when the

15  person actually opens the e-mail or when the

16  e-mail was sent?

17       A.    So it would in general, I think,

18  display based on the time zone of the computer

19  clock being used to view it, but I don't know

20  with Hotmail how that would operate in that

21  hypothetical.

22       Q.    And if that computer clock is set

23  correctly, hypothetically, then the Coordinated

24  Universal Time in that e-mail should be correct,

25  should be accurate?

                        B. Rose

1       A.      Again, I don't know how Hotmail

2   specifically operated there.

3       Q.      Are there any -- you conclude about

4   these e-mails that the Coordinated Universal Time

5   is not consistent with the time of year in which

6   they were allegedly received, I believe -- I'm

7   summarizing and if I'm doing it incorrectly,

8   please put the words in you think make it

9   correct.

10      A.      Okay.

11      Q.      Is it only fraud which could be the

12  cause of that Coordinated Universal Time being

13  apparently in error in these e-mails?  Just the

14  e-mail itself, not considering everything else

15  that you clearly think my client's committing a

16  fraud, just looking at that e-mail and

17  Coordinated Universal Time is off, is the only

18  conclusion for that fraud got to be fraud?

19      A.      So forgetting -- I guess I'm forgetting

20  everything else I know, I just got an e-mail --

21      Q.      If I just give you an e-mail and I say

22  I just got this e-mail today or it was sent today

23  and received today and you look at it and say,

24  Well, Dean, the Coordinated Universal Time is

Page 176

1                          B. Rose

2     off, would you then say, in my opinion that

3     e-mail is a fraud because of that one fact?

4          A.    I'd say that standing alone, no, not

5     necessarily.

6          Q.    And the formatting differences we

7     talked about before, standing alone, not

8     indications of fraud necessarily either, they can

9     just occur sometimes?

10         A.    I think the formatting differences we

11    see here are clear indications that the document

12    has been manipulated, so I would disagree with

13    that.  I don't think there's any plausible

14    explanation that these could be the result of

15    formatting differences introduced as a cut-and-

16    paste operation, so I would disagree with that.

17              You're asking me the mere appending of

18    the wrong time zone to an e-mail standing alone

19    without any other fact surrounding it, there

20    could be other explanations for that.

21         Q.    And are you aware of any e-mails or

22    references to e-mails in this case from a source

23    other than Mr. Ceglia which have the wrong

24    Coordinated Universal Time attached to them?

25         A.    I am aware -- I'm trying to think in

1                        B. Rose

2    terms of the time zones -- there is in, I think,

3    one of the, again, the intermediary servers in

4    the Sidley & Austin e-mails had the wrong time

5    zone setting; those are the only examples I can

6    think of.

7        Q.    Let me try and jog your memory a little

8    bit.

9              You and I have exchanged e-mails in the

10   past couple of weeks about this Kasowitz letter

11   issue; are you generally familiar with that?

12       A.    Yes.

13       Q.    You sent me a TrueCrypt container on a

14   couple of occasions, and there's an item 379,

15   does that ring a bell, as one of the items we've

16   been corresponding with and --

17       A.    It does.

18       Q.    And you had to evaluate that item to

19   see if it was relevant to put it on a relevant

20   items log in the past; do you recall that?

21       A.    Yes.

22       Q.    I'm not asking you to memorize it, but

23   you did read through it to see if it was

24   relevant, obviously?

25       A.    Yes.  I mean, it is an extremely long

```
1                        B. Rose
2    document --
3         Q.    It is.
4         A.    -- so I may not have read it word for
5    word, but I've reviewed enough of it to know that
6    the contents are relevant.
7         Q.    Right.
8               And let me just state, and this is the
9    record in this case, that that item 379 is a
10   single e-mail with some attachments and then in
11   the body of that e-mail are referenced many more
12   e-mails, it's quite a long document, as you
13   indicated.
14        A.    It's a long chain.
15        Q.    Right.
16              So that's generally what it is.
17              And many of those e-mails referenced in
18   the body of 379 are e-mails that appear to be
19   between lawyers that were working with Mr. Ceglia
20   at that time.
21              Do you recall that?
22        A.    I know there are some, some of those
23   e-mail exchanges are between lawyers working for
24   Mr. Ceglia at the time.
25        Q.    And now here's the hypothetical, and
```

Page 179

1                        B. Rose

2    because I don't have 379 in front of me, I won't

3    ask you to trust me on this, so I will convert it

4    to a hypothetical.

5              Let's say some of those e-mails

6    referenced in the body of 379, if some of them

7    were sent at a time where the Coordinated

8    Universal Time should have been, let's say, minus

9    500, but it says minus 400, it's wrong, you

10   wouldn't conclude, based on that, that some of

11   those prior lawyers for Paul Ceglia were

12   committing fraud?

13   A.      So this is a hypothetical specifically

14   about 379?

15   Q.      Right.

16             If some of those e-mails have the wrong

17   Coordinated Universal Time that's not an

18   indication of fraud by those lawyers, in your

19   opinion?

20   A.      So given the context, no, I would not

21   conclude that.

22   Q.      And that Kasowitz e-mail you just

23   recently sent it to me in a TrueCrypt container

24   as a native format e-mail.

25             Do you recall sending that to me?

Page 180

1                              B. Rose

2        A.     Yes.

3        Q.     Okay.

4               That native format e-mail itself has

5    one attachment.  I don't know if you recall that.

6               Do you recall it?

7        A.     I thought it had more attachments than

8    that, but I don't recall.

9        Q.     And that actual individual e-mail was

10   never included by you on a privilege log in this

11   case by itself, if you recall?

12              MR. SOUTHWELL:  What specifically are

13          you referring to?

14              MR. BOLAND:  The native format

15          individual e-mail dated August -- April 13,

16          2011, which you recently sent to me itself

17          was never included on a privilege log in

18          this case.

19              MR. SOUTHWELL:  I'm just going to

20          object, this doesn't seem to have anything

21          to do with Coordinated Universal Time or the

22          report, so it's an objectionable line, but

23          if you're going to connect it, I'd like to

24          hear that.

25              MR. BOLAND:  I would like to hear the

1                      B. Rose

2      answer of the witness, but I hear your

3      objection.

4      A.    I mean, I sent you, as I recall, what I

5   recently sent you included several -- it was

6   one -- it was item 379 -- I mean, there were

7   various items in that, right, there were various

8   attachments, I don't think it was limited to one

9   attachment, so I guess I'm not sure exactly which

10  document you're talking about.

11           I mean, it's possible to me -- and, you

12  know, we include, when we include an e-mail, we

13  also include their attachment, so just merely

14  saying dated April 13th I'm not sure I can with

15  precision identify the document which you're

16  talking about.

17      Q.    Fair enough.

18           Let's talk about use of computers

19  generally.

20           Would you agree with me that -- and

21  maybe you've seen this in your work -- that

22  people can lie about how they actually use their

23  computers?

24      A.    Yes, I would agree that people can lie

25  about the way they use their computers.

Page 182

1                    B. Rose

2      Q.    And as a forensics expert you wouldn't

3  rely on a witness' statement about how they used

4  their computer without confirming it through

5  forensic analysis?

6      A.    That's correct.

7      Q.    And would you agree that people who

8  commit fraud often make self-interested

9  statements to try and avoid detection for that

10 fraud?

11     A.    As a hypothetical, yes, I think I would

12 agree with that.

13     Q.    And I think I asked you this before.

14           You never spoke with Mark Zuckerberg

15 about how he used his Harvard e-mail account?

16     A.    I've never spoken with Mark Zuckerberg

17 about anything.

18     Q.    Did you ask his lawyers to get

19 information from him telling you how he used his

20 Harvard e-mail account?

21     A.    So let me be clear:  Our role in the

22 Harvard e-mail account was to work with Harvard

23 to make sure we'd gotten all of the historical

24 copies, to perform whatever collections were

25 necessary and then to perform electronic

1                         B. Rose

2    discovery processing to create an aggregate data

3    set, to then subject that to certain search terms

4    and provide those to Gibson, Dunn for review as

5    well as to conduct our own review of those, of

6    certain specified documents to determine whether

7    the purported e-mails were found there and to

8    identify communications between Mr. Zuckerberg

9    and various people involved with StreetFax.com,

10   that was our charge with the Harvard e-mail, and

11   so I did not ask Gibson, Dunn to do that, I don't

12   think, given our role, that would have been a

13   relevant consideration for us or appropriate for

14   me to tell Gibson, Dunn to go ask a question

15   that's irrelevant to the work I'm tasked to do.

16        Q.    And did you somehow confirm with anyone

17   that this was all of Mark Zuckerberg's available

18   e-mail that was relevant to expedited discovery?

19        A.    I find that to be a confusing question

20   because my reading of the order in the protocol

21   is that the expedited discovery phase is focused

22   on an analysis of Mr. Ceglia's media and

23   Mr. Ceglia's e-mail, so --

24        Q.    I'm just asking the question, sir.

25              Did you ask someone to have Mark

1                        B. Rose

2       Zuckerberg confirm that you had access to all of

3       his e-mail?  Did you ask someone that question?

4              MR. SOUTHWELL:  Objection.  You are

5          asking -- well, you are asking a different

6          question, but --

7              MR. BOLAND:  That's my question.

8          A.    I did not ask anyone to make sure that

9       we had access to all of Mark Zuckerberg's e-mail.

10      There was, you know, we were involved in

11      conversations with Harvard IT to make sure that

12      we had gotten everything that was available.  We

13      were, as I said, involved early on in analysis of

14      various other assets of Mr. Ceglia that I

15      understood to be comprehensive, but as to that

16      specific question, no, I don't recall asking that

17      specific question.

18         Q.    It's possible, then, that there is

19      additional sources of e-mail relevant to this

20      case which you have not had access to?

21         A.    Is it possible?

22              I mean, again, anything's possible, so

23      I would say yes.

24         Q.    Don't you think it's a prudent thing to

25      do to ask the person who's the custodian of their

```
 1                    B. Rose
 2   e-mail account if that's everything?
 3        A.    Is that a prudent thing to do in
 4   general?
 5        Q.    In this case don't you think it would
 6   have been a prudent thing to do to ask the
 7   defendants, Hey, ask Mr. Zuckerberg is this is
 8   everything or if he's got e-mails somewhere else?
 9        A.    To me, you're asking me a question that
10   is appropriately a strategy question for
11   attorneys that goes outside what I was charged to
12   do in the case, which involves expedited
13   discovery and to describe the work with
14   Mr. Zuckerberg's e-mails, so as to whether that
15   would be prudent in this case, you know, I
16   haven't really considered that and I don't think
17   I want to offer an opinion on it.
18        Q.    What do you think the likelihood is
19   that there's other e-mail or electronic
20   communications relevant to this case that you
21   have not had access to?
22        A.    I would think, given the thoroughness
23   I've seen of the investigations that I've been
24   party to, I think it unlikely, but it's possible.
25        Q.    You talked about one of the retrievals
```

1                          B. Rose

2    from the Harvard server was from November 2003,

3    you got e-mail from that time period?

4        A.    That's correct.

5        Q.    Not in that time period, but from that

6    time period?

7        A.    From that time period.

8              In other words, just to be clear, a

9    historical snapshot of what existed in the

10   mailbox at some point in November 2003.

11       Q.    And did you find any e-mails in that

12   retrieval that were not included in the

13   subsequent productions that you got, either

14   collected or received from Harvard?

15             MR. SOUTHWELL:  Are you asking about

16       Ceglia-Zuckerberg e-mails?

17             MR. BOLAND:  Yes.

18       A.    I believe so.  You're talking about

19   between the November 2003 and the subsequent

20   productions, the first of which would have been

21   in October 2010?

22       Q.    Right.

23       A.    Yes, I believe there were e-mails that

24   were included in that production that were not

25   included, not unsurprisingly, in a production

1                          B. Rose

2      that occurred seven years later.

3          Q.    And what happened to those e-mails that

4      were not in that production seven years later?

5          A.    I don't know.

6          Q.    Did you ask the defendants to ask

7      Mr. Zuckerberg what happened to those e-mails?

8          A.    I did not.

9          Q.    Did anyone else from Stroz Friedberg

10     ask that question of the defendants, if you know?

11         A.    Again, given our task with the e-mail,

12     I don't think that would be an appropriate

13     question for us to direct to Gibson, Dunn.

14         Q.    Did you see Paul Ceglia's -- a recent

15     declaration of Paul Ceglia stating that he sent

16     e-mails to Mr. Zuckerberg between the time period

17     of March 2003 and June of 2003?

18         A.    I may have, I don't recall that.

19         Q.    And are you aware that your -- that

20     Stroz Friedberg did not recover any e-mails

21     between Mr. Ceglia and Mr. Zuckerberg during that

22     time period?

23         A.    I am not.

24         Q.    Did you see the production that Stroz

25     Friedberg provided to the plaintiff pursuant to

Page 188

1                      B. Rose

2   the expedited discovery order of the Harvard

3   e-mails?

4       A.    Did I see the production itself?

5       Q.    Before it was produced to us did you

6   look at it?

7       A.    No.

8       Q.    Do you think it's -- what's your

9   opinion of the likelihood that this contract

10  signed on April 28, 2003, that the terms of this

11  contract were discussed between Mr. Ceglia and

12  Mr. Zuckerberg using e-mails before the date it

13  was signed?

14      A.    I wouldn't even want to offer an

15  opinion on that.

16      Q.    Assuming, because it is the case, but

17  we will just assume it for this, that there are

18  no e-mails between the parties Ceglia and

19  Zuckerberg from around March of '03 till June of

20  '03, don't you think that's a little odd that

21  they have no e-mail communication before the

22  signing of this contract in April of 2003 and

23  then for another six weeks, 5-1/2 weeks later,

24  still no e-mail communication in Mr. Zuckerberg's

25  Harvard e-mail account?  Don't you find that odd?

Page 189

1                          B. Rose

2        A.    No.

3        Q.    Now, you found -- the report details

4   several different documents that are similar to

5   the paper contract in this case with the Facebook

6   language in it, true, in your report, you talk

7   about those?

8        A.    So we talk about multiple unsigned

9   versions of what we refer to as the Work For Hire

10  contract, yes.

11       Q.    Yes.

12             And did your forensic analysis provide

13  you with which one, if any, of those unsigned

14  versions was the one that was printed and became

15  the paper contract that my client is now offering

16  as the authentic contract between the parties?

17       A.    I think none of them were printed

18  directly because they all vary somewhat in

19  substance from the actual original contract; in

20  other words, they are all similar documents, but

21  there are seven different variations, so the

22  printed copy is ultimately different.

23             We did not identify any exact duplicate

24  copies of the Work For Hire contract save for one

25  that was included in an e-mail from Mr. Argentieri

Page 190

1                          B. Rose

2   that was post litigation.

3       Q.     And you are aware that Mr. Ceglia has

4   not offered or attached to any pleadings any of

5   those similar versions of the Work For Hire

6   contract?  You are aware of that?

7       A.     I don't believe he has.

8       Q.     And he didn't attach the e-mail from

9   Jim Kole or the TIFF images to any pleadings or

10  anything that he's filed in this case, you are

11  aware of that?

12      A.     I am aware of that, yes.

13      Q.     Now, your forensic report and your

14  analysis is not arguing that the paper contract

15  itself is backdated somehow?

16      A.     I am not offering any opinions on the

17  paper contract at all.

18      Q.     And there's no computer evidence that

19  you found suggesting that Mr. Zuckerberg did not

20  sign page 2 of the paper contract?

21             That's a double negative, I can ask it

22  a little more clearly.

23      A.     Sure, that would help.

24      Q.     Did you find any computer forensics

25  evidence suggesting that Mr. Zuckerberg was not

Page 191

1                        B. Rose

2    the person who signed the second page of the

3    paper contract?

4            MR. SOUTHWELL:  You're talking about

5        the original paper Work For Hire document

6        that was presented for production?

7            MR. BOLAND:  Correct.

8        A.    The forensic evidence that we found

9    overwhelmingly indicates that the StreetFax

10   contract is authentic; therefore -- and the

11   evidence also indicates with all the manipulation

12   that the Work For Hire contract is a fake, so I

13   would say that that evidence would lead me to

14   conclude, without even having to analyze the

15   paper, which I have no opinion on and I am not an

16   expert on, that any paper document presented that

17   purports to be the Work For Hire document signed

18   by Mark Zuckerberg is a fake.

19       Q.    What I'm asking you is, is the computer

20   forensic evidence, is there any that tells you

21   that the person who put a signature on page 2 of

22   the paper contract was not Mark Zuckerberg?  Do

23   you have forensic evidence that points you to

24   that not happening, for example, an e-mail that

25   Mark Zuckerberg says, I never signed page 2 of

Page 192

1                          B. Rose

2    the contract, did you find anything like that?

3         A.    We did not find anything like an e-mail

4    from Mr. Zuckerberg disclaiming that he'd signed

5    page 2 of that contract.

6         Q.    Okay.

7               Did you find any Web history that

8    supports an argument that Mr. Zuckerberg didn't

9    sign page 2 of the paper contract?

10        A.    I mean, again, beyond, you know, some

11   of the Internet history providing some evidence

12   that, you know, the StreetFax contract is

13   authentic, the other contract is fake, no.

14        Q.    Did you visually compare a copy of page

15   2 of the paper contract with page 2 of the

16   StreetFax contract, looking at them side by side?

17        A.    I probably have looked at them side by

18   side before.  I don't recall.

19        Q.    Do you recall what your reaction was to

20   that comparison?  Did they look the same to you

21   or different?

22        A.    I don't recall.

23        Q.    Now --

24              MR. SOUTHWELL:  If you are going to a

25        different topic, we are approaching 3-1/2

Page 193

1                        B. Rose

2      hours.

3              Do you know how much more you think

4      you've got planned?

5              MR. BOLAND:  I don't really know.  I

6      will probably go over 3-1/2 a little bit.

7              MR. SOUTHWELL:  When would you like to

8      take a lunch break?  I would like to take a

9      little lunch break.

10             MR. BOLAND:  We can do that now.

11             Do you want to?

12             MR. SOUTHWELL:  How much more do you

13     think you have?

14             MR. BOLAND:  Probably an hour, I'm

15     guessing.

16             MR. SOUTHWELL:  Do you want to go off

17     the record, then, at this point?

18             MR. BOLAND:  Let's go off the record,

19     we can do that.

20             (Lunch recess: 2:09 p.m.)

21

22

23

24

25

Page 194

1                          B. Rose

2           A F T E R N O O N     S E S S I O N

3                  (Time noted: 3:05 p.m.)

4           MR. BOLAND:  We can start the tape.

5           THE VIDEOGRAPHER:  And we are rolling.

6           MR. DUPREE:  Timewise, I know you

7      requested, I think, three and a half hours,

8      which I think we are probably at about that

9      limit now.  I am not going to shut things

10     down, but I wanted to call that to your

11     attention.

12          MR. BOLAND:  Yes, we are a little bit

13     over.  Probably another hour or so and that

14     will wrap it up, presumably.

15          MR. DUPREE:  Hopefully we can do that

16     quickly.

17          MR. BOLAND:  Yes, I will.

18   B R Y A N   J.   R O S E,   resumed and

19     testified as follows:

20   EXAMINATION BY (Cont'd)

21   MR. BOLAND:

22      Q.    Mr. Rose, in addition to the two TIFF

23   images which were named Scan0001 and 0002, you

24   didn't find any other -- you found those on the

25   computer in one location and that was it,

1                           B. Rose

2      according to your report, if I'm recalling it

3      correctly, you didn't find them anywhere else?

4             I'm saying the Ceglia media, not the

5      Sidley & Austin servers now.

6         A.    So we found -- so we found the TIFF

7      images in the Outlook Express mailbox, we also

8      found what appeared to be deleted versions that

9      had been created on the hard drive immediately

10     before being sent, which is why we determined

11     they appeared to be copied from the hard drive

12     and then sent from the hard drive, but we

13     believed those copies represented those files

14     because the file size and file name, but in terms

15     of an actual copy with content, although one of

16     the deleted files was partially recoverable in

17     terms of content, that was the only location was

18     the Outlook Express file.

19        Q.    And the comment you just made about

20     believing that those files were the same, let's

21     talk about that for a moment.

22            The deleted versions had the same file

23     name as the versions you actually found and they

24     had the same file size?

25        A.    The same file size, in addition to one

1                          B. Rose

2    of them was partially recoverable and the content

3    was the same.

4        Q.    And what's the likelihood that those

5    files that had the same file name and the same

6    file size were in fact versions of the two files

7    that you did find, what would be your opinion on

8    that?

9        A.    I think it's very likely.  Certainly

10   for the one -- I would say for the one -- very

11   likely, particularly given the fact we were able

12   to recover some content, compare that.

13       Q.    Even without the content, is it fairly

14   likely they are same?

15       A.    Yeah.

16       Q.    Is that a common way that forensic

17   experts will reach that conclusion in general is

18   if they have two files with the same name and the

19   same file size, but one of them the content is

20   missing, they will conclude it's likely that

21   that's a copy?

22       A.    I think it depends on the context, but

23   in general, yes.  I mean, you know, the file

24   name, depending on what you're comparing, can be

25   more or less persuasive, depending on the

1                         B. Rose

2    circumstances.  Comparing the file size, you

3    know, it's one way to reach a conclusion the two

4    files are the same.

5        Q.    Can you, on this similar topic, on page

6    54 of Exhibit 1, which is the version of your

7    report that we provided you today that has the

8    file stamp across the top, do you see on page 54

9    you are talking about a missing USB device and

10   links, link files on a Toshiba laptop that

11   reference two files that your report indicates

12   you believe were on that missing USB device?

13            Do you see where I'm referring to

14   there?

15       A.    So the -- at the top of the page it's a

16   list of USB devices which were attached to

17   various PC media but were not produced.

18       Q.    Right.

19       A.    And then the discussion does include

20   two files which were link files were found on a

21   Toshiba laptop, two files on a USB device, yes.

22       Q.    Right.

23            And those are the files -- those are

24   two files that I believe -- correct me if I'm

25   wrong -- you're saying they were named -- well,

1                          B. Rose

2    yeah, what's a link file, if you can just

3    describe that for the Court?

4         A.    It's essentially like a shortcut, I

5    mean, it's a file, your computer puts down a link

6    file so that it can recall a document quicker, it

7    is a shortcut file, it's a pointer, essentially.

8         Q.    In about the third full paragraph you

9    start talking about on the Toshiba satellite

10   laptop.

11              Do you see that?

12        A.    Mm-hm.

13        Q.    And then you name the two link files?

14        A.    Yes.

15        Q.    And the embedded metadata, these link

16   files show that they point, what does that mean,

17   the embedded metadata, what are you referring to

18   there, these link files show that they point to a

19   removable device?  Can you explain that?

20        A.    So if you analyze the link file itself

21   you can see essentially to what it's pointing,

22   generally whether it's an Internet location,

23   whether it is a removable device location, so

24   that would just indicate that the metadata

25   associated with the files, which is just, you

1                         B. Rose

2   know, information about the -- data about data,

3   right, so it is data about the files, we were

4   able to determine from that that it pointed to a

5   USB removable device rather than to the Internet

6   or some other location.

7       Q.    And the link is not an actual file,

8   it's just a pointer?

9       A.    Well, it's an actual file, I mean, it's

10  a link file, but it's not -- it is a pointer to

11  another file, yes.

12      Q.    It isn't the file that it is pointing

13  to, it's just a pointer to it?

14      A.    So a link file to the Zuckerberg

15  contract page 1 TIFF is not the actual TIFF

16  document, it's a pointer to that document.

17      Q.    And it's not a copy of the actual

18  document, it's just a pointer?

19      A.    No, yes.

20      Q.    So that file, as you put in your report,

21  is one of the evidence, pieces of evidence under

22  a claim the defendants -- you know the defendants

23  have made a claim of spoliation of evidence

24  against Mr. Ceglia; right?  Are you aware of

25  that?